# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

NEW ENGLAND SYNOD, Evangelical Lutheran Church in America; GREATER MILWAUKEE SYNOD, Evangelical Lutheran Church in America; SOUTHWEST CALIFORNIA SYNOD, Evangelical Lutheran Church in America; SOUTHWESTERN TEXAS SYNOD, Evangelical Lutheran Church in America; SIERRA PACIFIC SYNOD, Evangelical Lutheran Church in America; SAN FRANCISCO FRIENDS MEETING OF THE RELIGIOUS SOCIETY OF FRIENDS; PACIFIC YEARLY MEETING OF THE RELIGIOUS SOCIETY OF FRIENDS; NORTH PACIFIC YEARLY MEETING OF THE RELIGIOUS SOCIETY OF FRIENDS; AMERICAN BAPTIST CHURCHES USA; ALLIANCE OF BAPTISTS; METROPOLITAN COMMUNITY CHURCHES,

*Plaintiffs-Appellees/Cross-Appellants,*

v.

UNITED STATES DEPARTMENT OF HOMELAND SECURITY; MARKWAYNE MULLIN, Secretary,

*Defendants-Appellants/Cross-Appellees.*

On Appeal from the United States District Court
for the District of Massachusetts

## BRIEF FOR APPELLANTS

BRETT A. SHUMATE
  *Assistant Attorney General*

LEAH B. FOLEY
  *United States Attorney*

MICHAEL S. RAAB
CHARLES W. SCARBOROUGH
LOWELL V. STURGILL JR.
SARAH N. SMITH
  *Attorneys, Appellate Staff*
  *Civil Division, U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*

## DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), Defendants-Appellants/ Cross-Appellees United States Department of Homeland Security and Markwayne Mullin certify that they are governmental parties that do not have parent corporations and that no publicly held corporations own more than ten percent of any of their stock.

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ...................................................................................................1

STATEMENT OF JURISDICTION ......................................................................2

STATEMENT OF THE ISSUE...............................................................................2

STATEMENT OF THE CASE................................................................................3

    A.     Statutory Background..................................................................3

    B.     Regulatory Background................................................................4

    C.     Prior Proceedings........................................................................6

SUMMARY OF ARGUMENT...............................................................................7

STANDARD OF REVIEW ................................................................................. 10

ARGUMENT ....................................................................................................... 10

I.     Plaintiffs Are Unlikely to Succeed on the Merits of Their Challenges to the 2025 Guidance........................................................................................ 11

    A.     Plaintiffs Lack Standing .............................................................11

           1.     Plaintiffs have not shown a cognizable injury fairly traceable to the 2025 Guidance...........................................12

           2.     Enjoining the 2025 Guidance would not redress plaintiffs' asserted injuries................................................................24

    B.     Plaintiffs Are Unlikely to Succeed on Their RFRA Claim .......................25

II.    The Remaining Injunction Factors Weigh Against an Injunction...................... 36

    A.     Plaintiffs Have Not Demonstrated Irreparable Harm Absent Preliminary Relief..................................................................36

B.      Plaintiffs Have Not Shown That the Balance of Equities Tips in their Favor..................................................................................................37

III.    The Preliminary Injunction Should Be Narrowed to Align with the Mayorkas Memorandum.......................................................................... 39

CONCLUSION ............................................................................................................... 41

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                                      **Page(s)**

*American Freedom Def. Initiative v. Massachusetts Bay Transp. Auth.*,
    781 F.3d 571 (1st Cir. 2015) ............................................................... 10-11

*Anderson v. Minneapolis, St. P. & S.S.M Ry. Co.*,
    146 Minn. 430 (1920) ............................................................................... 31

*Apache Stronghold v. United States*,
    101 F.4th 1036 (9th Cir. 2024) ................................................................ 27

*Arizona v. United States*,
    567 U.S. 387 (2012) ............................................................................ 3, 33

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ................................................................................. 15

*Benisek v. Lamone*,
    585 U.S. 155 (2018) ................................................................................. 36

*Blackie's House of Beef, Inc. v. Castillo*,
    659 F.2d 1211 (D.C. Cir. 1981) .............................................................. 33

*Bowen v. Roy*,
    476 U.S. 693 (1986) ............................................................... 8, 26, 27, 28

*Burwell v. Hobby Lobby Stores, Inc.*,
    573 U.S. 682 (2014) ........................................................................... 31, 34

*Califano v. Yamasaki*,
    442 U.S. 682 (1979) ................................................................................. 39

*Castro v. Scanlan*,
    86 F.4th 947 (1st Cir. 2023) .................................................................... 18

*Charlesbank Equity Fund II v. Blinds To Go, Inc.*,
    370 F.3d 151 (1st Cir. 2004) .................................................................... 36

*City of Boerne v. Flores*,
    521 U.S. 507 (1997) ................................................................................. 29

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013) ............................................................ 20, 21

*DaimlerChrysler Corp. v. Cuno,*
  547 U.S. 332 (2006) ................................................................. 25

*Dantzler, Inc. v. Empresas Berríos Inventory & Operations, Inc.,*
  958 F.3d 38 (1st Cir. 2020) ................................................ 19, 24

*Department of Com. v. New York,*
  588 U.S. 752 (2019) ................................................................. 19

*Doe v. Trustees of Bos. Coll.,*
  942 F.3d 527 (1st Cir. 2019) .................................................... 10

*Employment Division, Department of Human Services of Oregon v. Smith,*
  494 U.S. 872 (1990) ................................................................. 27

*Eternal Word Television Network, Inc. v. Secretary of U.S. DHS,*
  818 F.3d 1122 (11th Cir. 2016) ................................................ 31

*FDA v. Alliance for Hippocratic Med.,*
  602 U.S. 367 (2024) ...................................................... 22, 23, 24

*Fridley Pub. Sch. Dist., Indep. Sch. Dist. 14 v. Mullin,*
  No. 26-cv-1023, 2026 WL 1244043 (D. Minn. May 6, 2026) ............ 12, 13

*Garland v. Aleman Gonzalez,*
  596 U.S. 543 (2022) ................................................................... 4

*Gill v. Whitford,*
  585 U.S. 48 (2018) ................................................................... 39

*Holt v. Hobbs,*
  574 U.S. 352 (2015) ................................................................. 26

*INS v. Legalization Assistance Project of L.A. Cnty. Fed'n of Lab.,*
  510 U.S. 1301 (1993) ............................................................... 38

*Iowa Migrant Movement for Justice v. Bird,*
  157 F.4th 904 (8th Cir. 2025) ................................................ 9, 34

*Kaemmerling v. Lappin,*
    553 F.3d 669 (D.C. Cir. 2008) ................................................................. 32

*Laird v. Tatum,*
    408 U.S. 1 (1972) ................................................................................. 21

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania,*
    591 U.S. 657 (2020) ............................................................................. 27

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ............................................................... 11, 19, 25

*Lyng v. Northwest Indian Cemetery Protective Ass'n,*
    485 U.S. 439 (1988) .................................................................... 27, 29

*Margolin v. National Ass'n of Immigr. Judges,*
    146 S. Ct. 1285 (2026) ........................................................................ 41

*Maryland v. King,*
    567 U.S. 1301 (2012) .......................................................................... 38

*Murthy v. Missouri,*
    603 U.S. 43 (2024) ...................................................................... 11, 24

*National Treasury Emps. Union v. Von Raab,*
    489 U.S. 656 (1989) ........................................................................... 33

*New Doe Child #1 v. United States,*
    901 F.3d 1015 (8th Cir. 2018) ............................................................ 32

*Nken v. Holder,*
    556 U.S. 418 (2009) ........................................................................... 33

*Noem v. Vasquez Perdomo,*
    No. 25A169, 2025 WL 2585637 (2025) ......................................... 33, 34

*OfficeMax, Inc. v. Levesque,*
    658 F.3d 94 (1st Cir. 2011) ................................................................ 10

*Roe v. Healey,*
    78 F.4th 11 (1st Cir. 2023) .......................................................... 18, 19

*Roman Cath. Bishop of Springfield v. City of Springfield,*
724 F.3d 78 (1st Cir. 2013) .................................................. 26

*Spratt v. Rhode Island Dep't. of Corr.,*
482 F.3d 33 (1st Cir. 2007) .................................................. 26

*Tabbaa v. Chertoff,*
509 F.3d 89 (2d Cir. 2007) ............................................. 36, 38

*Thomas v. Review Bd. of the Ind. Emp. Sec. Div.,*
450 U.S. 707 (1981) .......................................................... 26

*TransUnion LLC v. Ramirez,*
594 U.S. 413 (2021) .......................................................... 11

*Trump v. CASA, Inc.,*
606 U.S. 831 (2025) .......................................................... 38

*Trump v. Hawaii,*
585 U.S. 667 (2018) .......................................................... 35

*United States v. Brignoni-Ponce,*
442 U.S. 873 (1975) .......................................................... 34

*United States v. Sineneng-Smith,*
590 U.S. 371 (2020) .......................................................... 40

*United States v. Texas,*
599 U.S. 670 (2023) ............................................. 11, 23, 24

*Whitley v. Albers,*
475 U.S. 312 (1986) .......................................................... 35

*Winter v. Natural Res. Def. Council, Inc.,*
555 U.S. 7 (2008) ................................................. 10, 11, 36, 37

**Statutes:**

5 U.S.C. § 705 .................................................................... 6

8 U.S.C. § 1103(a)(1) .......................................................... 3

8 U.S.C. §§ 1221-1231 ........................................................................... 3

8 U.S.C. § 1226 ..................................................................................... 33

8 U.S.C. § 1231 ..................................................................................... 33

8 U.S.C. § 1252(f)(1) .............................................................. 3, 7, 25, 38

8 U.S.C. § 1357 ................................................................................ 3, 33

8 U.S.C. § 1357(e) .................................................................................. 3

28 U.S.C. § 1292(a)(1) ........................................................................... 2

28 U.S.C. § 1331 ................................................................................... 2

42 U.S.C. § 2000bb-1(b) ...................................................................... 32

42 U.S.C. § 2000bb-1(b)(1) ................................................................. 25

42 U.S.C. § 2000bb-1(b)(2) ................................................................. 25

42 U.S.C. § 2000cc ............................................................................... 26

**Regulations:**

28 C.F.R. § 0.160(a)(3) ........................................................................ 28

28 C.F.R. § 0.161(a) ............................................................................ 28

28 C.F.R. § 0.168(a) ............................................................................ 28

28 C.F.R. § 0.168(d)(2) ....................................................................... 28

Exec. Order No. 14159,
    90 Fed. Reg. 8443 (Jan. 20, 2025) ................................................. 34

Exec. Order No. 14165,
    90 Fed. Reg. 8467 (Jan. 20, 2025) ................................................. 34

Proclamation No. 10886,
    90 Fed. Reg. 8327 (Jan. 20, 2025) ................................................. 34

**Rules:**

Fed. R. App. P. 4(a)(1)(B) ........................................................................ 2

Fed. R. Civ. P. 65(d)(1) ............................................................................ 7

**REASONS WHY ORAL ARGUMENT SHOULD BE HEARD**

The district court entered a preliminary injunction that improperly intrudes on the internal workings of the Department of Homeland Security. The government respectfully requests that the Court hold oral argument. Argument will aid the Court in resolving the important issues presented by this appeal.

## INTRODUCTION

On January 20, 2025, the Department of Homeland Security (DHS) issued new internal guidance (the Huffman Memorandum) advising immigration officers to exercise their "common sense" and "discretion" when conducting enforcement activities near sensitive locations, such as places of worship. Shortly thereafter, U.S. Immigration and Customs Enforcement (ICE) issued follow-on guidance charging local supervisors with the responsibility of determining whether enforcement actions should occur at sensitive locations (the Vitello Memorandum). Plaintiffs, a coalition of Lutheran, Quaker, Baptist, and Metropolitan Community churches, sued, arguing that the Huffman and Vitello memoranda (together, the 2025 Guidance) violate the Religious Freedom Restoration Act (RFRA), the First Amendment, and the Administrative Procedure Act (APA). The district court entered a preliminary injunction that prevents DHS from acting in accordance with its new guidance. The district court erred, and its injunction should be vacated.

Although many errors infected the district court's analysis, they all derive from the court's fundamental misunderstanding of the 2025 Guidance. The court understood the guidance to remove all meaningful restrictions on immigration enforcement at houses of worship, but that is not correct. All immigration enforcement actions must comply with applicable law, including the First Amendment and RFRA. The court's misunderstanding led it to erroneously conclude that plaintiffs had standing and were likely to succeed on the merits. The court's reasoning

is wrong as a matter of first principles, as its implications confirm.  Under the court's reasoning, religious communities would have standing—and suffer injury to their rights under RFRA—whenever the government takes any action that incidentally reduces attendance at their services, from the enforcement of criminal laws resulting in the arrest of congregants to economic policies that prompt individuals to work rather than worship.  That result is plainly untenable.  This Court should reverse.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. § 1331, JA51, but jurisdiction is disputed, *see infra* pp. 11-25.  The district court granted plaintiffs' motion for a stay or preliminary injunction in part on February 13, 2026.  ADD.1-62; ADD.63-68.  The government filed a timely notice of appeal on April 14, 2026.  JA255; *see* Fed. R. App. P. 4(a)(1)(B) (60-day time limit).  This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUE

On January 20, 2025, then-acting DHS Secretary Huffman issued a memorandum concerning immigration enforcement actions in or near sensitive locations, such as houses of worship.  On January 31, 2025, the acting Director of ICE issued follow-on guidance.  The question presented is whether the district court erred in preliminarily enjoining DHS from acting according to those memoranda in or near plaintiffs' houses of worship.

2

**STATEMENT OF THE CASE**

**A.      Statutory Background**

"The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona v. United States*, 567 U.S. 387, 394 (2012).  Congress has directed DHS to enforce the Nation's immigration laws, 8 U.S.C. § 1103(a)(1), and has granted immigration officers broad authority to arrest and detain removable aliens, *see, e.g., id.* § 1357.

Congress has not placed location-based restrictions on that authority, with one exception:  § 1357(e) requires immigration officers to obtain a warrant or the owner's consent before entering a farm or other outdoor agricultural operation for the purpose of interrogating a person believed to be an alien about his right to be in or remain in the United States.  8 U.S.C. § 1357(e).  But Congress has not otherwise imposed any location-based restrictions—such as those relating to places of worship—on the general arrest and detention authority of immigration officers.

Congress has, however, limited the power of lower courts to enjoin DHS from acting pursuant to certain statutory provisions that authorize immigration agents to detain and remove aliens.  Except in a case brought by "an individual alien" in removal proceedings, and "[r]egardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of [8 U.S.C. §§ 1221-1231]."  8 U.S.C. § 1252(f)(1).  Those provisions "charge the Federal

3

Government with the implementation and enforcement of the immigration laws governing the inspection, apprehension, examination, and removal of aliens." *Garland v. Aleman Gonzalez*, 596 U.S. 543, 549-50 (2022).

### B. Regulatory Background

For decades, federal agencies charged with enforcing immigration laws have issued internal guidance to immigration officers governing the factors they should consider, and the approvals they should obtain, before conducting enforcement actions in or near sensitive locations, including places of worship. Over that time, federal agencies have consistently instructed officers that they may conduct immigration enforcement actions in or near places of worship under exigent circumstances or with prior supervisor approval. *See, e.g.*, JA93-95 (Puleo Memorandum); JA97-98 (Myers Memorandum); JA100-102 (Morton Memorandum). As the 2011 Morton Memorandum explained, the agency's guidance was "meant to ensure that ICE officers and agents exercise sound judgment when enforcing federal law at or focused on sensitive locations" but was "not intended to categorically prohibit lawful enforcement operations when there is an immediate need for enforcement action." JA101 (emphasis omitted).

In 2021, DHS updated its guidance regarding enforcement activities near sensitive locations. JA104-108 (Mayorkas Memorandum). Consistent with prior memoranda, the Mayorkas Memorandum urged agents to avoid taking enforcement actions in or near sensitive locations but recognized that there were circumstances

4

"under which an enforcement action" in or near a sensitive location "needs to be taken." JA106. The guidance identified several circumstances that would justify action in or near a sensitive location but stressed that the list was "not complete" and that "the exercise of judgment is required." JA107. The guidance instructed immigration officers, "[a]bsent exigent circumstances," to "seek prior approval from their Agency's headquarters, or as" otherwise delegated before conducting an enforcement action. *Id.* Finally, the guidance expressly stated that it "does not limit an agency's or employee's statutory authority" and "is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party." JA107-108.

On January 20, 2025, DHS rescinded the Mayorkas Memorandum and issued superseding guidance. ADD.70 (Huffman Memorandum). The Huffman Memorandum explained that immigration officers routinely use their "enforcement discretion to balance a variety of interests, including the degree to which any law enforcement action occurs in a sensitive location." *Id.* The guidance directs agents to "continue to use that discretion along with a healthy dose of common sense," but explained that it is "not necessary . . . for the head of the agency to create bright line rules regarding where our immigration laws are permitted to be enforced." *Id.* The guidance acknowledged, however, that component heads "may wish to issue further guidance to assist officers in exercising appropriate enforcement discretion." *Id.*

On January 31, 2025, ICE issued follow-on guidance charging "Assistant Field Office Directors (AFODs) and Assistant Special Agents in Charge (ASACs) with responsibility for making case-by-case determinations regarding whether, where, and when to conduct an immigration enforcement action in or near a protected area." ADD.73 (Vitello Memorandum).

### C.    Prior Proceedings

Plaintiffs, a coalition of Lutheran, Quaker, Baptist, and Metropolitan Community churches, filed suit challenging the 2025 Guidance as violative of the First Amendment, RFRA, and the APA. ADD.1-2. Plaintiffs then moved for a stay under 5 U.S.C. § 705 or, in the alternative, a preliminary injunction prohibiting defendants from acting in accordance with the 2025 Guidance. *Id.*

The district court granted plaintiffs' motion in part. First, the court determined that at least some plaintiffs had standing to challenge the 2025 Guidance because they had experienced reductions in attendance at their worship services and ministry programs that were traceable to the 2025 Guidance and would be at least partially redressed by a favorable decision. ADD.20-39.

The district court then concluded that plaintiffs had established a likelihood of success on the merits of their RFRA claim. The court reasoned that enforcement activities at plaintiffs' churches would deter congregants from attending worship and ministry activities, thereby placing a substantial burden on plaintiffs' religious exercise. ADD.43. The court recognized that immigration enforcement is a compelling

6

governmental interest but determined that the 2025 Guidance was not the least restrictive means of furthering that interest. ADD.43-44. The court declined to reach plaintiffs' First Amendment claim, ADD.48, and rejected their APA claims and request for a § 705 stay on the ground that the 2025 Guidance is not "final agency action" reviewable under the APA, ADD.5; ADD.53. The court determined that plaintiffs satisfied the remaining preliminary injunction factors. ADD.54-56.

As to the scope of relief, the district court recognized that 8 U.S.C. § 1252(f)(1) prevented it from enjoining DHS with respect to enforcement activities taken pursuant to a warrant, and so the court limited its injunction to warrantless enforcement activities. ADD.58-59. And although plaintiffs requested a preliminary injunction reinstating the Mayorkas Memorandum, the court determined that such an injunction would not satisfy Federal Rule of Civil Procedure 65(d), because the Mayorkas Memorandum entrusted certain determinations to officers' discretion. *See* Fed. R. Civ. P. 65(d)(1); ADD.59. The court accordingly issued a preliminary injunction that "tracks" the Mayorkas Memorandum but deviates from that guidance in several respects. ADD.60; *see* ADD.63-68 (preliminary injunction).

## SUMMARY OF ARGUMENT

**I.** The district court's preliminary injunction should be vacated because plaintiffs cannot show a likelihood of success on the merits.

**A.** Plaintiffs have not shown that they have suffered any cognizable injury traceable to the 2025 Guidance. The district court determined that at least some

7

plaintiffs had standing to challenge the 2025 Guidance, based on reductions in attendance at their worship services and ministry activities. Although plaintiffs' declarations attribute, in a conclusory manner, declines in attendance to the 2025 Guidance, their factual allegations do not establish causation. Instead, plaintiffs' declarations suggest that some congregants are not attending church because they incorrectly believe that the 2025 Guidance targets houses of worship and others are staying home because they fear immigration enforcement more generally. Nothing in plaintiffs' declarations suggests that their congregants are staying home because enforcement actions in sensitive locations are being approved by local leadership instead of headquarters. Because plaintiffs have not established traceability, they also have not shown that their attendance injuries will likely be redressed by a judgment in their favor.

**B.** Plaintiffs are also unlikely to succeed on their RFRA claim because they have failed to identify a substantial burden on the free exercise of religion. The district court held that reduced attendance at plaintiffs' worship and ministry activities qualifies as a substantial burden, but that is incorrect for multiple reasons. To begin, the Free Exercise Clause "does not afford an individual a right to dictate the conduct of the Government's internal procedures." *Bowen v. Roy*, 476 U.S. 693, 693 (1986). Determining the proper level of prior supervisory approval for law enforcement activity is a paradigm example of an internal government procedure.

In addition, the Supreme Court has held that the incidental effects of religiously neutral government action do not impose a substantial burden on free exercise. The 2025 Guidance treats houses of worship the same as other common locations. It does not bar anyone from attending church, and plaintiffs' parishioners' alleged fear of immigration enforcement at plaintiffs' houses of worship is no more than the incidental result of neutral and generally applicable government action. To hold otherwise would lead to absurd results, requiring strict scrutiny of, *e.g.*, government economic policies that may cause parishioners to need to work and thus forgo gathering for worship.

Plaintiffs also have failed to demonstrate a likelihood of success on their RFRA claim because the 2025 Guidance is the least restrictive means to further the government's compelling interest in enforcing the Nation's immigration laws. Enforcing our Nation's immigration laws is critically important to the national security and public safety of the United States. The 2025 Guidance empowers agents to use their discretion, and "[d]iscretion in the enforcement of federal immigration law is vital for accomplishing the purposes of federal immigration law." *Iowa Migrant Movement for Justice v. Bird*, 157 F.4th 904, 921 (8th Cir. 2025).

**II.** The equitable factors do not support preliminary relief. Plaintiffs have not established an injury-in-fact to support Article III standing, much less irreparable harm. Nor have plaintiffs demonstrated that the 2025 Guidance inflicts irreparable harm by violating RFRA. On the other side of the balance, the district court's

injunction works irreparable harm on the government by interfering with the inner workings of DHS and constraining its ability to enforce the immigration laws.

**III.** At a minimum, the district court's injunction should be narrowed. Although plaintiffs expressly sought a preliminary injunction requiring the government to abide by the Mayorkas Memorandum pending resolution of this case on the merits, the court entered a preliminary injunction that prevents DHS from taking enforcement actions that would be permitted under that prior guidance. In granting relief plaintiffs did not seek, the court abused its discretion.

## STANDARD OF REVIEW

This Court reviews the district court's decision to grant a preliminary injunction for abuse of discretion. *OfficeMax, Inc. v. Levesque*, 658 F.3d 94, 97 (1st Cir. 2011). Where the court's analysis is premised on an error of law, the court "has abused its discretion and [this Court is] required to vacate the injunction." *Doe v. Trustees of Bos. Coll.*, 942 F.3d 527, 533 (1st Cir. 2019).

## ARGUMENT

To obtain the "extraordinary remedy" of a preliminary injunction, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 20, 22 (2008). Here, plaintiffs have not established "a strong likelihood that they will ultimately prevail on the merits." *American Freedom Def.*

*Initiative v. Massachusetts Bay Transp. Auth.*, 781 F.3d 571, 578 (1st Cir. 2015) (quotation marks omitted). Nor have they established that the equities favor an injunction. *See Winter*, 555 U.S. at 24. The district court erred in concluding that plaintiffs satisfied the requirements for interim relief.

## I. Plaintiffs Are Unlikely to Succeed on the Merits of Their Challenges to the 2025 Guidance

### A. Plaintiffs Lack Standing

The requirement that plaintiffs demonstrate Article III standing "is built on a single basic idea—the idea of separation of powers." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 422 (2021) (quotation marks omitted). Federal courts do not exercise "general legal oversight" of the Executive Branch. *Murthy v. Missouri*, 603 U.S. 43, 76 (2024) (quotation marks omitted). Standing doctrine thus "helps safeguard the Judiciary's proper—and properly limited—role in our constitutional system." *United States v. Texas*, 599 U.S. 670, 675-76 (2023).

To establish standing, a plaintiff must demonstrate (1) that it has suffered or will imminently suffer an injury-in-fact, (2) that its alleged injury is "fairly traceable" to the challenged conduct of the defendant, and (3) that it is "likely" that its injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). "At the preliminary injunction stage," plaintiffs "must make a 'clear showing'" that they are "'likely' to establish each element of standing." *Murthy*, 603 U.S. at 58 (quoting *Winter*, 555 U.S. at 22).

11

### 1. Plaintiffs have not shown a cognizable injury fairly traceable to the 2025 Guidance

**a.** The district court concluded that at least some plaintiffs had established standing to challenge the 2025 Guidance based on decisions made by third parties—plaintiffs' congregants—who have stopped attending worship services and social ministries, allegedly in response to the 2025 Guidance. ADD.20; ADD.38. The court accepted plaintiffs' assertions that reduced attendance at services impedes their ability to practice their faith and harms them financially, in the form of reduced offerings. ADD.15-18. The court's analysis suffers from several flaws.

First, the district court's analysis rests on a misunderstanding of the 2025 Guidance, which reflects only a modest change in internal DHS guidance. While the previous guidance, the Mayorkas Memorandum, stated that "to the fullest extent possible," agents should avoid taking enforcement actions in or near sensitive locations, JA106, it "did not categorically preclude such activity," *Fridley Pub. Sch. Dist., Indep. Sch. Dist. 14 v. Mullin*, No. 26-cv-1023, 2026 WL 1244043, at *8 (D. Minn. May 6, 2026). Indeed, like prior guidance, the Mayorkas Memorandum recognized that there are some circumstances in which an "enforcement action needs to be taken" in or near a sensitive location. JA106; *see* JA94 (1993 Puleo Memorandum recognizing that "[s]ome situations will require [an] officer" to take an enforcement action at a sensitive location without prior authorization); JA98 (2008 Myers Memorandum stating that "ICE policies and procedures do not specifically preclude enforcement

12

actions or investigative activities at" sensitive locations); JA101 (2011 Morton

Memorandum stating that the "*policy is not intended to categorically prohibit lawful enforcement*

*operations when there is an immediate need for enforcement action*"). Prior guidance accordingly

stated expressly that it did not "limit" the "statutory authority" of DHS's agencies or

agents. JA107 (Mayorkas Memorandum); *see also* JA95 (Puleo Memorandum stating

similar); JA102 (Morton Memorandum stating similar). "The 2025 Guidance, in

short, did not change DHS's ability or authority to engage in enforcement activity at

or near protected areas," which has "always been subject to DHS's judgment and

discretion." *Fridley Pub. Sch. Dist.*, 2026 WL 1244043, at *9.

The 2025 Guidance is different from prior guidance in two minor respects.

First, while the Mayorkas Memorandum directed agents, absent exigent

circumstances, to obtain approval from agency headquarters before taking

enforcement action in or near a sensitive location, the 2025 Guidance charges

AFODs and ASACs with responsibility for approving such actions on a case-by-case

basis. JA107; ADD.73. In this respect, the 2025 Guidance does not diverge

dramatically from prior guidance, which has vested local leadership with authority to

approve enforcement actions. *See* JA93 (1993 Puleo Memorandum requiring approval

by District Director or Chief Patrol Agent). Second, while the Mayorkas

Memorandum identified circumstances in which an enforcement action in or near a

sensitive location would be appropriate, JA106-107, the 2025 Guidance does not

articulate any such circumstances but instead directs agents to use their enforcement

discretion "along with a healthy dose of common sense" before taking action at sensitive locations, ADD.70. In this respect, too, the 2025 Guidance does not depart radically from prior guidance; the Mayorkas Memorandum expressly states that the circumstances it identifies are not exhaustive and that the "exercise of judgment is required." JA107. And indeed, prior guidance has consistently called on agents to "analy[ze]" facts and "exercise [their] judgment" before taking action in or near a sensitive location. JA106; *see also* JA94 (1993 Puleo Memorandum stating that, when agents must take action without prior approval, they "are expected to exercise good judgment concerning the appropriate action to take").

The district court nevertheless believed that the 2025 Guidance marked a stark departure from prior guidance because it "remove[d] restrictions on immigration raids at churches," ADD.23, and would permit agents to "conduct a raid, with weapons drawn, at any type of church proceeding . . . subject only to the exercise of their 'discretion' and 'common sense,'" ADD.2. That is incorrect. First, as noted, the 2025 Guidance did not remove any restrictions, because prior guidance simply "provid[ed] management guidance to . . . officers exercising discretionary law enforcement functions," but did not limit agents' statutory authority. JA102. Second, the district court seemed to believe that the 2025 Guidance relieved agents of their obligation to abide by other applicable constraints on government action, including the First Amendment and RFRA, which would almost certainly be violated if the government undertook the enforcement actions hypothesized by the court, absent truly

14

compelling circumstances. *See, e.g.*, ADD.2 (stating that under the 2025 Guidance, an agent "could conduct a raid during a church service, or lie in wait to interrogate or seize congregants as they seek to enter a church"); ADD.3 (stating that the 2025 Guidance "permits, without meaningful restraints, the disruption of church services and functions and the interrogation or seizure of anyone who may be on church property"). Importantly, plaintiffs have not alleged that any such enforcement action has occurred at any of their locations.

The district court's misunderstanding of the 2025 Guidance led it to conclude that it was "obvious" that people would avoid worship services and ministry activities "so as not to be swept up in a raid, a mass arrest, or a mass interrogation." ADD.23. But that misstates the question. For purposes of evaluating plaintiffs' standing, the relevant inquiry is whether plaintiffs' alleged injuries are fairly traceable to guidance that grants agents discretion to undertake enforcement actions that (1) would not have been authorized under the Mayorkas Memorandum but (2) do not violate applicable law, such as the First Amendment and RFRA, with which agents must continue to comply. The answer to that question is plainly no.

Plaintiffs' declarants repeatedly attribute declines in attendance to the 2025 Guidance, but their factual allegations do not support their conclusory assertions. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (conclusory statements are insufficient to establish standing, even at the pleading stage). None of the declarations trace congregants' lack of attendance to the fact that enforcement actions must now be

approved by AFODs and ASACs rather than headquarters or to the fact that instead of identifying a list of circumstances that would warrant action in a sensitive location, the 2025 Guidance encourages officers to use their training and common sense. Instead, it seems that many congregants are not attending services because they (incorrectly) believe that churches were previously off limits for immigration enforcement and that under the new guidance, church services can and will be targeted without any limitations or justification. *See, e.g.,* JA131 (congregants are not attending worship because they fear "ICE agents may infiltrate the church during Sunday worship"); JA143 (discussing congregants' fears that "ICE might invade the church building"); JA150 (asserting that "the new policy has put a target on houses of worship"); JA165 (congregants "now know that government agents conducting immigration enforcement could enter the sanctuary at any time"); JA175 (congregations are aware that "the church is no longer a safe place to protect" "undocumented families" and that "[a]t any moment [it] could be filled with force and violence"); JA182 (asserting that "the change in DHS's policy mean[s]" that churches are "no longer a safe space"); JA224-225 (congregants are not attending worship services "because they worry the church will be targeted by immigration enforcement"); JA230 (congregants "worry that ICE may enter their church and arrest indiscriminately").

But as discussed, DHS guidance has never precluded enforcement at houses of worship, and the 2025 Guidance does not direct enforcement at churches or any

other location.  To the extent congregants' fears are shaped by their misunderstanding of the 2025 Guidance, their nonattendance is traceable to their own misapprehension, not to the guidance.  Congregants' fears and misapprehensions seem to be encouraged to some extent by plaintiffs themselves, who have instructed congregants to stay home.  *See, e.g.*, JA142-144 (congregation canceled a summer camp for children and pastors "encourag[ed]" congregants "to miss church activities because of fear that ICE may show up"); JA172-173 (minister told congregants "not to participate in weekly public prayer vigils out of concern that I.C.E. could use the events to detain our members").

Congregants also appear to be staying home because they fear immigration enforcement generally.  Several declarations discuss enforcement actions that did not occur at or near a church.  *See* JA142 (asserting that attendance at worship services declined after a congregant was arrested by ICE "10 minutes away from the church"); JA160 (attendance declined after a congregant was detained by ICE).  Others discuss ICE operations in the general vicinity of plaintiffs' houses of worship, but the facts do not establish that such actions would have been prohibited under the Mayorkas Memorandum, which entrusted agents to determine whether an action is sufficiently "near" a sensitive location that it should be avoided.  *See, e.g.,* JA130 (congregants are not attending because of increased ICE activity "in the area of the church"); JA143 (ICE was spotted "three blocks away" from a church one Saturday); JA166 (congregation canceled Vacation Bible School after "several ICE sweeps" in the

neighborhood); JA217 (congregation experienced a decrease in attendance at its food pantry "because participants are afraid of ICE's presence in the immediate vicinity of the church"); JA230 (pastors have "shared anecdotal reports" of ICE presence "near places of worship or faith-based events"); *see also* JA106 (Mayorkas Memorandum).[1]

At most, plaintiffs allege two enforcement actions on church property. In one case, federal agents approached a church parsonage looking for an individual, but because the "home did not appear to be a house of worship or a temporary facility where worship was taking place," the district court rightly concluded that the action would not have been prohibited by the Mayorkas Memorandum. ADD.34 n.7; *see* JA231; JA235. In the second, agents used a church parking lot as a staging area for enforcement action directed elsewhere. JA130. Nothing in the record suggests that the affected church—or any of plaintiffs' other churches—will be the subject of future enforcement activity given that the 2025 Guidance does not direct enforcement at plaintiffs' locations or any other houses of worship. Indeed, the district court expressly found that plaintiffs "provide[d] no evidence that an enforcement action at

---

[1] In its standing analysis, the district court relied in part on enforcement actions that allegedly occurred near plaintiffs' houses of worship (or at houses of worship unrelated to plaintiffs) after they filed their complaint. *See* ADD.16 n.6; ADD.27; ADD.35-37 (discussing Notices of Supplemental Facts filed by plaintiffs after briefing concluded). That was error. For purposes of standing, "the facts that matter are 'the facts as they existed at the time the [operative] complaint was filed.'" *Castro v. Scanlan*, 86 F.4th 947, 953-54 (1st Cir. 2023) (alteration in original); *accord Roe v. Healey,* 78 F.4th 11, 20 (1st Cir. 2023) ("An inquiry into standing must be based on the facts as they existed when the action was commenced." (quotation marks omitted)).

any one of their places of worship is 'certainly impending,' or even that there is a 'substantial risk' that one will occur." ADD.19. That should preclude standing to seek prospective relief. *Roe v. Healey*, 78 F.4th 11, 20 (1st Cir. 2023).

In short, plaintiffs' declarations fail to establish that any attendance declines plaintiffs have experienced are traceable to the relatively nuanced changes in internal procedure effected by the 2025 Guidance, as opposed to the fears and misapprehensions of their congregants.

**b.** Even setting aside the insufficiency of plaintiffs' declarations, plaintiffs lack standing to challenge the 2025 Guidance because any declines in attendance would be fairly traceable to the subjective and speculative fears of their congregants, not to the guidance. The district court correctly recognized that plaintiffs' theory of standing depends upon the actions of third parties, making standing "substantially more difficult to establish." ADD.21-22 (quoting *Lujan*, 504 U.S. at 562). Plaintiffs must show that their injury arises from the "predictable effect of Government action on the decisions of third parties," *Department of Com. v. New York*, 588 U.S. 752, 768 (2019), and they must "show a sufficiently direct causal connection between the challenged action and the identified harm" that is not "overly attenuated," *Dantzler, Inc. v. Empresas Berríos Inventory & Operations, Inc.*, 958 F.3d 38, 47 (1st Cir. 2020) (quotation marks omitted).

Plaintiffs have not carried that burden. The objects of the governmental action here are DHS officers; the 2025 Guidance alters the guidance given to those officers

and changes the internal procedures they must observe before taking action in or near a sensitive location.  Plaintiffs claim to be harmed by the decisions of different third parties: their congregants, who fear that immigration officers may exercise the discretion granted to them by the new guidance in such a way that leads to enforcement actions at plaintiffs' churches.  The unstated link in plaintiffs' chain of causation is their congregants' speculative fears regarding how and where immigration officers will exercise their enforcement discretion.  But a theory of standing that rests on "only speculat[ion] as to how" law enforcement officers "will exercise their discretion" does not satisfy Article III.  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 412 (2013).

Plaintiffs cannot avoid these problems by arguing that they have already suffered the injury of decreased attendance, because any such declines were driven by the speculative fears of their congregants.  The Supreme Court confronted a similar situation in *Clapper*, where the plaintiffs argued that measures they had taken to avoid governmental surveillance constituted ongoing injuries traceable to the challenged statute.  *Clapper*, 568 U.S. at 416.  The Court rejected that argument because the harm the plaintiffs sought to avoid was "not certainly impending," and a plaintiff does not obtain standing "by inflicting harm on themselves based on their fears of hypothetical future harm."  *Id.*  The injuries alleged by plaintiffs here are not self-inflicted but that makes no difference: because their congregants' decision to avoid worship is "based on their fears of hypothetical future harm"— not any actual or imminent enforcement

20

action by the government, which plaintiffs have not shown, *see* ADD.19—plaintiffs'

alleged injuries are fairly traceable to their congregants, not to the government.

*Clapper*, 568 U.S. at 416. Indeed, for this reason, the Court in *Clapper* also rejected the

plaintiffs' argument that they were injured because "third parties might be disinclined

to speak with them due to a fear of surveillance." *Id.* at 417 n.7. The Court explained

that even if that were true, the plaintiffs would still lack standing because such injuries

would be "based on third parties' subjective fear of surveillance," not the challenged

statute. *Id.*

Put differently, plaintiffs cannot establish standing because their harms are

simply downstream consequences of the "subjective chill" experienced by their

congregants. *Laird v. Tatum*, 408 U.S. 1, 13 (1972) (quotation marks omitted). The

Supreme Court has explained that plaintiffs cannot establish standing based on the

alleged chilling effect of a policy that "does not regulate, constrain, or compel any

action on [the plaintiffs'] part." *Clapper*, 568 U.S. at 419; *see also Laird,* 408 U.S. at 11

(finding no injury where a challenged policy was not "regulatory, proscriptive, or

compulsory in nature"). Because the 2025 Guidance does not regulate or constrain

them, plaintiffs' congregants would clearly lack standing to challenge the guidance on

the ground that it has chilled them from attending worship services or ministry

activities. It follows *a fortiori* that plaintiffs' downstream attendance injuries do not

provide standing either.

21

Plaintiffs also cannot establish standing because their theory of causation is too attenuated. "The causation requirement . . . rules out attenuated links," including "distant (even if predictable) ripple effects." *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 383 (2024). For example, in *Alliance for Hippocratic Medicine*, the Court declined to recognize standing for plaintiff-doctors to challenge drug approvals merely because "use of the drugs by others may cause more visits to doctors." *Id.* at 392. The Court explained that finding causation in such circumstances would be both "unprecedented and limitless" and would "allow doctors to sue in federal court to challenge almost any policy affecting public health." *Id.* at 391-92. The Court further explained that there would be no "principled way to cabin" such a doctrinal change to doctors: firefighters, police officers, and teachers would also have standing to challenge policies that affected their work, and the "path would seemingly not end until virtually every citizen had standing to challenge virtually every government action that they do not like." *Id.* at 392.

That same logic applies here. The 2025 Guidance provides internal guidance to DHS agents; it does not regulate or constrain plaintiffs' conduct. To find that reductions in attendance at plaintiffs' worship services are fairly traceable to such memoranda would grant religious communities like plaintiffs standing to challenge virtually *any* governmental action that predictably reduces attendance at their services—from a military deployment to a federal highway project that increases

traffic on Sunday mornings. This Court should not endorse such an "unprecedented and limitless approach" to standing. *Alliance for Hippocratic Med.*, 602 U.S. at 391.

Finally, the Supreme Court has indicated that parties challenging the downstream effects of the government's immigration enforcement policies—as plaintiffs do here—lack a cognizable Article III injury. *Texas*, 599 U.S. at 676-77. In *Texas*, the Court held that the plaintiff States lacked standing to challenge DHS guidelines that they argued resulted in too few immigration arrests. *Id.* The Court reasoned that federal courts lack jurisdiction over such suits, which "run up against the Executive's Article II authority to enforce federal law." *Id.* at 678. Aside from interfering with the Executive's Article II authority, such suits are also improper because courts "lack meaningful standards for assessing the propriety of enforcement choices" with respect to arrest and detention, given the needs of the Executive to weigh "resource constraints and regularly changing public-safety and public-welfare needs" when devising policy. *Id.* at 679-80.

The district court suggested that *Texas* applies only to challenges asserting that the government is under-enforcing federal immigration law, ADD.39, but the Court's reasoning applies equally where, as here, plaintiffs attempt to superintend the Executive's enforcement authority by dictating where and under what circumstances immigration enforcement actions may occur. And just as courts are ill-equipped to "assess[] the propriety" of the government's discretionary decisions about who (and who not) to target for arrest, they are equally ill-equipped to decide how immigration

23

officers should exercise their enforcement discretion or who within an agency should grant prior approval for enforcement actions. *Texas*, 599 U.S. at 679.

### 2. Enjoining the 2025 Guidance would not redress plaintiffs' asserted injuries

Plaintiffs have also not made a "'clear showing,'" *Murthy*, 603 U.S. at 58, that their asserted injuries will likely "be redressed by the requested judicial relief," *Alliance for Hippocratic Med.*, 602 U.S. at 380. For much the same reason that plaintiffs cannot shown causation, they also fail to establish redressability. *See Dantzler*, 958 F.3d at 49. Although a plaintiff need not demonstrate that its entire injury will be redressed by a favorable judgment, it must show that the court could fashion a remedy that would at least lessen its injury. *Id.*

The district court reasoned that enjoining the 2025 Guidance would "likely lead to at least some increase in attendance" at plaintiffs' services, but the record does not support that conclusion. ADD.39. Plaintiffs' declarations indicate that their members have stopped attending worship services due to enforcement activity in the vicinity of plaintiffs' locations, *see supra* pp. 17-18, but many, if not all, of those actions would have been permitted under prior guidance. Such actions are therefore likely to continue, and congregants are likely to remain at home, even if the 2025 Guidance is enjoined. Similarly, enjoining the 2025 Guidance would not prompt congregants to return who have stayed at home because a fellow congregant has been detained elsewhere. *See supra* p. 18.

24

Other congregants have stayed home because they believe that church is no longer a "safe place," JA175, that is "free of government interference," JA149, but this also will not change if plaintiffs prevail. As the district court recognized, 8 U.S.C. § 1252(f)(1) prevents lower courts "from enjoining [DHS] from making arrests pursuant to a warrant," including administrative warrants. ADD.57. Consequently, even if plaintiffs obtain a favorable judgment, they could not tell their congregants that it is now "safe to go to church," and they cannot "promise" that enforcement actions will not be taken in or near their locations. JA149.

At bottom, redressability depends upon the "unfettered choices" of plaintiffs' congregants. *Lujan*, 504 U.S. at 562. Because the 2025 Guidance does not target houses of worship and because any judicial relief could not preclude enforcement actions in or near plaintiffs' locations, it is entirely speculative that plaintiffs' congregants would return to services if the 2025 Guidance were enjoined. "[R]edressability [that] requires speculat[ion]," however, is insufficient to support standing. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 344 (2006).

## B. Plaintiffs Are Unlikely to Succeed on Their RFRA Claim

RFRA provides that "Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b)(1), (2). As explained below, plaintiffs have failed to show they are likely to

25

succeed in showing that the 2025 Guidance imposes a substantial burden on their exercise of religion. And in any event, the guidance is the least restrictive means to further compelling government interests in enforcing the immigration laws.

### 1. The 2025 Guidance Does Not Impose a Substantial Burden on Plaintiffs' Exercise of Religion

This Court has not adopted a comprehensive definition of what constitutes a substantial burden on the exercise of religion under RFRA. In deciding cases involving the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc, which is a "sister statute" to RFRA, *Holt v. Hobbs*, 574 U.S. 352, 356 (2015), this Court has held that a substantial burden involves substantial or significant government pressure to modify or violate one's religious beliefs. *See Spratt v. Rhode Island Dep't. of Corr.*, 482 F.3d 33, 38 (1st Cir. 2007) (citing *Thomas v. Review Bd. of the Ind. Emp. Sec. Div.*, 450 U.S. 707, 718 (1981)); *accord Roman Cath. Bishop of Springfield v. City of Springfield*, 724 F.3d 78, 95-96 (1st Cir. 2013).

Not every "restriction on a religious organization imposes a substantial burden" on the exercise of religion, *Roman Cath. Bishop*, 724 F.3d at 96, however, and the Supreme Court has held that the free exercise of religion "does not afford an individual a right to dictate the conduct of the Government's internal procedures," *Bowen v. Roy*, 476 U.S. 693, 700 (1986). Applying that rule, *Bowen* held that the federal government's use of a child's social security number in determining the child's parents' eligibility for federal benefits did not impose a substantial burden on the

26

child's exercise of religion. *See id.* at 701-02. The parents argued that the government's use of the child's social security number would "'rob' the spirit" of the child and prevent her from attaining greater spiritual power. *Id.* at 696. The Supreme Court accepted the parents' religious beliefs as the parents expressed them, but held that the First Amendment does not "require the Government *itself* to behave in ways that the individual believes will further his or her spiritual development or that of his or her family," *id.* at 699.

The Supreme Court reaffirmed *Bowen* in *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439 (1988), holding that the Free Exercise Clause did not empower a Native American tribe to prevent the government from constructing a road on government land. *See Lyng*, 485 U.S. at 450-51 (noting that the "incidental effects of government programs, which may make it more difficult to practice certain religions but which have no tendency to coerce individuals into acting contrary to their religious beliefs," do not impose a substantial burden on religion). [2]

Plaintiffs contend the 2025 Guidance substantially burdens their exercise of religion by providing that law enforcement actions in or near sensitive locations

---

[2] While *Lyng* and *Bowen* involved Free Exercise Clause challenges, the substantial burden analysis in those cases properly inform the interpretation of RFRA because those cases were decided under the pre- *Employment Division, Department of Human Services of Oregon v. Smith*, 494 U.S. 872 (1990) substantial burden/compelling interest test RFRA restored as a matter of federal statutory right. *See, e.g.*, *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 687, 692 (2020) (Alito & Gorsuch, JJ., concurring) (citing *Bowen* in analyzing a RFRA claim); *Apache Stronghold v. United States*, 101 F.4th 1036, 1061 (9th Cir. 2024) (same).

(including houses of worship) may occur with approval from AFODs and ASACs instead of agency headquarters (or a designee).  Under *Bowen*, however, determining approval levels for government action is a classic type of internal affair that does not substantially burden the exercise of religion.  *See* 476 U.S. at 699.  For example, federal regulations specify different approval levels for settling claims against the United States:  subordinate DOJ officials and U.S. Attorneys have authority to settle claims not exceeding $1 million, 28 C.F.R. § 0.168(a), (d)(2); Assistant Attorneys General have authority to settle claims for above $1 million but not exceeding $4 million, *id.* § 0.160(a)(3); and the Deputy Attorney General or Associate Attorney General have authority to settle claims for above $4 million, *id.* § 0.161(a).  Under *Bowen*, those regulations clearly would not impose a substantial burden on a religious claimant who sought to settle a claim against the United States for more than $1 million merely by requiring approval by higher-level authority.

The district court held that the 2025 Guidance imposes a substantial burden on religion insofar as it "would permit immigration-enforcement officers to set up a checkpoint just outside a church."  ADD.43.  As noted, however, the 2025 Guidance merely dictates the government's own internal approval procedures, which under *Bowen* does not impose a substantial burden.  Moreover, like the government action challenged in *Bowen*, the guidance neither prohibits plaintiffs from conducting worship or ministry services nor imposes any financial or other penalty on plaintiffs for engaging in such activity.

Furthermore, under *Lyng*, RFRA does not empower plaintiffs to restrict how the government operates outside plaintiffs' own church property. *See* 485 U.S. at 750-51 (Stevens, J., dissenting); ADD.65 (enjoining defendants from conducting immigration enforcement activities at "any location within 100 feet of any doorway, gate, or other clearly demarcated entrance to any Protected Area" (emphasis omitted)); ADD.66 (prohibiting defendants from setting up a "checkpoint, roadblock, or other barrier in order to question, interrogate, or otherwise direct or undertake Immigration Enforcement Action against individuals who are on their way to or from a Protected Area" (emphases omitted)).

No court has ever suggested RFRA reaches that far, and the implications of the court's substantial-burden theory confirm its invalidity. *See Lyng*, 485 U.S. at 452 (noting that "government simply could not operate" if strict scrutiny were to be required of religiously neutral government action that burdens the exercise of religion only incidentally). Under the district court's reasoning, for example, the government's decision to close a key highway exit near a church for public safety reasons would impose a RFRA substantial burden if the closure would prevent people from attending church, and would require the government to prove that its action was the least restrictive means to further a compelling government interest, the "most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997). The court's substantial-burden theory also would require strict scrutiny of religiously neutral criminal laws that result in the imprisonment of congregants, *any*

29

increase in immigration enforcement that may result in deportation of would-be attendees, and economic policies that may cause parishioners to need to work and forgo gathering for worship.  Under the court's theory, for example, a religious entity that distributes illegal substances to its congregants for use during religious ceremonies could challenge stepped-up government enforcement of the drug laws by reciting that fear of enforcement has caused some participants to forgo attending those services.  RFRA should not be construed to require such absurd results.

The district court also held that the 2025 Guidance imposes a RFRA substantial burden because it would permit immigration-enforcement officers to "question parishioners in the middle of a Catholic Mass."  ADD.43.  Plaintiffs do not allege that any such activity has yet occurred at their houses of worship, and disrupting a church service would plainly impose a substantial burden on religion under RFRA, which still governs all immigration enforcement actions even under the 2025 Guidance.  By contrast, the guidance merely implements internal changes to the approval level for immigration enforcement activity near or at sensitive locations (including houses of worship), which do not impose any RFRA substantial burden. For similar reasons, plaintiffs' "belief that the 2025 Policy burdens their religious exercise by limiting attendance at worship services," ADD.46, also does not show a RFRA substantial burden, as plaintiffs' claims of reduced attendance are not traceable to the 2025 Guidance, *see supra* pp. 12-24.

The district court also erroneously stated that a plaintiff can show a RFRA substantial burden "no matter how attenuated the connection between the government action and the harm" alleged. ADD.45 (citing *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 724 (2014)). *Hobby Lobby* announced no such rule, and government action plainly cannot substantially burden religion where the government's action does not cause the burden alleged. Instead, *Hobby Lobby* rejected the government's attenuation argument there because it would have required determining whether the plaintiffs' religious beliefs were reasonable. *See* 573 U.S. at 724. Plaintiffs do not contend their belief that the 2025 Guidance is limiting attendance at their worship services is itself a religious belief, and neither in that respect nor in any other are defendants asking this Court to determine the reasonableness of plaintiffs' religious beliefs.[3]

Plaintiffs' contention that the 2025 Guidance prevents them from "fulfilling their calling to minister to all people," ADD.46, fails to identify a RFRA substantial

---

[3] The dissenting opinion in *Eternal Word Television Network, Inc. v. Secretary of U.S. DHS*, 818 F.3d 1122 (11th Cir. 2016), which the district court cited here, *see* ADD.75-76, is inapposite for similar reasons, as defendants are not asking this Court to make an "illegitimate foray into the realm of personal faith," *Eternal World*, 818 F.3d at 1188 (Tjoflat, J., dissenting). Moreover, Judge Tjoflat argued that the plaintiffs in *Eternal Word* identified a RFRA substantial burden because having to rely on the Affordable Care Act's religious accommodation to avoid complying with the Act's contraceptive coverage mandate was "a 'substantial factor' or 'material concurring cause' directly leading to the provision of religiously objectionable coverage." *Id.* at 1187 (quoting *Anderson v. Minneapolis, St. P. & S.S.M Ry. Co.*, 146 Minn. 430, 437, 439 (1920)).

burden because that contention flows from their claim of reduced attendance at their worship services.

The district court's statement that the 2025 Guidance "places plaintiffs at a serious risk of negative consequences if they continue to welcome all people," ADD.46, is similarly flawed, as the guidance imposes no duties on houses of worship and subjects them to no sanctions, civil or criminal, for welcoming illegal aliens into their facilities. *See New Doe Child #1 v. United States*, 901 F.3d 1015, 1026 (8th Cir. 2018) (because statutes requiring national motto on U.S. coins and currency "do not direct the Plaintiffs to *do* anything," "it is not clear that the Plaintiffs have alleged a substantial burden under RFRA").

### 2. The 2025 Guidance Is the Least Restrictive Means to Further a Compelling Government Interest

Even if the Court were to conclude that the 2025 Guidance imposes a substantial burden on plaintiffs, there is no RFRA violation if the government "demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b). Here, defendants have a compelling interest in the uniform enforcement of the Nation's immigration laws in light of the overwhelming surge of illegal immigration over the past several years, and the 2025 Guidance is the least restrictive means of advancing those interests. *See generally Kaemmerling v. Lappin*, 553 F.3d 669, 684-85 (D.C. Cir. 2008)

(noting RFRA does not require the government to adopt an alternative that is "less effective" at accomplishing its compelling interest than the action challenged).

**a.** The "government certainly has a compelling interest in the enforcement of the immigration laws." ADD.4. Enforcing our Nation's immigration laws is critically important to the national security and public safety of the United States. "The Supreme Court has recognized that the public interest in enforcement of the immigration laws is significant." *Blackie's House of Beef, Inc. v. Castillo*, 659 F.2d 1211, 1221 (D.C. Cir. 1981) (citing cases); *see National Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 672 (1989). Congress, through the Immigration and Nationality Act, delegated to the Secretary of Homeland Security significant authority to administer and enforce the immigration and nationality laws, without placing any limitations on the Executive's arrest authority on property owned or operated by religious organizations. *See, e.g.*, 8 U.S.C. §§ 1226, 1231, 1357; *see also Arizona v. United States*, 567 U.S. 387, 396 (2025). "The continued presence of an alien lawfully deemed removable undermines the streamlined removal proceedings [Congress] established, and permits and prolongs a continuing violation of United States law." *Nken v. Holder*, 556 U.S. 418, 436 (2009) (cleaned up).

"[A]t least 15 million people are in the United States illegally, many of whom entered (or legally overstayed) just in the last few years." *Noem v. Vasquez Perdomo*, No. 25A169, 2025 WL 2585637 *1 (2025) (Kavanaugh, J., concurring in the grant of the application for stay). The recent influx has "cost taxpayers billions of dollars at the

Federal, State, and local levels," Exec. Order No. 14159, 90 Fed. Reg. 8443, 8443 (Jan. 20, 2025), resulting in "[d]eadly narcotics and other illicit materials [flowing] across the border," Exec. Order No. 14165, 90 Fed. Reg. 8467 (Jan. 20, 2025). "Foreign criminal gangs and cartels" have extended their influence beyond the southern border into American cities, Proclamation 10886, 90 Fed. Reg. 8327 (Jan. 20, 2025), presenting "significant threats to national security and public safety," Exec. Order No. 14165, 90 Fed. Reg. at 8467. The 2025 Guidance furthers the government's compelling interest in addressing "myriad 'significant economic and social problems' caused by illegal immigration," *Vasquez-Perdomo*, 2025 WL 2585637 at *4 (Kavanaugh, J.) (quoting *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975)).

**b.** The 2025 Guidance is the least restrictive means of furthering that compelling interest. An alternative qualifies as a less-restrictive alternative only where it furthers the government's compelling interests "equally well" as the government's chosen approach. *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 731 (2014).

The district court held that the Mayorkas Memorandum is a less-restrictive alternative here, but requiring law enforcement officials to obtain prior high-level approval before conducting immigration enforcement in or near sensitive locations (including but not limited to houses of worship) is unduly bureaucratic and far less timely and effective than allowing those officials to obtain approval from a local supervisor. *See Iowa Migrant Movement for Justice v. Bird,* 157 F.4th 904, 921 (8th Cir. 2025) (noting that "[d]iscretion in the enforcement of federal immigration law is vital

34

for accomplishing the purposes of federal immigration law"). The district court held that nothing in the record shows that adherence to the Mayorkas Memorandum would "in any material respect impair the effective enforcement of the immigration laws," ADD.44, but in "sensitive and weighty" contexts such as immigration, the government is not required to wait until a threat has actually materialized before acting to address that threat. *Trump v. Hawaii*, 585 U.S. 667, 708 (2018) (quotation marks omitted) (noting the President's right to make "predictive judgments" regarding immigration, national security, and foreign affairs); *cf. Whitley v. Albers*, 475 U.S. 312, 322 (1986) (noting that officials are entitled to take prophylactic measures to prevent breaches of prison discipline).

As explained, recent events, including the influx of aliens (some of whom are dangerous) into the United States in the last several years, necessitated defendants' change in guidance. Given those events, and in light of the fact that DHS officers "frequently apply enforcement discretion to balance a variety of interests," including the extent to which any enforcement action occurs in a sensitive location, DHS reasonably determined that it would be more effective to entrust decisions regarding whether to take an enforcement action in or near a sensitive location to officers' common sense and law enforcement discretion, subject to any further guidance provided by leaders of ICE or U.S. Customs and Border Protection, rather than have the "head of the agency . . . create bright line rules" ex ante. ADD.70. The government's determination that the 2025 Guidance's turn toward common sense and

discretion is essential to effectively address the significant harms the massive increase in illegal immigration have imposed on Americans is reasonable, and the government is entitled to deference in determining how best to enforce the Nation's immigration laws and address those harms, including in a RFRA suit. *See Tabbaa v. Chertoff*, 509 F.3d 89, 106 (2d Cir. 2007).

## II. The Remaining Injunction Factors Weigh Against an Injunction

Even if plaintiffs could establish a likelihood of success on the merits, "a preliminary injunction does not follow as a matter of course." *Benisek v. Lamone*, 585 U.S. 155, 158 (2018) (per curiam). Plaintiffs have not demonstrated that the equitable factors weigh in favor of injunctive relief.

### A. Plaintiffs Have Not Demonstrated Irreparable Harm Absent Preliminary Relief

The Supreme Court's "frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is likely in the absence of an injunction." *Winter*, 555 U.S. at 22. Conclusory or speculative allegations do not establish a likelihood of irreparable harm. *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004) ("A finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store.").

For the same reasons plaintiffs lack standing to bring this lawsuit, *see supra* pp. 11-25, they fail to carry their burden of establishing irreparable harm. Plaintiffs have

not established that they have experienced reductions in attendance that are fairly traceable to the 2025 Guidance that would likely be reversed if that guidance were enjoined.  Nor could they, because the choice whether to attend lies with plaintiffs' congregants, not with DHS, and the 2025 Guidance does not regulate plaintiffs or restrict attendance at their services.  Because plaintiffs have not established injury traceable to the 2025 Guidance, they have not established irreparable harm.

Plaintiffs also cannot establish irreparable injury by alleging a RFRA violation. Plaintiffs have not shown that they are likely to succeed on the merits of that claim because any reductions in attendance at plaintiffs' worship services amounts to only an indirect and incidental effect on their religious practice, which does not substantially burden their religious exercise.

## B. Plaintiffs Have Not Shown That the Balance of Equities Tips in their Favor

The final two preliminary injunction factors, the public interest and the balance of the equities, also weigh against preliminary relief.  As discussed above, plaintiffs have not established an actual or imminent injury sufficient to confer Article III standing, let alone the much higher standard of an irreparable injury required for a preliminary injunction.  *Winter*, 555 U.S. at 21-22.  Nor have they demonstrated that they are likely to succeed on their RFRA claim, as discussed above.

On the other side of the balance, the government is irreparably injured when it "is enjoined by a court from effectuating statutes enacted by representatives of its

people." *Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025) (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers)). Congress has directed DHS to enforce the Nation's immigration laws and has placed very few location-based restrictions on that authority. And as discussed *supra* pp. 33-34, the government has a compelling interest in ensuring uniform enforcement of immigration laws. Further, section 1252(f)(1) reflects Congress's determination that the public interest supports avoiding judicial interference with enforcement by immigration officers carrying out their arrest and removal functions. The district court's injunction improperly impedes those efforts, and the court's contention that the government has other means to achieve its compelling interests here, *see* ADD.56, wrongly second-guesses the government's considered judgment that the 2025 Guidance is necessary and appropriate to achieve those interests. *See Tabba*, 509 F.3d at 106.

The injunction also harms the government by intruding on the internal workings of DHS. *INS v. Legalization Assistance Project of L.A. Cnty. Fed'n of Lab.*, 510 U.S. 1301, 1306 (1993) (O'Connor, J., in chambers) ("[A]n improper intrusion by a federal court into the workings of a coordinate branch of the [g]overnment" weighs against equitable relief.). As explained, both the 2025 Guidance and the Mayorkas Memorandum permit enforcement actions in or near sensitive locations and both acknowledge that whether an enforcement action occurs in or near a sensitive location is an important factor immigration agents must consider. Where the guidance differ is in their allocation of responsibility regarding who decides whether an enforcement

action in or near a sensitive location is warranted. That allocation of responsibility is properly left to the Department, not the courts.

## III. The Preliminary Injunction Should Be Narrowed to Align with the Mayorkas Memorandum

Assuming that some relief were proper, this Court should at least narrow the injunction to match any injury established by plaintiffs. Consistent with Article III, a court must tailor its remedy "to redress the plaintiff's particular injury." *Gill v. Whitford*, 585 U.S. 48, 73 (2018). Principles of equity reinforce those limitations. Injunctive relief may "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).

Here, plaintiffs argued that their injuries were caused by the recission of the Mayorkas Memorandum and they accordingly sought a preliminary injunction requiring DHS to abide by that guidance pending resolution of this case on the merits. *See* JA121 (proposed order). As discussed, the Mayorkas Memorandum generally discouraged officers from taking action in or near a sensitive location, but it identified a non-exhaustive set of circumstances in which action in or near a sensitive location might be necessary, including where the action involves (1) a national security threat; (2) an imminent risk of death or physical harm; (3) hot pursuit of an individual who poses a public safety threat; (4) hot pursuit of an observed border-crosser; (5) an imminent risk that evidence material to a criminal case may be destroyed; and (6)

where a safe alternative location for enforcement does not exist. JA106-107. The guidance also directed officers to obtain headquarters' approval before taking enforcement action in or near a sensitive location, absent exigent circumstances. JA107.

The district court's injunction, by contrast, prohibits defendants from taking enforcement action "In a Protected Area"—which includes plaintiffs' houses of worship, any adjacent buildings used for religious education or ministry, and any parking lots, sidewalks, playgrounds or other property adjacent to their houses of worship—absent an "immediate threat to human life or safety," regardless of whether headquarters has approved the action and regardless of whether any circumstances identified in the Mayorkas Memorandum are present. ADD.64-66.

In awarding plaintiffs greater relief than they sought or demonstrated entitlement to, the district court abused its discretion. "In our adversarial system of adjudication, we follow the principle of party presentation," by which we "rely on the parties to frame the issues for decision." *United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020). Plaintiffs did not ask for anything other than reinstatement of the Mayorkas Memorandum pending resolution of this case on the merits. JA121. Even accepting the district court's concern that an injunction requiring compliance with the Mayorkas Memorandum would not comply with Rule 56(d)'s specificity requirement, ADD.58-60, that concern does not justify the district court's decision to narrow the circumstances under which enforcement actions are permitted. The court's "drastic

40

departure from the principle of party presentation constituted an abuse of discretion" that this Court should correct. *Margolin v. National Ass'n of Immigr. Judges*, 146 S. Ct. 1285, 1288-89 (2026) (alterations and quotation marks omitted).

## CONCLUSION

For the foregoing reasons, the district court's preliminary injunction should be vacated.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

LEAH B. FOLEY
  *United States Attorney*

MICHAEL S. RAAB
CHARLES W. SCARBOROUGH
LOWELL V. STURGILL JR.

 *s/ Sarah N. Smith*
SARAH N. SMITH
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7533*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-0173*
  *Sarah.N.Smith@usdoj.gov*

July 2026

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 28.1(e)(2)(A) because it contains 9,937 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Sarah N. Smith*
Sarah N. Smith

## CERTIFICATE OF SERVICE

I hereby certify that on July 27, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*s/ Sarah N. Smith*
Sarah N. Smith

**ADDENDUM**

# TABLE OF CONTENTS

Memorandum and Order on Plaintiffs' Motion for Stay Under 5 U.S.C. § 705
or, in the Alternative, Preliminary Injunction, Dkt. No. 74........................ ADD.1

Preliminary Injunction, Dkt. No. 75 .................................................................... ADD.63

Enforcement Actions in or Near Protected Areas, Benjamine C. Huffman (Jan.
20, 2025), Dkt. No. 1-6.................................................................................. ADD.69

Common Sense Enforcement Actions in or Near Protected Areas, Caleb
Vitello (Jan. 31, 2025), Dkt. No. 1-8............................................................ ADD.71

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
                                        )
NEW ENGLAND SYNOD,                      )
EVANGELICAL LUTHERAN CHURCH             )
IN AMERICA, et al.,                     )
                                        )
            Plaintiffs,                 )         Civil Action No.
                                        )         25-40102-FDS
      v.                                )
                                        )
DEPARTMENT OF HOMELAND                  )
SECURITY, et al.,                       )
                                        )
            Defendants.                 )
                                        )
```

**MEMORANDUM AND ORDER ON PLAINTIFFS' MOTION
FOR STAY UNDER 5 U.S.C. § 705 OR, IN THE ALTERNATIVE,
PRELIMINARY INJUNCTION**

SAYLOR, J.

This case involves a challenge to a revised federal policy concerning immigration enforcement in or near churches. In January 2025, the Department of Homeland Security ("DHS") and Immigration and Customs Enforcement ("ICE") issued a new policy providing guidance about conducting immigration-enforcement operations, including arrests and searches, at so-called "sensitive places" or "protected areas," such as churches and other houses of worship.[1] Plaintiffs, various Christian church organizations, contend that the new policy violates the Religious Freedom Restoration Act of 1993, Pub. L. No. 103-141, 107 Stat. 1488 ("RFRA"); the First Amendment to the United States Constitution; and the Administrative

---

[1] The policy applies to other "sensitive places," such as schools, hospitals, and social-service facilities, and applies not only to churches, but also to synagogues, temples, mosques, and other houses of worship. For the sake of convenience, and because all plaintiffs are Christian church organizations, this memorandum and order will use the term "churches" to refer to all houses of religious worship unless the context indicates otherwise.

Procedure Act ("APA").  Defendants are the United States Department of Homeland Security and Kristi Noem, in her official capacity as Secretary of Homeland Security.  Plaintiffs have moved for a stay of that policy under 5 U.S.C. § 705 or, in the alternative, a preliminary injunction prohibiting defendants from enforcing the new policy.

In substance, the new government policy permits DHS law-enforcement agents, including ICE agents, to conduct arrests, searches, or interrogations in or near a church at their own discretion.  The prior policy, adopted in 2021, stated that DHS agents should avoid such enforcement actions "[t]o the fullest extent possible," and that "[a]bsent exigent circumstances," agents "must seek prior approval from their Agency's headquarters . . . before taking an enforcement action in or near a protected area" such as a church.  The new policy, adopted in January 2025, simply directs DHS agents to "use [their] discretion along with a healthy dose of common sense" in determining whether to conduct such operations, and grants lower-level supervisory officers "responsibility" for making "case by case determinations" in such matters.

The prospect that a street-level law-enforcement agent—acting without a judicial warrant and with little or no supervisory control—could conduct a raid during a church service, or lie in wait to interrogate or seize congregants as they seek to enter a church, is profoundly troubling.  Indeed, according to the new policy, agents could conduct a raid, with weapons drawn, at any type of church proceeding—including a regular Sunday service, a wedding, a baptism, a christening, or a funeral—subject only to the exercise of their "discretion" and "common sense."

It hardly requires mentioning that freedom of religion is both a core American value and a basic liberty protected by the First Amendment and laws of the United States.  That freedom encompasses not merely the freedom to believe, but the freedom to worship, including the freedom to attend church and to participate in sacraments, rituals, and ceremonies.  If

government interference with those freedoms is ever justifiable, it is only in relatively extreme circumstances, such as an immediate threat to public safety. The routine enforcement of the immigration laws does not involve such a threat, and cannot justify the harm to religious freedom posed by the new policy.

It is of course true that the presence of millions of illegal immigrants within the borders of the United States justifies a substantial government response. But the need to address that problem cannot override the fundamental liberties on which our nation was founded. And to be clear, the new policy does not simply permit the apprehension of illegal immigrants in churches; it permits, without meaningful restraints, the disruption of church services and functions and the interrogation or seizure of anyone who may be on church property, citizen and non-citizen alike. For that reason, and for the reasons set forth below, the issuance of preliminary injunctive relief is appropriate.

Nonetheless, the posture of this case presents a number of challenges and complications. Plaintiffs here are not individual churchgoers—that is, those who are staying away from church to avoid potential harassment, interrogation, or arrest. Instead, they are church organizations, who contend that the adoption of the 2025 Policy has harmed them by discouraging attendance at their member churches. Accordingly, there is a substantial threshold question as to whether all of the plaintiffs have standing to assert the claims in the complaint—in particular, whether their claimed injuries (principally, decreased attendance at member churches) are fairly traceable to the adoption of the new policy (as opposed to, for example, increased immigration enforcement generally).

Two federal courts, in substantially identical cases challenging the 2025 Policy, have considered the issue of standing and have reached opposite conclusions. *See Philadelphia Yearly*

*Meeting of Religious Soc'y of Friends v. U.S. Dep't of Homeland Sec.*, 767 F. Supp. 3d 293, 315-19 (D. Md. 2025) (concluding that decreased attendance at worship services and ministry programs was sufficient to demonstrate standing); *Mennonite Church USA v. U.S. Dep't of Homeland Sec.*, 778 F. Supp. 3d 1, 12 (D.D.C. 2025) (concluding that such decreases were not fairly traceable to the 2025 Policy and denying standing).  For the reasons set forth below, the Court concludes that some, but not all, of the plaintiffs have made at least a preliminary showing of standing.[2]

The issuance of a preliminary injunction also requires proof of likelihood of success on the merits of the substantive claims.  Here, the Court has little difficulty concluding that the 2025 Policy violates RFRA.  Under RFRA, the government may not "substantially burden" the exercise of religion unless it demonstrates that the burden "is in furtherance of a compelling governmental interest" and "is the least restrictive means of furthering that compelling governmental interest."  42 U.S.C. § 2000bb-1.  Again, it can hardly be doubted that arrests or searches in or at the entrances to churches, particularly during or near the time of religious services, impose a substantial burden on the exercise of religion.  And while the government certainly has a compelling interest in the enforcement of the immigration laws, the 2025 Policy—which, again, imposes virtually no limitations on the discretion of low-level law-enforcement officers—is not, in fact, the least restrictive means of furthering that interest.

The First Amendment claim asserted by plaintiffs is not perfectly congruent with the RFRA claim; it is not based on the right to religious freedom, but rather the right to associational

---

[2] There is also a question as to whether this is the proper venue for the assertion of those claims, as all of the plaintiffs but one are located entirely in other jurisdictions.  Because, however, the government has not opposed the motion on that basis, the Court will assume for present purposes that this is in fact an appropriate forum for the claims of all plaintiffs.

freedom.  Because the Court finds that plaintiffs are likely to succeed on the merits of their RFRA claim, it will not reach the question of whether they are also likely to succeed on their associational-freedom claim.  As for the APA claim, the Court does not find that the 2025 Policy represents a "final agency action" within the meaning of the APA, and therefore the request for a stay under 5 U.S.C. § 705 will be denied.

The requirement that plaintiffs must show immediate irreparable harm has likewise been satisfied.  It is well-settled that restrictions on the right to free exercise of religion, even for a minimal period of time, constitute irreparable injury.  Finally, the balance of equities and the public interest favor the granting of a preliminary injunction.

Although preliminary injunctive relief is appropriate, there are a number of potential limitations on the Court's ability to order the requested relief.

One such limitation arises from Rule 65, which requires that any injunction "state its terms specifically" and "describe in reasonable detail . . . the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1).  Plaintiffs seek an injunction restoring the *status quo*—that is, enjoining the government from following the 2025 Policy and therefore reinstating the 2021 Policy.  While that request for relief appears to be relatively simple, it is in fact fraught with problems.  The 2021 Policy may be perfectly sensible, but it contains almost no bright-line rules; rather, it sets forth various considerations and factors to guide law-enforcement discretion in or near sensitive locations such as churches.  Because of that, it would be difficult, if not impossible, to ascertain in any given circumstance whether law enforcement was complying with an injunction simply reinstating the 2021 Policy.  Thus, if the 2021 Policy were incorporated wholesale in an injunction, it is doubtful that such an injunction would satisfy the "reasonable detail" requirement of Rule 65.

In addition, the extent to which the burden on religious exercise extends beyond attendance at actual church services is far from clear. Some activities directly adjacent to the practice of religion (such as dropping children off for Sunday school, or attending choir practice) would appear to qualify as the exercise of religion; it is far less clear whether the operation of social-service ministries, such as day-care centers, meal programs, language classes, and food banks, do as well. For present purposes, and in the absence of countervailing evidence, the Court will accept the representations of the plaintiffs that certain identified activities are central to their religious mission, and therefore constitute protected activities.

Finally, the Court does not have subject-matter jurisdiction to enjoin immigration arrests or searches made pursuant to an administrative warrant—that is, a warrant issued by an ICE official. *See* 8 U.S.C. § 1252(f)(1). To the extent, therefore, that the Court is empowered to order relief, it is necessarily limited to warrantless arrests, searches, interrogations, and related activities.

In short, while the precise relief sought by plaintiffs is potentially problematic, the Court is persuaded that some measure of preliminary relief is appropriate. As set forth below, the Court will issue a preliminary injunction that is largely derived from the 2021 Policy, but that clearly delineates what is permissible and what is not, and that (among other things) restrains immigration-enforcement actions in the churches or other religious facilities of certain plaintiffs absent exigent circumstances.

Accordingly, and for the reasons set forth below, the motion will be granted in part and denied in part.

## I.  **Background**

### A.  **Factual Background**

#### 1.  **The 1993 and 2021 "Sensitive Locations" Policies**

Beginning in at least 1993, DHS and its predecessor agencies have limited immigration enforcement actions in or near "sensitive locations," including schools and houses of worship. (Compl. ¶ 27).  Although the policies have changed somewhat over the past three decades, they generally permitted enforcement actions in or near sensitive locations only under exigent circumstances or with written supervisory approval.  (*See id.* Exs. 1-3).

In 2021, then-Secretary of DHS Alejandro Mayorkas issued a memorandum providing new guidelines for enforcement actions in sensitive locations.  *See* Memorandum from Alejandro N. Mayorkas, Sec'y, Dep't of Homeland Sec., Guidelines for Enforcement Actions in or Near Protected Areas (Oct. 27, 2021) ("Mayorkas Memo" or the "2021 Policy").  The 2021 Policy established a policy that, "[t]o the fullest extent possible, [DHS] should not take an enforcement action in or near a location that would restrain people's access to essential services or engagement in essential activities," referring to such locations as "protected area[s]."  (Mayorkas Memo 2).  In a non-exhaustive list of what qualified as a "protected area," the 2021 Policy included "place[s] of worship or religious study, whether in a structure dedicated to activities of faith (such as a church or religious school) or a temporary facility or location where such activities are taking place."  (*Id.*).  The 2021 Policy did not give a "bright-line definition of what constitutes 'near,'" instead noting that "[a] variety of factors can be informative, such as proximity to the protected area, visibility from the protected area, and people's behavioral patterns in and around the protected area.  The determination requires an analysis of the facts and the exercise of judgment."  (*Id.* at 3).  "Absent exigent circumstances," the 2021 Policy provided,

"an Agent or Officer must seek prior approval from their Agency's headquarters . . . before taking an enforcement action in or near a protected area." (*Id.* at 4).

The 2021 Policy noted, however, that "[i]f the enforcement action is taken due to exigent circumstances and prior approval was therefore not obtained, Agency headquarters" or the delegated official "should be consulted post-action." (*Id.*). The guidance further provided that "[t]o the fullest extent possible, any enforcement action in or near a protected area should be taken in a non-public area, outside of public view, and be otherwise conducted to eliminate or at least minimize the chance that the enforcement action will restrain people from accessing the protected area." (*Id.*).[3]

### 2. The 2025 "Sensitive Locations" Policy

On January 20, 2025, then-Acting Secretary of DHS Benjamine C. Huffman issued a memorandum rescinding the Mayorkas Memo. *See* Memorandum from Benjamine C. Huffman, Acting Sec'y, Dep't of Homeland Sec., Enforcement Actions in or Near Protected Areas (Jan. 20, 2025) ("Huffman Memo"). The Huffman Memo stated that "officers frequently apply enforcement discretion to balance a variety of interests, including the degree to which any law enforcement action occurs in a sensitive location." *Id.* In place of "bright line rules," the Huffman Memo instructed officers to "continue to use [their] discretion along with a healthy dose of common sense" in determining whether to conduct enforcement operations at a sensitive location. *Id.*

On January 21, 2025, DHS issued a press release containing the following statement concerning the Huffman Memo:

> This action empowers the brave men and women in CBP and ICE to enforce our immigration laws and catch criminal aliens—including murderers and rapists—

---

[3] This opinion will refer to the policy of the Mayorkas Memo as the "2021 Policy."

who have illegally come into our country. Criminals will no longer be able to hide in America's schools and churches to avoid arrest. The Trump Administration will not tie the hands of our brave law enforcement, and instead trusts them to use common sense.

(Compl., Ex. 7).

On January 31, 2025, then-Acting Director of Immigration and Customs Enforcement Caleb Vitello issued further guidance concerning enforcement in protected areas. *See* Memorandum from Caleb Vitello, Acting Dir., Immigr. & Customs Enf't, Common Sense Enforcement Actions in or Near Protected Areas (Jan. 31, 2025) ("Vitello Memo"). The Vitello Memo reaffirmed that there would be no bright line rules concerning enforcement in protected areas.[4] It also "charge[d] Assistant Field Office Directors (AFODs) and Assistant Special Agents in Charge (ASACs) with responsibility for making case-by-case determinations regarding whether, where, and when to conduct an immigration enforcement action in or near a protected area." (*Id.*).[5]

### 3.    The Parties

New England Synod, Greater Milwaukee Synod, Southwest California Synod, Southwest Texas Synod, and Sierra Pacific Synod are regional bodies of the Evangelical Lutheran Church in America that are made up of individual congregations within their geographic borders. (Compl. ¶¶ 14-18). The complaint asserts that they "welcome all people at all times, especially for worship on Sunday morning," and they "also practice their faith through public works such as, for example, providing housing to migrants and asylum seekers, providing food and support services to people in need, assisting in refugee resettlement, and providing English-as-second-

---

[4] The Vitello Memo defined "protected areas" as including "churches, synagogues, mosques, or other institutions of worship."

[5] This opinion will refer to the Huffman and Vitello Memos together as the "2025 Policy."

language classes." (*Id.* ¶¶ 75-76).

San Francisco Friends Meeting of the Religious Society of Friends, Pacific Yearly Meeting of the Religious Society of Friends, and North Pacific Yearly Meeting of the Religious Society of Friends are "regional associations of Quakers—members of the Religious Society of Friends, a religious movement dating to the seventeenth century." (*Id.* ¶¶ 19-21, 77).  Although "Quakers have no formal hierarchy, they are generally organized into Yearly Meetings, Quarterly Meetings, and Monthly Meetings." (*Id.* ¶ 78).  "A 'meeting' is an association, a gathering held to do business at a certain interval . . . , and a way of describing Quakers within a certain region." (*Id.*).  "Quaker worship generally consists of Spirit-led waiting—gathering in silence and waiting to hear the voice of God," and "[t]his communal aspect of worship—of gathering as a body to experience spiritual connectedness with the Spirit/God through one another—is central to the exercise of the Quaker faith." (*Id.* ¶¶ 82-83).

American Baptist Churches USA and Alliance of Baptists are associations made up of Baptist congregations located around the United States.  (*Id.* ¶¶ 22-23).  According to the complaint, both groups believe strongly in the importance of welcoming and ministering to immigrants.  (*Id.* ¶¶ 95, 99).

Metropolitan Community Churches ("MCC") is a "legal association of approximately 90 churches throughout the United States and 27 additional churches globally." (*Id.* ¶ 24).  Since its founding, "MCC has had a particular focus on welcoming LGBTQ+ individuals, and many of its members and clergy identify as LGBTQ+." (*Id.* ¶ 104).  Furthermore, MCC's members believe that "when they care for those at the margins—the poor, the sick, the stranger, the prisoner—they serve God," and they therefore "practice their faith through social justice ministries, including those that serve immigrant communities." (*Id.* ¶ 107).

Defendants are the Department of Homeland Security and Kristi Noem, the current Secretary of Homeland Security, who is sued in her official capacity.  (*Id.* ¶¶ 25-26).

## B.       Procedural Background

On July 28, 2025, plaintiffs filed a complaint asserting five counts for relief.

Count 1 alleges that the 2025 Policy violates RFRA because it substantially burdens plaintiffs' free exercise of religion by "reducing the number and diversity of worshippers and interfering with their ability to practice communally" and by "rendering Plaintiffs unable to encourage all to join without contradicting their faith," and because the policy is not the least restrictive means of furthering the government's legitimate interests.  (Compl. ¶¶ 162-70).

Count 2 alleges that the policy violates the First Amendment because plaintiffs "engage in protected expressive association when they gather for communal religious worship and when they conduct social service ministries," the policy "burdens and chills the expressive association rights of Plaintiffs" and is therefore subject to strict scrutiny, and the policy cannot survive strict scrutiny because a less restrictive alternative exists:  the 2021 Policy and its predecessors. (Compl. ¶¶ 171-76).

Counts 3 through 5 allege violations of the APA, contending that the 2025 Policy is arbitrary and capricious, not in accordance with law, and contrary to constitutional right.  (*Id.* ¶¶ 177-92).

Plaintiffs have moved for a stay of the 2025 Policy under 5 U.S.C. § 705 or, in the alternative, a preliminary injunction barring defendants "from implementing or otherwise giving effect to" the 2025 Policy.  (Memo. Supp. Pls.' Mot. for Stay under 5 U.S.C. § 705 or, in the Alternative, Prelim. Inj. ("Pls.' Mot.") 30, Dkt. No. 33).

**II.    Standard of Review**

To issue a preliminary injunction under Fed. R. Civ. P. 65, a district court must find that the moving party has established (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm absent interim relief, (3) that the balance of equities weighs in its favor, and (4) that a preliminary injunction is in the public interest. *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). Of those factors, the likelihood of success on the merits "normally weighs heaviest in the decisional scales." *Coquico, Inc. v. Rodriguez-Miranda*, 562 F.3d 62, 66 (1st Cir. 2009); *see also New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002) ("The sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity.").

The court may accept as true "well-pleaded allegations [in the complaint] and uncontroverted affidavits." *Rohm & Haas Elec. Materials, LLC v. Electronic Cirs. Supplies, Inc.*, 759 F. Supp. 2d 110, 114 n.2 (D. Mass. 2010). "The Court may also rely on otherwise inadmissible evidence, including hearsay, in deciding a motion for preliminary injunction." *Boston Taxi Owners Ass'n v. City of Boston*, 84 F. Supp. 3d 72, 78 (D. Mass. 2015) (citing *Asseo v. Pan Am. Grain Co.*, 805 F.2d 23, 26 (1st Cir. 1986)). Evidentiary issues such as hearsay "go to weight rather than admissibility" in ruling on a preliminary injunction. *Gateway City Church v. Newsom*, 516 F. Supp. 3d 1004, 1009 n.3 (N.D. Cal. 2021) (quoting *Disney Enters., Inc. v. VidAngel, Inc.*, 224 F. Supp. 3d 957, 966 (C.D. Cal. 2016)).

"The standard of review for relief under 5 U.S.C. § 705 is the same as the standard of review for preliminary injunctions." *Northwest Immigrant Rts. Project v. U.S. Citizenship & Immigr. Servs.*, 496 F. Supp. 3d 31, 45 (D.D.C. 2020); *see Massachusetts Fair Hous. Ctr. v. U.S.*

*Dep't of Hous. & Urban Dev.*, 496 F. Supp. 3d 600, 609 (D. Mass. 2020); *Cook County v. Wolf*, 962 F.3d 208, 221 (7th Cir. 2020).

### III.    Analysis

#### A.        Likelihood of Success on the Merits

##### 1.        Article III Standing

Standing is a threshold question in every case; "[i]f a party lacks standing to bring a matter before the court, the court lacks jurisdiction to decide the merits of the underlying case." *United States v. AVX Corp.*, 962 F.2d 108, 113 (1st Cir. 1992).  To have standing to sue, plaintiffs must establish that they (1) have suffered an "injury in fact" that is "concrete," "particularized," and "actual or imminent"; (2) that the injury "likely was caused or likely will be caused by the defendant's conduct"; and (3) that the injury "likely would be redressed by the requested judicial relief."  *See Food & Drug Admin. v. Alliance for Hippocratic Med.*, 144 S. Ct. 1540, 1555-56 (2024).

"At the preliminary injunction stage . . . the plaintiff[s] must make a 'clear showing' that [they are] 'likely' to establish each element of standing." *Murthy v. Missouri*, 144 S. Ct. 1972, 1986 (2024) (quoting *Winter*, 555 U.S. at 22).

##### a.        Injury-in-Fact

The first requirement for standing requires plaintiffs to show that they have "suffered an injury in fact that is concrete, particularized, and actual or imminent." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021).  To be "concrete," a harm must be "real, and not abstract," and in making this determination, "courts should assess whether the alleged injury to the plaintiff has a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts."  *Id.* at 2204 (quoting *Spokeo, Inc. v. Robbins*, 578 U.S. 330, 340-

41 (2016)).  These "traditional harms may also include harms specified by the Constitution itself," including "infringement of free exercise."  *Id.*

Furthermore, to obtain injunctive relief, a party must show "ongoing injury or a sufficient threat that the injury will recur"; "past harm" otherwise "does not confer standing to seek forward-looking declaratory or injunctive relief."  *Roe v. Healey*, 78 F.4th 11, 21 (1st Cir. 2023).  Any future harm must be "imminent" to provide standing:  that is, it must be "certainly impending," or there must be "a substantial risk that the harm will occur."  *Id.* at 20 (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)) (citation modified).

The complaint alleges that plaintiffs have suffered, or will imminently suffer, four categories of injury:  first, that the 2025 Policy has led to decreased attendance at worship services (Compl. ¶¶ 110, 116, 121, 129, 133-34, 145, 159); second, that the policy has caused a decrease in attendance at plaintiffs' social ministries, which are an integral part of the exercise of their religious faith (*Id.* ¶¶ 112, 118, 121, 123, 125-26, 129, 136); third, that the decrease in attendance has led to financial harm in the form of decreased donations *(Id.* ¶ 111); and, fourth, that the policy has caused various intangible harms, including creating fear and anxiety, putting plaintiffs to an "impossible choice" of "either violat[ing] their core religious beliefs by failing to welcome all to worship or violat[ing] their core religious beliefs by placing others in harm's way," and "compelling" them to change their behavior, including locking doors, limiting access to services, and not speaking out about immigration matters.  (*Id.* ¶¶ 109, 114, 120-22, 127, 131-32, 137, 139, 141, 152, 158, 160, 160).  Each of those alleged injuries will be considered in turn.

### i.    Decreased Attendance at Worship Services

Courts have recognized that a decline in attendance at religious services can constitute an injury to a religious organization in certain circumstances.  *See Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 522 (9th Cir. 1989) (finding that "a concrete, demonstrable decrease

in attendance at . . . worship activities" was an injury-in-fact); *Philadelphia Yearly Meeting*, 767 F. Supp. 3d at 312 (finding that reductions in attendance of as much as 66 percent at worship services "cause injury" to plaintiffs); *cf. Mennonite Church USA*, 778 F. Supp. 3d at 10 (assuming, without deciding, that declines in attendance of 35 to 50 percent at worship services were injuries-in-fact).

Plaintiffs assert that despite their theological differences, they "all place great religious importance on coming together in person for regular communal worship." (Pls.' Mot. 15). For example, Jeff R. Johnson, Bishop of the Sierra Pacific Synod of the ELCA, attested that Lutherans "consider it an experience of the fullness of the body of Christ when [they] are able to come together" for communal worship, and that "not being able to do that is a harm." (*Id.*, Ex. 10 ¶ 18). Nathan D. Pipho, Bishop of the New England Synod of the ELCA, noted that "[t]he ability to gather together for regular communal worship . . . is vital to practicing [their] faith," and that "[d]ecreases in attendance have a ripple effect across [their] congregations, impacting those that cannot attend but also those that do attend." (*Id.*, Ex. 17 ¶¶ 15-16). For the Quaker organizations, whose unprogrammed worship allows "anyone who feels called upon by the Spirit/God to speak" during worship services, the "communal aspect of worship . . . is central to the exercise" of their faith. (Compl. ¶¶ 82-83). Robin DuRant, Presiding Clerk of the Pacific Yearly Meeting, attested that "[a] loss of members would harm" her organization by causing a "loss of spiritual and denominational unity." (Pls.' Mot., Ex. 11 ¶ 13). Gina C. Jacobs-Strain, General Secretary of American Baptist Churches USA, attested that "[c]ommunal worship and fellowship are fundamental to" the Baptist faith. (*Id.*, Ex. 26 ¶ 15).

Plaintiffs also assert that their congregations have suffered meaningful declines in attendance since the 2025 Policy was enacted. Edwin Aparicio, pastor of a Lutheran church

within the Greater Milwaukee Synod, reported that church attendance had declined by "50 percent in the last few months." (*Id.*, Ex. 12 ¶ 17).  Brenda Bos, Bishop of the Southwest California Synod of the ELCA, reported that a "migrant-serving congregation" within the Synod had reported an 80 percent decline in church attendance.  (*Id.*, Ex. 16 ¶ 19).  Other congregations similarly reported declines in attendance without providing exact figures.  (*Id.*, Ex. 10 ¶ 26; Ex. 24 ¶ 16; Ex. 13 ¶ 23).

Defendants do not appear to contest that a decline in attendance at worship services constitutes a cognizable injury-in-fact.  Furthermore, that harm "has a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts." *TransUnion*, 141 S. Ct. at 2204 (quoting *Spokeo*, 578 U.S. at 341).  There is a long tradition of churches and religious organizations suing based on injury to their religious exercise.  *See, e.g.*, *Gonzalez v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 423 (2006) (suit based on threatened enforcement of Controlled Substances Act to prohibit religious rituals using hallucinogens); *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 528 (1993) (suit based on city ordinances prohibiting ritual slaughter of animals as practiced in Santeria religion).  Therefore, because of the vital importance of communal worship to plaintiffs' religious exercise, their member congregations suffer a concrete injury-in-fact when attendance at religious services declines.[6]

---

[6] Plaintiffs' first Notice of Additional Facts also attached several news stories about immigration-enforcement actions at or near churches across the country, although most do not appear to involve plaintiffs' member churches.  For example, one news story details an immigration-enforcement action taken against members of a church in Charlotte, North Carolina, who were doing yard work on the church property.  (Decl. of J. Sterling Moore, Ex. 2, Dkt. No. 65-3).  It also includes several news articles suggesting that immigration-enforcement agencies "intend[ed] to implement a comprehensive plan to target Spanish-speaking churches across the country during the upcoming holiday season between Thanksgiving . . . and Christmas"; it is unclear whether this in fact occurred.  (*Id.*, Ex. 5 at 1, Dkt. No. 65-6).  These news stories serve to reinforce that the injuries-in-fact are not merely speculative, but that there is a "substantial risk that the harm will occur." *Roe*, 78 F.4th at 21.

### ii.    Decreased Attendance at Social Ministries

The same line of reasoning holds for plaintiffs' alleged injuries based on decreased attendance at their religious ministries, such as schools, and social ministries, such as food banks and day-care facilities. Several plaintiffs represent that these ministries are as much a part of their religious exercise as their formal worship services. Bishop Johnson of the Sierra Pacific Synod asserted that "[t]he fact that these activities may take place outside of Sunday worship services makes them no less an expression of our religious faith," and that "[r]estricting the idea of 'religious exercise' to the moment of Eucharist is inconsistent with who we are as Lutherans." (Pls.' Mot., Ex. 10 ¶ 17). Nelson Rabell-González, pastor of a Lutheran church in the Sierra Pacific Synod, asserted that Lutherans "fulfill [their] mandate to love through [their] ministry to the vulnerable," including "feeding the hungry." (*Id.*, Ex. 13 ¶¶ 17-18). And Jeanne-Marie Duval Pierrelouis, Clerk of the Quaker Multnomah Monthly Meeting, asserted that their "community lunch program is also part of [their] ministry of radical hospitality and worship." (*Id.*, Ex. 22 ¶ 21).

Plaintiffs further contend that attendance at these ministries has in fact declined since the 2025 Policy was implemented. One Lutheran congregation in Connecticut reported that attendance at its Sunday meal program decreased from "an average of 70 families every Sunday" in 2024 to "an average of 30 families per Sunday" in July 2025. (*Id.*, Ex. 17 ¶ 18). Another Lutheran ministry reported a "consistent drop by one third in the number of customers and vendors coming . . . to a weekly flea market they sponsor as [a] way to provide low-income vendors a way to support their families." (*Id.*, Ex. 10 ¶ 23). And a third congregation saw attendance at a diaper pantry decrease from "about 300 families to about 100." (*Id.*, Ex. 16 ¶ 15).

For the same reasons that decreased attendance at formal worship services causes plaintiffs to suffer a concrete injury-in-fact, so too does decreased attendance at social ministries.

### iii.    Financial Harm

It is well-established that financial harm is a concrete injury-in-fact. *See TransUnion*, 141 S. Ct. at 2204 (recognizing that "traditional tangible harms," including "monetary harms," "readily qualify as concrete injuries under Article III"); *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 110 F.4th 295, 308 (1st Cir. 2024) ("[A]n out-of-pocket loss is a quintessential injury in fact." (citation modified)).

Plaintiffs' assertions of financial harm here are largely unsubstantiated with specific evidence. Many are cast in vague language that makes it unclear whether, and to what degree, financial losses have occurred or will occur. (*See* Pls.' Mot., Ex. 13 ¶ 33 ("If people aren't showing up and we're not able to consistently raise what we need to meet our costs, we may have to fold."); Ex. 11 ¶ 13 ("Losing members would mean financial loss in addition to loss of spiritual and denominational unity."); Ex. 16 ¶ 12 ("[A] lack of attendance demoralizes the remaining congregation, who must move forward with . . . less income from weekly offerings."); Ex. 21 ¶ 10 ("Losing members hurts us, both spiritually and financially.")). Nevertheless, for purposes of standing, the allegations are not so speculative that they cannot suffice to show that financial injuries are either "certainly impending" or that there is a "substantial risk" of them occurring. *Healey*, 78 F.4th at 20 (quoting *Driehaus*, 573 U.S. at 158).

### iv.    Other Intangible Harms

The complaint also alleges that plaintiffs have suffered a variety of intangible harms. It alleges that the 2025 Policy has caused fear and anxiety among their members. (Compl. ¶¶ 114, 120, 152). It alleges that the 2025 Policy has caused them to spend time and energy educating their members about how to respond to a potential ICE raid. (*Id.* ¶¶ 109, 121, 127). And it

alleges that the 2025 Policy has caused them to change their behavior, including closing and locking doors which would typically remain open and refraining from speaking out on immigration issues for fear of government reprisal. (*Id.* ¶¶ 124, 132, 137, 139, 156, 160). It does not appear, however, that those types of intangible harms are cognizable Article III injuries.

As discussed, to be concrete, an intangible harm must have "a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts." *TransUnion*, 141 S. Ct. at 2204 (quoting *Spokeo*, 578 U.S. at 340-41). The mere knowledge of the existence of an allegedly illegal government program does not constitute a cognizable injury-in-fact. *See Laird v. Tatum*, 408 U.S. 1, 11 (1972). Furthermore, plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013). None of the alleged intangible harms appear to meet those standards.

First, plaintiffs' alleged fear and anxiety resulting from the 2025 Policy appears to be the very kind of harm addressed in *Laird*. In that case, the Supreme Court noted that it had never recognized an injury-in-fact "aris[ing] merely from [an] individual's knowledge that a governmental agency was engaged in certain activities" that were allegedly illegal. *Laird*, 408 U.S. at 11. Here, where plaintiffs' alleged injuries are merely the psychological consequences resulting from the knowledge of the 2025 Policy, they have not suffered a concrete injury-in-fact.

The complaint also alleges injury based on congregations spending time and resources to prepare for a potential ICE raid at their place of worship. (Compl. ¶¶ 109, 121-22, 127). But plaintiffs provide no evidence that an enforcement action at any one of their places of worship is "certainly impending," or even that there is a "substantial risk" that one will occur. *Healey*, 78 F.4th at 20 (quoting *Driehaus*, 573 U.S. at 158); *see Mennonite Church USA*, 778 F. Supp. 3d at

9. Therefore, just as the "costly and burdensome measures" taken by attorneys and human rights workers "to protect the confidentiality of their communications" in *Clapper* were insufficient to show injury in the absence of an immediate risk of harm, so too are the costs incurred by plaintiffs here insufficient to support standing. *See Clapper*, 568 U.S. at 415-18.

Finally, the allegations concerning changes to plaintiffs' behavior following implementation of the 2025 Policy do not constitute a concrete injury-in-fact. Those allegations appear to amount to a claim that plaintiffs have experienced a "subjective chill" because of the new policies—for example, they have caused plaintiffs to remain silent on certain immigration issues. However, those claimed injuries are foreclosed by *Laird*, which held that such claims of a "subjective chill" do not constitute an injury-in-fact in the absence of a "threat of specific future harm." *See Laird*, 408 U.S. at 13-14.

In summary, for purposes of standing, plaintiffs have suffered at least three cognizable injuries-in-fact: decreased attendance at worship services; decreased attendance at social ministries; and financial consequences.

### b.     Traceability

The "fairly traceable" component of constitutional standing examines the causal connection between the assertedly unlawful conduct and the alleged injury. *See California v. Texas*, 141 S. Ct. 2104, 2113-14 (2021) (finding no traceability where plaintiffs failed to show how defendant's "action or conduct has caused or will cause the injury" for which they sought redress). A critical question is whether the "causal relation between [the] injury and challenged action depends upon the decision of an independent third party." *Id.* at 2117; *see also Clapper*, 568 U.S. at 413 (stating that the Supreme Court has been "reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment"). "The Supreme Court has cautioned against courts finding that a plaintiff's injury is fairly

traceable to a defendant's conduct where the plaintiff alleges a causal chain dependent on actions of third parties." *Dantzler, Inc. v. Empresas Berrios Inventory & Operations, Inc.*, 958 F.3d 38, 48 (1st Cir. 2020). "[S]tanding is not precluded" in such circumstances but is "substantially more difficult to establish." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562 (1992) (citation modified).

In addition, a plaintiff must "show a sufficiently direct causal connection between the *challenged action* and the identified harm." *Dantzler*, 958 F.3d at 47 (quoting *Katz v. Pershing, LLC*, 672 F.3d 64, 71 (1st Cir. 2012)) (emphasis added). A theory of traceability cannot rest on "mere speculation about the decision of third parties." *Department of Comm. v. New York*, 139 S. Ct. 2551, 2566 (2019); *see Murthy*, 144 S. Ct. at 1994. It may, however, be based on "the predictable effect of Government action on the decisions of third parties." *Murthy*, 144 S. Ct. at 1994 (quoting *Department of Comm.*, 139 S. Ct. at 2566). The plaintiff must show that the third parties "will likely react in predictable ways" that will lead to an injury to the plaintiff. *Id.* at 1986.

The traceability analysis is complicated where, as here, multiple causes may contribute to a plaintiff's injury. "A plaintiff can satisfy traceability by showing 'that the defendant's conduct is one among multiple causes' of the alleged injury." *Conservation L. Found., Inc. v. Academy Express, LLC*, 129 F.4th 78, 90 (1st Cir. 2025) (quoting 13A WRIGHT & MILLER'S FEDERAL PRACTICE & PROCEDURE § 3531.5 (3d ed. 2008)). And "[p]roximate causation is not a requirement of Article III standing, which requires only that the plaintiff's injury be fairly traceable to the defendant's conduct." *Webb v. Injured Workers Pharmacy, LLC*, 72 F.4th 365, 377 (1st Cir. 2023) (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 n.6 (2014)). In a "case with multiple alleged contributors to a cumulative harm, a court

may find it helpful to engage in a counterfactual inquiry, asking whether the defendant's alleged conduct would 'have been a factual cause [of a concrete and particularized portion of the injury] if the other competing cause[s] had not been operating.'" *Conservation L. Found.*, 129 F.4th at 90 (quoting RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL & EMOTIONAL HARM § 27 cmt. a (A.L.I. 2010)) (alterations in original).

*Conservation Law Foundation* involved a claim that excessively idling buses created air pollution in violation of the Clean Air Act. 129 F.4th at 83. The defendants challenged the plaintiff's standing on multiple grounds, including traceability, arguing that the connection between the claimed injuries (such as breathing polluted air) and the unlawful conduct (idling buses) was too attenuated to support traceability, particularly in an urban environment with many vehicles. *See id.* at 90-91. The First Circuit rejected that argument:

> The existence of other potentially culpable vehicles does not eliminate traceability. CLF need only show that [defendants'] unlawful conduct, standing alone, causes a concrete and particularized portion of CLF members' asserted injuries.

*Id.* at 91 (citation modified). The court went on to state that CLF need not show a "conclusive link" to prove that causal connection. *Id.*

Thus, to establish traceability, plaintiffs here must show that third parties (their church members) will likely react in predictable ways to the challenged conduct (the adoption of the 2025 Policy) that will lead to an injury (declining church attendance). And because there are multiple potential causes, the causal connection between the challenged conduct and the injury can be satisfied by engaging in a counterfactual inquiry: that is, the court should ask whether the challenged conduct (again, the adoption of the 2025 Policy) would have caused a portion of the injury (again, declining church attendance) if other competing causes (increased immigration enforcement generally) had not been operating.

Before turning to the specific allegations of each plaintiff, the court will address those issues at a generalized level.  First, it seems obvious that the adoption of a policy that largely removes restrictions on immigration raids at churches, coupled with a public statement that "[c]riminals will no longer be able to hide in America's . . . churches to avoid arrest," would likely cause a marked decrease in church attendance, particularly in communities with large immigrant populations.  (Compl., Ex. 7).  That is true even as to persons who are not here illegally; even a citizen or permanent resident would be deterred from attending so as not to be swept up in a raid, a mass arrest, or a mass interrogation.

Second, the necessary causal connection between the challenged conduct and the asserted injuries can be established by a counterfactual inquiry.  If the 2025 Policy had been adopted, but immigration enforcement levels otherwise remained unchanged, would the policy have caused church attendance to decline by at least a measurable degree?  Again, at a generalized level, that would surely be true; it seems clear that the policy would deter at least some individuals from attending church and therefore would have caused the asserted injuries.

The question of standing cannot, however, be determined at a general level, but must be considered separately as to each plaintiff.  The Court will therefore turn to the evidence of traceability as to each.

### i.    New England Synod

Plaintiff New England Synod submitted declarations from its Bishop, Nathan Pipho, and from "Paul Doe," the pastor of a Lutheran congregation in Connecticut that is part of the New England Synod.  (Pls.' Mot, Exs. 17, 19).

Pipho asserts "[c]ongregants across our Synod know that the administration has changed the rules that used to limit immigration enforcement at churches."  (*Id.*, Ex. 17 ¶ 12).  He notes that "[c]ongregations are educating themselves and spending time, energy, and money . . . on

designating 'public' and 'private' spaces and how to interact with ICE officers if they show up during worship." (*Id.*). Pipho also said that "[f]ollowing the administration's change in policy, our Synod has seen a decrease in attendance at some churches, including in East Boston, Massachusetts." (*Id.* ¶ 14).

Pipho also states that the Synod has experienced decreases in attendance at church ministries, such as food pantries, and at "events and meetings of the Synod itself." (*Id.* ¶¶ 17-20). The Synod "had at least two people who didn't come to Worcester for [its] Annual New England Synod Assembly . . . because they feared I.C.E. would come during the assembly. They confirmed that they did not come specifically due to fears of I.C.E." (*Id.* ¶ 20). Pipho says the Synod had "budgeted for and hired Spanish interpreters for those members," but the members did not attend. (*Id.* ¶ 21). He further asserts that "[t]here is worship during the assembly." (*Id.*).

Pipho's declaration also states:

> The decrease in attendance at church creates financial costs as well. There is then a greater need for the Synod to support the clergy, and there are not endless funds. From a policy perspective, if people aren't coming to church and supporting financially, there's greater pressure on the Synod to provide for the communities. We may be forced to decrease financial support for immigrant communities in the future.

(*Id.* ¶ 22).

Doe's declaration asserts that "[t]he impact on [his] congregation of the changes to the sensitive locations policy has been drastic," and notes specific decreases in attendance at a weekly food pantry. (Ex. 19, ¶ 11, 15). He also asserts that "[i]n discussing these attendance decreases and requests for home delivery [of food] with partner organizations, escalating immigration enforcement has been consistently cited as a major cause." (*Id.* ¶ 18).

That evidence, taken as a whole, is sufficient to show that the New England Synod has suffered an injury-in fact traceable to the 2025 Policy.

### ii.      Greater Milwaukee Synod

Plaintiff Greater Milwaukee Synod submitted declarations from Edwin Aparicio, co-pastor of Ascension Lutheran Church, a member church of the Synod, and from Paul Erickson, the Synod's bishop.  (Pls.' Mot., Exs. 12, 15).

Aparicio asserts that "[m]any of [his] congregants confide in [him] and have expressed concern about the potential for ICE raids at the church or in the surrounding area," that they have made "several changes to the way [they] participate in [their] ministry" and canceled events as a result of the changes to the sensitive locations policy, and that "[a] pastor from another congregation in Milwaukee . . . reported that many immigrant families are not attending church due to fear of ICE raids at the church," causing a 50 percent decline in attendance.  (*Id.*, Ex. 12 ¶¶ 9-17).

Erickson's declaration states that because of the adoption of the policy, pastors "have reported a decrease in attendance at church service and church-sponsored events." (*Id.*, Ex. 15 ¶ 24). He also states:

> The impacts of the policy change have been widespread. It is not only communal worship and prayer that has suffered. Synod churches who offer food pantries and other social services as part of their mandate to feed the hungry and care for their neighbors have also reported a noticeable decline in participation due to fear of potential ICE raids at houses of worship.

(*Id.* Ex. 15, ¶ 28).

That evidence, taken as a whole, is sufficient to show that the Greater Milwaukee Synod has suffered an injury-in fact traceable to the 2025 Policy.

### iii.      Southwest California Synod

The Southwest California Synod submitted a declaration from Brenda Bos, its bishop. (*Id.*, Ex. 16 ¶ 2).  Her declaration asserts in relevant part as follows:

> The recission of the sensitive locations protections for our congregations has had a deleterious effect on many of our congregations and social service ministries.
>
> Our worshipping communities have experienced a drastic decrease in Sunday worship attendance due to fear of immigration enforcement. This lack of attendance demoralizes the remaining congregation, who must move forward with diminished relationships, fewer volunteers, and less income from weekly offerings. . . .

(*Id.* ¶¶ 11-12).  It goes on to say that "[d]ue to fear of immigration enforcement, many of our churches have seen fewer participants, both from volunteers and from communities served, at . . . social ministries" such as food banks.  (*Id.* ¶¶ 12-13).

The declaration continues:

> One of our congregations has about sixty active members, 25% of whom are from the Middle East, including Iran, Lebanon, and Palestine.  Since the first part of 2025, the Persian community has been very hesitant to enter the worshipping space.  . . .  These Middle Eastern parishioners would face certain persecution in their homeland, or even within their migrant communities in the United States, as they were born Muslim and have converted to Christianity.  A safe and confidential worshipping community is essential to their religious freedom and personal protection.  Because they now know that government agents conducting immigration enforcement could enter the sanctuary at any time, anonymity can no longer be guaranteed.  And because protections have been lifted for all places of worship, they cannot simply go to another church in a safer part of the city.

(*Id.* ¶ 14).

Bos asserts that a church-run diaper pantry for impoverished parents was formerly "run in the parking lot," "but the change in policy has forced the church to change its distribution protocols," and "the program has seen attendance decline precipitously."  (*Id.* ¶ 15).  And she asserts that "[a]n urban congregation had to cancel Vacation Bible Schools because of the threat of ICE raids after their neighborhood experienced several ICE sweeps," and that "[b]oth immigrant and U.S. citizen parents were not able to provide their children with religious education and formation because of the rescission of the sensitive locations policy."  (*Id.* ¶ 17).  And she asserts that a "migrant-serving congregation with approximately seventy Spanish-

language parishioners reports that church attendance is down 80% and the youth group attendance is down 40%, even though the vast majority of young people enjoy birthright citizenship." (*Id.* ¶ 19).

In a "notice of supplemental facts" filed after briefing was completed, plaintiffs provided a declaration from Caleb Crainer, Presiding Minister at St. Andrew's Lutheran Church in Los Angeles, California, which is a member church of the Southwest California Synod. (Decl. of Rev. Caleb Crainer ¶ 1, Dkt. No. 65-2). Crainer reported that on October 17, 2025, federal agents used the parking lot of St. Andrew's as a staging area for an immigration-enforcement action. (*Id.* ¶¶ 6-13). At "around 6 a.m." that day, "a white van pulled into [the] church parking lot," which is "clearly attached to the church" and is "right next to the sanctuary building." (*Id.* ¶ 6). "[A]dditional unmarked white vans enter[ed] the parking lot around 9 a.m., as well as unmarked SUVs." (*Id.* ¶ 8). Agents "wearing vests marked 'POLICE' and masks covering their faces" then exited the vehicles, with about 20 total agents present. (*Id.* ¶ 9). Crainer knew that an immigration-enforcement action occurred that morning at a nearby car wash, and the videos from St. Andrew's showed "individuals with their hands zip-tied . . . being escorted by the masked federal agents." (*Id.* ¶¶ 10-11). "The church did not give the agents permission to use [its] parking lot" for this action, and "[t]he congregation at St. Andrew's was horrified by this unsanctioned use of [their] space." (*Id.* ¶¶ 13-14). Additionally, Crainer worried about the community perception of St. Andrew's following the incident; in a video taken by a bystander, he heard someone say, "I can't believe the church would let this happen." (*Id.* ¶ 14).

While it is true that some of the statements in the Bos declaration are somewhat conclusory, the evidence in the record, taken as a whole, is sufficient to show that the Southwest California Synod has suffered an injury-in fact traceable to the 2025 Policy.

#### iv.    Southwestern Texas Synod

The Southwestern Texas Synod submitted a declaration from Susan Briner, its bishop. (Pls.' Mot., Ex. 18 ¶ 1).  Her declaration asserts that she is "aware that the government's decision to rescind its longstanding policy on immigration enforcement at churches has had a damaging effect on many congregations and Synod-authorized ministries within the Synod," and that "[p]astors have reported diminished attendance at worship services, ministries, and church-sponsored events.  (*Id.* ¶ 13).  She further asserts that at a "Know Your Rights" presentation hosted by a member congregation, "a woman raised her hand and shared that she had not been to church in weeks.  She was too afraid that doing so might mean that she would never come back home."  (*Id.* ¶ 14).  The declaration also describes the adverse impact on vacation Bible schools and food pantries, although the harms are tied to immigration enforcement generally rather than the specific effect of the change in policy.  (*Id.* ¶¶ 16-17).  Thus, she asserts that three predominantly Hispanic congregations saw major declines in attendance at Vacation Bible Schools, and that "[a]ll three of these congregations have reported that . . . the diminished attendance is because families are now afraid.  They are unwilling to step foot in a church, worried that ICE might show up."  (*Id.* ¶ 16).  Finally, she states that the synod has stopped advertising its ministry along the U.S.-Mexico border "[s]ince the implementation of DHS's new policy," for fear that raising its visibility will make it a target of immigration enforcement efforts.  (*Id.* ¶ 18).

Although some of the assertions are fairly conclusory, the evidence taken as a whole is sufficient to show that the Southwest Texas Synod has suffered an injury-in fact traceable to the 2025 Policy.

v.    **Sierra Pacific Synod**

Plaintiff Sierra Pacific Synod submitted three declarations:  one from Jeff Johnson, its bishop; one from Nelson Rabell-González, pastor of Iglesia Luterana Santa Maria Peregrina, one of the Synod's member congregations; and one from Bill Knezovich, pastor of Our Savior's Lutheran church, another of the Synod's member congregations.  (Pls.' Mot., Exs. 10, 13-14). Johnson asserts that he is "aware that the government's decision to rescind a longstanding policy on ICE enforcement at sensitive locations like churches, hospitals, and schools has had a damaging effect upon many congregations and Synod-authorized ministries in [his] territory," and that "[c]ongregants are aware of these changes to enforcement at sensitive locations . . . and as a result they are staying away from these places, including churches."  (*Id.*, Ex. 10 ¶¶ 19, 22). Johnson also asserted that "[p]astors report a decline in the numbers of people attending church. Pastors have spoken with some of their people who are not attending because of visible and increased ICE activity in the area of the church. Many members have expressed their fear of coming to worship given the possibility of being detailed by ICE while at church."  (*Id.* ¶ 26).

Knezovich's declaration further states that "[a]s a result of fear of immigration enforcement at our church since the policy change, we have roughly 40 families that are undocumented who are now afraid to come to our food distributions, even though they are in need."  (*Id.*, Ex. 14 ¶ 9).  And he states that "[f]ears of ICE activity at the church have also decreased attendance at our bilingual worship services since the policy change went into effect." (*Id.* ¶¶ 9-10).

Rabell-González's declaration asserts that the "new policy has had a huge and immediate impact on our weekly attendance, with a big first drop coming right after the sensitive locations policy was changed.  Attendance has remained lower and unsteady since then," and that "[m]embers of [his] church are very aware of the government's change in policy towards

29
ADD.29

churches." (*Id.*, Ex. 13 ¶¶ 23-25).  Rabell-González further asserts that he gets calls "several times a month" from "congregants asking if it is safe to go to church yet."  (*Id.* ¶ 24).  Although not explicitly stated, these calls, together with Rabell-González's assertion that his congregants are aware of the 2025 Policy, make it likely that the reason that the callers are not attending services is because they perceive it to be unsafe as a result of the 2025 Policy.

Based on that evidence, Sierra Pacific Synod has shown a concrete injury-in-fact fairly traceable to the 2025 Policy.

### vi.    San Francisco Friends Meeting

Plaintiff San Francisco Friends Meeting submitted a declaration from Gail Cornwall-Feeley, a member of its Ministry and Care Committee.  (Pls.' Mot., Ex. 20 ¶ 2).  Her declaration asserts that "DHS's new policy is causing serious harm to the religious exercise of San Francisco Friends Meeting."  (*Id.* ¶ 30).  She goes on to state:

> Already, the threat of armed immigration officers or immigration-enforcement actions at our meeting as a result of the policy has begun to have an impact on our meeting and is interfering with the religious exercise of San Francisco Friends Meeting and its members and attendees.
>
> After the policy took effect, members and attendees began fearfully discussing what would happen if ICE arrived at the front door or entered our meeting house undercover as attendees. The discussions have included whether to lock the doors or ask those who arrive their purpose in doing so.

(*Id.* ¶¶ 33, 34).

Other than the conclusory statement that the threat resulting from the policy "has begun to have an impact" and "is interfering with the religious exercise" of the meeting, she does not indicate that the new policy has led to decreased attendance at worship services or social ministries, or that it has caused any concrete financial harms.  The intangible harms she cites, standing alone, are not sufficient to constitute concrete injuries-in-fact that are fairly traceable to the 2025 Policy.  The San Francisco Friends Meeting has therefore failed to establish standing.

### vii.    <u>Pacific Yearly Meeting</u>

Plaintiff Pacific Yearly Meeting submitted a declaration from Robin DuRant, its

Presiding Clerk, which is a position "roughly equivalent to that of a Bishop of a religious

organization." (*Id.* Ex. 11, ¶ 26).  Her declaration asserts in relevant part:

> I believe that the threat of immigration-enforcement actions at a Quaker meeting house or at any place where a meeting for worship is occurring is already causing serious harm to the religious exercise of Pacific Yearly Meeting and its members in its constituent monthly meetings.
>
> Immigration-enforcement activities have been carried out in proximity to some of Pacific Yearly Meeting's monthly meetings, including just a short block away from one monthly meeting's campus in July 2025.
>
> People are afraid to come to weekly worship.  In addition, at least one family felt unsafe attending our annual session this year, which took place in July 2025, and declined to attend. . . .
>
> People are afraid to attend events sponsored by our monthly meetings about things like social action, learning to be bystanders, or any other event in support of immigrants, documented or undocumented, because they are fearful of immigration-enforcement action occurring at one of these events. These activities are part of our religious practice and exercise. . . .
>
> I believe that threatened or actual immigration-enforcement action near or inside a Quaker meeting house or at any place where a meeting for worship is occurring may lead some to refrain from attending worship services.
>
> Knowing that immigration enforcement can happen at a monthly meeting, annual gathering, or other worship event, I cannot be as encouraging of immigrants joining us for worship knowing that their attendance could subject them to armed federal officers. . . .
>
> The threat of immigration enforcement near or inside a Quaker meeting house or any place where a meeting for worship is occurring causes significant harm, including immediate and lasting disruption to our ability to worship.

(*Id.* Ex. 11, ¶¶ 33-35, 37, 39-40, 42).

DuRant's declaration does not directly state that the Pacific Yearly Meeting has suffered

decreased attendance or financial harms as a result of the implementation of the 2025 Policy.

Arguably, it does so indirectly, because it states that heightened concerns about enforcement

actions in or near a Quaker meeting house have caused at least some degree of decreased attendance. But the 2021 Policy also permitted such enforcement actions, albeit with greater controls and restrictions, and of course immigration enforcement has increased considerably irrespective of the 2025 Policy. The declaration therefore does not suffice to make a "clear showing" that Pacific Yearly Meeting has suffered any cognizable injuries that are attributable to the 2025 Policy itself. *See Murthy*, 144 S. Ct. at 1986. As a result, it has failed to establish standing.

### viii.    North Pacific Yearly Meeting

Plaintiff North Pacific Yearly Meeting submitted two declarations: one from Paul Christiansen, its Clerk, and another from Jeanne-Marie Duval Pierrelouis, who serves as the Clerk of the Multnomah Monthly Meeting, which is affiliated with the North Pacific Yearly Meeting. (*Id.*, Ex. 21, 22). Christiansen's declaration states in relevant part:

> We have never before had reason to worry about immigration enforcement at our Annual Session. This year, because of the administration's change in policy, we did.
>
> DHS's decision to revoke its sensitive-locations policy has put us and our Monthly Meetings under threat of immigration enforcement. That kind of enforcement action at or near one of our members' places of worship or during a meeting would hurt them and us, and even the threat of it has been harmful.
>
> For example, now that showing up could mean they come face-to-face with armed law enforcement officers, I am more reluctant to encourage immigrants to attend worship. Quakers are required to accept all who would join and their presence would add to our worship, so my new hesitation is in direct conflict with my faith. But telling someone that they should attend despite the risk of harm would be antithetical to my religious duties.
>
> I know of immigrant attenders who are worried about DHS's new policy, and some may simply not show up in person for worship services if there is a chance that immigration-enforcement actions could happen there.
>
> I also know of non-immigrant attenders who worry about indiscriminate immigration enforcement. DHS's policy could discourage them from attending worship services in person as well.

*(Id.* Ex. 21, ¶¶ 19-23).

Pierrelouis's declaration is essentially to the same effect.  She asserts, among other things, the following:

> The idea of the presence of armed immigration officers has tangibly impacted our meeting.  Multnomah Monthly Meeting is deeply concerned about the possibility of immigration enforcement at our Meetinghouse. . . .
>
> Some Multnomah Monthly Meeting members and attenders regularly protest outside of the local ICE office.  Some members and attenders also join groups that escort folks to their immigration appointments.  As a faith community, Friends worry that ICE might choose to retaliate against us by targeting our congregation.
>
> . . . Our dedication to non-violence includes asking people to respect our beliefs by not bringing weapons into the Meetinghouse.  The change in the sensitive locations policy and the recent escalation of immigration enforcement in and around houses of worship have forced us to spend increasingly more time and discernment on addressing this fear.  To date, we have put up signage at the entrance of our Meetinghouse and included a "no weapons" policy in our rental agreement.  The presence of armed immigration officers at the Meetinghouse is completely antithetical to our faith.
>
> Our concerns about the change in sensitive locations policy go further.  Multnomah Monthly Meeting has immigrants who attend worship as part of our community.  These Friends, including those who are naturalized citizens, are experiencing heightened fear and anxiety about attending Meetings for Worship since the change in policy at the start of the administration and even more so after recent escalations in immigration enforcement at and around houses of worship.  Concerns about immigration raids have prompted us to spend time developing plans to protect our most vulnerable community members, including designating private zones throughout the Meetinghouse, closed to the public.
>
> Our community lunch program is also part of our ministry of radical hospitality and worship.  Every lunch begins with a prayer.  Since the change in the sensitive locations policy in January and even more so since the increased immigration enforcement actions at houses of worship on the West Coast, we have seen increased anxiety among our unhoused neighbors attending the lunch program. . . .
>
> Any decrease in Friends attending or being fully present and grounded during worship has a cascading effect, diminishing corporate worship for the entire Meeting.

*(Id.* Ex. 22, ¶¶ 17-22).

Both declarants thus report fears, anxieties, and concerns about the prospect of future immigration raids, which are undoubtedly well-founded.  But neither declaration describes any actionable injury-in-fact, such as decreased attendance or financial harms.   Again, the asserted harms are not sufficient to constitute concrete injuries-in-fact that are fairly traceable to the 2025 Policy.  The North Pacific Yearly Meeting has therefore failed to establish standing.

### ix.    **American Baptist Churches USA**

Plaintiff American Baptist Churches USA submitted a declaration from Gina C. Jacobs-Strain, its General Secretary.  (Pls.' Mot., Ex. 26 ¶ 1).  Under the heading "The Impact of DHS's New Policy on ABCUSA," she asserts that "[m]ember churches in the western United States have reported noticeably diminished attendance at worship services, Bible studies, and community programs, out of concern for potential encounters with immigration enforcement." (*Id.* ¶ 13).  She also states:

> Some churches have observed a chilling effect on participation in ministries that once served as vital touchpoints for community support, such as food pantries, ESL classes, or counseling services. Pastors have shared anecdotal reports of visible Immigration and Customs Enforcement ("ICE") presence or activity near places of worship or faith-based events, which has further discouraged engagement and fostered mistrust and fear.

(*Id.* ¶ 14).  She asserts that "[m]any Latino American Baptists chose not to come to" a national summit "out of fear that they would be detained or engaged by ICE."  (*Id.* ¶ 18).  And she asserts that "[t]he rollback of protections at sensitive locations undermines our churches' abilities to be safe and welcoming places of refuge and support."  (*Id.* ¶ 19). [7]

---

[7] Jacobs-Strain also asserts that "a member church in upstate New York experienced an incursion by ICE onto their property" when federal agents "came through the privacy gate into the parsonage of the church property." (*Id.* ¶ 17).  A declaration submitted by Joshua Kincaid, one of the officers who conducted the enforcement action, asserts that the home "appeared . . . to be a private residence within a residential neighborhood," and nothing in Jacobs-Strain's declaration appears to rebut that claim.  (Defs.' Opp'n, Ex. 2 ¶ 3).  Because the home did not appear to be a house of worship or a temporary facility where worship was taking place, enforcement actions would not have been restricted there under the 2021 Policy.  For that reason, any harm which flowed from this attempted enforcement action cannot be traced to the 2025 Policy.

The evidence that the adoption of the 2025 Policy, as opposed to immigration enforcement generally, is the cause of the diminution in attendance and participation at the member churches is very thin, and indeed requires reliance in part on the heading in the declaration, rather than an affirmative statement in the document itself. Nonetheless, and while it is a close call at best, American Baptists USA has shown an injury-in-fact that is fairly traceable to the 2025 Policy.

### x.        Alliance of Baptists

Plaintiff Alliance of Baptists submitted a declaration from Carole Collins, its Co-Director. (*Id.* Ex. 23, ¶ 1). In her declaration, she asserts that the member churches of her organization consider themselves bound to provide refuge and sanctuary to illegal immigrants, and that the recission of the 2021 Policy has forced the churches "to change the way that they act on our denomination's religious mandate." (*Id.* ¶ 20). She also states that "one Virginia-based congregation that operates a day-care and preschool on church grounds has reported a decrease in attendance because parents and caregivers are afraid that their children will be confronted by immigration authorities on the property, and that parents might be detained at drop-off or pick-up times." (*Id.* ¶ 22). She further asserts that "[t]his same congregation has reported a decrease in attendance at outdoor food pantries because participants are afraid of ICE's presence in the immediate vicinity of the church." (*Id.*, Ex. 23 ¶ 22). Her declaration does not, however, tie those decreases to the recission of the 2021 policy specifically, as opposed to increased immigration enforcement generally.

Plaintiffs' second notice of supplemental facts also included a declaration from Doug Donley, pastor at University Baptist Church in Minneapolis. (Decl. of Rev. Doug Donley, Dkt. No. 72-2). He reported that on January 11, 2026, he learned just prior to Sunday worship that "ICE was parked outside a church less than half a mile away from" University Baptist. (*Id.*

¶ 10).  As a result, he "made an announcement at the start of service from the pulpit to let everyone know what was going on and to remind them of our protocols." (*Id.*).  He also reported that "[a]s soon as President Trump ended the sensitive locations policy, we saw a decline in attendance by Latinx attendees at our church," who comprise approximately 10% of the congregation.  (*Id.* ¶ 6).  Based on that declaration, the Alliance of Baptists has provided evidence of a decline in church attendance related to the adoption of the 2025 Policy, and therefore has demonstrated an injury-in-fact traceable to the 2025 Policy.

### xi.      Metropolitan Community Churches

Finally, plaintiff Metropolitan Community Churches submitted two declarations: one from Cecilia Eggleston, MCC's "Moderator" who serves as its "chief visionary, spiritual leader, official spokesperson, and CEO"; and one from "John Doe," the senior pastor at an MCC church in California.  (Pls.' Mot., Exs. 24, 25).  Eggleston's declaration asserts that "[o]ne MCC member church in California, which has a substantial number of immigrant attendees and offers worship services in Spanish, has reported declines in attendance by immigrant members." (*Id.*, Ex. 24 ¶ 16).

Doe's declaration asserts that "[s]ome immigrants in [his] congregation, regardless of status, have stopped attending in-person worship services.  They have confided in [him] that they are afraid to come to worship services because they worry the church will be targeted by immigration enforcement.  Before the recission of the sensitive locations policy, [he] had never heard from a congregant that they feared immigration enforcement at our church." (*Id.*, Ex. 25 ¶ 8).  The declaration connects the church's decreasing attendance to the 2025 Policy in particular by noting that parishioners are not attending services because of fears of enforcement at the church itself resulting from the policy.  This is sufficient to show that the 2025 Policy is "one among multiple causes of the alleged injury." *Conservation L. Found.*, 129 F.4th at 90.

Plaintiffs' second notice of supplemental facts, filed on January 13, 2026, also includes a declaration from Kenny Callaghan, senior pastor at All God's Children Metropolitan Community Church. (Decl. of Rev. Kenny Callaghan, Dkt. No. 72-1). He reported that on January 7, 2026, he "noticed that there was something going on just a block and a half from the church," which he eventually realized "was an ICE raid." (*Id.* ¶ 13). After approaching, he heard people chanting "[w]e are not afraid, we are not afraid," and "saw ICE agents circling a young woman who appeared to be Hispanic," and he moved towards her, saying to an ICE agent, "Take me. Stop harassing her. Take me." (*Id.* ¶ 14). According to Callaghan, the ICE agent pointed a gun at him, handcuffed him, and put him in the back of an SUV, although he was released after a short period. (*Id.* ¶¶ 15-18).

In a separate incident on that same day, Callaghan reported that "ICE seized people in the street right in front of the church and put at least one of them in a waiting car." (*Id.* ¶ 20). Based on reviewing a "video clip from somebody's cell phone," he saw "two people being seized from a car pulled over to the side of the street directly in front of the church"; the scene included "at least a half-dozen SUVs" and "a crowd of federal agents." (*Id.* ¶ 21). Callaghan also reported an incident in which he "saw ICE seizing someone who appeared to be a Somali man about four blocks from [his] church." (*Id.* ¶ 22).

He stated that those incidents had a meaningful impact on his congregation, including attendance at a food ministry decreasing from about 125 people per week to 55-80 people. (*Id.* ¶¶ 24-26). Attendance at worship services has also decreased, with at least one member telling Callaghan that she feared attending specifically "because of the incidents happening right around [the] church." (*Id.* ¶ 32). To some degree, at least, the incidents tend to reinforce the conclusion

that Metropolitan Community Churches has suffered an injury-in-fact that is fairly traceable to the 2025 Policy.

In summary, plaintiffs New England Synod, Greater Milwaukee Synod, Southwest California Synod, Southwest Texas Synod, Sierra Pacific Synod, American Baptists USA, Alliance of Baptists, and Metropolitan Community Churches have adequately alleged concrete injuries that are fairly traceable to the 2025 Policy. The other plaintiffs have not shown that they have standing to pursue injunctive relief at this stage of litigation.

### c.     <u>Redressability</u>

The final requirement of Article III standing, redressability, requires plaintiffs to show that their injuries are "likely to be redressed by a favorable judicial decision." *Conservation L. Found.*, 129 F.4th at 86. Traceability and redressability "are often 'flip sides of the same coin,'" because "[i]f a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury." *Alliance for Hippocratic Med.*, 144 S. Ct. at 1555 (quoting *Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 288 (2008)); *see Town of Milton v. Federal Aviation Admin.*, 87 F.4th 91, 95 (1st Cir. 2023) (discussing traceability and redressability together). Although it "need not be certain" that the requested relief will redress a plaintiff's injury, "it cannot be merely speculative." *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 110 F.4th at 319 (quoting *Dantlzer*, 958 F.3d at 47). That said, the threshold for showing redressability is low; in cases involving monetary damages, for example, "[e]ven 'one dollar' . . . would satisfy the redressability component of Article III standing." *Diamond Alternative Energy, LLC v. Envt'l Prot. Agency*, 145 S. Ct. 2121, 2135 (2025) (quoting *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 802 (2021)).

The plaintiffs who have shown traceability have also shown redressability for many of the same reasons. Because they have shown that their injuries of decreased attendance are likely

traceable to the 2025 Policy, granting the relief they seek would likely lead to at least some increase in attendance.  The relief sought need not fully redress a plaintiff's injury for that plaintiff to have standing to pursue it.  *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 110 F.4th at 319.  Furthermore, this case does not involve a situation in which traceability and redressability diverge because "the case [is not] of the kind 'traditionally redressable in federal court,'" *Alliance for Hippocratic Med.*, 144 S. Ct. at 1555 n.1 (quoting *United States v. Texas*, 143 S. Ct. 1964, 1970 (2023)), such as where a plaintiff seeks to challenge the government's non-enforcement decisions against someone else.  *See United States v. Texas*, 143 S. Ct. at 1970; *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973).

Because they have suffered concrete injuries-in-fact that are fairly traceable to the 2025 Policy and are likely to be redressed by a favorable ruling, plaintiffs New England Synod, Greater Milwaukee Synod, Southwest California Synod, Southwest Texas Synod, Sierra Pacific Synod, American Baptists USA, Alliance of Baptists, and Metropolitan Community Churches have shown that they likely have standing to seek a preliminary injunction.  *See Alliance for Hippocratic Med.*, 144 S. Ct. at 1555-56.

The Court will turn next to the first requirement for a preliminary injunction:  that plaintiffs have established a likelihood of success on the merits of their claim.

### 2.    **RFRA**

Count 1 asserts a claim under RFRA.  The statute provides that the "[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability" unless it "demonstrates that application of the burden to the person—(1) is

in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1.[8]

"A plaintiff alleging a RFRA claim has the initial burden of establishing a prima facie case by showing that the application of the challenged law substantially burdens a sincere religious exercise." *Perrier-Bilbo v. United States*, 954 F.3d 413, 431 (1st Cir. 2020). Here, the government does not contest the sincerity of plaintiffs' beliefs. (*See* Defs.' Opp'n 21, Dkt. No. 56). The key question, therefore, is whether the 2025 Policy "substantially burden[s]" plaintiffs' religious exercise.

### a.    "Substantial Burden" on Religious Exercise

RFRA does not define what constitutes a "substantial burden" on religious exercise. The First Circuit has stated that a "substantial burden on one's exercise of religion exists '[w]here the state conditions receipt of an important benefit upon conduct proscribed by a religious faith, or where it denies such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" *Perrier-Bilbo*, 954 F.3d at 431 (quoting *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 717-18 (1981)).

The burden on religion asserted by plaintiffs here does not fall directly within either of the two circumstances identified by the First Circuit in *Perrier-Bilbo*. The 2025 Policy does not condition the receipt of some benefit to the plaintiffs on their refraining from engaging in communal worship or worshipping with fewer congregants. Nor does it deny or condition any

---

[8] RFRA was enacted in the wake of the Supreme Court's decision in *Employment Division v. Smith*, 494 U.S. 872 (1990). It was intended to return free exercise law to its pre-*Smith* state, and offers "very broad protection for religious liberty." *See Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 693-95 (2014). However, RFRA was not meant to "merely restore[] [the Supreme Court's] pre-*Smith* decisions in ossified form and [to] not allow a plaintiff to raise a RFRA claim unless that plaintiff fell within a category of plaintiffs one of whom had brought a free-exercise claim that [the Supreme] Court entertained in the years before *Smith*." *Id.* at 715-16.

benefit to individual congregants in order to dissuade them from attending communal worship services.

Nonetheless, the *Perrier-Bilbo* court did not frame an exclusive test; it simply observed that "case law counsels that a substantial burden on one's exercise of religion exists" where either of the two conditions have been met. 954 F.3d at 431. It is true that the *Perrier-Bilbo* court cited a Ninth Circuit case holding that "[u]nder RFRA, a 'substantial burden' is imposed *only when* individuals are forced to choose between following the tenets of their religion and receiving a governmental benefit . . . or [are] coerced to act contrary to their religious beliefs by the threat of civil or criminal sanctions." *Id.* (quoting *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1069-70 (9th Cir. 2008) (emphasis added)). The First Circuit, however, did not expressly adopt or endorse that narrow standard.[9]

Furthermore, the clear direction of the case law is toward a broader standard. The Ninth Circuit subsequently overruled *Navajo Nation* and held that a substantial burden can exist under RFRA in other situations. *See Apache Stronghold v. United States*, 101 F.4th 1036, 1043 (9th Cir. 2024) (per curiam) (en banc). There, a fractured majority held that "[a] government act imposes a 'substantial burden' on religious exercise if it (1) 'requires the plaintiff to participate in an activity prohibited by a sincerely held religious belief,' (2) 'prevents the plaintiff from participating in an activity motivated by a sincerely held religious belief,' or (3) 'places

---

[9] The First Circuit has also suggested, in a case involving the Religious Land Use and Institutionalized Persons Act, ("RLUIPA"), 42 U.S.C. § 2000cc *et seq*, that a broader standard for "substantial burden" might apply. Courts have generally cited RFRA and RLUIPA cases somewhat interchangeably due to their substantial overlap. *See Apache Stronghold v. United States*, 101 F.4th 1036, 1043 (9th Cir. 2024) (per curiam) (en banc); *see also Holt v. Hobbs*, 574 U.S. 352, 361 (2015) (citing RFRA case in evaluating RLUIPA claim); *Tanzin v. Tanvir*, 141 S. Ct. 486, 491 (2020) (citing RLUIPA case in evaluating RFRA claim). Although the First Circuit "has not expressly defined 'substantial burden' under RLUIPA," it has assumed without deciding that the term "involves 'putting substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" *Denson v. Mici*, 581 F. Supp. 3d 330, 336 (D. Mass. 2022) (quoting *Thomas*, 450 U.S. at 718); *see Spratt v. R.I. Dept. of Corr.*, 482 F.3d 33, 38 (1st Cir. 2007) (assuming *arguendo* that *Thomas* applied to RLUIPA).

considerable pressure on the plaintiff to violate a sincerely held religious belief.'" *Id.* at 1091 (R. Nelson, J., concurring) (quoting *Yellowbear v. Lampert*, 741 F.3d 48, 55 (10th Cir. 2014)).

Other circuits have adopted different—and generally broader—standards as to what may constitute a "substantial burden" on the exercise of religion.  For example, the Eighth Circuit has held that "to demonstrate a substantial burden on the exercise of religion, a government policy or action [1] must significantly inhibit or constrain religious conduct or religious expression; [2] must meaningfully curtail a person's ability to express adherence to his or her faith; or [3] must deny a person reasonable opportunities to engage in those activities that are fundamental to a person's religion." *Van Wyhe v. Reisch*, 581 F.3d 639, 656 (8th Cir. 2009) (citation modified). The Sixth Circuit has stated more simply that "[t]he substantial-burden test [under RFRA] asks whether the Government is effectively forcing plaintiffs to choose between engaging in conduct that violates sincerely held religious beliefs and facing a serious consequence"—a consequence which, "absent formal legal coercion," must "place[] 'substantial pressure on an adherent to modify his behavior.'" *New Doe Child #1 v. Congress of U.S.*, 891 F.3d 578, 589-90 (6th Cir. 2018) (quoting *Haight v. Thompson*, 763 F.3d 554, 565 (6th Cir. 2014)).  And the Second Circuit has found that a plaintiff "easily satisfies his burden" of proving a substantial burden under RFRA where a prison policy "'puts him to the choice' between 'engaging in conduct that seriously violates his religious beliefs' or risking 'serious disciplinary action' for adhering to those beliefs." *Sabir v. Williams*, 52 F.4th 51, 60 (2d Cir. 2022) (quoting *Holt v. Hobbs*, 574 U.S. 352, 361 (2015)) (citation modified).[10]

---

[10] The Third Circuit has held that "a substantial burden on the exercise of religion exists only where the Government 'demands that [an individual] engage in conduct that seriously violates [his or her] religious beliefs.'" *Real Alternatives, Inc. v. Sec'y Dep't of Health & Hum. Servs.*, 867 F.3d 338, 359 (3d Cir. 2017) (quoting *Hobby Lobby*, 573 U.S. at 720) (alterations in original).

The court in *Philadelphia Yearly Meeting* concluded, in a substantially identical case involving a challenge to the 2025 Policy, that the policy imposed a "substantial burden" under RFRA. *See Philadelphia Yearly Meeting*, 767 F. Supp. 3d at 329-32. The court relied on the Second Circuit's decision in *Sabir* for the proposition that "[h]indrances to communal worship can establish a substantial burden for RFRA purposes." *Id.* at 330.

Under the circumstances, the Court concludes that the First Circuit has not imposed a narrow test for "substantial burden" that can only be satisfied in one of two specific ways. Furthermore, the Court need not decide the precise boundaries of the meaning of "substantial burden." For present purposes, it is sufficient to find that the 2025 Policy clearly imposes such a burden. It would permit immigration-enforcement officers to set up a checkpoint just outside a church, or to question parishioners in the middle of a Catholic Mass. Without question, those activities would substantially hinder, constrain, and inhibit individuals from attending church or religious schools or programs, regardless of citizenship status, thereby imposing a "substantial burden." *See Philadelphia Yearly Meeting*, 767 F. Supp. 3d at 330.

### b.  <u>Least Restrictive Means</u>

It is likewise clear that even though immigration enforcement is a compelling governmental interest, the 2025 Policy is not the least restrictive means of furthering that interest. It is not necessary to look further than the 2021 Policy itself to find such a less restrictive means. As noted, that policy was issued by the same government agency—DHS—and addressed the same topic—immigration enforcement in churches and other sensitive places. But it imposed additional restrictions (such as requiring supervisory approval before taking an enforcement action in a church, absent exigent circumstances) that minimized the burden on the free exercise of religion while furthering the governmental interest of immigration enforcement. And there is nothing in the record to suggest that limitations on immigration-enforcement

operations in churches—specifically, enforcement in circumstances not involving exigent circumstances, a judicial warrant, or an administrative warrant—would in any material respect impair the effective enforcement of the immigration laws.

### c. Effect of 8 U.S.C. § 1357(a)(1)

Whether plaintiffs have established a likelihood of success on the merits of the RFRA claim must also take into account the possible effect of 8 U.S.C. § 1357(a)(1).  That statute authorizes immigration officers to "interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States."  8 U.S.C. § 1357(a)(1).  By regulation, immigration officers "may briefly detain" an individual "for questioning" if they have "a reasonable suspicion, based on specific articulable facts, that the person being questioned . . . is an alien illegally in the United States."  8 CFR § 287.8(b)(2) (2025).

On its face, § 1357(a)(1) imposes no limitations on the times and places that a law-enforcement agent may lawfully detain and interrogate a "person believed to be an alien."  However, RFRA explicitly provides that it "applies to all Federal law, and the implementation of that law, whether statutory or otherwise, and whether adopted before or after" its enactment.  42 U.S.C. § 2000bb-3.  Therefore, § 1357 must yield to RFRA's unqualified command in circumstances such as these.[11]

---

[11] It is also well-settled that statutes must be construed to avoid constitutional conflicts.  *See, e.g., Jenings v. Rodriguez*, 138 S. Ct. 830, 842 (2018); *Bond v. United States*, 572 U.S. 844, 855 (2014).  The full extent to which the authority granted by § 1357(a)(1) is constrained by the Fourth Amendment, the Equal Protection Clause, or other constitutional protections is not before the Court.  Nonetheless, it seems clear that the Constitution does in fact limit that authority.  *See Noem v. Vasquez Perdomo*, 146 S. Ct. 1, 3 (2025) (Kavanaugh, J., concurring in the grant of the application for stay) (suggesting, without expressly stating, that the authority granted in § 1357(a)(1) is limited by the Equal Protection Clause:  "To be clear, apparent ethnicity alone cannot furnish reasonable suspicion" for detention and interrogation under § 1357(a)(1)).  And it seems equally clear that the scope of § 1357(a)(1) is likewise limited by the First Amendment—including freedom of religion, which encompasses freedom of worship.

### d.    Causation

A further issue concerning the likelihood of success of the RFRA claims concerns that of causation.  In *Burwell v. Hobby Lobby*, the Supreme Court addressed the issue of causation in RFRA cases in the context of the contraceptive-coverage mandate of the Affordable Care Act. *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 723 (2014).  In that case, the government argued that the contraceptive mandate did not burden the challengers' religious exercise because "the connection between what the objecting parties must do (provide health-insurance coverage for four methods of contraception that may operate after the fertilization of an egg) and the end that they find to be morally wrong (destruction of an embryo) is simply too attenuated," because "providing the coverage would not itself result in the destruction of an embryo; that would occur only if an employee chose to take advantage of the coverage and to use one of the [contraceptive] methods at issue." *Id.*  But the Supreme Court rejected that argument, holding that it "dodges the question that RFRA presents (whether the HHS mandate imposes a substantial burden on the ability of the objecting parties to conduct business in accordance with *their religious beliefs*) and instead addresses a very different question that the federal courts have no business addressing (whether the religious belief asserted in a RFRA case is reasonable)." *Id.* at 724 (emphasis in original).  Thus, the Supreme Court held that the government action (requiring the employer to provide contraceptive coverage) constituted a substantial burden under RFRA, no matter how attenuated the connection between the government action and the harm imposed. *See id.* at 724.

Accordingly, common-law causation concepts are not applicable in RFRA cases.  *See Eternal Word Television Network, Inc. v. Sec'y of U.S. Dep't of Health & Hum. Servs.*, 818 F.3d 1122, 1188 (11th Cir. 2016) (Tjoflat, J., dissenting), *vacated,* No. 14-12696-CC, 2016 WL

11503064 (11th Cir. May 31, 2016), *modified sub nom. Eternal Word Television Network, Inc. v. Sec'y of U.S. Dep't of Health & Hum. Servs.*, No. 14-12696, 2016 WL 11504187 (11th Cir. Oct. 3, 2016) ("Common-law principles of causation, however fundamental to our legal heritage, are simply too unreliable a light to guide RFRA's substantial-burden analysis.").

Thus, although there is some distance here between the challenged government action (the 2025 Policy) and the harm to plaintiffs' religious exercise (decreased church attendance), the connection between the two is not so attenuated as to defeat the RFRA claim. Plaintiffs have made clear their belief that the 2025 Policy burdens their religious exercise by limiting attendance at worship services and preventing them from fulfilling their calling to minister to all people, regardless of immigration status. The 2025 Policy places plaintiffs at a serious risk of negative consequences if they continue to welcome all people, including those without legal immigration status, into their houses of worship. The fact that an intervening event—an actual enforcement action—is required to connect the challenged government action to the harm to religious exercise does not defeat plaintiffs' RFRA claim.

In summary, the 2025 Policy substantially burdens the religious exercise of plaintiffs, and it is not the least restrictive means of pursuing the government's interest in effective enforcement of the immigration laws. Plaintiffs have therefore demonstrated a reasonable likelihood of success on the merits of their claim under RFRA.

### 3.  First Amendment

As noted, the complaint does not assert a claim under the First Amendment for violation of plaintiffs' right of religious freedom, but rather their right of expressive association. The Supreme Court has "long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others" for expressive purposes. *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2382 (2021) (quoting *Roberts v. U.S.*

*Jaycees*, 468 U.S. 609, 622 (1984).  To determine whether that right to expressive association has been infringed, a court must first "determine whether the group engages in 'expressive association.'"  *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000).  If it does, a court must then consider whether the challenged action would "significantly affect" or "significantly burden" the group's desired expression.  *Id.* at 650, 653.  Finally, the court must then determine whether the government has justified this burden on expressive association.  *Id.* at 658-59.  And "[b]ecause protection of the right to associate evolves from the First Amendment's guarantees of speech, assembly, petition, and free exercise, the scope of protection for association corresponds to the constitutional solicitude afforded to the mode of First Amendment expression in which a particular group seeks collectively to engage."  *Wine & Spirits Retailers, Inc. v. Rhode Island*, 418 F.3d 36, 50 (1st Cir. 2005).

Courts have recognized several ways in which government action can substantially burden expressive-association rights.  One is when the government directly interferes with an organization's decisions about who to admit as a member.  *See Dale*, 530 U.S. at 653; *Roberts*, 468 U.S. at 623.  The Supreme Court has also "held laws unconstitutional that require disclosure of membership lists for groups seeking anonymity, or impose penalties or withhold benefits based on membership in a disfavored group."  *Rumsfeld v. F. for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 69 (2006); *see also Doe v. Hopkinton Public Schs.*, 19 F.4th 493, 509 n.14 (1st Cir. 2021) (suggesting that imposing punishment based solely on membership in a group could violate the First Amendment).  Even though such actions do not directly intrude into an organization's internal affairs, they serve to make "group membership less attractive, raising the same First Amendment concerns about affecting the group's ability to express its message."  *Rumsfeld*, 547 U.S. at 69.

The court in *Philadelphia Yearly Meeting* concluded—based in part on a concession by counsel for the government—that "by engaging in communal worship and related activities, [the plaintiff churches] are engaged in expressive association."  767 F. Supp. 3d at 322.  It then concluded the 2025 Policy imported "a significant burden on expressive associational rights" because of the likelihood of law-enforcement intrusions at churches and related locations.  *Id.* And it concluded the 2025 Policy did not serve "compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms."  *Id.* at 326 (quoting *Roberts*, 468 U.S. at 623).

The applicable analytical framework for an expressive-association claim is substantially similar to that required for an RFRA claim.  The reviewing court must assess whether the government policy imposes a "significant burden" on expressive rights (as opposed to a "substantial burden" on religious rights) and then assess whether it serves "compelling state interests" that cannot be achieved through means that are "significantly less restrictive" (as opposed to whether it serves a "compelling government interest" and the policy is "the least restrictive means of furthering" that interest).  *Compare Boy Scouts of Am.*, 530 U.S. at 650, 658-59, *with* 42 U.S.C. § 2000bb-1.

Nonetheless, the expressive-association claims asserted here do not fit clearly within the framework established by the Supreme Court, which does not address when, if ever, generally applicable laws can unconstitutionally burden associational rights.  Rather than conduct a separate analysis of that issue, and because the Court concludes that plaintiffs are likely to succeed on the merits of their RFRA claim in any event, the Court will not reach the issue of whether the 2025 Policy also burdens plaintiffs' associational rights under the First Amendment.

      **4.**     **APA**

Finally, plaintiffs challenge the 2025 Policy under the Administrative Procedure Act,
contending that the policy is arbitrary and capricious, not in accordance with law, in excess of
statutory authority, and contrary to constitutional right.  (Compl. ¶¶ 177-92).  Defendants
contend that the 2025 Policy is not subject to judicial review under the APA for two reasons:
first, because the policy decisions underlying the 2025 Policy are "committed to agency
discretion by law," 5 U.S.C. § 701(a)(2), and, second, because the 2025 Policy is not a "final
agency action" made reviewable by the APA, *id.* § 704.  (Defs.' Opp'n 31).  Because the Court
concludes that the 2025 Policy is not final agency action and is therefore not reviewable under
the APA, it does not reach the issue of whether review of the 2025 Policy is barred by
§ 701(a)(2).

      **a.**     **Final Agency Action**

As relevant here, the APA provides for judicial review of "final agency action."  5 U.S.C.
§ 704.  To determine whether an agency action is final, and therefore reviewable, courts employ
a two-pronged test.  First, "the action must mark the consummation of the agency's
decisionmaking process." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (internal quotations
removed).  Second, "the action must be one by which rights or obligations have been determined,
or from which legal consequences will flow."  *Id.* at 178 (internal quotations removed).
Defendants do not appear to contest that the 2025 Policy represented the consummation of the
agency's decisionmaking process, and therefore only the second prong of the test is at issue here.

"Whether an agency action has direct and appreciable legal consequences under the
second prong of *Bennett* is a pragmatic inquiry." *Sierra Club v. Env't Prot. Agency*, 955 F.3d
56, 62 (D.C. Cir. 2020) (quoting *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590,
598-99 (2016)) (internal quotation marks omitted).  This "pragmatic inquiry" looks to "the

concrete consequences an agency action has or does not have as a result of the specific statutes and regulations that govern it." *Cal. Cmtys. Against Toxics v. Env't Prot. Agency*, 934 F.3d 627, 637 (D.C. Cir. 2019). Thus, for example, the Supreme Court has held that a "jurisdictional determination" by the EPA that certain lands did or did not contain "waters of the United States" for purposes of the Clean Water Act was a reviewable final agency action. *See Hawkes*, 578 U.S. at 597. The court recognized that "a negative [jurisdictional determination]"—that is, one ruling that "waters of the United States" were not present on the parcel in question—"both narrows the field of potential plaintiffs" who could sue under the CWA "and limits the potential liability a landowner faces for discharging pollutants without a permit," each of which is "a legal consequence satisfying the second *Bennett* prong." *Id.* at 599. And an affirmative jurisdictional determination was also final agency action because it "represent[s] the denial of the safe harbor that negative [jurisdictional determinations] afford." *Id.*

A variety of other legal consequences have been found sufficient to satisfy the second prong of *Bennett*. These include revocation of membership in an inter-agency database for sharing information on terrorism suspects, *Gill v. U.S. Dep't of Just.*, 913 F.3d 1179, 1185 (9th Cir. 2019); a freeze in new federal grant funding, *President & Fellows of Harvard Coll. v. U.S. Dep't of Health & Hum. Servs.*, 2025 WL 2528380, at *19-20 (D. Mass. Sep. 3, 2025); termination of federal employees pursuant to a reduction in force, *New York v. McMahon*, 784 F. Supp. 3d 311, 353 (D. Mass. 2025); and the exclusion of a certain drug from Medicare Part D coverage, *Akebia Therapeutics, Inc. v. Becerra*, 548 F. Supp. 3d 274, 289 (D. Mass. 2021).

On the other hand, the following actions have found to be nonfinal: an EPA document "recommend[ing] that States impose more stringent conditions for issuing" certain Clean Water Act permits but not actually imposing any additional obligations on regulated parties, *Nat'l Min.*

*Ass'n v. McCarthy*, 758 F.3d 243, 246, 253 (D.C. Cir. 2014); a summons issued by the IRS to a cryptocurrency exchange seeking information about account holders that was "far upstream of any potential tax enforcement actions against . . . accountholders," *Harper v. Werfel*, 118 F.4th 100, 116 (1st Cir. 2024); and a "Notice" to FAA aviation safety inspectors that provided guidance on how to evaluate an airline's plan for the use of personal electronic devices during flight but did not impose any requirements, *Ass'n of Flight Attendants-CWA v. Huerta*, 785 F.3d 710, 713 (D.C. Cir. 2015).

Turning to the present case, the 2025 Policy is a "general statement of policy" under the APA's rubric for categorizing agency action, because it "explain[s] how the agency . . . will exercise its broad enforcement discretion . . . under some extant statute or rule"—that is, the Immigration and Nationality Act and its associated regulations. *Nat'l Min. Ass'n*, 758 F.3d at 252. And such "statements of policy generally do not qualify" as final agency action "because they are not finally determinative of the issues or rights to which they are addressed." *Am. Tort Reform Ass'n v. Occupational Safety & Health Admin.*, 738 F.3d 387, 395 (D.C. Cir. 2013) (citation modified). Plaintiffs therefore face something of an uphill battle to show that the 2025 Policy is in fact a final agency action that is reviewable under the APA.

It also seems clear that for the 2025 Policy to constitute final agency action, the 2021 Policy must have been final agency action as well. That is, for the rescission of a given policy to have "legal consequences" that flow from it, the policy being rescinded must itself have had "legal consequences" as well. *Cf. Biden v. Texas*, 142 S. Ct. 2528, 2544 (2022) (holding that rescission of policy providing for return to Mexico of non-Mexican immigrants detained at U.S. border was final agency action). If the initial policy had no legal consequences, then the decision to rescind it necessarily could not have any legal consequences either.

By its terms, the 2021 Policy did not have sufficiently "concrete consequences" for either these plaintiffs or immigration-enforcement agents to constitute final agency action. *See Cal. Cmtys. Against Toxics*, 934 F.3d at 637. Again, that policy provided that DHS and ICE should avoid immigration-enforcement actions at sensitive places "[t]o the fullest extent possible," and that, "[a]bsent exigent circumstances," approval from agency headquarters was required before conducting such an action. (2021 Policy 2, 4). But the 2021 Policy did not entirely prevent immigration-enforcement actions at sensitive places. And it did not indicate that its policy of restraint was based on an interpretation of the INA or of any legislative rule promulgated pursuant to it. *See Cal. Cmtys. Against Toxics*, 934 F.3d at 637 (considering the "concrete consequences an agency action has or does not have as a result of the *specific statutes and regulations* that govern it" (emphasis added)). Instead, the 2021 Policy provided guidance regarding enforcement discretion, but did not purport to "limit an agency's or employee's statutory authority." (2021 Policy 4). The policy is therefore distinguishable from a case such as *Hawkes*, where the jurisdictional determinations at issue did in fact "bind[] the two agencies authorized to bring civil enforcement proceedings under the [CWA]." *See* 578 U.S. at 598. Unlike in *Hawkes*, for example, an arrest made in violation of the 2021 Policy would not have been subject to legal challenge solely on that basis. And other cases where agency action was found to be final involved more immediate and concrete legal consequences. For those reasons, the 2021 Policy did not constitute final agency action—and, similarly, neither does the 2025 Policy.

Plaintiffs' arguments to the contrary are ultimately unpersuasive. They contend that the 2025 Policy constitutes final agency action because it "revoked the safe harbor that previously existed for sensitive locations." (Pls.' Mot. 31). But that argument conflates the terms of the

2021 Policy—which made churches something of a literal "safe harbor"—with the use of the term "safe harbor" in *Hawkes*, where it referred to the *legal effect* of a negative jurisdictional determination protecting a landowner from Clean Water Act liability. *See* 578 U.S. at 598-99. Plaintiffs' citations to cases concerning agency actions that bind the agency and its staff to a certain legal position going forward are unpersuasive for similar reasons. (Pls.' Mot. 31).

Plaintiffs further contend that the 2021 Policy was itself final agency action because a page on DHS's website "provided a channel for the public to submit complaints if DHS officers and agents take enforcement actions that are believed to be in violation of the protected areas policy." (Pls.' Reply 21 (internal quotation omitted)). But plaintiffs cite no authority for the proposition that an agency's informal public statements about a policy can transform an otherwise nonbinding policy into a reviewable final agency action. And it is worth noting that the same web page plaintiffs cite explicitly states that "[t]he [2021 Policy] does not limit ICE's or [its] employee's statutory authority." (Compl., Ex. 5 at 4). Even if that web page were relevant to the question of whether the 2021 Policy was final agency action, this further language significantly undercuts the strength of plaintiffs' argument.

For those reasons, the Court concludes that the 2025 Policy is not "final agency action" made reviewable by 5 U.S.C. § 704.[12] Accordingly, plaintiffs are not likely to succeed on the merits of their APA claims.

---

[12] Plaintiffs do not suggest that the 2025 Policy is "[a]gency action made reviewable by" another "statute." 5 U.S.C. § 704; *see Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882 (1990) (recognizing that, under 5 U.S.C. § 704, review of nonfinal agency action may be had "pursuant to specific authorization in the substantive statute").

**B.    Other Preliminary Injunction Factors**

Having found that at least some plaintiffs have standing, and that plaintiffs are likely to succeed on their RFRA claim, the Court now turns to consideration of the remaining preliminary injunction factors.

**1.    Likelihood of Imminent Irreparable Harm**

The second requirement to obtain a preliminary injunction is that a plaintiff show that it "is likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20.

It is well-established that where a plaintiff shows a likelihood of success on a First Amendment claim, it need show no more in order to establish irreparable harm. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Mahmoud v. Taylor*, 145 S. Ct. 2332, 2364 (2025) (quoting *Roman Catholic Diocese v. Cuomo*, 141 S. Ct. 63, 67 (2020) (per curiam)) (citation modified); *see also Sindicato Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1, 15 (1st Cir. 2012) ("Because we conclude that plaintiffs have made a strong showing of likelihood of success on the merits of their First Amendment claim, it follows that the irreparable injury component of the preliminary injunction analysis is satisfied as well.").

Although the First Circuit has not directly addressed the question, there is good reason to conclude that the presumption of irreparable harm extends to violations of RFRA as it does to violations of the First Amendment. A RFRA claim is, essentially, a free-exercise claim that is judged against a more restrictive standard than what the Supreme Court has held the Constitution requires. *See City of Boerne v. Flores*, 521 U.S. 507, 515-16 (1997). And the basis for the irreparable-harm presumption in the First Amendment context is that the nature of the right in question—whether the right to free exercise of religion, free speech, or otherwise—is such that it is not susceptible to compensation by money damages after it has been denied. *See Roman*

*Catholic Diocese*, 141 S. Ct. at 67-68 (noting that "the great majority of those who wish to attend Mass on Sunday or services in a synagogue on Shabbat [being] barred" from attending would constitute irreparable injury).  A RFRA-based free-exercise claim is no more susceptible to compensation by money damages than a constitutional free-exercise claim, and therefore the presumption of irreparable harm ought to apply in RFRA cases as well.  Others courts that have considered the question have also reached this conclusion.  *See Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996) ("[I]rreparable harm accompanies a substantial burden on an individual's rights to the free exercise of religion under RFRA."); *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1146 (10th Cir. 2013) (en banc) ("[E]stablishing a likely RFRA violation satisfies the irreparable harm factor."), *aff'd sub nom. Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014); *Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 380 (5th Cir. 2022) ("We have recognized that the loss of freedoms guaranteed by the First Amendment, RLUIPA, and RFRA all constitute per se irreparable harm.").

Therefore, because plaintiffs have shown a likelihood of success on their RFRA claim, they have established a likelihood of irreparable harm if they are denied a preliminary injunction.

### 2.    Balance of Equities and Public Interest

Finally, the remaining requirements for a preliminary injunction are that "the balance of equities tips in [the plaintiffs'] favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20.  These factors merge when the government is the opposing party.  *See Does 1-6 v. Mills*, 16 F.4th 20, 37 (1st Cir. 2021).

Generally, the government is not harmed by an injunction enjoining it from implementing an unlawful or unconstitutional policy, because the government has no legitimate interest in following such a policy.  *Doe v. Trump*, 766 F. Supp. 3d 266, 286 (D. Mass. 2025).  And there is a strong public policy favoring protection of the freedom of religion.  *See Dorce v. Wolf*, 506 F.

Supp. 3d 142, 145 (D. Mass. 2020) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights.").[13]

The government nonetheless argues that the "public interest in enforcement of the Nation's immigration laws . . . particularly in light of the substantial increase in illegal immigration over the past several years," is sufficient to deny injunctive relief. (Defs.' Opp'n 37). But the fact that there is a public interest in achieving a particular end, such as effectively enforcing immigration law, does not mean that any and all means of achieving that end are necessarily in the public interest. There are many other means by which to enforce the nation's immigration laws other than conducting enforcement actions at houses of worship—including, of course, enforcement of immigration laws in those vast portions of the nation that are not places of worship. Furthermore, a preliminary injunction would not prevent the government from taking action in emergency situations, such as might occur if an armed and dangerous individual attempted to take refuge in a church. And the government can continue, if it chooses, to take enforcement actions in churches by obtaining judicial or administrative warrants.

For those reasons, the final two preliminary injunction factors favor plaintiffs as well. And because plaintiffs have therefore satisfied all four factors, they are entitled to a preliminary injunction. The question then becomes what form of relief is appropriate.

### C.    <u>Limitations on Injunctive Relief</u>

There are at least two substantial limits on the court's authority to issue injunctive relief in this case. The first is 8 U.S.C. § 1252(f)(1), which prohibits the court from enjoining arrests

---

[13] Because immigration arrests do not ordinarily result in criminal prosecutions, and often lead to quick deportations, violations of statutory or constitutional rights cannot normally be vindicated through other means, such as motions to suppress or writs of *habeas corpus*.

made pursuant to a warrant.  The second is Fed. R. Civ. P. 65(d), which sets forth the specificity required in an injunctive order.

### 1.    8 U.S.C. § 1252(f)(1)

Section 1252(f)(1) of Title 8 provides that "no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter [8 U.S.C. §§ 1221-32] . . . other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated." 8 U.S.C. § 1252(f)(1).  It thus "generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions."  *Garland v. Aleman Gonzalez*, 142 S. Ct. 2057, 2065 (2022).

Defendants argue that this provision bars the court from issuing any injunctive relief whatsoever.  (Defs.' Opp'n 20-21).  But as the court noted in *Philadelphia Yearly Meeting*, "the core of" the activities contemplated by the 2021 Policy and the 2025 Policies "is governed by 8 U.S.C. § 1357, which outlines the powers of 'immigration officers and employees' to act without a warrant, which include the authority to arrest, interrogate, and search aliens under certain circumstances."  767 F. Supp. 3d at 320.  An injunction restricting the government's warrantless activities would therefore not "enjoin or restrain the operation of" any provision in 8 U.S.C. §§ 1221-32 and thus would not violate § 1252(f)(1).

Section 1252(f)(1) does, however, prevent the court from enjoining ICE from making arrests pursuant to a warrant.  Section 1226 of Title 8 is the source of DHS's authority to make arrests pursuant to an administrative warrant.  It provides that "[o]n a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien

is to be removed from the United States."  8 U.S.C. § 1226(a).  The court in *Philadelphia Yearly Meeting* "conclude[d] that any injunction may not restrict or enjoin DHS's ability to engage in arrests pursuant to an administrative warrant," and specified that limitation in its injunction.  767 F. Supp. 3d at 320.[14]  Plaintiffs point to dicta in *Aleman Gonzalez* suggesting that "a court may enjoin the unlawful operation of a provision that is not specified in § 1252(f)(1) even if that injunction has some collateral effect on the operation of a covered provision."  (Pls. Reply 23-24, Dkt. No. 57).  But a restriction on how DHS can effect arrests pursuant to an administrative warrant would hardly be a "collateral effect," where the statutory provision granting that authority is located squarely within the statutes referenced by § 1252(f)(1).

Therefore, because of 8 U.S.C. § 1252(f)(1), any injunction issued by this Court may cover only warrantless arrests and other enforcement activities.

### 2.      Rule 65(d)

The second limitation on the court's ability to order relief is the specificity requirement of Rule 65(d), which sets out the basic requirements that an order granting an injunction must follow.  The rule provides that such an order must "state its terms specifically" and must "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required."  Fed. R. Civ. P. 65(d)(1).  "The drafting standard established by Rule 65(d) is that an ordinary person reading the court's order should be able to ascertain from the document itself exactly what conduct is proscribed."  11A WRIGHT & MILLER'S FEDERAL PRACTICE & PROCEDURE § 2955 (3d ed. 2025).  The specificity requirements of Rule 65(d) "are not merely technical but are designed to prevent uncertainty and confusion and to avoid basing a

---

[14] No party appears to suggest that the Court could enjoin arrests made pursuant to a judicial, rather than administrative, warrant.

contempt citation on a decree too vague to be understood." *NBA Props., Inc. v. Gold*, 895 F.2d 30, 32 (1st Cir. 1990) (quoting *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974) (per curiam)) (citation modified).  Therefore, the four corners of the injunctive order itself must sufficiently describe what actions the defendants may or may not take.

To be sure, Rule 65(d) "does not 'require that an order list the components of a term whose boundaries are understood by common parlance.'" *New York v. Trump*, 133 F.4th 51, 72 (1st Cir. 2025) (quoting *United States v. Pro. Air Traffic Controllers Org. (PATCO), PATCO Local 202*, 678 F.2d 1, 3 (1st Cir. 1982)).  But, for example, where an injunction requires that a state official "maintain in force and effect his or her policies, procedures, and directives . . . relative to the implementation of" a federal statute, without "defin[ing] the 'policies, procedures, and directives' it requires [the official] to maintain in force and effect, the injunction lacks the specificity required by Rule 65(d)." *Scott v. Schedler*, 826 F.3d 207, 211-13 (5th Cir. 2016) (per curiam).

Plaintiffs' requested injunction is an order staying the "rescission of the 2021 Mayorkas Memorandum" and requiring that defendants "in good faith continue to implement and act in accordance with [the memorandum] pending resolution of this case or further order of the Court."  (Dkt. No. 32-1 at 1).  To the extent that the plaintiffs seek the wholesale reimplementation of the 2021 Policy, it is difficult to see how such an order could be fashioned to comply with the requirements of Rule 65(d).  Most notably, the 2021 Policy was intended to guide the exercise of law-enforcement discretion without imposing bright-line rules.  But such bright-line rules are exactly what Rule 65(d) requires.  Thus, for example, the 2021 Policy placed restrictions on enforcement actions "near" houses of worship.  (2021 Policy at 3).  But the policy expressly declined to give a "bright-line definition of what constitutes 'near,'" instead noting that

"[a] variety of factors can be informative" and that "[t]he determination requires an analysis of the facts and the exercise of judgment." (*Id.*). Thus, an injunction that prohibited immigration enforcement "near" houses of worship, in accordance with the terms of the 2021 Policy, would appear to fail Rule 65(d)'s specificity requirement, because "an ordinary person reading the court's order" would not be able to understand "exactly what conduct is proscribed." 11A WRIGHT & MILLER'S FEDERAL PRACTICE & PROCEDURE § 2955 (3d ed. 2025).[15]

Accordingly, instead of simply reinstating the 2021 Policy, the Court will issue an injunction that largely tracks the contours of that policy while providing more specific requirements and limitations in order to comply with the requirements of Rule 65(d). In substance, the preliminary injunction will prohibit warrantless enforcement actions—absent exigent circumstances—inside a church, at the entrance to a church, at a religious education facility (such as a Sunday school), at a religious social-service facility (such as a day-care center), or on adjacent church property (such as a parking lot). It will also prohibit such enforcement within 100 feet of the entrance to a church, absent exigent circumstances or supervisory approval. And it will prohibit law enforcement from knowingly setting up checkpoints to interrogate persons on their way to or from a church.[16]

Accordingly, the preliminary injunction issued by the Court does not simply preserve the *status quo*, or return matters precisely to the *status quo ante*, but imposes a new set of

---

[15] The court in *Philadelphia Yearly Meeting* did not address that issue; instead, it enjoined certain actions "in or near any place of worship owned, operated, occupied, or used by one or more of the above-captioned Plaintiffs." 767 F. Supp. 3d at 337. But even a well-meaning immigration-enforcement officer would have difficulty determining whether an action is allowed or prohibited under the terms of that injunction.

[16] The word "church" has multiple meanings, including, among other things, (1) a physical building used for Christian worship, (2) a local congregation or community, and (3) an overarching body or organization of a particular denomination. For that reason, the preliminary injunction will use the term "place of worship" to describe the physical facility of the church, and "adjacent protected facility" to describe facilities such as religious schools.

restrictions.  Because such "a mandatory preliminary injunction alters rather than preserves the *status quo*, it 'normally should be granted only in those circumstances when the exigencies of the situation demand such relief.'"  *Braintree Laboratories, Inc. v. Citigroup Global Markets Inc.*, 622 F.3d 36, 41 (1st Cir. 2010) (quoting *Mass. Coal. of Citizens with Disabilities v. Civil Def. Agency*, 649 F.2d 71, 76 n.7 (1st Cir. 1981)).  While such relief may be granted only in extraordinary circumstances, the Court finds that it is appropriate here to protect against further injury to the religious freedoms of plaintiffs.

In one important respect, the preliminary injunction is broader than the 2021 Policy.  That policy permitted immigration officers to conduct operations inside churches, and on church property, either in exigent circumstances or with supervisory approval (although the policy clearly discouraged such operations).  The preliminary injunction issued by the Court will permit such operations *only* in exigent circumstances, regardless of supervisory approval.  The Court can conceive of no circumstance, outside of a true emergency, in which a law-enforcement operation to enforce the immigration laws inside a church would be justifiable under the First Amendment and RFRA.

The preliminary injunction is also narrower than the 2021 Policy, in that it applies only to the plaintiffs in this case who have standing, and not nationwide.  It will also require all plaintiffs to identify, in writing, the churches, properties, and other areas that they contend qualify as protected areas, to provide the necessary degree of specificity.  The preliminary injunction will also, as noted, exempt immigration-enforcement actions taken pursuant to an administrative warrant or judicial warrant.

**IV.**     **Conclusion**

For the foregoing reasons, plaintiffs' motion for a stay or preliminary injunction is

GRANTED in part and DENIED in part.  The Court will enter a separate preliminary injunction

order.

**So Ordered.**


/s/ F. Dennis Saylor IV
F. Dennis Saylor IV
Dated: February 13, 2026                    United States District Judge

62
ADD.62

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| NEW ENGLAND SYNOD, EVANGELICAL LUTHERAN CHURCH IN AMERICA, et al., | ) ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 25-40102-FDS |
| v. | ) ) | |
| DEPARTMENT OF HOMELAND SECURITY, et al., | ) ) ) ) | |
| Defendants. | ) ) | |

**PRELIMINARY INJUNCTION**

After a hearing, after consideration of the pleadings and record evidence, and for the reasons set forth in the accompanying Memorandum and Order, pursuant to Fed. R. Civ. P. 65, **Defendants**, as defined in Paragraph 1(b) of this order, are preliminarily ENJOINED, pending trial on the merits of this action, as follows:

**Definitions**

1.      As used in this Preliminary Injunction, the following terms shall have the following meanings:

a.      The term **"Plaintiffs"** shall mean

(1)     New England Synod;

(2)     Greater Milwaukee Synod;

(3)     Southwest California Synod;

(4)     Southwest Texas Synod;

(5)     Sierra Pacific Synod;

ADD.63

(6)    American Baptist Churches USA;

(7)    Alliance of Baptists;

(8)    Metropolitan Community Churches; and

(9)    all of their member churches, congregations, and meetings.

b.    The term "**Defendants**" shall mean any or all of the following:

(1)    the United States Department of Homeland Security ("DHS");

(2)    Kristi Noem, in her official capacity as Secretary of Homeland Security;

(3)    United States Immigration and Customs Enforcement ("ICE");

(4)    United States Customs and Border Protection ("CBP");

(5)    all officers, agents, employees, and appointees of DHS, ICE, and CBP;

and

(6)    all other persons who are in active concert and participation with them.

c.    The term **"Place of Worship"** shall mean any church, building, premises, or other physical facility, whether permanent or temporary, that is regularly used by **Plaintiffs** to conduct religious services; provided, however, that **Plaintiffs** have identified such a **Place of Worship** in accordance with paragraph 7 of this Preliminary Injunction.

d.    The term **"Adjacent Protected Facility"** shall mean any building, premises, or other physical facility attached to or adjacent to a **Place of Worship** that is used by **Plaintiffs** to conduct activities, such as religious education and religious ministry, that are central to their religious mission; provided, however, that **Plaintiffs** have identified such an **Adjacent Protected Facility** in accordance with paragraph 7 of this Preliminary Injunction.

e.    The term **"Adjacent Protected Area"** shall mean any parking lot, walkway, lawn, garden, playground, cemetery, or other property adjacent to a **Place of Worship** that is

owned, rented, leased, occupied, or operated by the **Place of Worship**; provided, however, that **Plaintiffs** have identified such an **Adjacent Protected Area** in accordance with paragraph 8 of this Preliminary Injunction.

     f.     The term **"Protected Area"** shall mean, collectively, **Places of Worship, Adjacent Protected Facilities**, and **Adjacent Protected Areas**.

     g.     The term **"In a Protected Area"** shall mean within

     (1)     any interior spaces of any **Protected Area**; and

     (2)     any other spaces within the physical boundaries of any **Protected Area**.

     h.     The term **"Near a Protected Area"** shall mean any location within 100 feet of any doorway, gate, or other clearly demarcated entrance to any **Protected Area**.

     i.     The term **"Immigration Enforcement Action"** shall mean any action by **Defendants** that is planned, conducted, undertaken, or executed, in whole or in part, to enforce the immigration laws of the United States, including any arrest, seizure, search, interrogation, questioning, interview, or investigation.

     j.     The term **"Exigent Circumstances"** shall mean an immediate threat to human life or safety.  For purposes of this Preliminary Injunction, the presence of one or more individuals who have entered or remained in the United States without authorization, without more, shall not constitute **Exigent Circumstances**.

     k.     The term **"Prior Approval"** shall mean approval by a supervisory law enforcement official at ICE or CBP headquarters in Washington, D.C.  For purposes of this Preliminary Injunction, **Prior Approval** of an **Immigration Enforcement Action** shall only be given on an individualized basis, after consideration of the relevant facts and circumstances, and only after consideration of ways to minimize the possibility that the **Immigration Enforcement**

**Action** will prevent, restrain, or discourage individuals from accessing the relevant **Place of Worship**.

  *l.*  The term **"2025 Policy"** shall mean the policies and procedures set forth in

    (1)  the Memorandum dated January 20, 2025 from the Acting Secretary of Homeland Security entitled "Enforcement Actions in or Near Protected Areas"; and

    (2)  the Memorandum dated January 31, 2025 from the Acting Director of ICE entitled "Common Sense Enforcement Actions in or Near Protected Areas."

**<u>Injunction</u>**

2.  Absent **Exigent Circumstances**, **Defendants** shall not take **Immigration Enforcement Action In a Protected Area**.

3.  Absent either **Exigent Circumstances** or **Prior Approval**, **Defendants** shall not take **Immigration Enforcement Action Near a Protected Area**.

4.  Absent **Exigent Circumstances**, **Defendants** shall not knowingly set up a checkpoint, roadblock, or other barrier in order to question, interrogate, or otherwise direct or undertake **Immigration Enforcement Action** against individuals who are on their way to or from a **Protected Area**.

5.  To the extent that the **2025 Policy** is inconsistent with any of the provisions of this Preliminary Injunction, this Preliminary Injunction shall control.

6.  This Preliminary Injunction shall not enjoin or restrict **Defendants** from conducting arrests or searches when authorized by an administrative or judicial warrant.

4

ADD.66

**Notice of Specific Locations**

7.      No later than 14 days after the date on which this Preliminary Injunction is entered, **Plaintiffs** shall provide to **Defendants** in writing, and shall file on the docket, one or more lists consisting of:

      a.      the names and addresses of all **Places of Worship**; and

      b.      the names and addresses of all **Adjacent Protected Facilities**.

8.      No later than 21 days after the date on which this Preliminary Injunction is entered, **Plaintiffs** shall provide to **Defendants** in writing, and shall file on the docket, one or more documents containing a description of all **Adjacent Protected Areas**.  Such descriptions shall be sufficient to provide a reasonable person notice of the identity and boundaries of such areas without making use of, or needing to refer to, any other document or source.  Any such description should not rely on technical language, such as a surveyor's description, but should be understandable to a reasonable person seeking to identify such areas on site at the relevant location.  Any such description may include maps, photographs, or other visual aids.

9.      **Defendants** may move to strike any such list or description, or to seek modification or clarification, at any time.  Any **Plaintiff** may remove any **Protected Area** from the list at any time by notifying **Defendants** and filing a notice of removal on the docket.  A **Plaintiff** may add a **Protected Area**, or modify a description, only by agreement of the parties or leave of Court.

**Requirement of Bond; Effective Date**

10.      Pursuant to Federal Rule of Civil Procedure 65(c), **Plaintiffs** shall post with this Court a bond of $100 within seven days.

11.      The Preliminary Injunction shall take effect upon (1) the posting of the bond and (2) (as to any specific **Protected Area**) the transmission to **Defendants** of the information required by Paragraphs 7 and 8 as to that **Protected Area**.

**Sanctions for Violation**

12.      Violations of this Preliminary Injunction may subject **Defendants** and all other persons bound by this Order to sanctions and penalties, including contempt of court.

/s/  F. Dennis Saylor IV  
F. Dennis Saylor IV  
United States District Judge

Boston, Massachusetts  
February 13, 2026  
2:30 p.m.

6

ADD.68

# EXHIBIT 6



*Secretary*

**U.S. Department of Homeland Security**
Washington, DC 20528

January 20, 2025

MEMORANDUM FOR:    Caleb Vitello
                   Acting Director
                   U.S. Immigration and Customs Enforcement

                   Pete R. Flores
                   Senior Official Performing the Duties of the Commissioner
                   U.S. Customs and Border Protection

FROM:              Benjamine C. Huffman
                   Acting Secretary

SUBJECT:           Enforcement Actions in or Near Protected Areas

---

This memorandum addresses Immigration and Customs Enforcement (ICE) and Customs and Border Protection (CBP) enforcement actions in or near areas that the Department of Homeland Security (DHS) previously determined require special protection. It is effective immediately. This memorandum supersedes and rescinds Alejandro Mayorkas's October 27, 2021 memorandum entitled, Guidelines for Enforcement Actions in or Near Protected Areas.

Our brave men and women in uniform put their lives on the line every day to advance the rule of law and keep our people safe. As part of that work, officers frequently apply enforcement discretion to balance a variety of interests, including the degree to which any law enforcement action occurs in a sensitive location.

Going forward, law enforcement officers should continue to use that discretion along with a healthy dose of common sense. It is not necessary, however, for the head of the agency to create bright line rules regarding where our immigration laws are permitted to be enforced. The Director of ICE and the Commissioner of CBP may wish to issue further guidance to assist officers in exercising appropriate enforcement discretion.

This memorandum is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter.

ADD.70                                                      www.dhs.gov

# EXHIBIT 8

FOR OFFICIAL USE ONLY

*Office of the Director*

**U.S. Department of Homeland Security**
500 12th Street, SW
Washington, DC  20536



**U.S. Immigration
and Customs
Enforcement**

January 31, 2025

MEMORANDUM FOR:    Russell Hott
Acting Executive Associate Director
Enforcement and Removal Operations

Robert Hammer
Acting Executive Associate Director
Homeland Security Investigations

FROM:                       Caleb Vitello
Acting Director

SUBJECT:                 Common Sense Enforcement Actions in or Near Protected Areas

---

On January 20, 2025, Acting Secretary Benjamine C. Huffman issued a memorandum titled, *Enforcement Actions in or Near Protected Areas*, superseding and rescinding effective immediately the October 27, 2021, *Guidelines for Enforcement Actions in or Near Protected Areas* memorandum from former Secretary Alejandro N. Mayorkas. The Acting Secretary's memorandum acknowledges the ability of the Department's law enforcement personnel to apply enforcement discretion to balance a variety of interests, including the degree to which law enforcement actions occur in protected areas.[1]

For this reason, the Department will not be issuing bright line rules regarding where immigration laws are permitted to be exercised. Instead, the Acting Secretary authorized the Director of U.S. Immigration and Customs Enforcement (ICE) and the Commissioner of U.S. Customs and Border Protection to issue further guidance to assist law enforcement personnel in exercising appropriate enforcement discretion.

---

[1] For purposes of ICE immigration enforcement action, protected areas include schools (pre-schools through post-secondary, including colleges, universities, and vocational and trade schools); hospitals; churches, synagogues, mosques, or other institutions of worship; and a site during the occurrence of a public demonstration, such as a march, rally, or parade.

FOR OFFICIAL USE ONLY

Common Sense Enforcement Actions in or Near Protected Areas
Page 2 of 2

I have great faith in the judgment of our law enforcement personnel and, accordingly, charge Assistant Field Office Directors (AFODs) and Assistant Special Agents in Charge (ASACs) with responsibility for making case-by-case determinations regarding whether, where, and when to conduct an immigration enforcement action in or near a protected area. AFODs and ASACs may provide authorization for such actions either verbally or in writing. Before authorizing an immigration enforcement action at a site where a public demonstration is underway, AFODs and ASACs must consult with local Office of the Principal Legal Advisor leadership for guidance on constitutional considerations.

Any further guidance your Directorates develop should be coordinated together and developed in consultation with the ICE Office of Regulatory Affairs and Policy and OPLA to ensure consistency and legal sufficiency.

Disclaimer

This guidance does not, is not intended to, and may not be construed to create or modify any right or benefit, substantive or procedural, enforceable at law by any party against the United States, its agencies, its officers, or any person.


Distribution:

Deputy Director
Executive Associate Director, Enforcement and Removal Operations
Executive Associate Director, Management and Administration
Associate Director, Office of Professional Responsibility
Principal Legal Advisor
Assistant Director, Office of Civil Rights Compliance
Assistant Director, Office of External Affairs
Assistant Director, Office of Firearms and Tactical Programs
Assistant Director, Office of Regulatory Affairs and Policy
Chief of Staff, Office of the Director
Deputy Chief of Staff, Office of the Director

FOR OFFICIAL USE ONLY

ADD.73