# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

NEW ENGLAND SYNOD, Evangelical Lutheran Church in America; GREATER MILWAUKEE SYNOD, Evangelical Lutheran Church in America; SOUTHWEST CALIFORNIA SYNOD, Evangelical Lutheran Church in America; SOUTHWESTERN TEXAS SYNOD, Evangelical Lutheran Church in America; SIERRA PACIFIC SYNOD, Evangelical Lutheran Church in America; SAN FRANCISCO FRIENDS MEETING OF THE RELIGIOUS SOCIETY OF FRIENDS; PACIFIC YEARLY MEETING OF THE RELIGIOUS SOCIETY OF FRIENDS; NORTH PACIFIC YEARLY MEETING OF THE RELIGIOUS SOCIETY OF FRIENDS; AMERICAN BAPTIST CHURCHES USA; ALLIANCE OF BAPTISTS; METROPOLITAN COMMUNITY CHURCHES,

Plaintiffs-Appellees/Cross-Appellants,

v.

UNITED STATES DEPARTMENT OF HOMELAND SECURITY; MARKWAYNE MULLIN, Secretary,

Defendants-Appellants/Cross-Appellees.

On Appeal from the United States District Court
for the District of Massachusetts

## APPENDIX

BRETT A. SHUMATE
  *Assistant Attorney General*
LEAH B. FOLEY
  *United States Attorney*
MICHAEL S. RAAB
CHARLES W. SCARBOROUGH
LOWELL V. STURGILL JR.
SARAH N. SMITH
  *Attorneys, Appellate Staff*
  *Civil Division, U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*

# TABLE OF CONTENTS

**Page**

Docket Sheet, No. 4:25-cv-40102 (D. Mass.) ..................................................JA1

Complaint, Dkt. No. 1....................................................................................JA48

Enforcement Activities at Schools, Places of Worship, or at funerals or other religious ceremonies, James A. Puleo (May 17, 1993), Dkt. No. 1-1 .............................JA92

Field Guidance on Enforcement Actions or Investigative Activities At or Near Sensitive Community Locations, Julie L. Myers (July 3, 2008), Dkt. No. 1-2 ....................................................................................................JA96

Enforcement Actions at or Focused on Sensitive Locations, John Morton (Oct. 24, 2011), Dkt. No. 1-3......................................................................JA99

Guidelines for Enforcement Actions in or Near Protected Areas, Alejandro N. Mayorkas (Oct. 27, 2021), Dkt. No. 1-4 ...........................................JA103

ICE.gov, Protected Areas and Courthouse Arrests, Dkt. No. 1-5 ...........................JA109

DHS, Statement from a DHS Spokesperson on Directives Expanding Law Enforcement and Ending the Abuse of Humanitarian Parole, Dkt. No. 1-7 ....................................................................................................JA119

Plaintiffs' Proposed Order, Dkt. No. 32-1 ..................................................JA121

Declaration of the Rev. Jeff R. Johnson, Dkt. No. 33-1 ...........................JA123

Declaration of Robin DuRant, Dkt. No. 33-2..............................................JA133

Declaration of Pastor Edwin Aparicio, Dkt. No. 33-3................................JA140

Declaration of Nelson H. Rabell-González, Dkt. No. 33-4 .......................JA146

Declaration of the Rev. Bill Knezovich, Dkt. No. 33-5..............................JA151

Declaration of Rev. Paul D. Erickson, Dkt. No. 33-6 ...............................JA155

Declaration of Rev. Brenda Bos, Dkt. No. 33-7 .......................................................JA162

Declaration of the Rev. Nathan D. Pipho, Dkt. No. 33-8.........................................JA169

Declaration of Rev. Susan Briner, Dkt. No. 33-9 .....................................................JA177

Declaration of the Rev. Paul Doe, Dkt. No. 33-10 ...................................................JA185

Declaration of Gail Cornwall-Feeley, Dkt. No. 33-11 ..............................................JA190

Declaration of Paul Christiansen, Dkt. No. 33-12.....................................................JA199

Declaration of Jeanne-Marie Duval Pierrelouis, Dkt. No. 33-13.............................JA205

Declaration of Carole Collins, Dkt. No. 33-14..........................................................JA212

Declaration of Rev. Cecilia Eggleston, Dkt. No. 33-15 ............................................JA219

Declaration of Rev. John Doe, Dkt. No. 33-16 .........................................................JA223

Declaration of Rev. Dr. Gina C. Jacobs-Strain, Dkt. No. 33-17 .............................JA226

Declaration of Joshua Kincaid, Dkt. No. 56-2...........................................................JA233

Declaration of Rev. Caleb Crainer, Dkt. No. 65-2.....................................................JA237

Plaintiffs' Second Notice of Supplemental Facts, Dkt. No. 72.................................JA240

Declaration of Rev. Kenny Callaghan, Dkt. No. 72-1................................................JA245

Declaration of Rev. Doug Donley, Dkt. No. 72-2......................................................JA252

Notice of Appeal, Dkt. No. 87....................................................................................JA255

Notice of Cross-Appeal, Dkt. No. 93 .........................................................................JA258

Query    Reports    Utilities    Help    Log Out

<span style="color:green">APPEAL</span>

# United States District Court
## District of Massachusetts (Worcester)
## CIVIL DOCKET FOR CASE #: 4:25-cv-40102-FDS

New England Synod, Evangelical Lutheran Church in America et al v. Department of Homeland Security et al
Assigned to: District Judge F. Dennis Saylor, IV
Case in other court:  USCA - First Circuit, 26-01396
　　　　　　　　　　USCA - First Circuit, 26-01493
Cause: 05:551 Administrative Procedure Act

Date Filed: 07/28/2025
Jury Demand: None
Nature of Suit: 899 Other Statutes: Administrative Procedures Act/Review or Appeal of Agency Decision
Jurisdiction: U.S. Government Defendant

### Plaintiff

**New England Synod**
*Evangelical Lutheran Church in America*

represented by **Kevin E. Friedl**
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
202-894-6035
Email: kfriedl@democracyforward.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Andrew Liang Bookbinder**
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
571-494-0306
Email:
abookbinder@democracyforward.org
*ATTORNEY TO BE NOTICED*

**Audrey Jordan Wiggins**
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
201-824-1347
Email: awiggins@democracyforward.org
*ATTORNEY TO BE NOTICED*

**Ayesha N. Khan**
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
240-938-4234
Fax: 202-796-4426
Email: akhan@democracyforward.org
*ATTORNEY TO BE NOTICED*

JA1

**Brandon Levey**
Gilbert LLP
700 Pennsylvania Ave. SE
Suite 400
Washington, DC 20003
202-772-2261
Email: leveyb@gilbertlegal.com
*ATTORNEY TO BE NOTICED*

**Brittney M. Welch**
Gilbert LLP
700 Pennsylvania Ave.
Ste SE #400
Washington, DC 20003
202-893-4544
Email: welchb@gilbertlegal.com
*ATTORNEY TO BE NOTICED*

**John Sterling Moore**
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
202-448-9090
Email: smoore@democracyforward.org
*ATTORNEY TO BE NOTICED*

**Madeleine Gates**
Washington Lawyers' Committee for Civil
Rights and Urba
700 14th St. NW, Suite 400
Washington, DC 20005
202-319-1044
Email: madeleine_gates@washlaw.org
*ATTORNEY TO BE NOTICED*

**Mark Samburg**
Democracy Forward Foundation
PO Box 34553
Washington, DC 20043
202-448-9090
Email: msamburg@democracyforward.org
*ATTORNEY TO BE NOTICED*

**Melissa Colon**
Washington Lawyers' Committee for Civil
Rights and Urba
700 14th St NW, Suite 400
Washington, DC 20005
202-813-1829
Fax: 202-319-1010
Email: melissa_colon@washlaw.org
*TERMINATED: 01/06/2026*
*ATTORNEY TO BE NOTICED*

JA2

**Richard James Leveridge**
Gilbert LLP
700 Pennsylvania Ave.
Ste 400
Washington, DC 20003
202-772-1918
Fax: 202-772-3333
Email: leveridger@gilbertlegal.com
*ATTORNEY TO BE NOTICED*

**Ryan C. Downer**
Washington Lawyers' Committee for Civil
Rights and Urba
700 14th Street NW
Suite 400
Washington, DC 20005
202-319-1000
Email: ryan_downer@washlaw.org
*ATTORNEY TO BE NOTICED*

**Samone Ijoma**
Gilbert LLP
700 Pennsylvania Ave. SE
Suite 400
Washington, DC 20003
202-772-3959
Email: IjomaS@gilbertlegal.com
*ATTORNEY TO BE NOTICED*

**Sarah Goetz**
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
202-383-0794
Email: sgoetz@democracyforward.org
*ATTORNEY TO BE NOTICED*

**Sarah Sraders**
Gilbert LLP
700 Pennsylvania Avenue, SE
Suite #400
Washington, DC 20003
202-772-1909
Email: sraderss@gilbertlegal.com
*TERMINATED: 09/03/2025*
*ATTORNEY TO BE NOTICED*

**Sonia W Murphy**
Gilbert LLP
700 Pennsylvania Ave. SE
Ste 400
Washington, DC 20003
202-305-3067

JA3

Email: murphys@gilbertlegal.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Greater Milwaukee Synod**                    represented by    **Kevin E. Friedl**
*Evangelical Lutheran Church in America*                        (See above for address)
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Andrew Liang Bookbinder**
                                                                (See above for address)
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Audrey Jordan Wiggins**
                                                                (See above for address)
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Ayesha N. Khan**
                                                                (See above for address)
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Brandon Levey**
                                                                (See above for address)
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Brittney M. Welch**
                                                                (See above for address)
                                                                *ATTORNEY TO BE NOTICED*

                                                                **John Sterling Moore**
                                                                (See above for address)
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Madeleine Gates**
                                                                (See above for address)
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Mark Samburg**
                                                                (See above for address)
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Melissa Colon**
                                                                (See above for address)
                                                                *TERMINATED: 01/06/2026*
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Richard James Leveridge**
                                                                (See above for address)
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Ryan C. Downer**
                                                                (See above for address)
                                                                *ATTORNEY TO BE NOTICED*

JA4

**Samone Ijoma**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah Goetz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah Sraders**
(See above for address)
*TERMINATED: 09/03/2025*
*ATTORNEY TO BE NOTICED*

**Sonia W Murphy**
(See above for address)
*ATTORNEY TO BE NOTICED*

## Plaintiff

| | | |
|---|---|---|
| **Southwest California Synod**<br>*Evangelical Lutheran Church in America* | represented by | **Kevin E. Friedl**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Andrew Liang Bookbinder**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Audrey Jordan Wiggins**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ayesha N. Khan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Brandon Levey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Brittney M. Welch**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John Sterling Moore**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Madeleine Gates**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Mark Samburg**
(See above for address)
*ATTORNEY TO BE NOTICED*

JA5

**Melissa Colon**
(See above for address)
*TERMINATED: 01/06/2026*
*ATTORNEY TO BE NOTICED*

**Richard James Leveridge**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ryan C. Downer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Samone Ijoma**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah Goetz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah Sraders**
(See above for address)
*TERMINATED: 09/03/2025*
*ATTORNEY TO BE NOTICED*

**Sonia W Murphy**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Southwestern Texas Synod**                represented by **Kevin E. Friedl**
*Evangelical Lutheran Church in America*                (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Andrew Liang Bookbinder**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Audrey Jordan Wiggins**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ayesha N. Khan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Brandon Levey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Brittney M. Welch**

JA6

(See above for address)
*ATTORNEY TO BE NOTICED*

**John Sterling Moore**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Madeleine Gates**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Mark Samburg**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Melissa Colon**
(See above for address)
*TERMINATED: 01/06/2026*
*ATTORNEY TO BE NOTICED*

**Richard James Leveridge**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ryan C. Downer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Samone Ijoma**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah Goetz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah Sraders**
(See above for address)
*TERMINATED: 09/03/2025*
*ATTORNEY TO BE NOTICED*

**Sonia W Murphy**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Sierra Pacific Synod**                        represented by **Kevin E. Friedl**
*Evangelical Lutheran Church in America*                       (See above for address)
                                                               *LEAD ATTORNEY*
                                                               *ATTORNEY TO BE NOTICED*

                                                               **Andrew Liang Bookbinder**
                                                               (See above for address)
                                                               *ATTORNEY TO BE NOTICED*

JA7

**Audrey Jordan Wiggins**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ayesha N. Khan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Brandon Levey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Brittney M. Welch**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John Sterling Moore**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Madeleine Gates**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Mark Samburg**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Melissa Colon**
(See above for address)
*TERMINATED: 01/06/2026*
*ATTORNEY TO BE NOTICED*

**Richard James Leveridge**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ryan C. Downer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Samone Ijoma**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah Goetz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah Sraders**
(See above for address)
*TERMINATED: 09/03/2025*
*ATTORNEY TO BE NOTICED*

JA8

**Sonia W Murphy**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**San Francisco Friends Meeting of the**            represented by   **Kevin E. Friedl**
**Religious Society of Friends**                                      (See above for address)
                                                                     *LEAD ATTORNEY*
                                                                     *ATTORNEY TO BE NOTICED*

**Andrew Liang Bookbinder**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Audrey Jordan Wiggins**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ayesha N. Khan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Brandon Levey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Brittney M. Welch**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John Sterling Moore**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Madeleine Gates**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Mark Samburg**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Melissa Colon**
(See above for address)
*TERMINATED: 01/06/2026*
*ATTORNEY TO BE NOTICED*

**Richard James Leveridge**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ryan C. Downer**
(See above for address)

JA9

*ATTORNEY TO BE NOTICED*

**Samone Ijoma**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah Goetz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah Sraders**
(See above for address)
*TERMINATED: 09/03/2025*
*ATTORNEY TO BE NOTICED*

**Sonia W Murphy**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

| | | |
|---|---|---|
| **Pacific Yearly Meeting of the Religious Society of Friends** | represented by | **Kevin E. Friedl**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Andrew Liang Bookbinder**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Audrey Jordan Wiggins**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ayesha N. Khan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Brandon Levey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Brittney M. Welch**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John Sterling Moore**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Madeleine Gates**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Mark Samburg**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Melissa Colon**
(See above for address)
*TERMINATED: 01/06/2026*
*ATTORNEY TO BE NOTICED*

**Richard James Leveridge**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ryan C. Downer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Samone Ijoma**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah Goetz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah Sraders**
(See above for address)
*TERMINATED: 09/03/2025*
*ATTORNEY TO BE NOTICED*

**Sonia W Murphy**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**North Pacific Yearly Meeting of the Religious Society of Friends**                    represented by **Kevin E. Friedl**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Andrew Liang Bookbinder**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Audrey Jordan Wiggins**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ayesha N. Khan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Brandon Levey**
(See above for address)
*ATTORNEY TO BE NOTICED*

JA11

**Brittney M. Welch**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John Sterling Moore**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Madeleine Gates**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Mark Samburg**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Melissa Colon**
(See above for address)
*TERMINATED: 01/06/2026*
*ATTORNEY TO BE NOTICED*

**Richard James Leveridge**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ryan C. Downer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Samone Ijoma**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah Goetz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah Sraders**
(See above for address)
*TERMINATED: 09/03/2025*
*ATTORNEY TO BE NOTICED*

**Sonia W Murphy**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**American Baptist Churches USA**          represented by **Kevin E. Friedl**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Andrew Liang Bookbinder**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Audrey Jordan Wiggins**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ayesha N. Khan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Brandon Levey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Brittney M. Welch**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John Sterling Moore**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Madeleine Gates**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Mark Samburg**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Melissa Colon**
(See above for address)
*TERMINATED: 01/06/2026*
*ATTORNEY TO BE NOTICED*

**Richard James Leveridge**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ryan C. Downer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Samone Ijoma**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah Goetz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah Sraders**
(See above for address)

JA13

*TERMINATED: 09/03/2025*
*ATTORNEY TO BE NOTICED*

**Sonia W Murphy**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Alliance of Baptists**                     represented by **Kevin E. Friedl**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Andrew Liang Bookbinder**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Audrey Jordan Wiggins**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ayesha N. Khan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Brandon Levey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Brittney M. Welch**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John Sterling Moore**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Madeleine Gates**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Mark Samburg**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Melissa Colon**
(See above for address)
*TERMINATED: 01/06/2026*
*ATTORNEY TO BE NOTICED*

**Richard James Leveridge**
(See above for address)
*ATTORNEY TO BE NOTICED*

JA14

**Ryan C. Downer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Samone Ijoma**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah Goetz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah Sraders**
(See above for address)
*TERMINATED: 09/03/2025*
*ATTORNEY TO BE NOTICED*

**Sonia W Murphy**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Metropolitan Community Churches**                represented by **Kevin E. Friedl**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Andrew Liang Bookbinder**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Audrey Jordan Wiggins**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ayesha N. Khan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Brandon Levey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Brittney M. Welch**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John Sterling Moore**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Madeleine Gates**
(See above for address)
*ATTORNEY TO BE NOTICED*

JA15

**Mark Samburg**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Melissa Colon**
(See above for address)
*TERMINATED: 01/06/2026*
*ATTORNEY TO BE NOTICED*

**Richard James Leveridge**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ryan C. Downer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Samone Ijoma**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah Goetz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah Sraders**
(See above for address)
*TERMINATED: 09/03/2025*
*ATTORNEY TO BE NOTICED*

**Sonia W Murphy**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Metropolitan New York Synod**                    represented by   **Andrew Liang Bookbinder**
*Metropolitan New York Synod*                                        (See above for address)
                                                                     *ATTORNEY TO BE NOTICED*

                                                                     **Ayesha N. Khan**
                                                                     (See above for address)
                                                                     *ATTORNEY TO BE NOTICED*

                                                                     **Brandon Levey**
                                                                     (See above for address)
                                                                     *ATTORNEY TO BE NOTICED*

                                                                     **Brittney M. Welch**
                                                                     (See above for address)
                                                                     *ATTORNEY TO BE NOTICED*

                                                                     **John Sterling Moore**
                                                                     (See above for address)

JA16

*ATTORNEY TO BE NOTICED*

**Kevin E. Friedl**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Madeleine Gates**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Mark Samburg**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Richard James Leveridge**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ryan C. Downer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Samone Ijoma**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah Goetz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sonia W Murphy**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Northwest Washington Synod**                    represented by **Andrew Liang Bookbinder**
*Northwest Washington Synod*                                            (See above for address)
                                                                                          *ATTORNEY TO BE NOTICED*

**Ayesha N. Khan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Brandon Levey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Brittney M. Welch**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John Sterling Moore**
(See above for address)
*ATTORNEY TO BE NOTICED*

JA17

**Kevin E. Friedl**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Madeleine Gates**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Mark Samburg**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Richard James Leveridge**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ryan C. Downer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Samone Ijoma**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah Goetz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sonia W Murphy**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Minneapolis Area Synod**                represented by **Andrew Liang Bookbinder**
*Minneapolis Area Synod*                                  (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

**Ayesha N. Khan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Brandon Levey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Brittney M. Welch**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John Sterling Moore**
(See above for address)
*ATTORNEY TO BE NOTICED*

JA18

**Kevin E. Friedl**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Madeleine Gates**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Mark Samburg**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Richard James Leveridge**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ryan C. Downer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Samone Ijoma**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah Goetz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sonia W Murphy**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Delaware- Maryland Synod**
*Delaware- Maryland Synod*

represented by **Andrew Liang Bookbinder**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ayesha N. Khan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Brandon Levey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Brittney M. Welch**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John Sterling Moore**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kevin E. Friedl**

JA19

(See above for address)
*ATTORNEY TO BE NOTICED*

**Madeleine Gates**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Mark Samburg**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Richard James Leveridge**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ryan C. Downer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Samone Ijoma**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah Goetz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sonia W Murphy**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Metro D.C. Synod**                  represented by   **Andrew Liang Bookbinder**
*Metro D.C. Synod*                                      (See above for address)
                                                        *ATTORNEY TO BE NOTICED*

                                                       **Ayesha N. Khan**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Brandon Levey**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Brittney M. Welch**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

                                                       **John Sterling Moore**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Kevin E. Friedl**
                                                       (See above for address)

JA20

*ATTORNEY TO BE NOTICED*

**Madeleine Gates**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Mark Samburg**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Richard James Leveridge**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ryan C. Downer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Samone Ijoma**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah Goetz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sonia W Murphy**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Southeastern Synod**                          represented by **Andrew Liang Bookbinder**
*Southeastern Synod*                                            (See above for address)
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Ayesha N. Khan**
                                                                (See above for address)
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Brandon Levey**
                                                                (See above for address)
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Brittney M. Welch**
                                                                (See above for address)
                                                                *ATTORNEY TO BE NOTICED*

                                                                **John Sterling Moore**
                                                                (See above for address)
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Kevin E. Friedl**
                                                                (See above for address)
                                                                *ATTORNEY TO BE NOTICED*

JA21

**Madeleine Gates**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Mark Samburg**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Richard James Leveridge**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ryan C. Downer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Samone Ijoma**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah Goetz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sonia W Murphy**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Metropolitan Chicago Synod**        represented by    **Andrew Liang Bookbinder**
*Metropolitan Chicago Synod*                                          (See above for address)
*ATTORNEY TO BE NOTICED*

**Ayesha N. Khan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Brandon Levey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Brittney M. Welch**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John Sterling Moore**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kevin E. Friedl**
(See above for address)
*ATTORNEY TO BE NOTICED*

JA22

**Madeleine Gates**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Mark Samburg**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Richard James Leveridge**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ryan C. Downer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Samone Ijoma**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah Goetz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sonia W Murphy**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Pacifica Synod**                          represented by  **Andrew Liang Bookbinder**
*Pacifica Synod*                                            (See above for address)
                                                            *ATTORNEY TO BE NOTICED*

**Ayesha N. Khan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Brandon Levey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Brittney M. Welch**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John Sterling Moore**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kevin E. Friedl**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Madeleine Gates**

JA23

(See above for address)
*ATTORNEY TO BE NOTICED*

**Mark Samburg**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Richard James Leveridge**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ryan C. Downer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Samone Ijoma**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah Goetz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sonia W Murphy**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Upstate New York Synod**                     represented by     **Andrew Liang Bookbinder**
*Upstate New York Synod*                                          (See above for address)
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Ayesha N. Khan**
                                                                 (See above for address)
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Brandon Levey**
                                                                 (See above for address)
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Brittney M. Welch**
                                                                 (See above for address)
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **John Sterling Moore**
                                                                 (See above for address)
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Kevin E. Friedl**
                                                                 (See above for address)
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Madeleine Gates**
                                                                 (See above for address)

JA24

*ATTORNEY TO BE NOTICED*

**Mark Samburg**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Richard James Leveridge**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ryan C. Downer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Samone Ijoma**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah Goetz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sonia W Murphy**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**District of Columbia Baptist Convention**
*District of Columbia Baptist Convention*

represented by **Andrew Liang Bookbinder**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ayesha N. Khan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Brandon Levey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Brittney M. Welch**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John Sterling Moore**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kevin E. Friedl**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Madeleine Gates**
(See above for address)
*ATTORNEY TO BE NOTICED*

JA25

**Mark Samburg**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Richard James Leveridge**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ryan C. Downer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Samone Ijoma**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah Goetz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sonia W Murphy**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

| | | |
|---|---|---|
| **Southern New England Conference, United Church of Christ**<br>*Southern New England Conference, United Church of Christ* | represented by | **Andrew Liang Bookbinder**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Ayesha N. Khan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Brandon Levey**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Brittney M. Welch**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John Sterling Moore**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kevin E. Friedl**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Madeleine Gates**
(See above for address)
*ATTORNEY TO BE NOTICED*

JA26

**Mark Samburg**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Richard James Leveridge**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ryan C. Downer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Samone Ijoma**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah Goetz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sonia W Murphy**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

| Department of Homeland Security | represented by | **Kristina A. Wolfe** |
|---|---|---|

United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Ben Franklin Station
Washington, DC 20044
(202) 353-4519
Email: Kristina.Wolfe@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Richard Cody Giles**
Federal Programs Branch
1100 L Street
Ste 11404
Washington, DC 20005
202-616-8482
Email: Richard.C.Giles@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

| Secretary Kristi L. Noem | represented by | **Kristina A. Wolfe** |
|---|---|---|
| *TERMINATED: 06/04/2026* | | (See above for address) |

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

JA27

Richard Cody Giles
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Markwayne Mullin**                     represented by **Kristina A. Wolfe**
*in his official capacity as Secretary of the*              (See above for address)
*Department of Homeland Security*                       *LEAD ATTORNEY*
                                          *ATTORNEY TO BE NOTICED*

                                          **Richard Cody Giles**
                                          (See above for address)
                                          *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 07/28/2025 | 1 | COMPLAINT against Department of Homeland Security, Kristi Noem Filing fee: $ 405, receipt number AMADC-11144147 (Fee Status: Filing Fee paid), filed by Alliance of Baptists, American Baptist Churches USA, Greater Milwaukee Synod, Evangelical Lutheran Church in America, Metropolitan Community Churches, New England Synod, Evangelical Lutheran Church in America, North Pacific Yearly Meeting of the Religious Society of Friends, Pacific Yearly Meeting of the Religious Society of Friends, San Francisco Friends Meeting of the Religious Society of Friends, Sierra Pacific Synod, Evangelical Lutheran Church in America, Southwest California Synod, Evangelical Lutheran Church in America, Southwestern Texas Synod, Evangelical Lutheran Church in America. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Civil Cover Sheet, # 11 Category Form)(Samburg, Mark) (Entered: 07/28/2025) |
| 07/28/2025 | 2 | MOTION for Leave to File Excess Pages *in Memorandum in Support of Motion for Preliminary Relief* by Alliance of Baptists, American Baptist Churches USA, Greater Milwaukee Synod, Evangelical Lutheran Church in America, Metropolitan Community Churches, New England Synod, Evangelical Lutheran Church in America, North Pacific Yearly Meeting of the Religious Society of Friends, Pacific Yearly Meeting of the Religious Society of Friends, San Francisco Friends Meeting of the Religious Society of Friends, Sierra Pacific Synod, Evangelical Lutheran Church in America, Southwest California Synod, Evangelical Lutheran Church in America, Southwestern Texas Synod, Evangelical Lutheran Church in America.(Samburg, Mark) (Entered: 07/28/2025) |
| 07/28/2025 | 3 | MOTION for Leave to Appear Pro Hac Vice for admission of Kevin E. Friedl Filing fee: $ 125, receipt number AMADC-11144404 by Alliance of Baptists, American Baptist Churches USA, Greater Milwaukee Synod, Evangelical Lutheran Church in America, Metropolitan Community Churches, New England Synod, Evangelical Lutheran Church in America, North Pacific Yearly Meeting of the Religious Society of Friends, Pacific Yearly Meeting of the Religious Society of Friends, San Francisco Friends Meeting of the Religious Society of Friends, Sierra Pacific Synod, Evangelical Lutheran Church in America, Southwest California Synod, Evangelical Lutheran Church in America, Southwestern Texas Synod, Evangelical Lutheran Church in America. (Attachments: # 1 Affidavit Declaration of Kevin E. Friedl)(Samburg, Mark) (Entered: 07/28/2025) |
| 07/28/2025 | 4 | MOTION for Leave to Appear Pro Hac Vice for admission of Sarah R. Goetz Filing fee: $ 125, receipt number AMADC-11144452 by Alliance of Baptists, American Baptist |

JA28

| | | |
|---|---|---|
| | | Churches USA, Greater Milwaukee Synod, Evangelical Lutheran Church in America, Metropolitan Community Churches, New England Synod, Evangelical Lutheran Church in America, North Pacific Yearly Meeting of the Religious Society of Friends, Pacific Yearly Meeting of the Religious Society of Friends, San Francisco Friends Meeting of the Religious Society of Friends, Sierra Pacific Synod, Evangelical Lutheran Church in America, Southwest California Synod, Evangelical Lutheran Church in America, Southwestern Texas Synod, Evangelical Lutheran Church in America. (Attachments: # 1 Affidavit Declaration of Sarah R. Goetz)(Samburg, Mark) (Entered: 07/28/2025) |
| 07/28/2025 | 5 | MOTION for Leave to Appear Pro Hac Vice for admission of J. Sterling Moore Filing fee: $ 125, receipt number AMADC-11144468 by Alliance of Baptists, American Baptist Churches USA, Greater Milwaukee Synod, Evangelical Lutheran Church in America, Metropolitan Community Churches, New England Synod, Evangelical Lutheran Church in America, North Pacific Yearly Meeting of the Religious Society of Friends, Pacific Yearly Meeting of the Religious Society of Friends, San Francisco Friends Meeting of the Religious Society of Friends, Sierra Pacific Synod, Evangelical Lutheran Church in America, Southwest California Synod, Evangelical Lutheran Church in America, Southwestern Texas Synod, Evangelical Lutheran Church in America. (Attachments: # 1 Affidavit Declaration of J. Sterling Moore)(Samburg, Mark) (Entered: 07/28/2025) |
| 07/28/2025 | 6 | MOTION for Leave to Appear Pro Hac Vice for admission of Andrew Bookbinder Filing fee: $ 125, receipt number AMADC-11144483 by Alliance of Baptists, American Baptist Churches USA, Greater Milwaukee Synod, Evangelical Lutheran Church in America, Metropolitan Community Churches, New England Synod, Evangelical Lutheran Church in America, North Pacific Yearly Meeting of the Religious Society of Friends, Pacific Yearly Meeting of the Religious Society of Friends, San Francisco Friends Meeting of the Religious Society of Friends, Sierra Pacific Synod, Evangelical Lutheran Church in America, Southwest California Synod, Evangelical Lutheran Church in America, Southwestern Texas Synod, Evangelical Lutheran Church in America. (Attachments: # 1 Affidavit Declaration of Andrew Bookbinder)(Samburg, Mark) (Entered: 07/28/2025) |
| 07/28/2025 | 7 | MOTION for Leave to Appear Pro Hac Vice for admission of Audrey Wiggins Filing fee: $ 125, receipt number AMADC-11144486 by Alliance of Baptists, American Baptist Churches USA, Greater Milwaukee Synod, Evangelical Lutheran Church in America, Metropolitan Community Churches, New England Synod, Evangelical Lutheran Church in America, North Pacific Yearly Meeting of the Religious Society of Friends, Pacific Yearly Meeting of the Religious Society of Friends, San Francisco Friends Meeting of the Religious Society of Friends, Sierra Pacific Synod, Evangelical Lutheran Church in America, Southwest California Synod, Evangelical Lutheran Church in America, Southwestern Texas Synod, Evangelical Lutheran Church in America. (Attachments: # 1 Affidavit Declaration of Audrey Wiggins)(Samburg, Mark) (Main Document 7 replaced on 7/29/2025) (MAC). (Attachment 1 replaced on 7/29/2025) (MAC). **Modified on 7/29/2025: Declaration document improperly filed as the main document. Admission for pro hac document incorrectly filed as the Declaration** . (MAC) (Entered: 07/28/2025) |
| 07/28/2025 | 8 | ELECTRONIC NOTICE of Case Assignment. District Judge F. Dennis Saylor, IV assigned to case. If the trial Judge issues an Order of Reference of any matter in this case to a Magistrate Judge, the matter will be transmitted to Magistrate Judge M. Page Kelley. (JB) (Entered: 07/28/2025) |
| 07/28/2025 | 9 | Summons Issued as to All Defendants. **Counsel receiving this notice electronically should download this summons, complete one for each defendant and serve it in accordance with Fed.R.Civ.P. 4 and LR 4.1. Summons will be mailed to plaintiff(s) not receiving notice electronically for completion of service.** (JB) (Entered: 07/28/2025) |

JA29

| 07/28/2025 | 10 | MOTION for Leave to Appear Pro Hac Vice for admission of Sonia W. Murphy Filing fee: $ 125, receipt number AMADC-11145061 by Alliance of Baptists, American Baptist Churches USA, Greater Milwaukee Synod, Metropolitan Community Churches, New England Synod, North Pacific Yearly Meeting of the Religious Society of Friends, Pacific Yearly Meeting of the Religious Society of Friends, San Francisco Friends Meeting of the Religious Society of Friends, Sierra Pacific Synod, Southwest California Synod, Southwestern Texas Synod. (Attachments: # 1 Appendix Declaration of Sonia W. Murphy)(Samburg, Mark) (Entered: 07/28/2025) |
|---|---|---|
| 07/28/2025 | 11 | MOTION for Leave to Appear Pro Hac Vice for admission of Brandon A. Levey Filing fee: $ 125, receipt number AMADC-11145082 by Alliance of Baptists, American Baptist Churches USA, Greater Milwaukee Synod, Metropolitan Community Churches, New England Synod, North Pacific Yearly Meeting of the Religious Society of Friends, Pacific Yearly Meeting of the Religious Society of Friends, San Francisco Friends Meeting of the Religious Society of Friends, Sierra Pacific Synod, Southwest California Synod, Southwestern Texas Synod. (Attachments: # 1 Affidavit Declaration of Brandon A. Levey)(Samburg, Mark) (Entered: 07/28/2025) |
| 07/28/2025 | 12 | MOTION for Leave to Appear Pro Hac Vice for admission of Sarah A. Sraders Filing fee: $ 125, receipt number AMADC-11145095 by Alliance of Baptists, American Baptist Churches USA, Greater Milwaukee Synod, Metropolitan Community Churches, New England Synod, North Pacific Yearly Meeting of the Religious Society of Friends, Pacific Yearly Meeting of the Religious Society of Friends, San Francisco Friends Meeting of the Religious Society of Friends, Sierra Pacific Synod, Southwest California Synod, Southwestern Texas Synod. (Attachments: # 1 Affidavit Declaration of Sarah A. Sraders) (Samburg, Mark) (Entered: 07/28/2025) |
| 07/28/2025 | 13 | MOTION for Leave to Appear Pro Hac Vice for admission of Madeleine Gates Filing fee: $ 125, receipt number AMADC-11145109 by Alliance of Baptists, American Baptist Churches USA, Greater Milwaukee Synod, Metropolitan Community Churches, New England Synod, North Pacific Yearly Meeting of the Religious Society of Friends, Pacific Yearly Meeting of the Religious Society of Friends, San Francisco Friends Meeting of the Religious Society of Friends, Sierra Pacific Synod, Southwest California Synod, Southwestern Texas Synod. (Attachments: # 1 Affidavit Declaration of Madeleine Gates) (Samburg, Mark) (Entered: 07/28/2025) |
| 07/28/2025 | 14 | MOTION for Leave to Appear Pro Hac Vice for admission of Ryan Downer Filing fee: $ 125, receipt number AMADC-11145114 by Alliance of Baptists, American Baptist Churches USA, Greater Milwaukee Synod, Metropolitan Community Churches, New England Synod, North Pacific Yearly Meeting of the Religious Society of Friends, Pacific Yearly Meeting of the Religious Society of Friends, San Francisco Friends Meeting of the Religious Society of Friends, Sierra Pacific Synod, Southwest California Synod, Southwestern Texas Synod. (Attachments: # 1 Affidavit Declaration of Ryan Downer) (Samburg, Mark) (Entered: 07/28/2025) |
| 07/28/2025 | 15 | MOTION for Leave to Appear Pro Hac Vice for admission of Melissa Colon Filing fee: $ 125, receipt number AMADC-11145117 by Alliance of Baptists, American Baptist Churches USA, Greater Milwaukee Synod, Metropolitan Community Churches, New England Synod, North Pacific Yearly Meeting of the Religious Society of Friends, Pacific Yearly Meeting of the Religious Society of Friends, San Francisco Friends Meeting of the Religious Society of Friends, Sierra Pacific Synod, Southwest California Synod, Southwestern Texas Synod. (Attachments: # 1 Affidavit Declaration of Melissa Colon) (Samburg, Mark) (Entered: 07/28/2025) |
| 07/28/2025 | 16 | MOTION for Leave to Appear Pro Hac Vice for admission of Richard J. Leveridge Filing fee: $ 125, receipt number AMADC-11145123 by Alliance of Baptists, American Baptist |

JA30

| | | |
|---|---|---|
| | | Churches USA, Greater Milwaukee Synod, Metropolitan Community Churches, New England Synod, North Pacific Yearly Meeting of the Religious Society of Friends, Pacific Yearly Meeting of the Religious Society of Friends, San Francisco Friends Meeting of the Religious Society of Friends, Sierra Pacific Synod, Southwest California Synod, Southwestern Texas Synod. (Attachments: # 1 Affidavit Declaration of Richard J. Leveridge)(Samburg, Mark) (Entered: 07/28/2025) |
| 07/28/2025 | 17 | MOTION for Leave to Appear Pro Hac Vice for admission of Samone Ijoma Filing fee: $125, receipt number AMADC-11145131 by Alliance of Baptists, American Baptist Churches USA, Greater Milwaukee Synod, Metropolitan Community Churches, New England Synod, North Pacific Yearly Meeting of the Religious Society of Friends, Pacific Yearly Meeting of the Religious Society of Friends, San Francisco Friends Meeting of the Religious Society of Friends, Sierra Pacific Synod, Southwest California Synod, Southwestern Texas Synod. (Attachments: # 1 Affidavit Declaration of Samone Ijoma) (Samburg, Mark) (Entered: 07/28/2025) |
| 07/28/2025 | 18 | District Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered GRANTING 3 Motion for Leave to Appear Pro Hac Vice Added Kevin E. Friedl. **Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.** Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen-current-pacer-accounts.htm#link-account. (MAC) (Entered: 07/29/2025) |
| 07/28/2025 | 19 | District Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered GRANTING 4 Motion for Leave to Appear Pro Hac Vice Added Sarah R. Goetz. **Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.** Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm. A Notice of Appearance must be entered on the docket by the newly admitted attorney. (MAC) (Entered: 07/29/2025) |
| 07/28/2025 | 20 | District Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered GRANTING 5 Motion for Leave to Appear Pro Hac Vice Added J. Sterling Moore. **Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.** |

JA31

| | | |
|---|---|---|
| | | Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm. <br><br> A Notice of Appearance must be entered on the docket by the newly admitted attorney. <br><br> (MAC) (Entered: 07/29/2025) |
| 07/28/2025 | 21 | District Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered GRANTING 6 Motion for Leave to Appear Pro Hac Vice Added Andrew Bookbinder. <br><br> **Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.** <br><br> Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm. <br><br> A Notice of Appearance must be entered on the docket by the newly admitted attorney. <br><br> (MAC) (Entered: 07/29/2025) |
| 07/28/2025 | 22 | District Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered GRANTING 7 Motion for Leave to Appear Pro Hac Vice Added Audrey Wiggins. <br><br> **Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.** <br><br> Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm. <br><br> A Notice of Appearance must be entered on the docket by the newly admitted attorney. <br><br> (MAC) (Entered: 07/29/2025) |

JA32

| 07/28/2025 | 23 | District Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered GRANTING 10 Motion for Leave to Appear Pro Hac Vice Added Sonia W. Murphy.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(MAC) (Entered: 07/29/2025) |
| 07/28/2025 | 24 | District Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered GRANTING 11 Motion for Leave to Appear Pro Hac Vice Added Brandon A. Levey.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(MAC) (Entered: 07/29/2025) |
| 07/28/2025 | 25 | District Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered GRANTING 12 Motion for Leave to Appear Pro Hac Vice Added Sarah A. Sraders.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(MAC) (Entered: 07/29/2025) |
| 07/28/2025 | 26 | District Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered GRANTING 13 Motion for Leave to Appear Pro Hac Vice Added Madeleine Gates.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To** |

JA33

| | | |
|---|---|---|
| | | register for a PACER account, go the Pacer website at **https://pacer.uscourts.gov/register-account**. **You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(MAC) (Entered: 07/29/2025) |
| 07/28/2025 | 27 | District Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered GRANTING 14 Motion for Leave to Appear Pro Hac Vice Added Ryan Downer.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(MAC) (Entered: 07/29/2025) |
| 07/28/2025 | 28 | District Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered GRANTING 15 Motion for Leave to Appear Pro Hac Vice Added Melissa Colon.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(MAC) (Entered: 07/29/2025) |
| 07/28/2025 | 30 | District Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered GRANTING 16 Motion for Leave to Appear Pro Hac Vice Added Richard J. Leveridge.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.** |

JA34

| | | |
|---|---|---|
| | | Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm. A Notice of Appearance must be entered on the docket by the newly admitted attorney. (MAC) (Entered: 07/29/2025) |
| 07/28/2025 | 31 | District Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered GRANTING 17 Motion for Leave to Appear Pro Hac Vice Added Samone Ijoma. **Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.** Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm. A Notice of Appearance must be entered on the docket by the newly admitted attorney. (MAC) (Entered: 07/29/2025) |
| 07/29/2025 | 29 | District Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered granting 2 MOTION for Leave to File Excess Pages in Memorandum in Support of Motion for Preliminary Relief ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (MMM) (Entered: 07/29/2025) |
| 07/29/2025 | 32 | MOTION Stay Under 5 U.S.C. § 705 *or, in the alternative,*, MOTION for Preliminary Injunction ( Responses due by 8/12/2025) by Alliance of Baptists, American Baptist Churches USA, Greater Milwaukee Synod, Metropolitan Community Churches, New England Synod, North Pacific Yearly Meeting of the Religious Society of Friends, Pacific Yearly Meeting of the Religious Society of Friends, San Francisco Friends Meeting of the Religious Society of Friends, Sierra Pacific Synod, Southwest California Synod, Southwestern Texas Synod. (Attachments: # 1 Text of Proposed Order)(Friedl, Kevin) (Entered: 07/29/2025) |
| 07/29/2025 | 33 | MEMORANDUM in Support re 32 MOTION Stay Under 5 U.S.C. § 705 *or, in the alternative,* MOTION for Preliminary Injunction filed by Alliance of Baptists, American Baptist Churches USA, Greater Milwaukee Synod, Metropolitan Community Churches, New England Synod, North Pacific Yearly Meeting of the Religious Society of Friends, Pacific Yearly Meeting of the Religious Society of Friends, San Francisco Friends Meeting of the Religious Society of Friends, Sierra Pacific Synod, Southwest California Synod, Southwestern Texas Synod. (Attachments: # 1 Exhibit 10, # 2 Exhibit 11, # 3 Exhibit 12, # 4 Exhibit 13, # 5 Exhibit 14, # 6 Exhibit 15, # 7 Exhibit 16, # 8 Exhibit 17, # 9 Exhibit 18, # 10 Exhibit 19, # 11 Exhibit 20, # 12 Exhibit 21, # 13 Exhibit 22, # 14 Exhibit 23, # 15 Exhibit 24, # 16 Exhibit 25, # 17 Exhibit 26)(Friedl, Kevin) (Entered: 07/29/2025) |
| 07/29/2025 | 34 | NOTICE of Appearance by John Sterling Moore on behalf of Alliance of Baptists, American Baptist Churches USA, Greater Milwaukee Synod, Metropolitan Community Churches, New England Synod, North Pacific Yearly Meeting of the Religious Society of Friends, Pacific Yearly Meeting of the Religious Society of Friends, San Francisco |

JA35

| | | Friends Meeting of the Religious Society of Friends, Sierra Pacific Synod, Southwest California Synod, Southwestern Texas Synod (Moore, John) (Entered: 07/29/2025) |
|---|---|---|
| 07/29/2025 | 35 | NOTICE of Appearance by Sarah Goetz on behalf of Alliance of Baptists, American Baptist Churches USA, Greater Milwaukee Synod, Metropolitan Community Churches, New England Synod, North Pacific Yearly Meeting of the Religious Society of Friends, Pacific Yearly Meeting of the Religious Society of Friends, San Francisco Friends Meeting of the Religious Society of Friends, Sierra Pacific Synod, Southwest California Synod, Southwestern Texas Synod (Goetz, Sarah) (Entered: 07/29/2025) |
| 07/29/2025 | 36 | NOTICE of Appearance by Andrew Liang Bookbinder on behalf of Alliance of Baptists, American Baptist Churches USA, Greater Milwaukee Synod, Metropolitan Community Churches, New England Synod, North Pacific Yearly Meeting of the Religious Society of Friends, Pacific Yearly Meeting of the Religious Society of Friends, San Francisco Friends Meeting of the Religious Society of Friends, Sierra Pacific Synod, Southwest California Synod, Southwestern Texas Synod (Bookbinder, Andrew) (Entered: 07/29/2025) |
| 07/29/2025 | 37 | NOTICE of Appearance by Audrey Jordan Wiggins on behalf of Alliance of Baptists, American Baptist Churches USA, Greater Milwaukee Synod, Metropolitan Community Churches, New England Synod, North Pacific Yearly Meeting of the Religious Society of Friends, Pacific Yearly Meeting of the Religious Society of Friends, San Francisco Friends Meeting of the Religious Society of Friends, Sierra Pacific Synod, Southwest California Synod, Southwestern Texas Synod (Wiggins, Audrey) (Entered: 07/29/2025) |
| 07/30/2025 | 38 | NOTICE of Appearance by Sonia W Murphy on behalf of Alliance of Baptists, American Baptist Churches USA, Greater Milwaukee Synod, Metropolitan Community Churches, New England Synod, North Pacific Yearly Meeting of the Religious Society of Friends, Pacific Yearly Meeting of the Religious Society of Friends, San Francisco Friends Meeting of the Religious Society of Friends, Sierra Pacific Synod, Southwest California Synod, Southwestern Texas Synod (Murphy, Sonia) (Entered: 07/30/2025) |
| 07/30/2025 | 39 | NOTICE of Appearance by Richard James Leveridge on behalf of Alliance of Baptists, American Baptist Churches USA, Greater Milwaukee Synod, Metropolitan Community Churches, New England Synod, North Pacific Yearly Meeting of the Religious Society of Friends, Pacific Yearly Meeting of the Religious Society of Friends, San Francisco Friends Meeting of the Religious Society of Friends, Sierra Pacific Synod, Southwest California Synod, Southwestern Texas Synod (Leveridge, Richard) (Entered: 07/30/2025) |
| 07/30/2025 | 40 | NOTICE of Appearance by Sarah Sraders on behalf of Alliance of Baptists, American Baptist Churches USA, Greater Milwaukee Synod, Metropolitan Community Churches, New England Synod, North Pacific Yearly Meeting of the Religious Society of Friends, Pacific Yearly Meeting of the Religious Society of Friends, San Francisco Friends Meeting of the Religious Society of Friends, Sierra Pacific Synod, Southwest California Synod, Southwestern Texas Synod (Sraders, Sarah) (Entered: 07/30/2025) |
| 07/30/2025 | 41 | NOTICE of Appearance by Brandon Levey on behalf of Alliance of Baptists, American Baptist Churches USA, Greater Milwaukee Synod, Metropolitan Community Churches, New England Synod, North Pacific Yearly Meeting of the Religious Society of Friends, Pacific Yearly Meeting of the Religious Society of Friends, San Francisco Friends Meeting of the Religious Society of Friends, Sierra Pacific Synod, Southwest California Synod, Southwestern Texas Synod (Levey, Brandon) (Entered: 07/30/2025) |
| 07/31/2025 | 42 | NOTICE of Appearance by Samone Ijoma on behalf of Alliance of Baptists, American Baptist Churches USA, Greater Milwaukee Synod, Metropolitan Community Churches, New England Synod, North Pacific Yearly Meeting of the Religious Society of Friends, Pacific Yearly Meeting of the Religious Society of Friends, San Francisco Friends |

JA36

| | | |
|---|---|---|
| | | Meeting of the Religious Society of Friends, Sierra Pacific Synod, Southwest California Synod, Southwestern Texas Synod (Ijoma, Samone) (Entered: 07/31/2025) |
| 08/01/2025 | 43 | NOTICE of Appearance by Madeleine Gates on behalf of Alliance of Baptists, American Baptist Churches USA, Greater Milwaukee Synod, Metropolitan Community Churches, New England Synod, North Pacific Yearly Meeting of the Religious Society of Friends, Pacific Yearly Meeting of the Religious Society of Friends, San Francisco Friends Meeting of the Religious Society of Friends, Sierra Pacific Synod, Southwest California Synod, Southwestern Texas Synod (Gates, Madeleine) (Entered: 08/01/2025) |
| 08/04/2025 | 44 | MOTION for Leave to Appear Pro Hac Vice for admission of Brittney M. Welch Filing fee: $ 125, receipt number AMADC-11157803 by Alliance of Baptists, American Baptist Churches USA, Greater Milwaukee Synod, Metropolitan Community Churches, New England Synod, North Pacific Yearly Meeting of the Religious Society of Friends, Pacific Yearly Meeting of the Religious Society of Friends, San Francisco Friends Meeting of the Religious Society of Friends, Sierra Pacific Synod, Southwest California Synod, Southwestern Texas Synod. (Attachments: # 1 Affidavit Declaration of Brittney M. Welch)(Samburg, Mark) (Entered: 08/04/2025) |
| 08/04/2025 | 47 | District Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered GRANTING 44 Motion for Leave to Appear Pro Hac Vice Added Brittney M. Welch.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(MAC) (Entered: 08/05/2025) |
| 08/05/2025 | 45 | SUMMONS Returned Executed by San Francisco Friends Meeting of the Religious Society of Friends, Metropolitan Community Churches, Southwest California Synod, Pacific Yearly Meeting of the Religious Society of Friends, American Baptist Churches USA, Greater Milwaukee Synod, North Pacific Yearly Meeting of the Religious Society of Friends, Southwestern Texas Synod, New England Synod, Alliance of Baptists, Sierra Pacific Synod. (Attachments: # 1 Affidavit of Service - Department of Homeland Security, # 2 Affidavit of Service - Kristi Noem)(Murphy, Sonia) (Entered: 08/05/2025) |
| 08/05/2025 | 46 | SUMMONS Returned Executed as to US Attorney by San Francisco Friends Meeting of the Religious Society of Friends, Metropolitan Community Churches, Southwest California Synod, Pacific Yearly Meeting of the Religious Society of Friends, American Baptist Churches USA, Greater Milwaukee Synod, North Pacific Yearly Meeting of the Religious Society of Friends, Southwestern Texas Synod, New England Synod, Alliance of Baptists, Sierra Pacific Synod. All Defendants. (Murphy, Sonia) (Entered: 08/05/2025) |
| 08/07/2025 | 48 | NOTICE of Appearance by Richard Cody Giles on behalf of Department of Homeland Security, Kristi Noem (Giles, Richard) (Entered: 08/07/2025) |
| 08/07/2025 | 49 | **SCHEDULING ORDER re Preliminary Injunction filings:**<br>Opposition to Motion shall be filed by 8/18/25.<br>Reply memorandum shall be filed by 8/25/25. |

JA37

| | | |
|---|---|---|
| | | **NOTICE OF HEARING:** Motion Hearing set for 9/9/2025 02:00 PM in Courtroom 1 (In person only) before District Judge F. Dennis Saylor IV. (MMM) (Entered: 08/07/2025) |
| 08/08/2025 | 50 | NOTICE of Appearance by Brittney M. Welch on behalf of Alliance of Baptists, American Baptist Churches USA, Greater Milwaukee Synod, Metropolitan Community Churches, New England Synod, North Pacific Yearly Meeting of the Religious Society of Friends, Pacific Yearly Meeting of the Religious Society of Friends, San Francisco Friends Meeting of the Religious Society of Friends, Sierra Pacific Synod, Southwest California Synod, Southwestern Texas Synod (Welch, Brittney) (Entered: 08/08/2025) |
| 08/08/2025 | 51 | Joint MOTION for Leave to File Excess Pages by Department of Homeland Security, Kristi Noem. (Attachments: # 1 Proposed Order)(Giles, Richard) (Entered: 08/08/2025) |
| 08/08/2025 | 52 | District Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered granting 51 Joint MOTION for Leave to File Excess Pages; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (MMM) (Entered: 08/08/2025) |
| 08/13/2025 | 53 | NOTICE of Appearance by Ryan C. Downer on behalf of Alliance of Baptists, American Baptist Churches USA, Greater Milwaukee Synod, Metropolitan Community Churches, New England Synod, North Pacific Yearly Meeting of the Religious Society of Friends, Pacific Yearly Meeting of the Religious Society of Friends, San Francisco Friends Meeting of the Religious Society of Friends, Sierra Pacific Synod, Southwest California Synod, Southwestern Texas Synod (Downer, Ryan) (Entered: 08/13/2025) |
| 08/15/2025 | 54 | MOTION to Withdraw as Attorney *of Sarah A. Sraders* by Alliance of Baptists, American Baptist Churches USA, Greater Milwaukee Synod, Metropolitan Community Churches, New England Synod, North Pacific Yearly Meeting of the Religious Society of Friends, Pacific Yearly Meeting of the Religious Society of Friends, San Francisco Friends Meeting of the Religious Society of Friends, Sierra Pacific Synod, Southwest California Synod, Southwestern Texas Synod. (Attachments: # 1 Proposed Order)(Sraders, Sarah) (Entered: 08/15/2025) |
| 08/18/2025 | 55 | Consent MOTION Excuse Attendance of Local Counsel by Alliance of Baptists, American Baptist Churches USA, Greater Milwaukee Synod, Metropolitan Community Churches, New England Synod, North Pacific Yearly Meeting of the Religious Society of Friends, Pacific Yearly Meeting of the Religious Society of Friends, San Francisco Friends Meeting of the Religious Society of Friends, Sierra Pacific Synod, Southwest California Synod, Southwestern Texas Synod.(Samburg, Mark) (Entered: 08/18/2025) |
| 08/18/2025 | 56 | Opposition re 32 MOTION Stay Under 5 U.S.C. § 705 *or, in the alternative,* MOTION for Preliminary Injunction filed by Department of Homeland Security, Kristi Noem. (Attachments: # 1 Exhibit Transcript of Hearing - DPS v. Noem, # 2 Exhibit Declaration of Officer Kincaid, # 3 Proposed Order)(Giles, Richard) (Entered: 08/18/2025) |
| 08/25/2025 | 57 | REPLY to Response to 32 MOTION Stay Under 5 U.S.C. § 705 *or, in the alternative,* MOTION for Preliminary Injunction filed by Alliance of Baptists, American Baptist Churches USA, Greater Milwaukee Synod, Metropolitan Community Churches, New England Synod, North Pacific Yearly Meeting of the Religious Society of Friends, Pacific Yearly Meeting of the Religious Society of Friends, San Francisco Friends Meeting of the Religious Society of Friends, Sierra Pacific Synod, Southwest California Synod, Southwestern Texas Synod. (Friedl, Kevin) (Entered: 08/25/2025) |

JA38

| | | |
|---|---|---|
| 09/03/2025 | 58 | NOTICE of Appearance by Melissa Colon on behalf of Alliance of Baptists, American Baptist Churches USA, Greater Milwaukee Synod, Metropolitan Community Churches, New England Synod, North Pacific Yearly Meeting of the Religious Society of Friends, Pacific Yearly Meeting of the Religious Society of Friends, San Francisco Friends Meeting of the Religious Society of Friends, Sierra Pacific Synod, Southwest California Synod, Southwestern Texas Synod (Colon, Melissa) (Entered: 09/03/2025) |
| 09/03/2025 | 59 | District Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered granting 55 Consent MOTION Excuse Attendance of Local Counsel. (MMM) (Entered: 09/03/2025) |
| 09/09/2025 | 60 | Electronic Clerk's Notes for proceedings held before District Judge F. Dennis Saylor, IV: Motion Hearing held on 9/9/2025. Case called; Arguments heard; Court takes matter under advisement. (Court Reporter: Valerie OHara at vaohara@gmail.com.)(Attorneys present: Kevin Friedl, Andrew Bookbinder, John Moore, Audrey Wiggins, Sonia Murphy and Samone Ijoma for the plaintiffs. Richard Giles for the government.) (MMM) (Entered: 09/09/2025) |
| 09/15/2025 | 61 | Transcript of Motion Hearing held on September 9, 2025, before Judge F. Dennis Saylor IV. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Valerie OHara at vaohara@gmail.com. Redaction Request due 10/6/2025. Redacted Transcript Deadline set for 10/16/2025. Release of Transcript Restriction set for 12/15/2025. (DRK) (Entered: 09/15/2025) |
| 09/15/2025 | 62 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm (DRK) (Entered: 09/15/2025) |
| 09/15/2025 | 63 | MOTION for Extension of Time to File Answer *Unopposed by Plaintiffs* by Department of Homeland Security, Kristi Noem. (Attachments: # 1 Proposed Order)(Giles, Richard) (Entered: 09/15/2025) |
| 09/16/2025 | 64 | District Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered granting 63 MOTION for Extension of Time to File Answer Unopposed by Plaintiff. Defendant answer due 30 days after the resolution of the pending motion to stay. (MMM) (Entered: 09/16/2025) |
| 11/21/2025 | 65 | NOTICE by Alliance of Baptists, American Baptist Churches USA, Greater Milwaukee Synod, Metropolitan Community Churches, New England Synod, North Pacific Yearly Meeting of the Religious Society of Friends, Pacific Yearly Meeting of the Religious Society of Friends, San Francisco Friends Meeting of the Religious Society of Friends, Sierra Pacific Synod, Southwest California Synod, Southwestern Texas Synod *Plaintiffs' Notice of Supplemental Facts and Reports of Impending Enforcement Operations* (Attachments: # 1 Affidavit Declaration of J. Sterling Moore and Exhibits)(Moore, John) (Attachment 1 replaced on 11/26/2025) (MAC). (Additional attachment(s) added on 11/26/2025: # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9) (MAC). (Entered: 11/21/2025) |
| 11/24/2025 | 66 | Notice of Supplemental Authorities re 32 MOTION Stay Under 5 U.S.C. § 705 *or, in the alternative,* MOTION for Preliminary Injunction (Attachments: # 1 Make the Road New York v. Noem, No. 25-5320 (D.C. Cir. Nov. 22, 2025))(Friedl, Kevin) (Entered: 11/24/2025) |
| 11/26/2025 | 67 | NOTICE re 65 **ELECTRONIC NOTICE TO COUNSEL:** In the future all exhibits should be separated and filed as separate attachments. Counsel is reminded to review the local rules and the attorney handbook when filing documents with the Court by accessing |

JA39

| | | |
|---|---|---|
| | | our web page, at www.mad.uscourts.gov under CM/ECF E-Filing. (MAC) (Entered: 11/26/2025) |
| 12/11/2025 | 68 | MOTION for Leave to Appear Pro Hac Vice for admission of Ayesha N. Khan Filing fee: $ 125, receipt number AMADC-11414925 by Alliance of Baptists, American Baptist Churches USA, Greater Milwaukee Synod, Metropolitan Community Churches, New England Synod, North Pacific Yearly Meeting of the Religious Society of Friends, Pacific Yearly Meeting of the Religious Society of Friends, San Francisco Friends Meeting of the Religious Society of Friends, Sierra Pacific Synod, Southwest California Synod, Southwestern Texas Synod. (Attachments: # 1 Affidavit Declaration of Ayesha N. Khan) (Samburg, Mark) (Entered: 12/11/2025) |
| 12/12/2025 | 69 | District Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered granting 68 Motion for Leave to Appear Pro Hac Vice Added Ayesha N. Khan. |
| | | **Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.** |
| | | Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm. |
| | | A Notice of Appearance must be entered on the docket by the newly admitted attorney. |
| | | (MBM) (Entered: 12/12/2025) |
| 12/16/2025 | 70 | NOTICE of Appearance by Ayesha N. Khan on behalf of Alliance of Baptists, American Baptist Churches USA, Greater Milwaukee Synod, Metropolitan Community Churches, New England Synod, North Pacific Yearly Meeting of the Religious Society of Friends, Pacific Yearly Meeting of the Religious Society of Friends, San Francisco Friends Meeting of the Religious Society of Friends, Sierra Pacific Synod, Southwest California Synod, Southwestern Texas Synod (Khan, Ayesha) (Entered: 12/16/2025) |
| 01/06/2026 | 71 | NOTICE of Withdrawal of Appearance by Melissa Colon (Attachments: # 1 Text of Proposed Order [PROPOSED] ORDER GRANTING MOTION FOR LEAVE TO WITHDRAW AS COUNSEL)(Colon, Melissa) (Entered: 01/06/2026) |
| 01/13/2026 | 72 | NOTICE by Alliance of Baptists, American Baptist Churches USA, Greater Milwaukee Synod, Metropolitan Community Churches, New England Synod, North Pacific Yearly Meeting of the Religious Society of Friends, Pacific Yearly Meeting of the Religious Society of Friends, San Francisco Friends Meeting of the Religious Society of Friends, Sierra Pacific Synod, Southwest California Synod, Southwestern Texas Synod *Plaintiffs' Second Notice of Supplemental Facts* (Attachments: # 1 Exhibit 27, # 2 Exhibit 28) (Friedl, Kevin) (Entered: 01/13/2026) |
| 02/03/2026 | 73 | Second Notice of Supplemental Authorities re 32 MOTION Stay Under 5 U.S.C. § 705 *or, in the alternative,* MOTION for Preliminary Injunction (Attachments: # 1 Philadelphia Yearly Meeting v. DHS, No. 25-cv-0243 (D. Md. Feb. 3, 2026))(Friedl, Kevin) (Entered: 02/03/2026) |
| 02/13/2026 | 74 | District Judge F. Dennis Saylor, IV: MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION FOR STAY UNDER 5 U.S.C. § 705 OR, IN THE ALTERNATIVE, |

JA40

PRELIMINARY INJUNCTION entered.

For the foregoing reasons, plaintiffs' motion for a stay or preliminary injunction is GRANTED in part and DENIED in part. The Court will enter a separate preliminary injunction order.

**So Ordered**.

(MAC) (Entered: 02/13/2026)

| | | |
|---|---|---|
| 02/13/2026 | 75 | District Judge F. Dennis Saylor, IV: PRELIMINARY INJUNCTION ORDER entered. (MAC) (Entered: 02/13/2026) |
| 02/19/2026 | 76 | MOTION to Seal Document , MOTION for Protective Order *and Request for Expedited Consideration* ( Responses due by 3/5/2026) by Alliance of Baptists, American Baptist Churches USA, Greater Milwaukee Synod, Metropolitan Community Churches, New England Synod, North Pacific Yearly Meeting of the Religious Society of Friends, Pacific Yearly Meeting of the Religious Society of Friends, San Francisco Friends Meeting of the Religious Society of Friends, Sierra Pacific Synod, Southwest California Synod, Southwestern Texas Synod. (Attachments: # 1 Exhibit A, # 2 Proposed Protective Order) (Friedl, Kevin) (Entered: 02/19/2026) |
| 02/26/2026 | 77 | District Judge F. Dennis Saylor, IV: MEMORANDUM AND ORDER ON PLAINTIFFS' CONSOLIDATED MOTIONTO IMPOUND AND FOR ENTRY OF PROTECTIVE ORDER entered. For the foregoing reasons, plaintiffs' consolidated motion to impound and for entry of protective order is DENIED. **So Ordered.** (MAC) (Entered: 02/26/2026) |
| 02/27/2026 | 78 | NOTICE by Alliance of Baptists, American Baptist Churches USA, Greater Milwaukee Synod, Metropolitan Community Churches, New England Synod, North Pacific Yearly Meeting of the Religious Society of Friends, Pacific Yearly Meeting of the Religious Society of Friends, San Francisco Friends Meeting of the Religious Society of Friends, Sierra Pacific Synod, Southwest California Synod, Southwestern Texas Synod *of Filing in Compliance with Preliminary Injunction, ECF 75* (Attachments: # 1 Protected Areas Address List)(Gates, Madeleine) (Entered: 02/27/2026) |
| 03/05/2026 | 79 | RECEIPT: Receipt # 100014705 for monies received on 2/19/2026 in amount of $ 100.00, re: 75 Preliminary Injunction. (LBO) (Entered: 03/05/2026) |
| 03/06/2026 | 80 | NOTICE by Alliance of Baptists, American Baptist Churches USA, Greater Milwaukee Synod, Metropolitan Community Churches, New England Synod, North Pacific Yearly Meeting of the Religious Society of Friends, Pacific Yearly Meeting of the Religious Society of Friends, San Francisco Friends Meeting of the Religious Society of Friends, Sierra Pacific Synod, Southwest California Synod, Southwestern Texas Synod *of Filing in Compliance with Preliminary Injunction, ECF 75* (Attachments: # 1 Protected Areas Address and Descriptions List)(Gates, Madeleine) (Entered: 03/06/2026) |
| 03/10/2026 | 81 | NOTICE of Appearance by Kristina A. Wolfe on behalf of Department of Homeland Security, Kristi Noem (Wolfe, Kristina) (Entered: 03/10/2026) |

JA41

| | | |
|---|---|---|
| 03/10/2026 | 82 | Consent MOTION for Extension of Time to March 30, 2026 to Respond to Complaint by Department of Homeland Security, Kristi Noem. (Attachments: # 1 Text of Proposed Order)(Wolfe, Kristina) (Entered: 03/10/2026) |
| 03/10/2026 | 83 | District Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered granting 82 Consent MOTION for Extension of Time to March 30, 2026 to Respond to Complaint (MMM) (Entered: 03/10/2026) |
| 03/26/2026 | 84 | Consent MOTION for Extension of Time to April 13, 2026 to respond to the complaint by Department of Homeland Security, Kristi L. Noem. (Attachments: # 1 Text of Proposed Order)(Giles, Richard) (Entered: 03/26/2026) |
| 03/26/2026 | 85 | District Judge F. Dennis Saylor, IV: ELECTRONIC ORDER entered granting 84 Consent MOTION for Extension of Time to April 13, 2026 to respond to the complaint. (MMM) (Entered: 03/26/2026) |
| 04/08/2026 | 86 | Joint MOTION *for a Scheduling Order Governing Further Proceedings* by Department of Homeland Security, Kristi L. Noem. (Attachments: # 1 Text of Proposed Order)(Giles, Richard) (Entered: 04/08/2026) |
| 04/14/2026 | 87 | NOTICE OF APPEAL as to 75 Preliminary Injunction, 74 Memorandum & ORDER, by Department of Homeland Security, Kristi L. Noem. Fee Status: US Government. <br><br> NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be downloaded from the First Circuit Court of Appeals web site at http://www.ca1.uscourts.gov MUST be completed and submitted to the Court of Appeals. **Counsel shall register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf. Counsel shall also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf. US District Court Clerk to deliver official record to Court of Appeals by 5/4/2026. (Wolfe, Kristina) (Entered: 04/14/2026)** |
| 04/14/2026 | 88 | Certified and Transmitted Abbreviated Electronic Record on Appeal to US Court of Appeals re 87 Notice of Appeal. (MAP) (Entered: 04/14/2026) |
| 04/14/2026 | 89 | USCA Case Number 26-1396 for 87 Notice of Appeal, filed by Kristi L. Noem, Department of Homeland Security. (MAP) (Entered: 04/14/2026) |
| 04/17/2026 | 90 | NOTICE by Department of Homeland Security, Kristi L. Noem *of Production of Administrative Record* (Attachments: # 1 Exhibit DHS AR Index, # 2 Exhibit DHS AR Certification, # 3 Exhibit ICE AR Index, # 4 Exhibit ICE AR Certification)(Wolfe, Kristina) (Entered: 04/17/2026) |
| 04/22/2026 | 91 | District Judge F. Dennis Saylor, IV: SCHEDULING ORDER entered. (MMM) (Entered: 04/22/2026) |
| 04/22/2026 | 92 | **ELECTRONIC NOTICE of Hearing:** Status Conference set for 6/16/2026 03:20 PM by telephone before District Judge F. Dennis Saylor IV. (MMM) (Entered: 04/22/2026) |
| 04/27/2026 | 93 | NOTICE OF CROSS APPEAL as to 75 Preliminary Injunction, 74 Memorandum & ORDER, by Alliance of Baptists, American Baptist Churches USA, Greater Milwaukee Synod, Metropolitan Community Churches, New England Synod, North Pacific Yearly Meeting of the Religious Society of Friends, Pacific Yearly Meeting of the Religious Society of Friends, San Francisco Friends Meeting of the Religious Society of Friends, Sierra Pacific Synod, Southwest California Synod, Southwestern Texas Synod. ( Filing fee: $ 605, receipt number AMADC-11702829 (Fee Status: Filing Fee paid)) NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be downloaded from the First Circuit Court of Appeals web site at http://www.ca1.uscourts.gov MUST be |

JA42

|  |  | completed and submitted to the Court of Appeals. **Counsel shall register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf. Counsel shall also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/efiling.htm.** US District Court Clerk to deliver official record to Court of Appeals by 5/18/2026. (Friedl, Kevin) (Entered: 04/27/2026) |
| --- | --- | --- |
| 04/30/2026 | 94 | Certified and Transmitted Abbreviated Electronic Record on Appeal to US Court of Appeals re 93 Notice of Cross Appeal. (MAC) (Entered: 04/30/2026) |
| 04/30/2026 | 95 | USCA Case Number 26-1493 for 93 Notice of Cross Appeal filed by Southwestern Texas Synod, Sierra Pacific Synod, Greater Milwaukee Synod, Alliance of Baptists, American Baptist Churches USA, Southwest California Synod, Metropolitan Community Churches, North Pacific Yearly Meeting of the Religious Society of Friends, San Francisco Friends Meeting of the Religious Society of Friends, Pacific Yearly Meeting of the Religious Society of Friends, New England Synod. (MAC) (Entered: 04/30/2026) |
| 05/11/2026 | 96 | NOTICE by Alliance of Baptists, American Baptist Churches USA, Greater Milwaukee Synod, Metropolitan Community Churches, New England Synod, North Pacific Yearly Meeting of the Religious Society of Friends, Pacific Yearly Meeting of the Religious Society of Friends, San Francisco Friends Meeting of the Religious Society of Friends, Sierra Pacific Synod, Southwest California Synod, Southwestern Texas Synod *of Filing in Compliance with Preliminary Injunction, ECF 75* (Attachments: # 1 Exhibit Protected Areas Address List, revised)(Gates, Madeleine) (Entered: 05/11/2026) |
| 06/04/2026 | 97 | AMENDED COMPLAINT against All Defendants, filed by Alliance of Baptists, American Baptist Churches USA, Greater Milwaukee Synod, Metropolitan Community Churches, New England Synod, North Pacific Yearly Meeting of the Religious Society of Friends, Pacific Yearly Meeting of the Religious Society of Friends, San Francisco Friends Meeting of the Religious Society of Friends, Sierra Pacific Synod, Southwest California Synod, Southwestern Texas Synod, Metropolitan New York Synod, Northwest Washington Synod, Minneapolis Area Synod, Delaware- Maryland Synod, Metro D.C. Synod, Southeastern Synod, Metropolitan Chicago Synod, Pacifica Synod, Upstate New York Synod, District of Columbia Baptist Convention, Southern New England Conference, United Church of Christ. (Attachments: # 1 Exhibit 1-1993 Enforcement, # 2 Exhibit 2-2008 Sen. Lo. Memo, # 3 Exhibit 3 - 2011 Sen. Lo. Policy, # 4 Exhibit 4 - Mayorkas Memo, # 5 Exhibit 5 - 01.27.2025 ICE Website, # 6 Exhibit 6 - Huffman Memo, # 7 Exhibit 7 - 2025.01.21 Statement from DHS, # 8 Exhibit 8 - Vitello Memo, # 9 Exhibit 9 - 2021 GAO Report, # 10 Redline FAC)(Gates, Madeleine) (Entered: 06/04/2026) |
| 06/12/2026 | 98 | NOTICE of Appearance by Andrew Liang Bookbinder on behalf of Alliance of Baptists, American Baptist Churches USA, Delaware- Maryland Synod, District of Columbia Baptist Convention, Greater Milwaukee Synod, Metro D.C. Synod, Metropolitan Chicago Synod, Metropolitan Community Churches, Metropolitan New York Synod, Minneapolis Area Synod, New England Synod, North Pacific Yearly Meeting of the Religious Society of Friends, Northwest Washington Synod, Pacific Yearly Meeting of the Religious Society of Friends, Pacifica Synod, San Francisco Friends Meeting of the Religious Society of Friends, Sierra Pacific Synod, Southeastern Synod, Southern New England Conference, United Church of Christ, Southwest California Synod, Southwestern Texas Synod, Upstate New York Synod (Bookbinder, Andrew) (Entered: 06/12/2026) |
| 06/12/2026 | 99 | NOTICE of Appearance by Sarah Goetz on behalf of Alliance of Baptists, American Baptist Churches USA, Delaware- Maryland Synod, District of Columbia Baptist Convention, Greater Milwaukee Synod, Metro D.C. Synod, Metropolitan Chicago Synod, Metropolitan Community Churches, Metropolitan New York Synod, Minneapolis Area |

JA43

| | | |
|---|---|---|
| | | Synod, New England Synod, North Pacific Yearly Meeting of the Religious Society of Friends, Northwest Washington Synod, Pacific Yearly Meeting of the Religious Society of Friends, Pacifica Synod, San Francisco Friends Meeting of the Religious Society of Friends, Sierra Pacific Synod, Southeastern Synod, Southern New England Conference, United Church of Christ, Southwest California Synod, Southwestern Texas Synod, Upstate New York Synod (Goetz, Sarah) (Entered: 06/12/2026) |
| 06/12/2026 | 100 | NOTICE of Appearance by Kevin E. Friedl on behalf of Alliance of Baptists, American Baptist Churches USA, Delaware- Maryland Synod, District of Columbia Baptist Convention, Greater Milwaukee Synod, Metro D.C. Synod, Metropolitan Chicago Synod, Metropolitan Community Churches, Metropolitan New York Synod, Minneapolis Area Synod, New England Synod, North Pacific Yearly Meeting of the Religious Society of Friends, Northwest Washington Synod, Pacific Yearly Meeting of the Religious Society of Friends, Pacifica Synod, San Francisco Friends Meeting of the Religious Society of Friends, Sierra Pacific Synod, Southeastern Synod, Southern New England Conference, United Church of Christ, Southwest California Synod, Southwestern Texas Synod, Upstate New York Synod (Friedl, Kevin) (Entered: 06/12/2026) |
| 06/12/2026 | 101 | NOTICE of Appearance by Ayesha N. Khan on behalf of Alliance of Baptists, American Baptist Churches USA, Delaware- Maryland Synod, District of Columbia Baptist Convention, Greater Milwaukee Synod, Metro D.C. Synod, Metropolitan Chicago Synod, Metropolitan Community Churches, Metropolitan New York Synod, Minneapolis Area Synod, New England Synod, North Pacific Yearly Meeting of the Religious Society of Friends, Northwest Washington Synod, Pacific Yearly Meeting of the Religious Society of Friends, Pacifica Synod, San Francisco Friends Meeting of the Religious Society of Friends, Sierra Pacific Synod, Southeastern Synod, Southern New England Conference, United Church of Christ, Southwest California Synod, Southwestern Texas Synod, Upstate New York Synod (Khan, Ayesha) (Entered: 06/12/2026) |
| 06/12/2026 | 102 | NOTICE of Appearance by Mark Samburg on behalf of Alliance of Baptists, American Baptist Churches USA, Delaware- Maryland Synod, District of Columbia Baptist Convention, Greater Milwaukee Synod, Metro D.C. Synod, Metropolitan Chicago Synod, Metropolitan Community Churches, Metropolitan New York Synod, Minneapolis Area Synod, New England Synod, North Pacific Yearly Meeting of the Religious Society of Friends, Northwest Washington Synod, Pacific Yearly Meeting of the Religious Society of Friends, Pacifica Synod, San Francisco Friends Meeting of the Religious Society of Friends, Sierra Pacific Synod, Southeastern Synod, Southern New England Conference, United Church of Christ, Southwest California Synod, Southwestern Texas Synod, Upstate New York Synod (Samburg, Mark) (Entered: 06/12/2026) |
| 06/12/2026 | 103 | NOTICE of Appearance by John Sterling Moore on behalf of Alliance of Baptists, American Baptist Churches USA, Delaware- Maryland Synod, District of Columbia Baptist Convention, Greater Milwaukee Synod, Metro D.C. Synod, Metropolitan Chicago Synod, Metropolitan Community Churches, Metropolitan New York Synod, Minneapolis Area Synod, New England Synod, North Pacific Yearly Meeting of the Religious Society of Friends, Northwest Washington Synod, Pacific Yearly Meeting of the Religious Society of Friends, Pacifica Synod, San Francisco Friends Meeting of the Religious Society of Friends, Sierra Pacific Synod, Southeastern Synod, Southern New England Conference, United Church of Christ, Southwest California Synod, Southwestern Texas Synod, Upstate New York Synod (Moore, John) (Entered: 06/12/2026) |
| 06/16/2026 | 104 | Electronic Clerk's Notes for proceedings held before District Judge F. Dennis Saylor, IV: Case called; Status discussed; Motion hearing set.<br><br>**NOTICE OF HEARING:** Motion Hearing set for 10/14/2026 02:30 PM in by video before District Judge F. Dennis Saylor IV. |

JA44

| | | (Court Reporter: Linda Horne at lindahorne1@charter.net.)(Attorneys present: Kevin Friedl for the plaintiff. Richard Giles for the defendant.) (MMM) (Entered: 06/16/2026) |
|---|---|---|
| 06/17/2026 | 105 | NOTICE of Appearance by Sonia W Murphy on behalf of Alliance of Baptists, American Baptist Churches USA, Delaware- Maryland Synod, District of Columbia Baptist Convention, Greater Milwaukee Synod, Metro D.C. Synod, Metropolitan Chicago Synod, Metropolitan Community Churches, Metropolitan New York Synod, Minneapolis Area Synod, New England Synod, North Pacific Yearly Meeting of the Religious Society of Friends, Northwest Washington Synod, Pacific Yearly Meeting of the Religious Society of Friends, Pacifica Synod, San Francisco Friends Meeting of the Religious Society of Friends, Sierra Pacific Synod, Southeastern Synod, Southern New England Conference, United Church of Christ, Southwest California Synod, Southwestern Texas Synod, Upstate New York Synod (Murphy, Sonia) (Entered: 06/17/2026) |
| 06/17/2026 | 106 | NOTICE of Appearance by Richard James Leveridge on behalf of Alliance of Baptists, American Baptist Churches USA, Delaware- Maryland Synod, District of Columbia Baptist Convention, Greater Milwaukee Synod, Metro D.C. Synod, Metropolitan Chicago Synod, Metropolitan Community Churches, Metropolitan New York Synod, Minneapolis Area Synod, New England Synod, North Pacific Yearly Meeting of the Religious Society of Friends, Northwest Washington Synod, Pacific Yearly Meeting of the Religious Society of Friends, Pacifica Synod, San Francisco Friends Meeting of the Religious Society of Friends, Sierra Pacific Synod, Southeastern Synod, Southern New England Conference, United Church of Christ, Southwest California Synod, Southwestern Texas Synod, Upstate New York Synod (Leveridge, Richard) (Entered: 06/17/2026) |
| 06/17/2026 | 107 | NOTICE of Appearance by Samone Ijoma on behalf of Alliance of Baptists, American Baptist Churches USA, Delaware- Maryland Synod, District of Columbia Baptist Convention, Greater Milwaukee Synod, Metro D.C. Synod, Metropolitan Chicago Synod, Metropolitan Community Churches, Metropolitan New York Synod, Minneapolis Area Synod, New England Synod, North Pacific Yearly Meeting of the Religious Society of Friends, Northwest Washington Synod, Pacific Yearly Meeting of the Religious Society of Friends, Pacifica Synod, San Francisco Friends Meeting of the Religious Society of Friends, Sierra Pacific Synod, Southeastern Synod, Southern New England Conference, United Church of Christ, Southwest California Synod, Southwestern Texas Synod, Upstate New York Synod (Ijoma, Samone) (Entered: 06/17/2026) |
| 06/17/2026 | 108 | NOTICE of Appearance by Brandon Levey on behalf of Alliance of Baptists, American Baptist Churches USA, Delaware- Maryland Synod, District of Columbia Baptist Convention, Greater Milwaukee Synod, Metro D.C. Synod, Metropolitan Chicago Synod, Metropolitan Community Churches, Metropolitan New York Synod, Minneapolis Area Synod, New England Synod, North Pacific Yearly Meeting of the Religious Society of Friends, Northwest Washington Synod, Pacific Yearly Meeting of the Religious Society of Friends, Pacifica Synod, San Francisco Friends Meeting of the Religious Society of Friends, Sierra Pacific Synod, Southeastern Synod, Southern New England Conference, United Church of Christ, Southwest California Synod, Southwestern Texas Synod, Upstate New York Synod (Levey, Brandon) (Entered: 06/17/2026) |
| 06/17/2026 | 109 | NOTICE of Appearance by Brittney M. Welch on behalf of Alliance of Baptists, American Baptist Churches USA, Delaware- Maryland Synod, District of Columbia Baptist Convention, Greater Milwaukee Synod, Metro D.C. Synod, Metropolitan Chicago Synod, Metropolitan Community Churches, Metropolitan New York Synod, Minneapolis Area Synod, New England Synod, North Pacific Yearly Meeting of the Religious Society of Friends, Northwest Washington Synod, Pacific Yearly Meeting of the Religious Society of Friends, Pacifica Synod, San Francisco Friends Meeting of the Religious Society of Friends, Sierra Pacific Synod, Southeastern Synod, Southern New England |

JA45

| | | Conference, United Church of Christ, Southwest California Synod, Southwestern Texas Synod, Upstate New York Synod (Welch, Brittney) (Entered: 06/17/2026) |
|---|---|---|
| 06/18/2026 | 110 | MOTION for Summary Judgment by Alliance of Baptists, American Baptist Churches USA, Delaware- Maryland Synod, District of Columbia Baptist Convention, Greater Milwaukee Synod, Metro D.C. Synod, Metropolitan Chicago Synod, Metropolitan Community Churches, Metropolitan New York Synod, Minneapolis Area Synod, New England Synod, North Pacific Yearly Meeting of the Religious Society of Friends, Northwest Washington Synod, Pacific Yearly Meeting of the Religious Society of Friends, Pacifica Synod, San Francisco Friends Meeting of the Religious Society of Friends, Sierra Pacific Synod, Southeastern Synod, Southern New England Conference, United Church of Christ, Southwest California Synod, Southwestern Texas Synod, Upstate New York Synod. (Attachments: # 1 Text of Proposed Order)(Friedl, Kevin) (Entered: 06/18/2026) |
| 06/18/2026 | 111 | MEMORANDUM in Support re 110 MOTION for Summary Judgment filed by Alliance of Baptists, American Baptist Churches USA, Delaware- Maryland Synod, District of Columbia Baptist Convention, Greater Milwaukee Synod, Metro D.C. Synod, Metropolitan Chicago Synod, Metropolitan Community Churches, Metropolitan New York Synod, Minneapolis Area Synod, New England Synod, North Pacific Yearly Meeting of the Religious Society of Friends, Northwest Washington Synod, Pacific Yearly Meeting of the Religious Society of Friends, Pacifica Synod, San Francisco Friends Meeting of the Religious Society of Friends, Sierra Pacific Synod, Southeastern Synod, Southern New England Conference, United Church of Christ, Southwest California Synod, Southwestern Texas Synod, Upstate New York Synod. (Attachments: # 1 Ex. 1, # 2 Ex. 2, # 3 Ex. 3, # 4 Ex. 4, # 5 Ex. 5, # 6 Ex. 6, # 7 Ex. 7, # 8 Ex. 8, # 9 Ex. 9, # 10 Ex. 10, # 11 Ex. 11, # 12 Ex. 12, # 13 Ex. 13, # 14 Ex. 14, # 15 Ex. 15, # 16 Ex. 16, # 17 Ex. 17, # 18 Ex. 18, # 19 Ex. 19, # 20 Ex. 20, # 21 Ex. 21, # 22 Ex. 22, # 23 Ex. 23, # 24 Ex. 24, # 25 Ex. 25, # 26 Ex. 26, # 27 Ex. 27, # 28 Ex. 28, # 29 Ex. 29, # 30 Ex. 30, # 31 Ex. 31, # 32 Ex. 32, # 33 Ex. 33, # 34 Ex. 34, # 35 Ex. 35, # 36 Ex. 36, # 37 Ex. 37, # 38 Ex. 38, # 39 Ex. 39, # 40 Ex. 40, # 41 Ex. 41, # 42 Ex. 42, # 43 Ex. 43, # 44 Ex. 44, # 45 Ex. 45, # 46 Ex. 46, # 47 Ex. 47, # 48 Ex. 48, # 49 Ex. 49, # 50 Ex. 50, # 51 Ex. 51, # 52 Ex. 52, # 53 Ex. 53, # 54 Ex. 54, # 55 Ex. 55, # 56 Ex. 56, # 57 Ex. 57, # 58 Ex. 58, # 59 Ex. 59, # 60 Ex. 60, # 61 Ex. 61, # 62 Ex. 62, # 63 Ex. 63, # 64 Ex. 64, # 65 Ex. 65, # 66 Ex. 66, # 67 Ex. 67, # 68 Ex. 68, # 69 Ex. 69, # 70 Ex. 70, # 71 Ex. 71, # 72 Ex. 72, # 73 Ex. 73, # 74 Ex. 74, # 75 Ex. 75, # 76 Ex. 76, # 77 Ex. 77, # 78 Ex. 78, # 79 Ex. 79, # 80 Ex. 80, # 81 Ex. 81, # 82 Ex. 82, # 83 Ex. 83, # 84 Ex. 84, # 85 Ex. 85, # 86 Ex. 86, # 87 Ex. 87, # 88 Ex. 88, # 89 Ex. 89, # 90 Decl. of Kevin E. Friedl, # 91 Index of Exhibits)(Friedl, Kevin) (Attachment 90 replaced on 6/22/2026) (MAC). (Attachment 84 replaced on 6/22/2026) (MAC). (Entered: 06/18/2026) |
| 06/26/2026 | 112 | NOTICE of Appearance by Ryan C. Downer on behalf of Alliance of Baptists, American Baptist Churches USA, Delaware- Maryland Synod, District of Columbia Baptist Convention, Greater Milwaukee Synod, Metro D.C. Synod, Metropolitan Chicago Synod, Metropolitan Community Churches, Metropolitan New York Synod, Minneapolis Area Synod, New England Synod, North Pacific Yearly Meeting of the Religious Society of Friends, Northwest Washington Synod, Pacific Yearly Meeting of the Religious Society of Friends, Pacifica Synod, San Francisco Friends Meeting of the Religious Society of Friends, Sierra Pacific Synod, Southeastern Synod, Southern New England Conference, United Church of Christ, Southwest California Synod, Southwestern Texas Synod, Upstate New York Synod (Downer, Ryan) (Entered: 06/26/2026) |
| 07/23/2026 | 113 | Opposition re 110 MOTION for Summary Judgment filed by Department of Homeland Security, Markwayne Mullin. (Attachments: # 1 Exhibit A, # 2 Text of Proposed Order) (Wolfe, Kristina) (Entered: 07/23/2026) |

JA46

| 07/23/2026 | 114 | Cross MOTION for Summary Judgment *and Motion to Sever on Grounds of Improper Joinder* by Department of Homeland Security, Markwayne Mullin. (Attachments: # 1 Text of Proposed Order)(Wolfe, Kristina) (Entered: 07/23/2026) |
| 07/23/2026 | 115 | MEMORANDUM in Support re 114 Cross MOTION for Summary Judgment *and Motion to Sever on Grounds of Improper Joinder* filed by Department of Homeland Security, Markwayne Mullin. (Attachments: # 1 Exhibit A)(Wolfe, Kristina) (Entered: 07/23/2026) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 07/24/2026 12:48:46 | | |
| **PACER Login:** | ssmith1129 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 4:25-cv-40102-FDS |
| **Billable Pages:** | 30 | **Cost:** | 3.00 |

JA47

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**
**CENTRAL DIVISION**

|  |  |
|---|---|
| **New England Synod, Evangelical Lutheran Church in America; Greater Milwaukee Synod, Evangelical Lutheran Church in America; Southwest California Synod, Evangelical Lutheran Church in America; Southwestern Texas Synod, Evangelical Lutheran Church in America; Sierra Pacific Synod, Evangelical Lutheran Church in America; San Francisco Friends Meeting of the Religious Society of Friends; Pacific Yearly Meeting of the Religious Society of Friends; North Pacific Yearly Meeting of the Religious Society of Friends; American Baptist Churches USA; Alliance of Baptists;** and **Metropolitan Community Churches,**<br><br>        Plaintiffs,<br><br>**v.**<br><br>**Department of Homeland Security** and **Kristi Noem**, in her official capacity as Secretary of the Department of Homeland Security,<br><br>        Defendants. | **Civil Case No.**<br><br>**COMPLAINT** |

1.     For over 30 years, the federal government restricted immigration enforcement at houses of worship and other "sensitive locations," recognizing that it could enforce immigration laws without, in its words, "denying . . . people of faith access to their places of worship."

2.     Under that policy, the government barred immigration enforcement in or near sensitive locations "to the fullest extent possible." Agents were allowed to carry out such actions only in exigent circumstances or with prior approval from supervisors who were themselves bound by the government's policy to avoid such actions whenever possible. Where enforcement actions

1

JA48

had to occur at sensitive locations, they were to be done in nonpublic areas and with the aim of minimizing the impact on people's access to the sensitive location.

3.      Soon after taking office, the new administration abruptly reversed course and abandoned these longstanding protections.

4.      In a memorandum issued on January 20, 2025, then-Acting Secretary of the Department of Homeland Security, Benjamine Huffman, rescinded the prior sensitive locations policy. In place of the guardrails that policy provided, Acting Secretary Huffman determined that the decision whether to carry out enforcement actions at or near houses of worship should be left to agents' individual discretion, guided only by "common sense."

5.      Unsurprisingly, the revocation of decades-old protections for churches and other sensitive locations by Defendants Department of Homeland Security ("DHS") and DHS Secretary Kristi Noem has led to a growing number of immigration enforcement actions at or near these formerly protected areas. In recent weeks, as the administration has accelerated its immigration enforcement efforts across the country, federal agents have become an increasingly common presence at houses of worship.

6.      For example, last month alone, agents seized a man in front of a church near Los Angeles and brandished a rifle at a pastor in the process; detained a grandfather in the same city who was dropping his granddaughter off at a church school; arrested a man outside a church in Oregon; and carried out arrests on two Catholic parish properties in Montclair and Highland, California.

7.      As a result, people across the country, regardless of immigration status, reasonably fear attending houses of worship. Churches have seen both attendance and financial giving plummet. Congregations have gone underground to protect their parishioners, eschewing in-person

2

meetings central to their faith. Baptisms that previously would have been occasions for communal worship and celebration are now being held in private. Families are making hard choices about which parent gets to practice their religion communally and which stays home, so that their children have at least one caregiver should the other be detained at Sunday service. Churches have quietly stopped advertising immigrant-focused ministries and have canceled programming that served immigrant populations who are now too fearful to attend. Congregations whose faith compels them to worship with open doors and open arms have suddenly had to lock those doors and train their staff how to respond to immigration raids. In many places of faith across the United States, the open joy and spiritual restoration of communal worship has been replaced by isolation, concealment, and fear.

8.      For Plaintiffs and their members, the present threat of surveillance, interrogation, or arrest at their houses of worship means, among other things, fewer congregants participating in communal worship; a diminished ability to provide or participate in religious ministries; and interference with their ability to fulfill their religious mandates, including their obligations to welcome all comers to worship and not to put any person in harm's way.

9.      Defendants' rescission of longstanding protections for houses of worship and other sensitive religious locations is not just harmful and un-American; it violates federal law.

10.      By unjustifiably and substantially burdening Plaintiffs' religious exercise and chilling their First Amendment right of expressive association, Defendants' new policy violates the First Amendment and the Religious Freedom Restoration Act ("RFRA"). And, as an unexplained and irrational change in agency policy, it violates the Administrative Procedure Act ("APA"). It is arbitrary and capricious, contrary to constitutional right, and in excess of statutory authority.

3

11.    The Court should hold the new policy unlawful and order appropriate preliminary and permanent relief.

## JURISDICTION AND VENUE

12.    This Court has federal-question jurisdiction under 28 U.S.C. § 1331. Plaintiffs allege violations of the First Amendment; RFRA, 42 U.S.C. § 2000bb, *et seq.*; and the APA, 5. U.S.C. § 701, *et seq.*

13.    Venue is proper under 28 U.S.C. § 1391(e)(1) because at least one Plaintiff resides in this district and no real property is involved in the action.

## PARTIES

14.    Plaintiff **New England Synod** is a regional body of the Evangelical Lutheran Church in America ("ELCA") with territory across New England. It represents 155 congregations and 10 synodically authorized worship communities and has its main offices in Worcester, Massachusetts.

15.    Plaintiff **Greater Milwaukee Synod** is a regional body of the ELCA that includes 115 congregations and other authorized worshipping communities with over 59,000 baptized members across southeast Wisconsin. Its main offices are in Milwaukee, Wisconsin.

16.    Plaintiff **Southwest California Synod** is a regional body of the ELCA that includes 105 congregations across five counties in California: Kern, Los Angeles, San Luis Obispo, Santa Barbara, and Ventura. Its main offices are in Glendale, California.

17.    Plaintiff **Southwestern Texas Synod** is a regional body of the ELCA that includes 113 congregations with over 26,000 worshipping members across southwest Texas. Its headquarters are in Seguin, Texas.

4

18.    Plaintiff **Sierra Pacific Synod** is a regional body of the ELCA with territory covering Northern California and Northern Nevada. It comprises more than 170 congregations, ministries, and authorized worshipping communities; along with a camp, seminary, and a social service agency. Its main offices are in Berkeley, California.

19.    Plaintiff **San Francisco Friends Meeting of the Religious Society of Friends** is a Quaker religious corporation located in San Francisco, California.

20.    Plaintiff **Pacific Yearly Meeting of the Religious Society of Friends** is the association of the members of 34 local Quaker congregations—Monthly Meetings—in California, Nevada, Hawaii, and Mexico. It was formed in 1947 and legally incorporated as a 501(c)(3) nonprofit organization in 2004.

21.    Plaintiff **North Pacific Yearly Meeting of the Religious Society of Friends** is the formal and legal association of more than 20 local Quaker congregations throughout parts of Washington, Oregon, Idaho, and Montana. It has met continuously since 1972, and is headquartered in Portland, Oregon.

22.    Plaintiff **American Baptist Churches USA** is the formal and legal association of approximately 4,700 congregations across the United States. It was named American Baptist Churches USA in 1972. It is the successor of the American Baptist Convention, which was originally known as Northern Baptist Convention and traces its roots to the first Baptist association formed in 1707. Its main offices are in King of Prussia, Pennsylvania.

23.    Plaintiff **Alliance of Baptists** is a partnership of approximately 5,000 individuals and roughly 155 member congregations mutually supporting one another to pursue God's justice in the world. It was founded in 1987 and has its main offices in Raleigh, North Carolina.

24.     Plaintiff **Metropolitan Community Churches** is the formal and legal association of approximately 90 churches throughout the United States and 27 additional churches globally. It was founded in 1968 and has its principal address in Venice, Florida.

25.     Defendant **Department of Homeland Security** is the federal agency responsible for enforcing United States immigration laws and policies. DHS contains component agencies, including U.S. Citizenship and Immigration Services ("USCIS"), U.S. Immigration and Customs Enforcement ("ICE"), and U.S. Customs and Border Protection ("CBP").

26.     Defendant **Kristi Noem** is sued in her official capacity as the Secretary of the Department of Homeland Security.

## FACTUAL BACKGROUND

### *The Government's Longstanding Policy Toward "Sensitive Locations"*

27.     For more than 30 years, it has been the government's policy not to conduct immigration enforcement operations in certain "sensitive locations"—also referred to as "protected areas"—such as houses of worship and other places where religious activities are taking place.

28.     In 1993, the Immigration and Naturalization Service ("INS") adopted a policy "to attempt to avoid apprehension of persons and to tightly control investigative operations on the premises of schools, places of worship, funerals and other religious ceremonies." Ex. 1, Memorandum from James A. Puleo, INS Acting Associate Commissioner, "Enforcement Activities at Schools, Places of Worship, or at funerals or other religious ceremonies" HQ 807-P (May 17, 1993). Under that policy, the INS required written advance notice of operations that were likely to involve such sensitive locations. *Id.* at 1. It set standards for when such operations were appropriate and required agents to consider ways to "minimize the impact on operation of the …

6

place of worship." *Id.* at 2. And it provided that when exigent circumstances arose that did not permit prior written approval before carrying out operations at a sensitive location, "the matter must be reported immediately" up the chain of command. *Id.*

29. INS ceased to exist in 2003, when most of its functions were transferred to ICE, USCIS, and CBP. In 2008, ICE reiterated the importance of avoiding enforcement "at or near sensitive community locations such as schools, places of worship, and funerals or other religious ceremonies," directing ICE personnel to "refrain from conducting enforcement actions or investigative activities" at such locations "except in limited circumstances." Ex. 2, Memorandum from Julie L. Myers, Assistant Secretary, ICE, "Field Guidance on Enforcement Actions or Investigative Activities at or Near Sensitive Community Locations" 10029.1 (Jul. 3, 2008). "Precedent for this approach is clear," the agency noted, citing the 1993 INS policy. *Id.* The memo outlined the extreme situations that might merit enforcement at or near sensitive locations, including "terrorism-related investigations" or "matters of public safety." *Id.*

30. In 2011, ICE adopted further guidance designed to ensure that enforcement actions neither occurred at nor were focused on sensitive locations absent either exigent circumstances (such as terrorism, imminent risk of death, or pursuit of a dangerous felon) or prior written approval. Ex. 3, Memorandum from John Morton, Director, ICE, "Enforcement Actions at or Focused on Sensitive Locations" 10029.2 (Oct. 24, 2011). Where "extraordinary circumstances" compelled enforcement action at or near a sensitive location, agents were required to "conduct themselves as discre[et]ly as possible, consistent with officer and public safety, and make every effort to limit the time at or focused on the sensitive location." *Id.* at 3.

31. In 2021, DHS Secretary Alejandro Mayorkas rescinded and superseded the prior memos while reaffirming the government's historic policy of avoiding enforcement at sensitive

7

JA54

locations. *See* Ex. 4, Memorandum from Alejandro N. Mayorkas, Secretary, DHS, to Tae D. Johnson, et al., "Guidelines for Enforcement Actions in or Near Protected Areas" (Oct. 27, 2021) ("Mayorkas Memo").

32. The Mayorkas Memo described a "fundamental" and "bedrock" principle: DHS can accomplish its mission "without denying or limiting individuals' access to needed medical care, children access to their schools, the displaced access to food and shelter, people of faith access to their places of worship, and more." *Id.* at 2. The memo recognized that enforcement actions in or around sensitive locations could "restrain people from accessing the protected area to receive essential services or engage in essential activities." *Id.* at 3.

33. The Mayorkas Memo thus announced that DHS had an "obligation to refrain, *to the fullest extent possible*, from conducting a law enforcement action in or near a protected area." *Id.* (emphasis added). And it explained that the "enforcement actions" covered by the policy "include, but are not limited to, such actions as arrests, civil apprehensions, searches, inspections, seizures, service of charging documents or subpoenas, interviews, and immigration enforcement surveillance." *Id.* at 4.

34. The Mayorkas Memo recognized that certain exigent circumstances might require enforcement in or near a sensitive location. Outside of those circumstances, however, it dictated that "an Agent or Officer must seek prior approval" before proceeding. *Id.* And because the Mayorkas Memo applied to all DHS personnel, not just line-level agents, any official asked to provide prior approval of an enforcement action at a sensitive location would themselves be bound by the rule that such actions were to be avoided "to the fullest extent possible." *Id.* at 3.

35. Consistent with that direction, ICE's website formerly emphasized that "[a]bsent exigent circumstances, DHS officers and agents *must* seek prior approval" before taking

enforcement actions at protected areas. Ex. 5, ICE, Protected Areas Enforcement Actions (accessed Jan. 27, 2025) (emphasis added). And it explained that individuals who believe DHS officers violated the sensitive locations policy should file complaints with ICE, CBP, the Office of the Inspector General, or the DHS Office for Civil Rights and Civil Liberties. *Id.* at 3.

### *The Current Administration Abandons Protections for Sensitive Locations*

36.    This January, DHS broke with decades of prior practice and removed the guardrails that had long protected houses of worship and other sensitive locations.

37.    In a short memo from then-Acting Secretary Benjamine Huffman, DHS rescinded the Mayorkas Memo and its protections for sensitive locations, effective immediately. Ex. 6, Memorandum from Benjamine C. Huffman, Acting Secretary, DHS, to Caleb Vitello, et al., "Enforcement Actions in or Near Protected Areas" (Jan. 20, 2025) ("Huffman Memo").

38.    The Huffman Memo jettisons the former rule that enforcement at sensitive locations should be avoided "to the fullest extent possible." It contains no replacement constraints on agents' authority. It does not require any internal process before agents may carry out enforcement at these locations. And it does not require that exigent circumstances exist before agents enter sensitive locations, let alone define what exigent circumstances could justify such operations. Instead, the Huffman Memo leaves these decisions to individual agents' "enforcement discretion" and "common sense," specifically disavowing the need for "bright line rules" to cabin that discretion. *Id.*

39.    Although DHS undid more than 30 years of policy, it did not explain why the previous policy had failed. It did not address how people may have come to rely on the policy. It did not address any of the harms it was likely to cause. And it did not outline any alternatives that the agency considered.

9

40.    In a press release issued the next day, DHS stated of its new policy:

> This action empowers the brave men and women in CBP and ICE to enforce our immigration laws and catch criminal aliens—including murders [*sic*] and rapists—who have illegally come into our country. Criminals will no longer be able to hide in America's schools and churches to avoid arrest. The Trump Administration will not tie the hands of our brave law enforcement, and instead trusts them to use common sense.

Ex. 7, DHS, Statement from a DHS Spokesperson on Directives Expanding Law Enforcement and Ending the Abuse of Humanitarian Parole (Jan. 21, 2025).

41.    Following the Huffman Memo, then-Acting ICE Director Caleb Vitello issued further instructions to staff. Ex. 8, Memorandum from Caleb Vitello, Acting Director, ICE, to Russell Hott, et al., "Common Sense Enforcement Actions in or Near Protected Areas" (Jan. 31, 2025) ("Vitello Memo" and, together with the Huffman Memo, the "2025 Policy"). The Vitello Memo applies to ICE personnel but not to CBP personnel. It states in relevant part:

> I have great faith in the judgment of our law enforcement personnel and, accordingly, charge Assistant Field Office Directors (AFODs) and Assistant Special Agents in Charge (ASACs) with responsibility for making case-by-case determinations regarding whether, where, and when to conduct an immigration enforcement action in or near a protected area. AFODs and ASACs may provide authorization for such actions either verbally or in writing. Before authorizing an immigration enforcement action at a site where a public demonstration is underway, AFODs and ASACs must consult with local Office of the Principal Legal Advisor leadership for guidance on constitutional considerations.

*Id.* at 2.

42.    ICE agents told Fox News when the new policy was announced that they expected it would "free them up to go after more illegal immigrants, because illegal immigrants have until now been able to hide near schools and churches and avoid arrest." Adam Shaw & Bill Melugin, *Trump DHS Repeals Key Mayorkas Memo Limiting ICE Agents, Orders Parole Review*, Fox News (Jan. 21, 2025), https://perma.cc/KSC2-MAUR.

***Implementation of the Administration's New Policy***

43.    From the start, the new DHS policy and its abrupt abandonment of decades of protections for sensitive locations "sow[ed] fear within . . . migrant-friendly congregations," and faith leaders reported almost immediately that it has caused many immigrants to fear attending houses of worship. Giovanna Dell'Orto, Luis Andres Henao & Deepa Bharath, *Trump won't ban immigration arrests at churches. Now clergy are weighing how to resist*, Associated Press (Jan. 23, 2025), https://perma.cc/C8GW-R586.

44.    Shortly after it issued, three of the largest Catholic organizations in the United States—the U.S. Conference of Catholic Bishops, the Catholic Health Association of the United States, and Catholic Charities USA—stated that, "[w]ith the mere rescission of the protected areas guidance," they were "already witnessing reticence among immigrants to engage in daily life, including . . . attending religious services." *Human Dignity is Not Dependent on a Person's Citizenship or Immigration Status*, U.S. Conf. of Cath. Bishops (Jan. 23, 2025), https://perma.cc/QP2N-77S6.

45.    The National Association of Evangelicals stated similarly that "[e]ven the announcement of this policy has caused fear, deterring some from attending church." Press Release, Nat'l Ass'n of Evangelicals, *National Association of Evangelicals Responds to New Executive Orders* (Jan. 22, 2025), https://perma.cc/77UB-H7N3.

46.    These fears were quickly borne out. On January 26, for example, the first Sunday following announcement of the 2025 Policy, ICE agents came to Fuente de Vida Church in Tucker, Georgia, while a worship service was ongoing, and arrested the congregant they sought—a father of three whose GPS ankle monitor began alarming mid-service—after he exited the church. Billal

11

Rahman, *ICE Strikes During Church Service to Arrest Migrant*, Newsweek (Jan. 30, 2025), https://perma.cc/7EJP-Q33G.

47.    The same day, in Washington State, federal agents in unmarked pickups and SUVs surrounded a family in their church parking lot as they were leaving Sunday services. Gustavo Sagrero Álvarez, *Washington family torn apart after father arrested outside of church and deported*, NPR (Mar. 6, 2025), https://perma.cc/L638-43VG. Men in bulletproof vests pulled the father out of his car and arrested him in front of his family and the church pastor. *Id.*; Gustavo Sagrero, *A high schooler stays back as his family, separated by deportation, returns to Guatemala*, NPR (Apr. 26, 2025), https://perma.cc/9T5J-B52T.

48.    These incidents continued over subsequent months, further stoking fear. *See, e.g.*, Myles Harris, '*Wrong on every level' Faith leaders lambast recent ICE operation at Charlotte church during preschool pickup*, WCNC (May 28, 2025), https://perma.cc/NS4W-YBNJ (reporting on an operation by armed ICE agents carried out during preschool pick-up time at a church in Charlotte, North Carolina).

49.    In recent weeks, however, the pace and aggression of immigration enforcement activities at houses of worship appears to have increased substantially.

50.    Last month, a group of armed, masked federal agents arrested a man outside a church in Downey, California, a predominately Latino suburb of Los Angeles. Jesus Jiménez and Emily Baumgaertner Nunn, *Church Leaders Shaken After a Man Was Detained in Their Parking Lot*, N.Y. Times (Jun. 11, 2025), https://perma.cc/M3MQ-KZRF. After a pastor told the masked agents they were on church property, one of them reportedly responded, "The whole country is our property." *Id.* After another pastor shouted instructions to the man being arrested, an agent pointed his rifle at her. *Id.*

51. That same day in Downey, federal agents stopped a man on the sidewalk in front of Our Lady of Perpetual Help as he was dropping his granddaughter off at the church's school. Karla Rendon, *Immigration raids reported near Downey churches*, NBC News (Jun. 11, 2025), https://perma.cc/W4DV-QPWW. Parishioners at churches in the area told reporters they were concerned that the same could happen elsewhere, and some churches began offering online streaming options for those who were worried about attending in-person service. Mónica De Anda, *Fear looms among immigrant community over church gatherings after ICE raid*, ABC News (Jun. 15, 2025), https://abc7.com/videoClip/16757306/.

52. Fears have grown to the point that church leadership have given the faithful permission not to attend services if they face a risk of immigration enforcement. During an immigration enforcement sweep in Nashville, Tennessee, the Diocese of Nashville issued a message telling worshippers they are not required to attend Sunday Mass if they fear for their well-being; the diocese reported that Sunday Mass attendance at its two major Spanish-speaking parishes was down about 50%. Gina Christian, *Amid immigration raids, Nashville diocese tells Catholics they don't have to attend Sunday Mass if safety is at risk*, America (May 15, 2025), https://perma.cc/Z8RS-NPEY.

53. On July 8, the Catholic Bishop of the San Bernadino Diocese was compelled to issue a similar statement, indefinitely lifting the obligation to attend Sunday mass for those "who, due to genuine fear of immigration enforcement actions, are unable to attend." Diocese of San Bernardino, *Decree Dispensing from the Obligation to Attend Sunday Mass* (Jul. 8, 2025), https://perma.cc/7ZSC-WCTH. The diocese reported that "attendance at Spanish-language Masses across its parishes had dropped by at least half." Claire Moses and Orlando Mayorquín, *L.A.-Area*

13

JA60

*Bishop Excuses Faithful From Mass Over Fear of Immigration Raids*, N.Y. Times (Jul. 10, 2025), https://perma.cc/8P2D-8866.

54.     In Chelsea, Massachusetts, some congregants are splitting their families up when attending church, because they are fearful that an ICE raid would leave their children parentless. Kristina Rex, *Some Massachusetts schools see spike in absences amid immigration fears*, CBS News (Feb. 13, 2025), https://perma.cc/Z88D-7T2A (reporting that some families are no longer attending church together so that only one parent would be deported in the event of an ICE raid at church).

55.     These fears are well-supported. In response to criticism of DHS's tactics in Los Angeles, Border Patrol Chief Gregory Bovino recently told reporters, "Better get used to us now, [']cause this is going to be normal very soon." He added: "We will go anywhere, anytime we want in Los Angeles." Kelli Johnson, *ICE in LA: Mayor Bass confronts federal agents in MacArthur Park, demands withdrawal*, Fox 11 Los Angeles (Jul. 7, 2025), https://perma.cc/9GYV-UY85.

56.     DHS has applied that "go anywhere" policy well beyond Los Angeles. It seized a man last month outside St. Michael's Episcopal Church in Oregon, taking him into ICE custody. Celine Stevens, *Vineyard business owner detained by ICE outside Oregon church amid heightened immigration enforcement*, KGW9 (Jun. 15, 2025), https://perma.cc/F8Z6-PY2E. Immediately following that arrest, attendance at the church's Spanish-language service dropped from the typical 40-50 people to just 12 adults and no children. *Id.*

57.     On June 20, ICE agents entered two Catholic parish properties in Montclair and Highland, California, detaining multiple people in the parking lot of St. Adelaide Church and arresting a man at Our Lady of Lourdes Church. Alexandra Crosnoe, *After Reports of ICE at*

14

*Catholic Churches, California Bishop Denounces Raids*, Mercury News (June 25, 2025) https://perma.cc/G3P2-APWR.

58.    The fears created by Defendants' new policy and the resulting wave of immigration enforcement at houses of worship extend far beyond people without lawful immigration status.

59.    Ample data shows that "[f]ears of detention and deportation are a concern for immigrants across immigration statuses." Shannon Schumacher et al., *Understanding the U.S. Immigrant Experience: The 2023/KFF LA Times Survey of Immigrants*, KFF (Sep. 17, 2023), https://perma.cc/UHB7-A7VN. A 2023 study described as "the largest and most representative survey of immigrants living in the U.S. to date" found that 26% of all immigrants, regardless of their own legal status, "worry they or a family member could be detained or deported." *Id.*

60.    That finding echoed previous research showing that even those with legal status fear immigration enforcement because they are "fearful for their family members or because their own 'status' might be questioned." Karen Hacker et al., *The Impact of Immigration and Customs Enforcement on Immigrant Health: Perceptions of Immigrants in Everett, Massachusetts, USA*, 73(4) Soc. Sci. & Med. 586 (2011), https://perma.cc/DRW9-SB2A.

61.    Such fears are reasonable, particularly given how often ICE operations sweep up citizens or others with legal status. In 2021, the Government Accountability Office reported that ICE "arrested 674, detained 121, and removed 70 potential U.S. citizens from fiscal year 2015 through the second quarter of fiscal year 2020." Ex. 9, U.S. Gov't Accountability Office, GAO-21-487, *Immigration Enforcement: Actions Needed to Better Track Cases Involving U.S. Citizenship Investigations* (2021).

62.    Similar mistakes are becoming increasingly common as Defendants rush to meet arrest quotas.

63.    In January, ICE agents conducting a warrantless raid in New Jersey detained a U.S. military veteran. *Mayor Ras. J. Baraka's Statement on ICE Raid on Newark Business Establishment*, City of Newark (Jan. 23, 2025), https://perma.cc/H7QX-82G6. ICE arrested and detained a Florida-born U.S. citizen, claiming his REAL ID was fake, while he was working at his construction job in Alabama. Naomi LaChance, *Trump's ICE Detains U.S. Citizen, Claiming His REAL ID Was Fake*, Naomi LaChance, Rolling Stone (May 24, 2025), https://perma.cc/NA6B-6F9M. A U.S.-born citizen was detained at the request of immigration authorities, and, despite demonstrating that he was a citizen, was released only after his case gained widespread media attention. Gisela Salamon, *A US citizen was held for pickup by ICE even after proving he was born in the country*, AP (Apr. 19, 2025), https://perma.cc/T7H9-5Y89. And, infamously, the administration rendered a man living in Maryland to a hellish Salvadoran super-prison by mistake—then fought efforts to secure his return. *See Noem v. Abrego Garcia*, 145 S. Ct. 1017, 1018 (2025).

64.    Indeed, a judge of the U.S. District Court for the Central District of California recently determined, on review of a "mountain of evidence presented," that defendants in that case—federal immigration enforcement authorities, including Secretary Noem—were responsible for carrying out detentive stops in Los Angeles without reasonable suspicion and based solely on race, accents, presence at a particular location, and profession. Order Granting Plaintiffs' *Ex Parte* Applications for Temporary Restraining Order and Order to Show Cause Regarding Preliminary Injunction, *Vasquez-Perdomo v. Noem*, No. 2:25-cv-05605, ECF No. 87 (C.D. Cal. July 11, 2025).

65.    The administration has indicated that it will only continue to escalate its efforts. President Trump recently directed ICE agents "to do all in their power to achieve the very important goal of delivering the single largest Mass Deportation Program in History" and stated

16

that "we must expand efforts to detain and deport Illegal Aliens in America's largest Cities, such as Los Angeles, Chicago, and New York." Donald J. Trump, "*Our Nation's ICE Officers have shown incredible strength, determination, and courage as they facilitate a very important mission, the largest Mass De...*" Truth Social (Jun. 15, 2025, 8:43 PM), https://perma.cc/LP22-CR95. This escalation extends to this District. During a recent Massachusetts immigration sweep dubbed "Operation Patriot," immigration authorities arrested more than 1,500 people across the state; a Milford resident described ICE "pounding on the back door" of Catholic Charities Worcester County during a food distribution drive. Isabela Dias, *How ICE's Arrest of a High School Student Activated a Massachusetts Town*, Mother Jones (Jul. 15, 2025), https://perma.cc/GUR9-FE29.

66.    Defendants now have more resources than ever with which to conduct immigration enforcement: Earlier this month, Congress appropriated more than $6 billion dollars for hiring additional CBP personnel and almost $30 billion that can be used for hiring ICE agents. H.R. 1, 119th Cong. §§ 90002, 100052 (2025). The nearly $30 billion in additional funding for ICE is comparable to the annual military budgets of Italy, Israel, and the Netherlands. Brendan Cole and John Feng, *ICE Budget Now Bigger Than Most of the World's Militaries*, Newsweek (Jul. 2, 2025), https://perma.cc/7VKM-979H.

***Plaintiffs' Religious Beliefs and Their Connections to Immigrant Communities***

**New England Synod, ELCA; Greater Milwaukee Synod, ELCA; Southwest California Synod, ELCA; Southwestern Texas Synod, ELCA; and Sierra Pacific Synod, ELCA**

67.    The New England Synod, Greater Milwaukee Synod, Southwest California Synod, Southwestern Texas Synod, and Sierra Pacific Synod (collectively, "the Synods") are regional bodies of the ELCA with shared religious commitments to welcoming all who wish to worship and seeking to protect the most vulnerable.

17

JA64

68.    The New England Synod includes 165 congregations and authorized worship communities across Massachusetts, Maine, Rhode Island, Connecticut, New Hampshire, Vermont, and a small part of eastern New York. It contains congregations that serve sizable immigrant populations from across the world, including the Dominican Republic, Liberia, China, and Central and South America. These congregations include people both with and without documented legal status.

69.    The Greater Milwaukee Synod includes 115 congregations and other authorized worshipping communities in the greater Milwaukee area. It contains churches with significant Latino memberships, including congregants from El Salvador, Colombia, Venezuela, Guatemala, and Honduras. Some of these congregants have documented status; some do not.

70.    The Southwest California Synod includes 105 congregations in the Southwest region of California. Its territory spans Los Angeles, Kern, Ventura, Santa Barbara and San Luis Obispo counties. It contains churches with significant immigrant membership, including congregants with legal status and without.

71.    The Southwestern Texas Synod consists of 113 congregations in Southwestern Texas. Its territory stretches east from the U.S.-Mexico border and includes Austin, San Antonio, and Corpus Christi. It shares the longest border with Mexico of any synod in the ELCA.

72.    The Sierra Pacific Synod includes more than 170 congregations, ministries, and authorized worshipping communities across Northern California and Northern Nevada. It includes churches with significant memberships from a variety of different immigrant communities, including from the Americas, Asia, and Africa.

73.    Synod members believe that Jesus's command to love God and one's neighbors must guide their actions as they build and nurture just and welcoming communities. The scriptural

18

mandate in Matthew 25—"I was hungry and you gave me something to eat, I was thirsty and you gave me something to drink, I was a stranger and you invited me in . . ."—is essential to who they are as followers of Christ.

74. Reflecting that belief, in 2019 the ELCA Churchwide Assembly adopted a resolution declaring the ELCA a sanctuary church body. That resolution affirmed the Synods' and the broader ELCA's religiously-rooted commitment to support and protect immigrants, refugees, and asylum-seekers through actions such as offering physical sanctuary to individuals seeking refuge, advocating for changes in the country's immigration laws and policies, and welcoming all to join in religious worship.

75. Synod members welcome all people at all times, especially for worship on Sunday morning. They believe that every person is created in the image and likeness of God. They value people from all walks of life and the diversity of people and consider it an experience of the fullness of the body of Christ when they are able to come together. They commune with the Holy Trinity through their sacraments, which they participate in collectively.

76. Congregations also practice their faith through public works such as, for example, providing housing to migrants and asylum seekers, providing food and support services to people in need, assisting in refugee resettlement, and providing English-as-second-language classes. That these activities may take place outside of Sunday worship services makes them no less an expression of the members' religious faith. Restricting the idea of "religious exercise" to formal sacraments like the Eucharist is inconsistent with their faith as Lutherans who believe that loving one's neighbor has to be something they do in practice.

**San Francisco Friends Meeting, Pacific Yearly Meeting, and North Pacific Yearly Meeting**

77.    Plaintiffs San Francisco Friends Meeting, Pacific Yearly Meeting, and North Pacific Yearly Meeting and are regional associations of Quakers—members of the Religious Society of Friends, a religious movement dating to the seventeenth century.

78.    While Quakers have no formal hierarchy, they are generally organized into Yearly Meetings, Quarterly Meetings, and Monthly Meetings. A "meeting" is an association, a gathering held to do business at a certain interval (*i.e.*, yearly, quarterly, or monthly), and a way of describing Quakers within a certain region.

79.    Monthly Meetings are the basic organizational unit in the Quaker religion. They are local congregations that hold weekly worship services and, once a month, hold a meeting for worship with attention to business.

80.    Quaker religious practice is rooted in the belief that anyone can hear the voice of God, and there is part of God in every person.

81.    Different life experiences, backgrounds, and cultures lead people to hear and experience God differently. Having a diversity and richness of human experience yields a fuller understanding of how God speaks to the Quakers, individually and as a community.

82.    Quaker worship generally consists of Spirit-led waiting—gathering in silence and waiting to hear the voice of God. There is no clergy leading worship; rather, anyone who feels called upon by the Spirit/God to speak may do so. Everyone who attends worship meetings is participating in worship, whether they speak or not.

83.    This communal aspect of worship—of gathering as a body to experience spiritual connectedness with the Spirit/God through one another—is central to the exercise of the Quaker faith.

84.     Likewise, welcoming and worshipping with all comers, including by opening meetings to anyone who desires to attend, is an important aspect of the Quaker faith because every individual who attends presents an opportunity for God to speak to worshippers through them.

85.     Pacifism is deeply ingrained in the Quaker faith. The Friends have a religious commitment to oppose violence in all forms. The presence of arms in or around their meeting houses would violate this founding principle of their faith. Knowingly putting a person in harm's way or risking their involvement in a violent encounter likewise violates Quaker religious beliefs.

86.     Quakers practice their faith and live their core testimonies—including community, equality, and stewardship—by carrying out Spirit-led ministries and services in their communities.

87.     Given the Quaker values of welcoming strangers, worshipping with all-comers from diverse backgrounds, community, and service, many Quaker meetings, including Plaintiffs, have built deep and meaningful connections to immigrant communities.

88.     Plaintiffs Pacific Yearly Meeting and North Pacific Yearly Meeting and their constituent Monthly Meetings, including Plaintiff San Francisco Friends Meeting, have members and attenders who are immigrants from around the world. Both Pacific Yearly Meeting and North Pacific Yearly Meeting have special ties to Friends in Latin America who join their in-person annual sessions.

89.     Many of their Monthly Meetings carry out ministries that serve immigrants in their communities. These ministries include: welcoming immigrants into their meeting house for food, shelter, and other services; hosting other organizations that serve immigrant communities; and providing financial and other support for immigrants going through legal proceedings.

21

**American Baptist Churches USA**

90.    Plaintiff American Baptist Churches USA, so named in 1972, is the successor of the American Baptist Convention and traces its roots to the first Baptist association formed in 1707. Transforming communities, engaging in hands-on ministry, speaking the prophetic Word of Christ in love, and nurturing authentic relations are primary tenets of their ministry.

91.    American Baptist Churches USA represents approximately 4,700 congregations and 1.3 million members across the country, participating in shared mission and ministry. At the core of who American Baptists are, there is a commitment to the Baptist freedoms—soul, church, religious and biblical freedom. As reflected in their mission statement, American Baptist churches are missional congregations that nurture devoted disciples of Jesus Christ who live their lives in mission and ministry for the healing of the world through the love of God.

92.    Since educating freedmen after the Civil War, social outreach and justice have been a core aspect of the tradition of American Baptists and their commitment to promote holistic and healing change.

93.    The American Baptists are one of the most ethnically diverse bodies of Protestants. American Baptist Churches USA includes a vibrant number of congregations representing diverse backgrounds, including Hispanic congregations (e.g., Puerto Rican, Mexican, Dominican, Central and South American), Haitian congregations, African congregations (e.g., Somalian, Congolese), as well as congregations made up of refugees from Burma (e.g., Chin, Kachin, Karen). Many of these churches are bilingual or Spanish-speaking, or speak languages other than English, and are actively engaged in ministries of evangelism, community development, worship, and social justice.

94.    Support and ministry to immigrants and refugees is among the pillars of the American Baptist Churches USA faith. Through its regions and local congregations, American

22

Baptist Churches USA offers immigration- and refugee-related resources to its member churches, including providing training opportunities and information about changes in immigration law and policy.

95.    American Baptist Churches USA believes that serving and ministering to immigrants, refugees, and asylum seekers is a biblical and moral responsibility. Rooted in Scripture's call to love one's neighbors, show hospitality, and seek justice, the denomination affirms the dignity and rights of all people regardless of immigration status. American Baptists have a long history of advocacy, direct service, and resettlement work in support of immigrant communities.

96.    Serving and ministering to immigrant communities is a core tenet of American Baptists' faith because it reflects the biblical call to love one's neighbors, practice hospitality, seek justice, and care for the vulnerable. Rooted in the teachings of Christ, American Baptists believe that all people are made in the image of God and deserve dignity, compassion, and support. American Baptist Churches USA's longstanding commitment to immigrants and refugees is an expression of their faith in action—offering holistic ministry, advocating for just policies, and partnering in resettlement efforts as they welcome the stranger and serve those in need.

**Alliance of Baptists**

97.    Plaintiff Alliance of Baptists is a group of progressive Baptists and Christians committed to enacting God's love and justice in the world.

98.    As affirmed in its organizational Covenant, the Alliance of Baptists is dedicated to welcoming "all persons with full respect to gender, sexual, racial, and ethnic identities" and "hold[ing] space for all persons with varying abilities, social standing, or economic status."

99.    Guided by the teachings of the Bible, the Alliance of Baptists believes they are called to welcome, clothe, and feed foreigners and immigrants as their neighbors, regardless of their legal status. As Baptists, they have a fundamental obligation to lead with love, show mercy, and walk humbly with God. To the Alliance of Baptists, this means that they must show kindness and compassion to their immigrant neighbors, regardless of their immigration status.

100.    The Alliance of Baptists considers immigrants to be members of their community that they must love as they love themselves. Its members believe that the Bible makes their call to welcome and support immigrants very clear, from the Parable of the Good Samaritan in Luke 10:25-37 to Leviticus 19:34, which teaches Baptists to treat the whole world as their neighbors.

101.    The Alliance of Baptists' member churches have publicly proclaimed their support for immigrants and their belief that immigrants should be safe from governmental action in houses of worship. The Alliance of Baptists has also funded ministry and congregational partners who work closely with immigrant populations to assist them in providing food, legal aid, and other social services.

102.    The Alliance of Baptists has a demonstrated commitment—rooted in its faith and religious practice—to social justice and healing, including with respect to race, immigration, and refugees. In 1990, for example, the Alliance of Baptists offered the first public apology from any Baptist organization in the South for the sins of slavery.

**Metropolitan Community Churches**

103.    Plaintiff Metropolitan Community Churches ("MCC") was founded by Rev. Troy Perry in 1968 in Los Angeles. It is a Christian denomination with approximately 90 member churches in the United States.

24

104.   Since the start, MCC has had a particular focus on welcoming LGBTQ+ individuals, and many of its members and clergy identify as LGBTQ+. It was the first religious organization to bless same-sex marriages beginning in 1969.

105.   One of MCC's core religious beliefs is that love is the greatest moral value, and resisting exclusion is a primary focus of MCC's ministry. MCC believes that everyone is included in the family of God and that all parts of people's being are welcomed at God's table. Indeed, while the structure of worship is generally not prescribed, all member churches are required to use inclusive language in their services and to maintain an "open table," that is, to welcome all comers to communion, regardless of their religious tradition. MCC has always been and will continue to be welcoming towards immigrants, without regard to immigration status.

106.   MCC's members believe that they are required to make a "house of prayer for all the peoples," as God commands in Isaiah 56:7. Communal worship in a welcoming and inclusive space is central to their faith.

107.   MCC's members further believe, in accordance with Matthew 25:36-40, that when they care for those at the margins—the poor, the sick, the stranger, the prisoner—they serve God. Accordingly, they practice their faith through social justice ministries, including those that serve immigrant communities. MCC believes in the "priesthood of all believers," meaning that every single person is gifted and called by God to serve. Members become involved in the church's ministry as part of their own spiritual growth.

### *Defendants' Policy Burdens Plaintiffs' Religious Exercise and Expressive Association*

108.   Defendants' rescission of the sensitive locations policy and adoption of the 2025 Policy has substantially harmed and continues to harm the religious exercise and freedom of association of Plaintiffs and their members. Plaintiffs, whose religious beliefs mandate that they

JA72

welcome immigrants without regard to immigration status, now face the risk of immigration enforcement actions at or near their places of worship—and some members have already had this happen.

**New England Synod, ELCA**

109.   Congregants across the New England Synod are aware that the administration has changed the rules that once limited immigration enforcement at churches. Congregations are educating themselves and spending time, energy, and money that would otherwise be spent on religious activities to designate "public" and "private" spaces and prepare themselves and others on how to interact with ICE officers if they show up during worship.

110.   Following the administration's change in policy, the Synod has seen a decrease in attendance at some of its churches, including in East Boston. The minister there also had to tell some congregants not to participate in weekly public prayer vigils out of concern that ICE could use the events to detain members.

111.   Decreases in attendance have a ripple effect across the Synod's congregations, impacting those that cannot attend but also those that do attend. Those prevented from attending due to the new policy are robbed of the opportunity to fully experience fellowship with God and the other members of the congregation. The drop in attendance also has a financial impact on the congregations and on the Synod itself.

112.   The Synod's social ministries have seen decreased attendance as well. One member church in Connecticut operates a food pantry as part of their religious mission. It has seen a steady and sustained reduction in the number of families who come to their Sunday meal program, as people in need are now too afraid to come to the church even for food and sustenance.

JA73

113. Operating food pantries is an expression of Synod members' Lutheran Christian faith, as much as praying or gathering on Sundays. The act of feeding the hungry is a direct response to Jesus's teachings, and caring for and feeding our neighbors is part of the process of directly serving Jesus.

114. For those who stay home as well as those who come to church to attend worship or to provide or receive vital services, Defendants' change in policy has created deep fear and anxiety. It has caused congregations to wonder if outreach ministries to their community, and loving and serving their neighbors in need, puts them on the radar for ICE enforcement.

**Greater Milwaukee Synod, ELCA**

115. The Greater Milwaukee Synod has long been active on immigration issues and works with immigration attorneys to make sure people understand their rights by holding workshops and providing informational "know your rights" cards and other materials. Congregations within the Synod are aware of the change in policy and the removal of former limits on immigration enforcement at churches and other religious spaces.

116. The fear engendered by the new policy has caused significant drops in church attendance, with one of the Synod's churches noting a staggering 50 percent drop in attendance.

117. At Ascension Lutheran Church, for example, following the arrest of a congregation member by ICE in late May, some families were too frightened to attend church service the next Sunday. When the church held a prayer vigil in support of its arrested member, it had to advise Latino members of the congregation not to attend because of fear that ICE might show up. As a result, many members were unable to come together in communal prayer and worship both at regular Sunday service and at the vigil. And even those who were able to attend were denied the

27

JA74

chance to participate in worship and prayer with all of their co-congregants—and, in particular, with the most vulnerable of their co-congregants—as their religious beliefs compel them to do.

118. Defendants' new policy has affected other aspects of the Synod's religious mission. Many Synod churches run food pantries to fulfill their spiritual obligation to feed the hungry and care for those in need. Yet fear of ICE raids at these pantries has driven down the number of people who come to receive food, directly impairing the ability of Synod members to carry out this important group expression of their faith.

119. The policy change has even affected how Synod members can gather for baptisms, one of the most central rites of the Christian faith. Before the change, baptisms would happen at a publicly announced service with the community present. Synod members believe in the power and religious significance of having the community in attendance in order to witness and support a child's entrance into the religion. Now, following Defendants' change in policy and the concomitant increase in enforcement at churches, some families have concluded that the risk is too great and have requested private baptisms instead. Others have had baptisms in churches but have had to do so secretly, without the opportunity to celebrate and worship with their full faith community.

120. Even where congregants and clergy can come to worship services, the fear of immigration enforcement at church has and will continue to have a chilling effect on their expressive association and religious worship. And it puts Synod members to an impossible choice, where to honor their deeply held beliefs in welcoming the stranger and opening their doors to all who would come to worship means violating their equally deeply held beliefs in caring for and ensuring the protection of the vulnerable.

**Southwest California Synod, ELCA**

121.    As a result of the change in policy, the Southwest California Synod's congregations have seen declines in attendance at Sunday worship services, as well as declines in participation at social service ministries. Congregations have dedicated time and resources to protect members from immigration enforcement, including by organizing volunteers to patrol the church perimeter and screen visitors, locking gates and entrances, moving previously outdoor ministries inside, and training congregations on what to do in case of an immigration raid. Fear of and preparation for an immigration enforcement action has substantially chilled congregations' religious expression and disrupted their religious practice.

122.    One congregation with significant immigrant membership from the Middle East, including from Iran, Lebanon, and Palestine, took on non-budgeted construction to seal and fortify a private space in the event that parishioners need protection from immigration enforcement.

123.    Another congregation offers, as part of its ministry, a monthly diaper pantry that provides free diapers to families and primarily serves immigrants. Prior to the rescission of the sensitive locations policy, the program was run in the parking lot, but the change in policy has forced the church to change its distribution protocols. Now, the pantry has moved indoors, and volunteers wear identifying vests that read "safe" to signal that they are a part of the program. Despite these measures, attendance has dropped precipitously, from about 300 families to around 100. Not only has the church's ability to conduct its ministry in the community been seriously impacted, babies and children in the community are losing access to a valuable resource.

124.    Another church is situated close to an ICE headquarters, causing members to fear immigration enforcement at the church. The congregation has had to keep the exterior doors and gates locked to limit access to the building and programs. Locking doors and limiting access to the

church goes against their religious obligation to welcome the stranger and serve their neighbors, but they have to take these measures to protect their congregants.

125.    Another congregation situated in a neighborhood that experienced several ICE sweeps had to cancel its Vacation Bible School program because of the threat of an ICE raid. This program often serves 100 children aged five to twelve with religious education, social skills, and lunch programs. Both immigrant and U.S. citizen parents were not able to provide their children with religious education and formation because of the rescission of the sensitive locations policy.

126.    Another migrant-serving congregation has seen an 80% decline in church attendance and a 40% decline in youth group attendance. Youth groups provide spiritual and social development for the congregation's young people; the rescission of the sensitive locations policy has deprived them of this community and opportunity for faith formation.

127.    In Synod congregations, volunteers have been taken out of education programs or feeding programs to serve as observers and guards on church property. Hours that could be spent on Christian education are now being spent training congregants on what to do if ICE interrupts a worship service or Sunday school. Churches that do not perceive themselves to be at risk of an immigration raid are sending resources to support impacted congregations.

**Southwestern Texas Synod, ELCA**

128.    The unique geography of the Southwestern Texas Synod joins it with individuals and families fleeing horrible circumstances in their home countries to seek asylum and a new life in the United States. Part of its ministry is to offer welcome, safety, and belonging to their migrant neighbors on their journey, through direct service, education, and advocacy.

129.    The Southwestern Texas Synod has been deeply impacted by the adoption of the 2025 Policy. Pastors have seen diminished attendance at worship services, ministries, and church-

sponsored events. Daycare providers in churches focus on what they will do if ICE shows up on church grounds rather than on the joy of teaching Jesus's message to children. Members of the congregations are distracted from their worship by anxieties and fears that they or their neighbors are at risk of being arrested or deported. Food pantries operated by members of the Synod are serving fewer people as compared to 2024 because people feel vulnerable waiting in line outside for food.

130.    Many congregations within the Synod host Vacation Bible Schools. Of those, three that serve predominantly Hispanic communities used to each have, on average, 20 to 25 children in attendance. This year was different. One of those congregations welcomed only four children. Another had ten, and the third, just nine. All three of these congregations have reported that this is not due to lack of interest or poor outreach—the diminished attendance is because families are now afraid. They are unwilling to step foot in a church, worried that ICE might show up. And as a result, activities that were once joyful, hopeful, and sacred opportunities for these churches to nurture the next generation are now marked by hesitation and anxiety.

131.    As part of their efforts to help and welcome the immigrant community, churches within the Synod hold "Know Your Rights" presentations. One church, Iglesia Luterana San Pablo, planned such a presentation for its Spanish-speaking church community in February of 2025. The church had hosted similar events before, and always held them at the church following a worship service. This time, however, the lay leader held the presentation at her house, knowing that the church was no longer a safe space. The pastor spent the evening constantly checking the windows, making sure the curtains were closed, and felt afraid every time the doorbell rang.

132.    In 2019, the Synod announced a new ministry, where the Synod would focus on ministering to migrants along the U.S.-Mexico border. From the inception of that ministry up until

31

the adoption of the 2025 Policy, the Synod preached, advertised, and fundraised extensively for this ministry. Since the 2025 Policy was implemented, however, the Synod has stopped these activities. It no longer preaches about it, reference to the ministry was removed from the front page of its website, and there is no longer any active fundraising, for fear of making the Synod a target of immigration enforcement efforts.

**Sierra Pacific Synod, ELCA**

133.   As a result of the new policy, the number of people attending church services at congregations within the Sierra Pacific Synod has declined. Congregants are now afraid to come because of visible and increased ICE activity near churches. ICE used the parking lot at one church as a base for carrying out enforcement activity, parking several large unmarked SUVs in the lot while agents donned weapons and law enforcement gear.

134.    The experience of Iglesia Luterana Santa Maria Peregrina, a member congregation located in Stockton, California, exemplifies the harms suffered by Sierra Pacific churches. Santa Maria Peregrina serves a predominantly Spanish-speaking community and includes undocumented members in its congregation. Attendance at the church dropped after the sensitive locations policy was changed and has remained depressed and unsteady ever since.

135.   Congregants at other Sierra Pacific churches have expressed their fear of coming to worship given the possibility of being detained by ICE while at church. Attendance has further suffered because of the fear many mixed-status families have if one of their breadwinners is deported. That in turn has a direct impact on the ability of the churches and other worshipping communities across the Synod to carry out their outreach work and grow their congregations.

136.   Attendance at church-run activities has also declined due to fears of the new policy. One church has had to stop holding its English-language classes entirely after attendance

fell from 14 students to just two. Since the rescission of the sensitive locations policy, another ministry has seen a consistent drop in the number of customers and vendors coming each week to a flea market they sponsor as a way to provide low-income vendors a means to support their families. Since that change, participation is down roughly one third, meaning 40-50 fewer vendors showing up.

137.    Defendants' changed policy has put significant pressure on congregations to abandon their religiously rooted commitment to welcoming all to worship services. One congregation asked their pastor to lock the church doors on Sunday for fear of governmental authorities entering the church. Santa Maria Peregrina, which used to leave its doors open during worship as a message of welcome, has had to begin closing them to reduce the risk of immigration enforcement. Others have had to prepare for a potential encounter with immigration enforcement, including adding signage to designate certain areas as "non-public."

**San Francisco Friends Meeting**

138.    For Plaintiff San Francisco Friends Meeting, the threat of immigration enforcement action at its meeting house has interfered with members' and attenders' ability to welcome all comers to communal worship and to encourage a diversity of worshippers, core aspects of their faith.

139.    Members and attenders have, for example, discussed whether to lock the doors during worship, or to ask those arriving their purpose in doing so, measures that San Francisco Friends Meeting has never taken because closing off the meeting or interrogating attendees would interfere with the Quaker religious commitment to communal worship.

140.    At the same time, knowingly putting a person in harm's way or subjecting them to the possibility of a violent encounter with an armed law-enforcement officer would violate Quaker beliefs in peace and nonviolence.

141.    The present threat of immigration enforcement activity also makes it more difficult for members and attenders to engage in waiting worship and Spirit-led listening, which are at the core of Quaker worship. It likewise impedes their ability to carry out their religious and spiritual practice of community ministry in the meeting house.

142.    Quakers have held a religious commitment against violence for hundreds of years. For many Quakers, the presence of a weapon in a Quaker meeting would be absolutely unacceptable.

143.    The presence of armed immigration officers at meeting houses—which the new policy allows—would thus significantly hamper Plaintiffs' ability to exercise their faith. Importantly, even the *threat* of armed government agents at meeting houses—which has existed since the moment DHS announced its new policy—does the same.

**Pacific Yearly Meeting**

144.    Immigration enforcement activities have been carried out in proximity to some of Pacific Yearly Meeting's monthly meetings, including just a block away from one monthly meeting in July 2025.

145.    Not surprisingly, people are afraid to come to weekly worship. At least one family felt unsafe attending the Meeting's annual session this year, which took place in July 2025, and declined to attend.

146.    People are likewise afraid to attend events sponsored by monthly meetings about topics like social action, learning to be bystanders, or any other event in support of immigrants,

documented or undocumented. These activities are part of Pacific Yearly Meeting members' religious practice and exercise.

147.    The threat of immigration enforcement near or inside a Quaker meeting house or any place where a meeting for worship is occurring causes significant harm, including immediate and lasting disruption to Pacific Yearly Meeting members' ability to worship.

**North Pacific Yearly Meeting**

148.    DHS's decision to revoke its sensitive locations policy has put North Pacific Yearly Meeting and its Monthly Meetings under threat of immigration enforcement. As a result, members are reluctant to encourage immigrants to attend worship. Both immigrant and non-immigrant attenders who are worried about DHS's new policy may simply not show up in person for worship services if there is a chance that immigration enforcement actions could happen there.

149.    Some of North Pacific Yearly Meeting's members have virtual attendance options, but some do not. And even when such an option is available, it does not facilitate complete participation in Quaker worship. Some Friends find it is essentially impossible to facilitate a spiritual connection online, as opposed to through in-person worship.

150.    Armed law enforcement showing up in worship rooms or at meeting houses would be massively disruptive to the ability of members to worship. Because Quakers avoid and abhor physical violence, bringing weapons into their places of worship would be an assault on their faith.

**American Baptist Churches USA**

151.    American Baptists openly welcome immigrants and refugees to their services and ministries. American Baptists boast of being one of the most ethnically diverse congregations, including Hispanic congregations (e.g., Puerto Rican, Mexican, Dominican, Central and South

American), Haitian congregations, and African congregations (e.g., Somalian, Congolese), as well as congregations made up of refugees from Burma (e.g., Chin, Kachin, Karen).

152.    While American Baptist Churches USA congregations vary in their experiences based on geography and demographics, churches with significant immigrant populations, particularly those serving undocumented or mixed-status families, have reported increased fear and anxiety among members. Even congregants who have legal status in the United States worry that ICE may enter their church and arrest indiscriminately. Churches in the western United States have reported diminished attendance at worship services, Bible studies, and community programs out of concern for potential encounters with immigration enforcement while taking part in those activities.

153.    Communal worship and fellowship are fundamental to the American Baptists' faith. Many member churches host Bible studies, which are an essential part of spiritual growth for American Baptists, as well as a fellowship hour after the worship service, where congregants can gather as a community. Churches also offer Sunday School to children during the worship services, which forms the basis for the next generation's spiritual formation. The ability of American Baptists to come together for worship and fellowship is significantly burdened when members of the congregations stay home, depriving them and their fellow congregants of their religious community.

154.    Earlier this summer, a member church in New York experienced an incursion by ICE onto their property. This church is heavily involved in resettling refugees who arrive in the United States. Four individuals—one wearing a t-shirt identifying him as an agent of ICE, one wearing a t-shirt labeled "FBI," and two others in plain clothes—came through the privacy gate

36

into the parsonage of the church property. They indicated that they were looking for someone. The pastor told these individuals that they needed a warrant.

**Alliance of Baptists**

155.   The rescission of the 2025 Policy is substantially burdening the Alliance of Baptists' religious exercise and their ability to come together to worship.

156.   Member congregations and pastors have had to change the way that they act on their religious mandate. Pastors have reported not feeling comfortable preaching freely about their stance on immigration and have removed signage from church windows indicating that they are a place of refuge for undocumented immigrants for fear of becoming a target for immigration enforcement. Churches that declared themselves sanctuary churches under the previous policy are no longer publicizing themselves as such.

157.   Multiple congregations have revisited their security protocols and begun locking church doors during services. Locking the church doors and monitoring who is coming and going are antithetical to the Alliance of Baptists' religious teachings.

**Metropolitan Community Churches**

158.   Many MCC member churches count immigrants, both with legal status and without, among their congregations. The threat of immigration enforcement at worship services inhibits churches' ability to create a safe and inclusive house of prayer. Leadership, clergy, and congregants have expressed anxiety and fear about the possibility of enforcement at a member church.

159.   For example, an MCC member church in California, which has a substantial number of immigrant attendees and offers worship services in Spanish, has seen declines in attendance by immigrant members who have expressed fear of the church being the target of an immigration raid.

160. The church has been forced to take steps to protect congregants in case of such a raid, including closing off entrances that were left open prior to the rescission, marking previously public areas as private, and dedicating staff and congregation time and resources to developing and training on a plan in the event that immigration authorities enter the church. During Spanish-language services, the church has taken to locking the doors and having volunteers from the congregation screen anyone coming in, only permitting entry to those present for the worship service. The church has been forced to choose between its religious mandate to welcome all comers and its obligation to protect its congregation. Congregants' communal worship experience is diminished by the loss of their co-congregants' presence.

161. An immigration enforcement action at an MCC member church would seriously harm MCC, its congregants, and community members to whom the church ministers. It would desecrate the sacred, welcoming space and further prevent congregants from coming together in communal worship.

**CLAIMS FOR RELIEF**

**COUNT I**

***Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb, et seq.***

162. Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

163. RFRA provides that "[g]overnment may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b).

38

164. Anyone "whose religious exercise has been burdened in violation" of RFRA may raise a RFRA claim and "obtain appropriate relief" against the government. 42 U.S.C. § 2000bb-1(c).

165. The 2025 Policy frees Defendants and their agents to conduct enforcement operations—including arrests, investigations, interviews, and surveillance—at and near houses of worship and religious ceremonies.

166. Permitting immigration enforcement operations at and near houses of worship, including those in which Plaintiffs practice, deters people from attending religious services, even if they are lawful permanent residents or citizens.

167. The 2025 Policy substantially burdens Plaintiffs' free exercise of religion by reducing the number and diversity of worshippers and interfering with their ability to practice communally, as their religious beliefs call them to do.

168. The 2025 Policy also substantially burdens Plaintiffs' free exercise of religion by rendering Plaintiffs unable to encourage all to join without contradicting their faith.

169. The 2025 Policy puts Plaintiffs to an impossible choice: either violate their core religious beliefs by failing to welcome all to worship or violate their core religious beliefs by placing others in harm's way.

170. The 2025 Policy is not the least restrictive means of furthering the government's legitimate interests, including because the government operated for decades, and across multiple administrations, under its previous policy of providing appropriate protections for sensitive locations.

## COUNT II

### *First Amendment—Freedom of Expressive Association*

171.    Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

172.    The First Amendment to the U.S. Constitution safeguards the freedom of expressive association: the right to associate with others for the purpose of engaging in activities protected by the First Amendment, including the exercise of religion.

173.    Government actions that directly abridge freedom of expressive association, as well as those that chill the exercise of that right, are subject to strict scrutiny. *See, e.g.*, *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 606 (2021); *Perry v. Schwarzenegger*, 591 F.3d 1147, 1160 (9th Cir. 2010).

174.    Plaintiffs and their congregants engage in protected expressive association when they gather for communal religious worship and when they conduct social service ministries, activities that are core aspects of their religious exercise.

175.    The 2025 Policy toward sensitive locations adopted by Defendants burdens and chills the expressive association rights of Plaintiffs and their congregants and is therefore subject to strict scrutiny.

176.    Defendants cannot prevail under that standard, including because for more than three decades they have deployed less restrictive means with respect to enforcement in or near houses of worship and cannot articulate a reason why they are now insufficient.

## COUNT III

### *Violation of the Administrative Procedure Act—§ 706(2)(A)*
### *Arbitrary and Capricious*

177.    Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

40

178.   Under the APA, a court shall "hold unlawful and set aside agency action" that is arbitrary and capricious. 5 U.S.C. § 706(2)(A).

179.   The 2025 Policy is a final agency action subject to review under the APA because it is "the consummation of the agency's decisionmaking process" and it determines "rights [and] obligations" and creates "legal consequences." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (internal citation omitted); *see also U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 599-600 (2016) (finding final agency action can include the denial or revocation of a safe harbor).

180.   Since at least 1993, federal immigration authorities have adopted a consistent rule restricting their agents' authority to carry out enforcement operations in and around sensitive locations.

181.   Under the APA, agencies cannot depart from prior policies without explaining their reasons for doing so. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Agencies must, for example, "examine the relevant data and articulate a satisfactory explanation" for their choice. *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43 (1983). And they must specifically consider the reliance interests of those who may be impacted by a change in their policies. *DHS v. Regents of the Univ. of California*, 591 U.S. 1, 30-31 (2020).

182.   The 2025 Policy is arbitrary and capricious in numerous respects, including because it undoes decades of prior agency policy without adequate reasoning, it fails to consider alternative approaches, and it leaves unaddressed decades of substantial reliance interests held by Plaintiffs and others.

## COUNT IV

### *Violation of the Administrative Procedure Act—§ 706(2)(A), (C)*
### *Contrary to Law and In Excess of Statutory Limitation*

183.   Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

41

184.    Under the APA, a court shall "hold unlawful and set aside agency action" that is "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A), (C).

185.    As set forth above, the 2025 Policy constitutes final agency action subject to review under the APA.

186.    As set forth above, the 2025 Policy substantially burdens Plaintiffs' religious exercise and fails to satisfy strict scrutiny, in violation of RFRA.

187.    Because the 2025 Policy is barred by RFRA, it is both "not in accordance with law" and "in excess of statutory jurisdiction, authority, or limitations" under the APA, 5 U.S.C. § 706(2)(A), (C).

## COUNT V

### *Violation of the Administrative Procedure Act—§ 706(2)(B)*
### *Contrary to Constitutional Right*

188.    Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

189.    Under the APA, a court shall "hold unlawful and set aside agency action" that is "contrary to constitutional right." 5 U.S.C. § 706(2)(B).

190.    As set forth above, the 2025 Policy burdens and chills the First Amendment expressive-association rights of Plaintiffs and their congregants and is subject to strict scrutiny.

191.    As set forth above, the 2025 Policy fails strict scrutiny, including because Defendants cannot show it is the least restrictive means of advancing their asserted interest.

192.    Because the 2025 Policy is contrary to the First Amendment, it is unlawful under § 706(2)(B) and must be set aside.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court:

a.    Declare the 2025 Policy unconstitutional and otherwise unlawful;

b.    Vacate and set aside the 2025 Policy;

c.    Preliminarily set aside and stay the 2025 Policy under 5 U.S.C. § 705;

d.    Preliminarily and permanently enjoin Defendants, including DHS's constituent subagencies, from implementing, enforcing, acting according to, or reissuing under another name the 2025 Policy;

e.    Preliminarily and permanently enjoin Defendants, including DHS's constituent subagencies, from carrying out immigration enforcement operations at or near houses of worship absent a judicial warrant or genuinely exigent circumstances;

f.    Award Plaintiffs costs of suit, attorneys' fees, and expenses to the greatest extent authorized by all applicable laws; and

g.    Issue such other relief as the Court deems proper.

July 28, 2025                    Respectfully submitted,

/s/
Mark B. Samburg (MA Bar No. 680099)
Kevin E. Friedl*
Sarah Goetz*
Andrew Bookbinder*
J. Sterling Moore*
Audrey Wiggins*
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
Phone: (202) 448-9090
Fax: (202) 796-4426
msamburg@democracyforward.org
kfriedl@democracyforward.org
sgoetz@democracyforward.org
abookbinder@democracyforward.org
smoore@democracyforward.org
awiggins@democracyforward.org

43

JA90

Ryan Downer*
Madeleine Gates*
Melissa Colon*
WASHINGTON LAWYERS' COMMITTEE FOR CIVIL RIGHTS AND
        URBAN AFFAIRS
700 14th St. NW, Suite 400
Washington, DC 20005
ryan_downer@washlaw.org
madeleine_gates@washlaw.org
melissa_colon@washlaw.org

Richard J. Leveridge*
Sonia W. Murphy*
Sarah Sraders*
Brandon A. Levey*
Samone Ijoma*
GILBERT LLP
700 Pennsylvania Ave. SE #400
Washington, DC 20003
Leveridger@gilbertlegal.com
Murphys@gilbertlegal.com
Sraderss@gilbertlegal.com
Leveyb@gilbertlegal.com
IjomaS@gilbertlegal.com

*Counsel for Plaintiffs*

*\* Seeking admission* pro hac vice

44

JA91

# EXHIBIT 1

SUPERSEDED BY POLICY #10029.2 "Enforcement Actions at or Focused on Sensitive Locations" (OCTOBER 24, 2011)



# Memorandum

| | HQ 807-P |
|---|---|
| **Subject**<br><br>Enforcement Activities at Schools, Places of Worship, or at funerals or other religious ceremonies. | **Date**<br><br>MAY 17 1993 |
| **To**<br><br>District Directors<br>Chief Patrol Agents | **From**<br><br>Office of Operations |

## POLICY:

It is a policy of the Service to attempt to avoid apprehension of persons and to tightly control investigative operations on the premises of schools, places of worship, funerals and other religious ceremonies.

## PROCEDURES:

Enforcement operations which are likely to involve apprehensions on the premises of schools, places of worship, or at funerals or other religious ceremonies require advance written approval by the District Director or Chief Patrol Agent. Such actions are reportable under Operations Instructions (OI) 103.1(g) pertaining to reporting of incidents and unusual matters. Approval of an operation by a field office manager does not substitute for required headquarters authorizations for actions requiring such approval, e.g., 511 cases.

The Assistant District Directors, OIC, or Deputy Chief Patrol Agent, may approve inspections of records; preliminary investigative activities related to a specific individual or individuals which will not entail contact with the person under investigation; and similar activities at such locations when apprehensions will not be made.

For purposes of this policy, the term "schools" includes pre-schools; primary, secondary, and post-secondary schools (including colleges and universities); and other institutions of learning such as vocational or trade schools. "Places of worship" includes such institutions as churches, temples, and synagogues. "Other religious ceremonies" include grave site ceremonies and rosaries. The requirement for advance approval of operations in such locations should not be construed as tolerance for violations of the law by or on the premises of such institutions.

In determining the appropriateness of a proposed action, District Directors and Chief Patrol Agents shall consider the following:

SUPERSEDED BY POLICY #10029.2 "Enforcement Actions at or Focused on Sensitive Locations" (OCTOBER 24, 2011)

JA93

REL0000024901

SUPERSEDED BY POLICY #10029.2 "Enforcement Actions at or Focused on Sensitive Locations" (OCTOBER 24, 2011)

Page 2
District Directors
Chief Patrol Agents

The availability of alternative measures which would achieve the enforcement objective (e.g., making the arrest off the premises);

The importance of the enforcement objective in the context of Service priorities;

Measures which can be taken to minimize the impact on operation of the school or place of worship;

Whether the action has been requested or approved by managers of the institution involved.

Exceptions to this policy, e.g., local agreements to cover a specific situation or institution, must be approved in writing by the Associate Commissioner for Enforcement. Headquarters may also direct exceptions in such unusual situations as a declared national emergency by Presidential Executive Order or National Security Council directive, e.g., a mass alien influx or alien registration action.

When situations arise that do not permit written authorization prior to entry onto the premises of schools or places of worship, officers are expected to exercise good judgement concerning the appropriate action to take. Some situations will require the officer to proceed; in other instances entry onto the premises will not be appropriate. If exigent circumstances require a deviation from this policy, the matter must be reported immediately by the District Director or Chief Patrol Agent to the appropriate Assistant Commissioner. All field office managers must ensure that enforcement officers are well versed in and able to apply the criteria for exigent circumstances stated in the Service manual on The Law of Arrest, Search, and Seizure for Immigration Officers (M-69). Reports should explain the exigency requiring the officer's action, any steps which were taken to secure supervisory authorization in the absence of written approval (e.g., oral approval from supervisor), the seriousness of the suspected violation, whether the facility was in operation (e.g., were classes in session), and other pertinent facts.

Where operations covered by this policy are planned in advance, the general practice for Border Patrol officers requires that the operation will be conducted in plain clothes. However, under exigent circumstances, one of the factors that officers should consider is the likelihood that they will be identified as law enforcement officers; in such instances, the absence of a uniform may mitigate against continuing a pursuit.

SUPERSEDED BY POLICY #10029.2 "Enforcement Actions at or Focused on Sensitive Locations" (OCTOBER 24, 2011)

REL0000024901

SUPERSEDED BY POLICY #10029.2 "Enforcement Actions at or Focused on Sensitive Locations" (OCTOBER 24, 2011)

Page 3
District Directors
Chief Patrol Agents

This directive does not affect the scope of authority of Service
officers under the Immigration and Nationality Act, but is directed
to the operational implementation of such authority.    The
requirement for approval in advance of such operations and actions
on such premises should not be construed as an indication of
tolerance for any violations of the law by anyone at or in charge
of a school or a place of worship.  This directive is an internal
statement of procedure which does not confer any benefits upon nor
impose any requirements upon anyone other than Service officers as
a part of a uniform exercise of delegated authority.

James A. Puleo
Acting Associate Commissioner

Enclosure

SUPERSEDED BY POLICY #10029.2 "Enforcement Actions at or Focused on Sensitive Locations" (OCTOBER 24, 2011)

JA95

REL0000024901

# EXHIBIT 2

SUPERSEDED BY POLICY #10029.2 "Enforcement Actions at or Focused on Sensitive Locations" (OCTOBER 24, 2011)

*Office of the Assistant Secretary*

**U.S. Department of Homeland Security**
425 I Street, NW
Washington, DC 20536



**U.S. Immigration
and Customs
Enforcement**

July 3, 2008

MEMORANDUM FOR:    All Field Office Directors
                   All Special Agents in Charge

FROM:              Julie L. Myers
                   Assistant Secretary

SUBJECT:           <u>Field Guidance on Enforcement Actions or Investigative Activities
                   At or Near Sensitive Community Locations</u>

ICE personnel should refrain from conducting enforcement actions or investigative activities at or near sensitive community locations such as schools, places of worship, and funerals or other religious ceremonies, except in limited circumstances as set forth within this memorandum. Such restraint strikes a balance between our law enforcement responsibilities and the public's confidence in the way ICE executes its mission.

Precedent for this approach is clear. Under Immigration and Naturalization Service (INS) Policy HQ 807-P, <u>Enforcement Activities at Schools, Places of Worship, or at funerals or other religious ceremonies</u> (May 17, 1993), law enforcement personnel were directed to:

> *"[A]ttempt to avoid apprehension of persons and to tightly control investigative operations on the premises of schools, places of worship, funerals and other religious ceremonies."*

ICE policies are in place to ensure that our personnel conduct enforcement operations in a manner that is safe and respectful of all persons. This policy was recently reinforced in a December 26, 2007 Memorandum from Marcy M. Forman, Director, Office of Investigations, entitled <u>Enforcement Actions at Schools</u>. This field guidance clearly states that ICE views these actions with particular sensitivity:

> *"[I]t is important to emphasize that great care and forethought be applied before undertaking any investigative or enforcement type action at or near schools, other institutions of education, and venues generally where children and their families may be present."*

Policies governing ICE Office of Detention and Removal (DRO) Fugitive Operations Teams have similarly discouraged enforcement actions in these sensitive locations. Furthermore, all of our enforcement actions have been, and should continue to be, thoroughly planned, reviewed, and approved by senior field office personnel so that both the public's safety and our national security are guaranteed.

SUPERSEDED BY POLICY #10029.2 "Enforcement Actions at or Focused on Sensitive Locations" (OCTOBER 24, 2011)
www.ice.gov

JA97

REL0000024902

SUPERSEDED BY POLICY #10029.2 "Enforcement Actions at or Focused on Sensitive Locations" (OCTOBER 24, 2011)

SUBJECT: Field Guidance on Enforcement Actions or Investigative Activities At or Near Sensitive Community Locations
Page 2

While ICE policies and procedures do not specifically preclude enforcement actions or investigative activities at the aforementioned locations, the direction of INS HQ807-P remains in effect.

Consistent with these policies, including INS HQ807-P, there may be specific situations requiring ICE personnel to act at or near sensitive locations. Such situations would include those involving terrorism-related investigations, matters of public safety, or actions where no enforcement activity is involved, such as requesting information from school officials, retrieving records, or otherwise routine, non-enforcement activity. Any such case must be raised to the appropriate Headquarters program office prior to any action or, in exigent circumstances, as soon as practicable. Moreover, personnel are reminded to be cognizant of the impact of their activity, exercise good judgment and act with an appropriate level of compassion in light of the location while exercising their authority in such circumstances.

This policy should not be construed as an indication of tolerance for any violations of the law by anyone at or in charge of any of these sensitive locations. A formal ICE Policy Directive providing policy and procedures for these enforcement actions and/or investigative activities will be issued in the near future.

SUPERSEDED BY POLICY #10029.2 "Enforcement Actions at or Focused on Sensitive Locations" (OCTOBER 24, 2011)

JA98

REL0000024902

# EXHIBIT 3

JA99

Policy Number: 10029.2
FEA Number: 306-112-002b

*Office of the Director*

U.S. Department of Homeland Security
500 12th Street, SW
Washington, D.C. 20536



**U.S. Immigration
and Customs
Enforcement**

OCT 2 4 2011

MEMORANDUM FOR:    Field Office Directors
                   Special Agents in Charge
                   Chief Counsel

FROM:              John Morton
                   Director

SUBJECT:           Enforcement Actions at or Focused on Sensitive Locations

Purpose

This memorandum sets forth Immigration and Customs Enforcement (ICE) policy regarding certain enforcement actions by ICE officers and agents at or focused on sensitive locations. This policy is designed to ensure that these enforcement actions do not occur at nor are focused on sensitive locations such as schools and churches unless (a) exigent circumstances exist, (b) other law enforcement actions have led officers to a sensitive location as described in the *"Exceptions to the General Rule"* section of this policy memorandum, or (c) prior approval is obtained. This policy supersedes all prior agency policy on this subject.[1]

Definitions

The enforcement actions covered by this policy are (1) arrests; (2) interviews; (3) searches; and (4) for purposes of immigration enforcement only, surveillance. Actions not covered by this policy include actions such as obtaining records, documents and similar materials from officials or employees, providing notice to officials or employees, serving subpoenas, engaging in Student and Exchange Visitor Program (SEVP) compliance and certification visits, or participating in official functions or community meetings.

The sensitive locations covered by this policy include, but are not limited to, the following:

---

[1] Memorandum from Julie L. Myers, Assistant Secretary, U.S. Immigration and Customs Enforcement, "Field Guidance on Enforcement Actions or Investigative Activities At or Near Sensitive Community Locations" 10029.1 (July 3, 2008); Memorandum from Marcy M. Forman, Director, Office of Investigations, "Enforcement Actions at Schools" (December 26, 2007); Memorandum from James A. Puleo, Immigration and Naturalization Service (INS) Acting Associate Commissioner, "Enforcement Activities at Schools, Places of Worship, or at funerals or other religious ceremonies" HQ 807-P (May 17, 1993). This policy does not supersede the requirements regarding arrests at sensitive locations put forth in the Violence Against Women Act, see Memorandum from John P. Torres, Director Office of Detention and Removal Operations and Marcy M. Forman, Director, Office of Investigations, "Interim Guidance Relating to Officer Procedure Following Enactment of VAWA 2005 (January 22, 2007).

www.ice.gov

Enforcement Actions at or Focused on Sensitive Locations
Page 2

- schools (including pre-schools, primary schools, secondary schools, post-secondary schools up to and including colleges and universities, and other institutions of learning such as vocational or trade schools);
- hospitals;
- churches, synagogues, mosques or other institutions of worship, such as buildings rented for the purpose of religious services;
- the site of a funeral, wedding, or other public religious ceremony; and
- a site during the occurrence of a public demonstration, such as a march, rally or parade.

This is not an exclusive list, and ICE officers and agents shall consult with their supervisors if the location of a planned enforcement operation could reasonably be viewed as being at or near a sensitive location. Supervisors should take extra care when assessing whether a planned enforcement action could reasonably be viewed as causing significant disruption to the normal operations of the sensitive location. ICE employees should also exercise caution. For example, particular care should be exercised with any organization assisting children, pregnant women, victims of crime or abuse, or individuals with significant mental or physical disabilities.

Agency Policy

*General Rule*

Any planned enforcement action at or focused on a sensitive location covered by this policy must have prior approval of one of the following officials: the Assistant Director of Operations, Homeland Security Investigations (HSI); the Executive Associate Director (EAD) of HSI; the Assistant Director for Field Operations, Enforcement and Removal Operations (ERO); or the EAD of ERO. This includes planned enforcement actions at or focused on a sensitive location which is part of a joint case led by another law enforcement agency. ICE will give special consideration to requests for enforcement actions at or near sensitive locations if the only known address of a target is at or near a sensitive location (e.g., a target's only known address is next to a church or across the street from a school).

*Exceptions to the General Rule*

This policy is meant to ensure that ICE officers and agents exercise sound judgment when enforcing federal law at or focused on sensitive locations and make substantial efforts to avoid unnecessarily alarming local communities. The policy is not intended to categorically prohibit lawful enforcement operations when there is an immediate need for enforcement action as outlined below. ICE officers and agents may carry out an enforcement action covered by this policy without prior approval from headquarters when one of the following exigent circumstances exists:

- the enforcement action involves a national security or terrorism matter;
- there is an imminent risk of death, violence, or physical harm to any person or property;

JA101

Enforcement Actions at or Focused on Sensitive Locations
Page 3

- the enforcement action involves the immediate arrest or pursuit of a dangerous felon, terrorist suspect, or any other individual(s) that present an imminent danger to public safety; or
- there is an imminent risk of destruction of evidence material to an ongoing criminal case.

When proceeding with an enforcement action under these extraordinary circumstances, officers and agents must conduct themselves as discretely as possible, consistent with officer and public safety, and make every effort to limit the time at or focused on the sensitive location.

If, in the course of a planned or unplanned enforcement action that is not initiated at or focused on a sensitive location, ICE officers or agents are subsequently led to or near a sensitive location, barring an exigent need for an enforcement action, as provided above, such officers or agents must conduct themselves in a discrete manner, maintain surveillance if no threat to officer safety exists and immediately consult their supervisor prior to taking other enforcement action(s).

## Dissemination

Each Field Office Director, Special Agent in Charge, and Chief Counsel shall ensure that the employees under his or her supervision receive a copy of this policy and adhere to its provisions.

## Training

Each Field Office Director, Special Agent in Charge, and Chief Counsel shall ensure that the employees under his or her supervision are trained (both online and in-person/classroom) annually on enforcement actions at or focused on sensitive locations.

## No Private Right of Action

Nothing in this memorandum is intended to and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter.

This memorandum provides management guidance to ICE officers exercising discretionary law enforcement functions, and does not affect the statutory authority of ICE officers and agents, nor is it intended to condone violations of federal law at sensitive locations.

Case 4:25-cv-40102    Document 1-4    Filed 07/28/25    Page 1 of 6
# EXHIBIT 4

JA103

*Secretary*

**U.S. Department of Homeland Security**
Washington, DC 20528



October 27, 2021

MEMORANDUM TO:    Tae D. Johnson
Acting Director
U.S. Immigration and Customs Enforcement

Troy A. Miller
Acting Commissioner
U.S. Customs and Border Protection

Ur M. Jaddou
Director
U.S. Citizenship and Immigration Services

Robert Silvers
Under Secretary
Office of Strategy, Policy, and Plans

Katherine Culliton-González
Officer for Civil Rights and Civil Liberties
Office of Civil Rights and Civil Liberties

Lynn Parker Dupree
Chief Privacy Officer
Privacy Office

FROM:    Alejandro N. Mayorkas
Secretary

SUBJECT:    **Guidelines for Enforcement Actions in or Near Protected Areas**

This memorandum provides guidance for ICE and CBP enforcement actions in or near areas that require special protection. It is effective immediately.

This memorandum supersedes and rescinds John Morton's memorandum entitled, "Enforcement Actions at or Focused on Sensitive Locations" (number 10029.2, dated October 24, 2011), and David Aguilar's memorandum entitled, "U.S. Customs and Border Protection Enforcement Actions at or Near Certain Community Locations" (dated January 18, 2013).

## I.    Foundational Principle

In our pursuit of justice, including in the execution of our enforcement responsibilities, we impact people's lives and advance our country's well-being in the most fundamental ways. It is because of the profound impact of our work that we must consider so many different factors before we decide to act. This can make our work very difficult. It is also one of the reasons why our work is noble.

When we conduct an enforcement action – whether it is an arrest, search, service of a subpoena, or other action – we need to consider many factors, including the location in which we are conducting the action and its impact on other people and broader societal interests. For example, if we take an action at an emergency shelter, it is possible that noncitizens, including children, will be hesitant to visit the shelter and receive needed food and water, urgent medical attention, or other humanitarian care.

To the fullest extent possible, we should not take an enforcement action in or near a location that would restrain people's access to essential services or engagement in essential activities. Such a location is referred to as a "protected area."

This principle is fundamental. We can accomplish our enforcement mission without denying or limiting individuals' access to needed medical care, children access to their schools, the displaced access to food and shelter, people of faith access to their places of worship, and more. Adherence to this principle is one bedrock of our stature as public servants.

## II.    Protected Areas

Whether an area is a "protected area" requires us to understand the activities that take place there, the importance of those activities to the well-being of people and the communities of which they are a part, and the impact an enforcement action would have on people's willingness to be in the protected area and receive or engage in the essential services or activities that occur there. It is a determination that requires the exercise of judgment.

The following are some examples of a protected area. The list is not complete. It includes only examples:

- A school, such as a pre-school, primary or secondary school, vocational or trade school, or college or university.

- A medical or mental healthcare facility, such as a hospital, doctor's office, health clinic, vaccination or testing site, urgent care center, site that serves pregnant individuals, or community health center.

- A place of worship or religious study, whether in a structure dedicated to activities of faith (such as a church or religious school) or a temporary facility or location where such activities are taking place.

JA105

- A place where children gather, such as a playground, recreation center, childcare center, before- or after-school care center, foster care facility, group home for children, or school bus stop.

- A social services establishment, such as a crisis center, domestic violence shelter, victims services center, child advocacy center, supervised visitation center, family justice center, community-based organization, facility that serves disabled persons, homeless shelter, drug or alcohol counseling and treatment facility, or food bank or pantry or other establishment distributing food or other essentials of life to people in need.

- A place where disaster or emergency response and relief is being provided, such as along evacuation routes, where shelter or emergency supplies, food, or water are being distributed, or registration for disaster-related assistance or family reunification is underway.

- A place where a funeral, graveside ceremony, rosary, wedding, or other religious or civil ceremonies or observances occur.

- A place where there is an ongoing parade, demonstration, or rally.

We need to consider the fact that an enforcement action taken near – and not necessarily in – the protected area can have the same restraining impact on an individual's access to the protected area itself. If indeed that would be the case, then, to the fullest extent possible, we should not take the enforcement action near the protected area. There is no bright-line definition of what constitutes "near." A variety of factors can be informative, such as proximity to the protected area, visibility from the protected area, and people's behavioral patterns in and around the protected area. The determination requires an analysis of the facts and the exercise of judgment.

The fundamental question is whether our enforcement action would restrain people from accessing the protected area to receive essential services or engage in essential activities. Our obligation to refrain, to the fullest extent possible, from conducting a law enforcement action in or near a protected area thus applies at all times and is not limited by hours or days of operation.

Whether an enforcement action can be taken in or near a courthouse is addressed separately in the April 27, 2021 Memorandum from Tae Johnson, ICE Acting Director, and Troy Miller, CBP Acting Commissioner, entitled "Civil Immigration Enforcement Actions in or Near Courthouses," which remains in effect.

## III.   Exceptions and Limitation on Scope

The foundational principle of this guidance is that, to the fullest extent possible, we should not take an enforcement action in or near a protected area. The phrase "to the fullest extent possible" recognizes that there might be limited circumstances under which an enforcement action needs to be taken in or near a protected area. The following are some examples of such limited circumstances:

JA106

- The enforcement action involves a national security threat.

- There is an imminent risk of death, violence, or physical harm to a person.

- The enforcement action involves the hot pursuit of an individual who poses a public safety threat.

- The enforcement action involves the hot pursuit of a personally observed border-crosser.

- There is an imminent risk that evidence material to a criminal case will be destroyed.

- A safe alternative location does not exist.

This list is not complete. It includes only examples. Here again, the exercise of judgment is required.

Absent exigent circumstances, an Agent or Officer must seek prior approval from their Agency's headquarters, or as you otherwise delegate, before taking an enforcement action in or near a protected area. If the enforcement action is taken due to exigent circumstances and prior approval was therefore not obtained, Agency headquarters (or your delegate) should be consulted post-action. To the fullest extent possible, any enforcement action in or near a protected area should be taken in a non-public area, outside of public view, and be otherwise conducted to eliminate or at least minimize the chance that the enforcement action will restrain people from accessing the protected area.

Enforcement actions that are within the scope of this guidance include, but are not limited to, such actions as arrests, civil apprehensions, searches, inspections, seizures, service of charging documents or subpoenas, interviews, and immigration enforcement surveillance. This guidance does not apply to matters in which enforcement activity is not contemplated. As just one example, it does not apply to an Agent's or Officer's participation in an official function or community meeting.

This guidance does not limit an agency's or employee's statutory authority, and we do not tolerate violations of law in or near a protected area.

## IV.    Training and Reporting

Please ensure that all employees for whom this guidance is relevant receive the needed training. Each of your respective agencies and offices should participate in the preparation of the training materials.

Any enforcement action taken in or near a protected area must be fully documented in your Agency's Privacy Act-compliant electronic system of record in a manner that can be searched and validated. The documentation should include, for example, identification of the protected area; the reason(s) why the enforcement action was taken there; whether or not prior approval was obtained and, if not, why not; the notification to headquarters (or headquarters' delegate) that occurred after an action was taken without prior approval; a situational report of what

JA107

occurred during and immediately after the enforcement action; and, any additional information that would assist in evaluating the effectiveness of this guidance in achieving our law enforcement and humanitarian objectives.

### V.     Statement of No Private Right Conferred

This guidance is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter.

JA108

# EXHIBIT 5

 An official website of the United States government

Here's how you know

 **Official websites use .gov**

A **.gov** website belongs to an official government organization in the United States.

**Secure .gov websites use HTTPS**

A **lock** ( 🔒 ) or **https://** means you've safely connected to the .gov website. Share sensitive information only on official, secure websites.

 **U.S. Immigration and Customs Enforcement**

Call <u>1-866-DHS-2-ICE</u>

Report Crime

<u>ICE</u>    <u>WHO WE ARE</u>    <u>ENFORCEMENT AND REMOVAL OPERATIONS</u>

# Protected Areas and Courthouse Arrests

## Webpage under construction

This page contains information that is outdated. It is being revised in accordance with new policy guidance as of Jan. 21, 2025.

JA110

# Protected Areas Enforcement Actions

The Department of Homeland Security (DHS) issued a memorandum — _Guidelines for Enforcement Actions In or Near Protected Areas_ — instructing officers to refrain from taking enforcement actions at or near locations or protected areas in October 2021. This policy is part of DHS's effort to avoid restricting people's access to essential services or engagement in essential activities.

# Protected Areas

Protected areas are locations that provide essential services or activities. When determining if a location is a protected area, DHS considers the activities that take place there, the importance of those activities to the well-being of people and the communities of which they are a part and the impact an enforcement action would have on people's willingness to be in the protected area and receive or engage in the essential services or activities that occur there. It is a determination that requires the exercise of judgment.

Examples of protected areas include, but are not limited to:

- Schools
- Medical or mental healthcare facilities
- Places of worship or religious studies
- Places where children gather
- Social services establishments
- Places where disaster or emergency response/relief is provided
- Places where funerals, graveside ceremonies, rosaries, weddings, or other religious or civil ceremonies or observances occur

- Places where there are ongoing parades, demonstrations, or rallies

# Enforcement Actions Within the Scope of the Protected Areas Memorandum

Enforcement actions that are within the scope of this guidance include, but are not limited to, such actions as arrests, civil apprehensions, searches, inspections, seizures, the service of charging documents or subpoenas, interviews and immigration enforcement surveillance.

# Exceptions and Limitations on Scope

There might be limited circumstances under which an enforcement action needs to be taken in or near a protected area. The following are some examples of such limited circumstances:

- The enforcement action involves a national security threat
- There is an imminent risk of death, violence, or physical harm to a person
- The enforcement action involves the hot pursuit of an individual who poses a public safety threat
- The enforcement action involves the hot pursuit of a personally observed border crosser
- There is an imminent risk that evidence material to a criminal case will be destroyed
- A safe alternative location — a location deemed safe for DHS personnel, the subject of the enforcement action, and the public — does not exist

The memorandum does not limit ICE's or employee's statutory authority, and DHS does not tolerate violations of law in or near a protected area.

Absent exigent circumstances, DHS officers and agents must seek prior approval from their agency's headquarters or an authorized delegate before taking an enforcement action in or near a protected area. To the fullest extent possible, any

enforcement actions in or near a protected area should be taken in a non-public area, outside of public view, and to eliminate or minimize the chance that the enforcement action will prevent people from accessing the protected area.

If DHS officers and agents take enforcement actions that are believed to be in violation of the protected areas policy, a complaint may be filed through one of the following channels:

### ICE

(888) 351-4024
ERO Contact Form
Website

### CBP

(877) 227-5511
Website

### Office of the Inspector General

(800) 323-8603
Website

### DHS Office for Civil Rights and Civil Liberties

(866) 644-8360
CRCLCompliance@hq.dhs.gov

JA113

# Courthouses

Courthouses do not fall under ICE policies concerning enforcement actions in or near protected areas. To clarify policy on civil immigration enforcement actions related to courthouses, in April 2021, ICE and CBP jointly issued a memorandum — *Civil Immigration Enforcement Actions In or Near Courthouses*.

## Courthouse Enforcement Actions

The *Civil Immigration Enforcement Actions In or Near Courthouses* provides ICE and CBP officers with guidance as to when and how civil immigration law enforcement action can be executed in or near a courthouse so as not to unnecessarily impinge upon the core principle of preserving access to justice.

## Courthouses

To uphold the rule of law, DHS ensures that courthouses are open to all people — regardless of citizenship. As a result, this memorandum provides guidance on when and how civil immigration law enforcement actions may be executed in or near a courthouse.

This memorandum does not apply to criminal immigration enforcement actions. A courthouse includes any municipal, county, state, federal, tribal, or territorial courthouse, including immigration courts. "Near" the courthouse means in the close vicinity of the courthouse, including the entrance and exit of a courthouse, and in adjoining or related areas such as an adjacent parking lot or

JA114

transportation point (such as a bus stop right outside a courthouse). It does not include adjacent buildings or houses that are not part of the courthouse or otherwise are not used for court-related business.

# When Enforcement Actions May Be Taken

Civil immigration law enforcement actions at courthouses will only be executed in limited circumstances against public safety threats. Namely, civil immigration enforcement actions may be taken in or near courthouses if:

- It involves a national security threat
- There is imminent risk of death, violence, or physical harm to any person
- It involves the pursuit of an individual who poses a threat to public safety
- There is an imminent risk of destruction of evidence material to a criminal case

In the absence of a hot pursuit, a civil immigration enforcement action may be taken in or near a courthouse against individuals who pose threats to public safety if:

- It is necessary to act in or near the courthouse because a safe alternative location does not exist or would be too difficult to achieve the enforcement action at such a location
- The action has been approved in advance by a Field Office Director, Special Agent in Charge, Chief Patrol Agent, or Port Director approval in advance of the enforcement action

As this is but a partial summary, the visitor is recommended to view the policy at the link provided above.

JA115

Updated: 01/22/2025

## ADDRESS                                                                    —

500 12th St SW
Washington, DC 20536

Report Crimes: Call 1-866-DHS-2-ICE

## RELATED INFORMATION                                                        —

Enforcement and Removal Operations

## DHS MEMO                                                                    —

DHS Guidance for Enforcement Action at Protected Areas

About Us                          Immigration Enforcement

Combating Transnational Crime              Newsroom

   

 



**ICE Contact Center**

JA116

Report suspicious activity:
866-DHS-2-ICE


ICE.gov

**An official website of the <u>U.S. Department of Homeland Security</u>**

<u>About ICE</u>

<u>Accessibility</u>

<u>FOIA Requests</u>

<u>Privacy Policy</u>

<u>DHS.gov</u>

<u>Archive</u>

<u>No FEAR Act Data</u>

<u>Site Links</u>

<u>Performance Reports</u>

<u>Inspector General</u>

<u>The White House</u>

<u>DHS Components</u>

<u>USA.gov</u>

# National Terrorism Advisory System

# EXHIBIT 7

 **Homeland Security**

**U.S. Department of Homeland Security**

# Statement from a DHS Spokesperson on Directives Expanding Law Enforcement and Ending the Abuse of Humanitarian Parole

**Release Date:** January 21, 2025

WASHINGTON – Yesterday, Acting Department of Homeland Security Secretary Benjamine Huffman issued two directives essential to ending the invasion of the US southern border and empower law enforcement to protect Americans.

The first directive rescinds the Biden Administration's guidelines for Immigration and Customs Enforcement (ICE) and Customs and Border Protection (CBP) enforcement actions that thwart law enforcement in or near so-called "sensitive" areas. The second directive ends the broad abuse of humanitarian parole and returns the program to a case-by-case basis. ICE and CBP will phase out any parole programs that are not in accordance with the law. The following statement is attributable to a DHS Spokesperson:

*"This action empowers the brave men and women in CBP and ICE to enforce our immigration laws and catch criminal aliens—including murders and rapists—who have illegally come into our country. Criminals will no longer be able to hide in America's schools and churches to avoid arrest. The Trump Administration will not tie the hands of our brave law enforcement, and instead trusts them to use common sense.*

*"The Biden-Harris Administration abused the humanitarian parole program to indiscriminately allow 1.5 million migrants to enter our country. This was all stopped on day one of the Trump Administration. This action will return the humanitarian parole program to its original purpose of looking at migrants on a case-by-case basis."*

## Topics

BORDER SECURITY (/TOPICS/BORDER-SECURITY)     IMMIGRATION AND CUSTOMS ENFORCEMENT (/TOPICS/IMMIGRATION-AND-CUSTOMS-ENFORCEMENT)

## Keywords

BORDER SECURITY (/KEYWORDS/BORDER-SECURITY)     CUSTOMS AND BORDER PROTECTION (CBP) (/KEYWORDS/CUSTOMS-AND-BORDER-PROTECTION-CBP)

IMMIGRATION AND CUSTOMS ENFORCEMENT (ICE) (/KEYWORDS/IMMIGRATION-AND-CUSTOMS-ENFORCEMENT-ICE)

Last Updated: 03/21/2025

JA120

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**
**CENTRAL DIVISION**

| | |
|---|---|
| **New England Synod, Evangelical Lutheran Church in America,** *et al.*,<br><br>Plaintiffs,<br><br>**v.**<br><br>**Department of Homeland Security,** *et al.*,<br><br>Defendants. | Case No. 4:25-cv-40102 |

**[PROPOSED] ORDER**

Upon consideration of Plaintiffs' motion for a stay under 5 U.S.C. § 705 or, in the alternative, a preliminary injunction, the accompanying memorandum and supporting materials, and any related responses and replies filed, it is hereby

**ORDERED** that the motion is **GRANTED**;

**ORDERED** that Defendants' recission of the 2021 Mayorkas Memorandum is **STAYED** and preliminarily set aside pending resolution of this case on the merits or further order of the Court;

**ORDERED** that Defendants shall in good faith continue to implement and act in accordance with the 2021 Mayorkas Memorandum pending resolution of this case on the merits or further order of the Court;

**ORDERED** that within one day of the issuance of this Order, Defendants provide notice of this Order to their employees and agents involved in carrying out immigration enforcement operations;

1

**ORDERED** that within seven days of the issuance of this Order, Defendants shall file a status report apprising the Court of their compliance with this Order and providing a copy of the notice that Defendants provided to their employees and agents pursuant to this Order;

**ORDERED** that within 30 days of the issuance of this Order, and every 30 days after that, Defendants shall file a status report apprising the Court of the total number of enforcement actions carried out at houses of worship or other sensitive locations of religious practice and, for each such action: what type of exigent circumstances existed, if any; whether the action was conducted pursuant to an administrative or judicial warrant; and whether prior approval for the operation was given.

**SO ORDERED**

Dated: _____, 2025

_____
THE HON. F. DENNIS SAYLOR, IV
UNITED STATES DISTRICT JUDGE

2

JA122

# EXHIBIT 10

## Declaration of the Rev. Jeff R. Johnson

I, Jeff R. Johnson, declare under penalty of perjury, under 28 U.S.C. § 1746, that the following is true and correct:

1. I am Bishop of the Sierra Pacific Synod of the Evangelical Lutheran Church in America (ELCA). I have served in that position since being elected Bishop in 2023.

2. As Bishop, I serve as the president of the Synod corporation and the chief executive and administrative officer of the Synod. I lead the Synod by advocating and supporting the Synod and the ELCA's mission and maintaining oversight for the congregations, missions, and ministries throughout the territory of our Synod.

3. Before becoming Bishop, I served as the pastor of two congregations, First United Lutheran Church of San Francisco and University Lutheran Chapel of Berkeley. I hold bachelor of arts degrees in History and German from California Lutheran University in Thousand Oaks, California, and a master of divinity from Pacific Lutheran Theological Seminary in Berkeley.

4. I make this statement based on my personal knowledge, Synod business documents that I have reviewed, and other information made available to me during the ordinary course of my duties conducting the business of the Synod.

5. The Synod's territory covers Northern California and Northern Nevada. It comprises more than 170 congregations, ministries, and authorized worshipping communities; along with a camp, seminary, and a social service agency. The Synod is headquartered in Berkeley.

6. Our purpose, as set forth in the Synod Constitution, is to be "a people created by God in Christ, empowered by the Holy Spirit, called and sent to bear witness to God's creative, redeeming, and sanctifying activity in the world."

1

JA124

7.     Our Constitution affirms that, in fulfillment of this purpose, we strive to "serve in response to God's love to meet human needs, caring for the sick and the aged, advocating dignity, justice, and equity for all people, working for peace and reconciliation among the nations, caring for the marginalized, embracing and welcoming racially and ethnically diverse populations, and standing in solidarity with the poor and oppressed and committing itself to their needs."

8.     For decades, the Synod and the ELCA generally have carried out the mission compelled by our faith to advocate for the rights of immigrants, refugees, and asylum seekers.

9.     In 1998, the ELCA adopted a Social Message on Immigration. Its basic themes are grounded in the call to welcome the stranger in Matthew 25:35. This Social Message recognizes and rejoices in the contributions of newcomers to our church and our country and calls for our denomination to advocate for immigration, refugee, and asylum laws that are fair and generous.

10.     In 2016, the ELCA adopted the *AMMPARO Strategy to Accompany Migrant Minors with Protection, Advocacy, Representation and Opportunities*. AMMPARO represents a whole-church commitment by the ELCA, as a church in the world, to accompany migrant families.

11.     As part of its AMMPARO strategy, the ELCA committed to uphold and guarantee basic human rights and safety of migrant children and their families; address the root causes of migration around the world and the treatment of migrants in transit; work toward just and humane policies affecting migrants in and outside the United States; and engage as a church body with all of its companions, affiliates and partners to respond to the migration situation and its causes and to advocate for migrant children and their families. As siblings in Christ, the

2

ELCA is called to bear witness to the conditions affecting so many communities and to work to find solutions that will acknowledge the humanity in all of God's children.

12. In 2017, our Synod declared itself a Sanctuary Synod. In doing so, we urged the congregations and members of this Synod to, among other things, continue to serve as places of welcome, refuge, healing, and to provide material and pastoral support for those targeted due to their immigration status or other differences.

13. The ELCA took official action to declare itself a Sanctuary Denomination in 2019. As a Sanctuary Denomination, the ELCA has declared publicly that walking alongside immigrants and refugees is a matter of faith and discipleship.

14. This kind of accompaniment is a core religious practice rooted in the witness, ministry, and mission of Jesus Christ. In baptism, we are brought into a covenantal relationship with Jesus Christ, and commit as baptised Christians to an identity where we "strive for justice and peace in all the earth."

15. Following the example of Martin Luther, we believe that advocacy and accompaniment are fundamental expressions of this basic baptismal identity. Consequently, as a church, we have advocated strongly for stopping the detention of children and families for decades. We have spoken out against family separation. We have sought a pathway to citizenship for community members who have lived in the United States for many years. We have supported DACA recipients. We have taken steps to address the root causes of migration in a way that honors the humanity in people who must flee terror and repression. We have done these things because of our faith.

16. Our Synod embodies these commitments in the ministries of our congregations and authorized worshipping communities. Immigrants, asylum seekers, and migrants are an

3

JA126

integral part of many of our congregations and ministries. Our churches do not discriminate on the basis of immigration status for access to any programs or events. We have congregations who provide housing within their buildings to migrants and asylum seekers, churches that provide food and support services to people, churches that help with resettlement, churches that provide English-as-second-language classes, churches that provide rental assistance and help connect immigrants in need to low-cost housing, and churches that host events like first communions, weddings, and funerals for immigrant communities, all regardless of immigration status.

17.     The fact that these activities may take place outside of Sunday worship services makes them no less an expression of our religious faith. Restricting the idea of "religious exercise" to the moment of Eucharist is inconsistent with who we are as Lutherans. Loving our neighbor has to be something we do in practice. Activities that happen outside of services, activities that are missional, even if there is not necessarily a prayer said at these activities, these are love-our-neighbor activities. They allow the church to be a catalyst in our communities for new life, for loving our neighbors. "God's work, our hands" is an ubiquitous message in our Church. Because it's not only about our prayer in private, it's about our work in public.

18.     That same spirit of openness and engagement applies to Sunday morning services. The Lutheran theologian, the Rev. Dietrich Bonhoeffer,  who was martyred by German nationalists at the end of World War II, instructs us that, "The Church is the Church only when it exists for others." Love of neighbor is fundamental to our practice of faith. Part of loving our neighbor means keeping the church open as a welcoming space for those who would worship with us. Congregations in the Synod welcome all people at all times, especially for worship on Sunday morning. We value people from all walks of life and the diversity of people, and we consider it an experience of the fullness of the body of Christ when we are able to come together.

The body of Christ is reflective of every different kind of experience, every different kind of person. The body of Christ gathers regularly around the table on communal basis for Eucharist. And not being able to do that is a harm. When people feel excluded or are not able to participate, their presence is not just missed. It compromises the body—the body gathering for Eucharist.

19.    Congregants are aware of these changes to enforcement at sensitive locations, including schools, hospitals, and churches. These used to be places that had a higher level of safety and protection so people could engage in essential activities. Even though walking down the street might expose you to jeopardy from ICE, at least these places were considered protected. Once you got to school, you didn't have to worry about your children there. Once you were in your seat at church, you didn't expect ICE to show up there. Same at the hospital. That was true even in the first Trump administration, because the sensitive locations policy was still in place then. But people know that has changed now, and as a result they are staying away from these places, including churches.

20.    Our Synod has taken active roles in helping our congregations, including rostered leaders, staff, and church members, understand how to prepare for the possibility of immigration raids at churches and other locations where religious activities are occurring.

21.    To that end, we have met with rostered leaders. We've provided information about constitutional protections. We have posted information for use by congregations on our website.   We have made available materials to encourage congregations that may be impacted by enforcement activities to prepare for a potential encounter with immigration enforcement and to be ready to assert Fourth Amendment rights to protect private spaces within church buildings from unwarranted intrusion. Congregations have been encouraged to develop a written response policy and preparedness plans in advance, to designate an authorized person to review warrants,

5

JA128

to understand the difference between public and private spaces, to have appropriate signage, to train staff and volunteers on how to respond to ICE requests, to document all interactions with immigration enforcement, and to connect with immigration response networks in their areas. We have not offered in any of these materials formal legal advice, and we do not encourage anyone to violate the law. But we do encourage church leaders with information on how to assert their rights and protect congregants in the event this is necessary.

22.     I am aware that the government's decision to rescind a longstanding policy on ICE enforcement at sensitive locations like churches, hospitals, and schools has had a damaging effect upon many congregations and Synod-authorized ministries in our territory and upon basic faith formation and discipleship activities. Consequently, there has been decreased attendance at services; new practices of locking sanctuaries during worship and creating safety protocols and preparing emergency plans; cancelling programming; increased anxiety and stress on clergy and rostered leaders who are responsible for the families in their communities; and the cancellation of classes and sacramental education.

23.     One ministry reports since the rescission of the sensitive locations policy, a consistent drop by one third in the number of customers and vendors coming (down from 40-50 vendors) to a weekly flea market they sponsor as way to provide low-income vendors a way to support their families by selling many items, including clothing, food, toys, tools, plants, produce, and household goods.

24.     One of our mission developers—who work under the authority of the bishop to develop and cultivate new worshipping communities—has shared that some of the people in his congregation have asked him to lock the church doors on Sunday for fear of the governmental authorities. Even the idea of locking the doors of the church once people are inside is foreign to

6

JA129

our faith. Normally this is an open, public space. It's a form of harm and harassment that people are even having to think about this danger when they are there to worship together and with their community.

25.    Another mission developer within the African National community has reported that people are shaken, confused, and afraid because of the dramatic increase in enforcement at or near churches. Many who have been here for a long time, who have been focusing more on supporting their families and contributing to society and less on the right documentation, fear that they are now vulnerable in ways they have not been for decades.

26.    Pastors report a decline in the numbers of people attending church. Pastors have spoken with some of their people who are not attending because of visible and increased ICE activity in the area of the church. Many members have expressed their fear of coming to worship given the possibility of being detained by ICE while at church. Attendance suffers because of the fear many mixed-status families have if one of their breadwinners is deported.This has a direct impact on the ability of our rostered leaders to carry out their outreach work and grow their congregations.

27.    One pastor complained that ICE was using their parking lot for enforcement activity, noting the presence of three large unmarked SUVs in the church's parking lot, with men standing around "strapping on weapons" and vests marking them as federal law enforcement. When ICE shows up in stages in the congregation's parking lot, it sends a clear signal to the whole neighborhood that this is no longer a safe space.

28.    One of our Synod council members has stopped teaching English language classes at church that were serving our Hispanic Community because attendance had fallen from fourteen to two students. Special services at the church for first communion, baptisms, and

7

JA130

confirmations have been put on pause and the ministry is "in limbo" due to decreases in attendance from people afraid to come to church.

29.    One pastor of a small Spanish-speaking inner-city ministry reported to me that the government's recissions of protections for houses of worship has left him deeply anxious for his congregation that ICE agents may infiltrate the church during Sunday worship. Some of his congregants are no longer participating in worship for fear of the same thing; others continue to attend but do so with the ever-present anxiety that their church could become the next target.

30.    One of our churches which has provided sanctuary and housing for many immigrants, refugees, and asylum seekers regardless of their immigration status over many years is afraid that the ministry to which they are committed may be in jeopardy. They have not hidden their ministry but provided shelter publicly, training volunteers, and receiving donations to support their ministry. But now they feel at risk.

31.    One ministry has a regular meal program that is offered without respect to legal status. They are afraid that this will now be the target of enforcement activities and have had to establish a team within the ministry to prepare possible steps to protect parishioners and neighbors were this or any other ministry activity to become a target of enforcement activities.

32.    The rescission of the sensitive locations policy has and will continue to have a profound effect on our ability to continue to faithfully follow Jesus Christ without potentially being persecuted by the government.

33.    I fear that our rostered leaders and congregations could be exposing themselves to potential prosecutions by following Jesus Christ and responding to the needs of our immigrant members and neighbors. The government has created an untenable situation where baptized

8

JA131

believers have to choose between what Jesus requires of them and what the government would have them to do.

34.    Our Synod urges that the government respect the sanctuary of our congregations, missions, ministries, and other Synodically authorized communities as fundamental religious activity and core responsibilities protected under the First Amendment of the Constitution.

Berkeley, California
July 24, 2025

Signed by:

*Jeff R. Johnson*

82BB4F75D8354E4...

The Rev. Jeff R. Johnson

9

# EXHIBIT 11

## Declaration of Robin DuRant

I, Robin DuRant, declare under penalty of perjury, under 28 U.S.C. § 1746, that the following is true and correct:

**The history and structure of Pacific Yearly Meeting of the Religious Society of Friends**

1.      Pacific Yearly Meeting of the Religious Society of Friends is the association of the members of 34 local Quaker congregations—Monthly Meetings—in California, Nevada, Hawaii, and Mexico.

2.      It was formed in 1947 and legally incorporated as a 501(c)(3) nonprofit organization in 2004.

3.      A Yearly Meeting in the Quaker religion is an association, a yearly gathering, and a way of describing Quakers within a certain region.

4.      Monthly meetings are the heart and basic organizational unit in the Quaker religion. Generally, monthly meetings have their own governing instruments and budgets and own or rent a meeting house. Most community-based activities happen at monthly meetings.

5.      Some of Pacific Yearly Meeting's constituent monthly meetings gather for worship in churches and synagogues owned by other religious denominations.

6.      To be a monthly meeting in the Religious Society of Friends, a meeting generally must be recognized by the yearly meeting.

7.      Quarterly meetings are regional gatherings of monthly meetings. They gather a few times a year for worship and to make decisions about issues that concern the monthly meetings in the region. All monthly meetings within Pacific Yearly Meeting are members of a quarterly meeting.

JA134

8.      Pacific Yearly Meeting is composed of an estimated 1,071 registered members and approximately 2,000 additional regularly participating attenders from its 34 constituent Monthly Meetings, as well as 20 informal Worship Groups, smaller groups of Friends who meet for worship under the care of a Monthly Meeting.

9.      Monthly meetings within Pacific Yearly Meeting are guided by a common faith and practice.

10.      Each monthly meeting sends an annual report to Pacific Yearly Meeting on the spiritual state of the meeting.  These reports are published for the information of all monthly meetings and are also summarized in the annual gathering. Pacific Yearly Meeting offers support to monthly meetings based on the content of those reports.

11.      Pacific Yearly Meeting does not manage the budget of its monthly meetings. If a monthly meeting closes down, generally the monthly meeting's assets transfer to Pacific Yearly Meeting Holding Corporation.

12.      Monthly meetings fund Pacific Yearly Meeting in part. Approximately 75% of the budget of Pacific Yearly Meeting comes from monthly contributions. These payments are made according to membership, but each monthly meeting discerns the final amount.

13.      A loss of members would harm the monthly meetings and Pacific Yearly Meeting. Losing members would mean financial loss in addition to loss of spiritual and denominational unity.

14.      Pacific Yearly Meeting gathers twice annually, once in person and once virtually, for worship, fellowship, and decision-making about the development of the Quaker faith in our region. We understand those gatherings to be gathered meetings for worship.

JA135

15. Pacific Yearly Meeting's gatherings are attended by the members of its constituent monthly meetings and others who are not official members but are active participants in our worshipping body.

16. All are welcome to attend and worship at Pacific Yearly Meeting's gatherings. We would never turn anyone away, and we do not ask about immigration status. All are welcome. We believe that the Spirit is present in each person.

17. Some of Pacific Yearly Meeting's constituent monthly meetings are located in areas with large populations of immigrants and have a substantial number of members or attenders who are immigrants from all over the world.

18. Pacific Yearly Meeting has several committees devoted to the rights and well-being of immigrant communities, including our Latin American Concerns Committee, Indigenous Concerns Committee, and Racial Justice Committee. These committees exist because of and reflect the core Quaker belief in welcoming all comers.

19. We publish Quaker Faith and Practice—a collection of writings and teachings on our faith—in both Spanish and English.

20. We understand ourselves to be part of a worldwide body of Quakers.

21. The Quakers have a long tradition of hosting people who come from places where there is ongoing violence or civil unrest. Our hospitality is an exercise of our faith and does not turn on someone's legal status.

22. We practice "intervisitation"—visiting Quakers from different parts of the world and different branches of Quakerism.

JA136

23. Practicing intervisitation is an important means of building and maintaining our relationship with our coreligionists across theological and geographical differences, as our Quaker faith requires.

24. In 2024, for example Friends from Pacific Yearly Meeting were part of a delegation of Quakers to South Africa for a worldwide gathering of Friends.

25. One of our Monthly Meetings is in Mexico City, Mexico. We are also affiliated with an informal worshipping community in Guatemala. Friends from both these communities attend our annual session.

## My role in Pacific Yearly Meeting

26. I am Presiding Clerk of Pacific Yearly Meeting. The position is roughly equivalent to that of a Bishop of a religious organization.

27. As Presiding Clerk, I serve as the legal agent and representative of Pacific Yearly Meeting.

28. I have been in my position for one year.

29. I am an active member of the Religious Society of Friends and a member of Orange Grove Monthly Meeting in Pasadena, California.

30. I previously served as Clerk of Orange Grove Monthly Meeting, and Clerk of Southern California Quarterly Meeting. I founded Friends Western School, which currently meets on the Orange Grove Monthly Meeting campus.

31. I hold a Master of Divinity.

JA137

**My faith and the effects of DHS's new policy**

32.     I believe that any immigration-enforcement action at a Quaker meeting house or at any place where a meeting for worship is occurring would impair the religious exercise of Pacific Yearly Meeting and its members in its constituent monthly meetings.

33.     I believe that the threat of immigration-enforcement actions at a Quaker meeting house or at any place where a meeting for worship is occurring is already causing serious harm to the religious exercise of Pacific Yearly Meeting and its members in its constituent monthly meetings.

34.     Immigration-enforcement activities have been carried out in proximity to some of Pacific Yearly Meeting's monthly meetings, including just a short block away from one monthly meeting's campus in July 2025.

35.     People are afraid to come to weekly worship. In addition, at least one family felt unsafe attending our annual session this year, which took place in July 2025, and declined to attend.

36.     Some of Pacific Yearly Meeting's monthly meetings have programs serving their immigrant communities or populations that may include immigrants. We do not check immigration status before offering services.

37.     People are afraid to attend events sponsored by our monthly meetings about things like social action, learning to be bystanders, or any other event in support of immigrants, documented or undocumented, because they are fearful of immigration-enforcement action occurring at one of these events. These activities are part of our religious practice and exercise.

38.     One monthly meeting is providing shelter for a documented immigrant as one of its ministries; he is afraid to come and go as he pleases.

39.     I believe that threatened or actual immigration-enforcement action near or inside a Quaker meeting house or at any place where a meeting for worship is occurring may lead some to refrain from attending worship services.

40.     Knowing that immigration enforcement can happen at a monthly meeting, annual gathering, or other worship event, I cannot be as encouraging of immigrants joining us for worship knowing that their attendance could subject them to armed federal officers.

41.     Knowingly putting a person in harm's way or subjecting them to the possibility of a violent encounter violates my religious beliefs.

42.     The threat of immigration enforcement near or inside a Quaker meeting house or any place where a meeting for worship is occurring causes significant harm, including immediate and lasting disruption to our ability to worship.

43.     The DHS policy violates the Quaker testimonies of equality and community and its spiritual commitment to fight against the marginalization of those who have been devalued or excluded.

Signed by:

*Robin DuRant*

7B10C7FA9F1C44A...

Los Angeles, CA

July 24, 2025                                Robin DuRant

JA139

# EXHIBIT 12

## DECLARATION OF PASTOR EDWIN APARICIO

I, Edwin Aparicio, declare under penalty of perjury, under 28 U.S.C. § 1746, that the following is true and correct:

1. I am a co-pastor at Ascension Lutheran Church in Waukesha, Wisconsin.

2. I have been affiliated with the church since 2013.

3. I have been a pastor at the church for two years. I serve the congregation along with two other pastors.

4. Ascension Lutheran is a member church of the Greater Milwaukee Synod (the "Synod"). It is one of five congregations participating in the Latino Strategy Ministry Team ("Latino Strategy"). The Latino Strategy Ministry Team was formalized through a resolution passed by the Synod Council. The purpose of the Latino Strategy is to share the joys, sorrows, and challenges we face in our journey with our ministries. We support one another in local activities and work together to find new ways to strengthen our religious practice and our communities.

5. I previously served on the Synod Council for the Greater Milwaukee Synod, which is the "Board of Directors for the Synod and serves as its interim legislative authority in between meetings of the Synod Assembly."

6. The information included in this declaration is based on knowledge I have obtained through my work as a pastor at Ascension Lutheran Church and through my leadership role with the Latino Strategy Ministry Team of the Greater Milwaukee Synod.

1

7. Ascension Lutheran has a membership of approximately 800 people. 55 of our members participate in the Latino ministry. Through this ministry, we offer worship in Spanish simultaneously with an English-language service.

8. The congregation at Ascension Lutheran includes immigrant populations from countries, such as El Salvador, Colombia, Venezuela, Guatemala, Honduras, and Mexico. Some of those individuals are documented, and some are not.

9. Many of our congregants confide in me and have expressed concern about the potential for ICE raids at the church or in the surrounding area. When one of my congregants was arrested by ICE in May 2025—just 10 minutes away from the church—some families refused to participate in worship the following Sunday due to fear that ICE could detain them at church. There was a noticeable decrease in attendance after that event.

10. In response, the church hosted a prayer vigil. My co-pastors and I agreed to send a message to the families who participate in our Latino ministry letting them know that they should not attend due to safety concerns. Just three days prior to these events, the church had a Pupusa[1] fundraiser, and so my congregation went from celebrating Latino communities to encouraging them to miss church activities because of fear that ICE may show up. In many ways, congregants of all backgrounds are missing out on or otherwise being deprived of the cross-cultural/multi-cultural connection that is foundational to the Lutheran church.

---

[1] Ascension describes itself as a "faith community that welcomes, supports, walks with, and identifies in many ways with immigrants." One of these many ways is through Pupusa Fest, which also serves as a fundraiser for the church, where visitors can buy pupusas and see the church's facilities. Pastor Edwin, *Mathew 25*, ASCENSION LUTHERAN CHURCH (June 2, 2025), https://ascensionelca.org/matthew-25/ (on file with author) (last visited July 22, 2025).

2

JA142

11. On Saturday, June 21, ICE was in Waukesha again. This time, they were spotted just three blocks away from the church. Again, church members were fearful and concerned about ICE's proximity to the church. Some worshipers reported fear that ICE might invade the church building.

12. As a result of the changes to the sensitive locations policy, we have made several changes to the way we participate in our ministry. We have designated a U.S. citizen to stand at the sanctuary entrance to prevent ICE from entering the sanctuary, should they show up. This summer, we had planned to hold outdoor family events on the church grounds. Due to the rescission of the sensitive locations policy, we decided to cancel many of them. Some events are being held inside the church with the doors closed, which is inconsistent with the principles of our faith which require us to welcome our neighbors.

13. We currently have outdoor events scheduled for the winter on the church grounds. If this policy change remains in effect, we will cancel those events as well. These types of activities bring families from diverse backgrounds together as a Christian community. Continued cancellation of these types of activities due to fears of ICE presence will continue to harm our place of worship and our ability to worship cross-culturally.

14. Other congregations in the Latino Strategy are reporting similar fears and changes.

15. One congregation from Racine, Wisconsin, with approximately 60 percent Hispanic membership (about 45 percent of those individuals are immigrants) has informed me that they had to cancel a church-sponsored summer camp for

3

JA143

children because of fear of ICE's coming on church grounds, and questioning the children of immigrants.

16. The same congregation reported that an outdoor event scheduled for May 5 was quietly moved to the church basement to allow congregants who were concerned about ICE presence outside the church to still participate in the event.

17. A pastor from another congregation in Milwaukee that participates in the Latino Strategy reported that many immigrant families are not attending church due to fear of ICE raids at the church. Church attendance is estimated to have dropped by a staggering 50 percent in the last few months, especially at Mass. One South American couple and their US-born son are not attending church for worship because they have received a communication from Customs and Border Patrol threatening deportation, and they worry that they could face detainment at Sunday service.

18. This church also hosts a food-pantry as part of their ministry. The number of people participating in the food pantry has decreased by roughly 30 percent. The food pantry—which used to take place outside—has been moved inside, behind closed doors due to fear of ICE presence in the surrounding area during these types of church activities.

19. Multiple congregations have reported that they have had to maintain a more watchful eye at the entrance of the church. Pastors and congregants are generally more skeptical of newcomers at worship because of the rescission of the sensitive locations policy.

4

20. Some of the congregants at another church in the Latino Strategy learned of ICE presence just two blocks away from the church, and as a result, they elected to stay home and not attend worship the following Sunday. Three families from this same congregation opted for private baptisms and weddings in the church basement, which has no public entrance. These families did not feel safe publicizing these momentous occasions, but still wanted to celebrate as a family with their pastor. The private events allowed them to do so in a safer manner.

21. Some of our congregations are even considering cancelling food pantries altogether because they do not feel it is safe for their congregants or other community members who may not attend the church, but rely on the pantry. One congregation has even discussed changing the day and time of Mass to ward off ICE.

Waukesha, Wisconsin
July 22, 2025

Edwin Aparicio

5

JA145

# EXHIBIT 13

## DECLARATION OF NELSON H. RABELL-GONZÁLEZ

I, Nelson Rabell-González, declare under penalty of perjury, under 28 U.S.C. § 1746, that the following is true and correct:

1.  I am the pastor of Iglesia Luterana Santa Maria Peregrina in Stockton, California.

2.  Santa Maria Peregrina is a congregation of the Evangelical Lutheran Church in America, and a member of the Sierra Pacific Synod within the ELCA.

3.  Financially, we are supported by a combination of funding from our Synod and contributions from our congregants.

4.  The funding from our Synod alone is not enough to cover all of our costs.

5.  Santa Maria Peregrina is located in Stockton, California, and serves a predominantly Spanish-speaking community. We maintain a congregation of around 150 people.

6.  We do not own our own building for worship. Instead, we rent space from a Unitarian church where we meet.

7.  A significant number of our congregation's members are undocumented. And many families in our congregation are of mixed immigration status, with some family members having legal status and some being undocumented.

### Our Religious Beliefs and Practices

8.  As Lutherans, we understand the Church to be the assembly of all believers, where the Word of God is proclaimed and the sacraments are administered.

9.  We commune with the Holy Trinity through our sacraments, which we participate in collectively. Gathering together to listen to the Word of God and to participate in sacraments like the Eucharist is literally how we are saved by God, how we are forgiven by God, and how we experience the divine.

10. When Lutherans are baptized, we take a vow to work for justice and peace, and to denounce evil. We have a mandate to love each other, especially those that are vulnerable.

1

11. The Old and New Testaments speak of the evil we must denounce in systemic ways. It includes the mistreatment of the poor and social injustice.

12. Jesus told us that whatever we do for the marginalized—the "least of these"—we are doing for him.

13. So we believe that when we serve the stranger—which we believe is just another word for the immigrant—we are serving Jesus directly. He is made present in the other.

14. Theologically speaking, when we serve the neighbor who is a migrant, poor, and dispossessed, we are literally touching the body of Christ. This is true whether the person we are serving is a citizen or an immigrant, or whether they are documented or undocumented.

15. The Bible tells us that Jesus himself along with his family emigrated to Egypt after he was born seeking safe haven. It doesn't speak to an immigration process, because no such thing existed. The legality of someone's presence in a country is immaterial to why they needed to leave where they came from.

16. A basic tenet of our faith is that everyone is a creature created by God regardless of their political or legal status. So I don't ask for the citizenship statuses of our congregants or the people we serve.

17. We fulfill our mandate to love through our ministry to the vulnerable and our practice of hospitality.

18. Our ministry to the vulnerable includes feeding the hungry, tending to the sick, and doing everything else we can to ensure that the vulnerable among us have a decent, dignified life wherever they may be.

19. For example, we recently secured a grant from the national church to provide gift cards to local supermarkets to anyone who might need them.

20. We accompany immigrants when they need it, and provide attorneys to help them with legal issues.

21. We have also prepared care packages with hygiene products and food for members of the migrant community that were visiting a local charity that provides information, legal counseling, financial assistance, day care for children and other types of services to the Spanish-speaking community in Stockton.

2

JA148

22. Our practice of hospitality drives us to welcome all who would join for worship. Before DHS's new policy, we would actually leave the church doors open during services as a message of welcoming.

### Effects of DHS's New Policy on Our Church

23. DHS's new policy has had a huge and immediate impact on our weekly attendance, with a big first drop coming right after the sensitive locations policy was changed. Attendance has remained lower and unsteady since then.

24. Beginning that first week when the new policy went into effect, and several times a month since then, I get calls from congregants asking if it is safe to go to church yet. And I can't promise them that our church won't be raided because it could be.

25. Members of our church are very aware of the government's change in policy towards churches. They follow the news. One of the advantages of the Spanish-speaking community is having access to Univision and Telemundo, both of which are covering these issues extensively.

26. Because of the makeup of our congregation, I am worried that immigration authorities might conduct enforcement actions at Santa Maria Peregrina now that the policy protecting churches has been rescinded.

27. The uncertainty around whether there will be raids or not is devastating to the congregants. The church has always been a sacred place that's free of government interference, and the new policy has completely done away with that idea. Our church was one of the places that our congregants used to feel safe, and the recission has ended that. Every time there is reporting of raids in the area, congregants that had slowly been building up the confidence to come back to church are shattered. You can only do that so many times before it chips away at your ability to engage in your faith. This hurts the church so much because there's only so many times you can build your confidence back up before you eventually are forced to stop coming.

28. The rescission of the sensitive locations policy has discouraged more than just undocumented congregants from attending. Some congregants who are immigrants with legal status or Latino citizens, and some families with mixed immigration statuses, have stopped attending for fear of immigration enforcement at church.

3

JA149

29. Even I, as a United States citizen, don't feel safe at the church. I am Afro-Latino, born and raised in Puerto Rico. And I feel targeted and unprotected. I can't help but feel the new policy has put a target on houses of worship.

30. Fewer attendees means both fewer people in need seeking our help and fewer congregants to help serve those people in need. Ultimately, fewer attendees means that we are less able to fulfill our religious mandate to love.

31. The decreased attendance also takes a toll on the community that does come for worship. Everyone knows why people aren't coming, so there are little traumas happening every Sunday. It depletes people's faith and souls, making it harder to worship joyfully together.

32. When fewer people can collectively participate in the sacraments, it takes away from everyone's ability to experience the divine.

33. Additionally, the decreased attendance directly impacts our ability to raise money as a congregation. We are a vulnerable church because of the community we serve, which is largely lower income. We don't even own our own space. If people aren't showing up and we're not able to consistently raise what we need to meet our costs, we may have to fold.

34. Because of the new policy, we have had to close our doors during worship. That was our message of welcome, but we've had to stop because we just can't accept the risk of immigration enforcement.

35. We have had to spend time and resources preparing the church for a potential raid. We have engaged in know-your-rights education and crafted extensive response plans for congregants. If the rescission stays in effect, Santa Maria Peregrina will continue to be affected adversely by losing more of its membership and financial support.

36. We're forced to consider these actions because an immigration raid during worship would be devastating to our congregation. We would be deeply traumatized. The congregation might not hold together, and many congregants might stop going to church altogether. Once congregants stopped coming, I don't know if they would ever come back.

Stockton, CA

July 18, 2025

Signed by:

Nelson Rabell-González

839FAE77132B4B4...

4

JA150

# EXHIBIT 14

## DECLARATION OF THE REV. BILL KNEZOVICH

1.      I serve as Pastor of Our Saviour's Lutheran Church located in Fresno, California.

2.      Our Savior's Lutheran Church is part of the Sierra Pacific Synod of the Evangelical Lutheran Church of America. We serve a community that includes many immigrants, including from Mexico, Central America, the Philippines, and Eritrea.

3.      As part of our religious mission, our church does a food distribution every month for those in need in our community.

4.      The food distribution is a core part of our practice of faith. Jesus says, whatever you do to the least, you do unto me. So if we leave people hungry, we're leaving Jesus hungry. It's an essential part of who we are to have these food distributions. It's a central ministry of our Church. This is one of our mandates from God to feed God's people.

5.      Our Savior's Lutheran Church also offers bilingual worship services through an outreach program to the Hispanic community called Misión Esperanza. These services are held every week, and we have many attendees from the immigrant community where we are located in central Fresno.

6.      It is fundamental to our beliefs as Lutherans not only that we meet regularly to worship but that we welcome our neighbors into our church to worship with us. Our Savior's Lutheran Church in particular is committed to being an open and affirming congregation where we provide services, ministry, and pastoral care to all who seek God. We celebrate our unity together as God's people. For us that has meant welcoming, protecting, and uplifting members of the LGBTQIA community as well as those of different national origins and legal status.

JA152

7. The recission of the sensitive locations policy has directly harmed our church and congregants by interfering with our religious obligations not only to worship together and with open arms but to serve the most vulnerable in our community through our food distributions.

8. Our congregants and those who come to our food distributions are aware that there used to be more protections at church from immigration enforcement and that that's no longer the case since the policy was changed. We're trying to provide safe space for people who don't have safe space, and the fear created by this change in policy makes that impossible.

9. As a result of fear of immigration enforcement at our church since the policy change, we have roughly 40 families that are undocumented who are now afraid to come to our food distributions, even though they are in need. We can't carry out our religious mission to serve those folks when they're going hungry because they've been scared away by ICE. We're working to set up delivery alternatives, but we have limited resources and it's more difficult to help when people are afraid to come to us.

10. Fears of ICE activity at the church have also decreased attendance at our bilingual worship services since the policy change went into effect. We have five families that have stopped coming to those services since the policy was changed. When those people stay home, it not only harms their religious exercise, it hurts our entire church community because we are unable to welcome and pray with our friends, neighbors, and fellow congregants into the church in communal worship.

11. Our Savior's Lutheran Church was already the target of violence in the recent past. In 2023, our church was vandalized and more than $45,000 in damage was caused by Proud Boys who did not like our support for LGBTQIA rights. So to now be under threat that ICE could come into our church to seize members of our community, it's trauma on top of trauma.

JA153

I declare under penalty of perjury that the foregoing is true and correct.

Signed by:

00651BE36CA543C...

Fresno, California
July 24, 2025

The Rev. Bill Knezovich

JA154

# EXHIBIT 15

## <u>DECLARATION OF REV. PAUL D. ERICKSON</u>

I, Rev. Paul D. Erickson, declare under penalty of perjury, under 28 U.S.C. § 1746, that the following is true and correct:

1.    My name is Rev. Paul D. Erickson.

2.    I am currently serving my second, six-year term as Bishop of the Greater Milwaukee Synod of the Evangelical Lutheran Church in America ("Greater Milwaukee Synod" or the "Synod"). I began my first term as a Synod bishop in 2016 and was re-elected to the position in 2022.

3.    As Bishop, I am a minister of Word and Sacrament for the Greater Milwaukee Synod and its congregations.

4.    I provide leadership, administrative support, and pastoral guidance for the Synod's congregations.

5.    In addition, I serve as a staff representative on many boards, committees, and ministry teams within the Synod, where I connect the work of the various parts of our synod ecology.

6.    Because I am fluent in Spanish, I am also the synod's liaison to the Latino Strategy Ministry Team ("The Latino Strategy"), and I regularly visit with the Latino pastors and their congregations, offering support and resources as needed, including informing them of resources and opportunities available through the national ELCA, Wisconsin Council of Churches, and the Greater Milwaukee Synod. I regularly preach and lead worship in our Spanish-speaking parishes and occasionally write pastoral messages, reminding them that the Synod supports them.

7.     Before I was elected Bishop of the Greater Milwaukee Synod, I served congregations in Chicago, Milwaukee, and West St. Paul, Minnesota. I also served as Assistant to the Bishop for Evangelical Mission in the Saint Paul Area Synod from 2008 through 2014.

8.     The information included in this declaration is based upon my personal knowledge, Synod documents that I have reviewed, and other information made available to me in my role as Bishop.

**Background on the Greater Milwaukee Synod**

9.     The Greater Milwaukee Synod is a regional body of Lutheran congregations and ministries with over 59,000 baptized members across southeast Wisconsin. It is a synod of the Evangelical Lutheran Church in America ("ELCA") and includes 115 congregations and other authorized worshipping communities. The ELCA was formed in 1987 when three Lutheran churches merged to form one denomination. The Greater Milwaukee Synod was also organized in 1987.

10.    Part of our Synod's purpose—as outlined in our constitution—is to "carry out Christ's Great Commission by reaching out to all people to bring them to faith in Christ and by . . . minist[ering] with a global awareness consistent with the understanding of God as Creator, Redeemer, and Sanctifier of all."

11.    As part of our mission and purpose, our Synod "serve[s] in response to God's love to meet human needs, caring for the sick and the aged, advocating dignity, justice, and equity for all people, working for peace and reconciliation among the nations, caring for the marginalized, embracing and welcoming racially and ethnically diverse populations, and standing in solidarity with the poor and oppressed, and committing itself to their needs."

JA157

12.     As one of 65 synods in the ELCA, we are committed to spreading the Word of God across many different cultures, believing, as depicted in Acts 2:1‑12, that the Church of Jesus Christ originated as a multicultural, multiracial, multilingual church.

**Greater Milwaukee Synod's Religious Practices and Beliefs Concerning Immigrant Communities**

13.     The framework for our beliefs as Lutherans began during the Protestant Reformation in the 16th century, from the teaching of Martin Luther.  These beliefs center the love of our neighbor, including immigrant communities.

14.     Some of the Synod's congregations have significant Latino memberships, including congregants from El Salvador, Colombia, Venezuela, Guatemala, Mexico, and Honduras.  Some of these congregants have documented status; some do not.

15.     The Synod has passed a formal resolution, authorized by the Synod Council, creating a Latino Strategy Ministry Team.  The Latino Strategy meets monthly, gathering the pastors and lay leaders of the five Latino ministries in the Greater Milwaukee Synod, that offer worship services in Spanish.  The purposes of these gatherings is to:  (1) share the joys, sorrows, and struggles of our congregations and communities so that we might celebrate, mourn, and strategize together; (2) develop programs and initiatives that strengthen the ministries of all of our congregations; and (3) share resources and information that help the congregations support their congregants and the larger community.

16.     There are over 40 Biblical passages that guide the Synod's work with Latino and other immigrant communities.  Chief among them is the Parable of the Good

Samaritan in Luke 10:25–37.  In our faith, the Good Samaritan—who was generally considered a foreigner and an outsider—serves as a guidepost for Lutherans (and all Christians) for how we are expected to treat others.

17.   The Good Samaritan showed mercy to the man who was beaten and left for dead, even as he himself was being ostracized.  The Samaritan never questioned whether the man deserved to be helped.  He did not ask for his documents, his nationality, or religious affiliation; he saw a man in need and helped him.

18.   Jesus commands his disciples to "go and do likewise."  This command is why we in the Church stand with, care for, and advocate for vulnerable and marginalized communities, regardless of their race, nationality, gender, political affiliation, citizenship status, or anything else.  This is a high calling—one that we do not always fulfill, but the day we stop working to this achieve this mandate is the day we stop being faithful to our call as followers of Christ.

19.   Similar to Luke 10:25–37, the scriptural mandate in Matthew 25:35—"I was hungry and you gave me something to eat, I was thirsty, and you gave me something to drink, I was a stranger, and you invited me in "—is the foundation of who we are as Lutherans and followers of Christ.

20.   It is also a core belief of the Synod's members that every person is created in the image and likeness of God.  They believe that citizenship in the reign of God is primary; citizenship in a country is secondary.  Every person's identity is as a child of God first and foremost.

21.   These deeply held beliefs led the Synod to support a resolution, which the ELCA Churchwide Assembly adopted at a 2019 meeting in Milwaukee, declaring the

JA159

ELCA a sanctuary church body.  That resolution affirmed the Synod's and the broader ELCA's religiously rooted commitment to support and protect immigrants, refugees, and asylum-seekers through actions, such as offering shelter to individuals seeking refuge, advocating for changes in the country's immigration laws and policies, and welcoming all to join in religious worship.

22.    Also in 2019, the Synod adopted a new statement of mission and core values that identified "invitation" as a central faith practice.  The statement affirmed that members of the Synod "actively invite others into deeper relationships with Jesus, welcoming them into communities shaped by unconditional love and acceptance."

23.    The statement reflects the central role of communal worship, loving one's neighbor, and standing with all who are in need play in the Synod's religious practice.  Members of the Synod put these beliefs into practice by, among other things, supporting the Latino Strategy, welcoming all to worship, operating food pantries to help the needy, and offering Spanish-language church services.

**The Impact of DHS's New Policy on the Greater Milwaukee Synod**

24.    Some of the pastors who participate in the Latino Strategy have reported a decrease in attendance at church service and church-sponsored events.  A congregant at the Ascension Lutheran Church—one of the Latino ministries in the Synod was detained by Immigration and Customs Enforcement ("ICE").  The Sunday after this individual was detained, some congregants stayed home from worship because they were afraid that ICE would now be able to enter the sanctuary.

25.    The congregation hosted a prayer vigil in the sanctuary of the church in support of the individual who was detained, and it had to advise Latino members—

JA160

regardless of immigration status—to stay home because of the potential for ICE practice on church property.

26.     As a result, many members could not participate in communal prayer and worship both in support of their fellow congregant and at regular Sunday church service.

27.     Pastors in these ministries and others have also reported that their congregants no longer feel safe participating in public baptisms.  Instead of bringing their new child into the fold with a communal celebration, they are limiting baptisms to the immediate family and pastor.

28.     The impacts of the policy change have been widespread.  It is not only communal worship and prayer that has suffered.  Synod churches who offer food pantries and other social services as part of their mandate to feed the hungry and care for their neighbors have also reported a noticeable decline in participation due to fear of potential ICE raids at houses of worship.

Milwaukee, Wisconsin
July 22, 2025                                                Rev. Paul D. Erickson

JA161

# EXHIBIT 16

## DECLARATION OF REV. BRENDA BOS

I, Rev. Brenda Bos, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1. My name is Rev. Brenda Bos.

2. I am an ordained minister of word and sacrament in the Evangelical Lutheran Church in America ("ELCA"), and serve as the bishop of the Southwest California Synod of the ELCA.

3. In June 2021, I was elected to serve a six-year term, and my term began in September of that year.

4. Before I was elected Bishop of the Southwest California Synod, I served as the Assistant to the Bishop for Rostered Leadership for Southwest California Synod. I also served Christ Lutheran Church in San Clemente.

5. The information included in this declaration is based upon my personal knowledge, Synod documents that I reviewed, and other information made available to me in my role as Bishop.

### Background on the Southwest California Synod

6. The ELCA was formed in 1988 from three predecessor Lutheran bodies, and we are comprised of 65 regional synods in the continental United States and the Caribbean.

7. The Southwest California Synod has 105 congregations and spans the Los Angeles, Kern, Ventura, Santa Barbara and San Luis Obispo counties. Our region spans from Long Beach in the south to Templeton in the north. We have approximately 10,000 members in those congregations, but our ministries and social service programs serve 30,000 to

JA163

50,000 unique recipients annually. Thirteen of our congregations worship in a language other than English.

8. Our synod is governed by an annual synod assembly, comprised of representatives of the 105 congregations. The assembly passes the annual budget, changes to our constitution and other practical and ethical resolutions. The assembly also elects a synod council that makes decisions throughout the year. The synod council is comprised of twenty-four elected ordained and lay people.

9. While I write this declaration as the Bishop of this Synod, the executive committee of my Synod Council has approved us entering this lawsuit. We seek to protect and support our congregational ministries, as our constitution requires.

10. Our Christian values call us to welcome the stranger in our midst, and to see all people as children of God. We follow the teachings of Jesus, which tell us to feed the hungry, clothe the naked, care for the sick, and visit the prisoner. We are called to provide congregants with safe and welcoming worship spaces where we can worship as we wish.

11. The recission of the sensitive locations protections for our congregations has had a deleterious effect on many of our congregations and social service ministries.

12. Our worshipping communities have experienced a drastic decrease in Sunday worship attendance due to fear of immigration enforcement. This lack of attendance demoralizes the remaining congregation, who must move forward with diminished relationships, fewer volunteers, and less income from weekly offerings. A worshipping community's first priority is the spiritual wellbeing of the flock, and because they cannot guarantee safety for parishioners, this first priority has been imperiled.

13. Additionally, many of our congregations offer food and social services. When participants join food lines and social service events, pastors often pray with them and offer spiritual care and counsel. These social service ministries open doorways to Bible studies, small group, and worship attendance. We have ordained pastors whose gifts and Christian calling were first identified when they were served by these ministries. Due to fear of immigration enforcement, many of our churches have seen fewer participants, both from volunteers and from communities served, at these social service ministries. A valuable door to evangelism (sharing the Word of God with others) and a means of practicing our faith has been diminished.

14. One of our congregations has about sixty active members, 25% of whom are from the Middle East, including Iran, Lebanon, and Palestine. Since the first part of 2025, the Persian community has been very hesitant to enter the worshipping space. The congregation has taken on non-budgeted construction to seal and fortify a private space, should congregants need to be protected from raids by U.S. Immigration and Customs Enforcement ("ICE"). These Middle Eastern parishioners would face certain persecution in their homeland, or even within their migrant communities in the United States, as they were born Muslim and have converted to Christianity. A safe and confidential worshipping community is essential to their religious freedom and personal protection. Because they now know that government agents conducting immigration enforcement could enter the sanctuary at any time, anonymity can no longer be guaranteed. And because protections have been lifted for all places of worship, they cannot simply go to another church in a safer part of the city.

JA165

15. One congregation of fifty (half Spanish-speaking, half Anglo) has a long-established diaper pantry, where over 300 impoverished parents can receive diapers monthly. The program primarily serves immigrants, approximately 60% of whom have legal status or are in citizenship proceedings. Prior to the recission of the sensitive locations policy, the program was run in the parking lot, but the change in policy has forced the church to change its distribution protocols. Now, volunteers wear identifying vests that read "safe" to signal that the volunteer is part of the program, and the program has been moved indoors. Despite these measures, the program has seen attendance decline precipitously, from about 300 families to around 100. Not only has the church's ability to conduct its ministry in the community been seriously impacted, babies and children in the community are losing access to a valuable resource.

16. Another congregation has been deeply impacted, as the pastor reports the church is located very close to an ICE headquarters, causing congregants to fear an immigration enforcement action at the church. The congregation has had to start being very cautious about unlocking exterior gates and doors to limit access to the building and programs. As Lutherans, locking doors and limiting access to the church goes against our religious obligation to welcome the stranger and serve our neighbors, but this congregation has been forced to take these measures to protect congregants.

17. An urban congregation had to cancel Vacation Bible School because of the threat of ICE raids after their neighborhood experienced several ICE sweeps. This program often serves one hundred children aged five to twelve, with religious education, social skills and lunch programs. Both immigrant and U.S. citizen parents were not able to provide their children with religious education and formation because of the recission of the

JA166

sensitive locations policy. The pastor reports a painful spiritual crisis: he cannot promise his people God will keep them safe.

18. In Southwest California Synod congregations, volunteers have been taken out of education programs or feeding programs to serve as observers and guards on church property. Hours which could be spent on Christian education are now being spent training congregants on what to do if ICE interrupts a worship service or Sunday school. While our parishioners are performing these acts of protection because they love their neighbor, they know their first role as church is to support faith formation. The recission of the policy has made our congregations compromise their beliefs; these compromises have negative impacts on every congregant, regardless of their immigration status.

19. Another migrant-serving congregation with approximately seventy Spanish-language parishioners reports that church attendance is down 80% and the youth group attendance is down 40%, even though the vast majority of young people enjoy birthright citizenship. Youth groups provide spiritual and social development for our young people; the recission of the sensitive locations policy has deprived them of this community and opportunity for faith formation.

20. Migrant serving congregations are not the only congregations having to shift program priorities or volunteer duties: two of our larger suburban congregations are also sending resources to affected churches and spending education funds teaching their congregants about Christian response to ICE raids and other loss of human rights. They are sending volunteers to migrant churches for court accompaniment and perimeter patrols.

21. As Lutheran churches, our call is to care for the most vulnerable and to provide Christian education and faith formation for all. The recission of the sensitive locations policy has

JA167

deeply hindered the church's ability to do the most basic things we are called to do. We

seek to practice our faith, serve our communities, and worship God as we have always

done, without regard for the immigration status of the believers who worship beside us.

Glendale, California
July 23___, 2025

DocuSigned by:

*Bishop Brenda Bos*
399DCA92BE5E449...
Bishop Brenda Bos

JA168

# EXHIBIT 17

## DECLARATION OF THE REV. NATHAN D. PIPHO

I, Nathan D. Pipho, declare under penalty of perjury, under 28 U.S.C. § 1746, that the following is true and correct:

1. I am Bishop of the New England Synod of the Evangelical Lutheran Church in America. I have served in that role since 2024.

2. The statements in this declaration are based on my personal knowledge and on information made available to me in the normal course of my duties as Bishop.

### The New England Synod and the Importance of Immigrants to our Worship

3. The New England Synod of the Evangelical Lutheran Church in America includes 17,000 active participants in 155 congregations and 10 synodically authorized worship communities across Massachusetts, Maine, Rhode Island, Connecticut, New Hampshire, Vermont, and New York. Its main offices are located in Worcester, Massachusetts.

4. The Synod includes congregations that serve sizable immigrant populations from countries across the world, including the Dominican Republic and other Caribbean countries, Liberia and other African countries, Hong Kong and Indonesia, and Central and South America. These congregations include people both with and without documented legal status.

5. Prior to becoming Bishop, I served for more than 20 years as a parish pastor in the Synod. At the time of my election as Bishop, I was serving as the pastor of Trinity Lutheran Church in Worcester. Before that, I served as pastor of Good Shepherd Lutheran Church in North Quincy, where among other things I helped to establish a Chinese outreach ministry.

6. We are an immigrant church. Lutherans in New England largely descend from Swedish immigrants, but our congregations today consist of immigrants from around the world. The history of immigration is part of our identity and background, but it also has a direct

1

JA170

connection to our understanding as Lutherans that Christ who loves us by grace calls us to love and serve our neighbors as an expression of grace. As recipients of God's free gift of grace we have an obligation rooted in our faith to love and serve our immigrant neighbors.

7.     That obligation to love and serve our neighbors is clear from the Bible, which teaches that, "You shall also love the stranger, for you were strangers in the land of Egypt," Deuteronomy 10:19, and, "You shall not wrong or oppress a resident alien, for you were aliens in the land of Egypt," Exodus 22:21.

8.     To live out that commitment in the world, some congregations in our Synod have made commitments to becoming AMMPARO congregations. AMMPARO (Accompanying Migrants with Protection, Advocacy, Representation and Opportunities) is a program of the ELCA, as a church in the world, to accompany migrant families through their transition to life in the U.S. and, in some cases, as the physical presence of the church in the courtroom.

9.     Many of our congregations also work with individual immigrant families to resettle them and serve them. Most recently, many of our congregations organized "Neighborhood Support Teams" to resettle refugees from Afghanistan. Our congregations have been resettling immigrants and refugees for decades. Not only do we provide communities of spiritual support, but we also provide financial support for housing and transportation for medical appointments, ESL classes, and errands.  This is all part of our religious commitment to loving and serving our neighbor, regardless of legal or immigration status.

10.     Similarly, some congregations express their faith and love of neighbor by operating food pantries for those in need in their communities. We would and do serve anyone in need at those pantries, regardless of immigration status.

2

11. Gathering for regular communal worship is also central to the practice of our faith, and it is critical that such worship be open and welcoming to all. Gathering with others in community of the faithful to receive God's word, receive the sacraments of holy baptism and holy communion, to pray and sing with other believers, is central to our Christian belief. Gathering with the Christian assembly for worship strengthens our faith and gives us strength to live our lives in the world. When we come together, regardless of citizenship status or any other identity, we do so guided by the belief expressed in scripture that "there is neither Jew nor Gentile, neither slave nor free, nor is there male and female, for you are all one in Christ Jesus," Galatians 3:28.

**The Effect of Immigration Enforcement and the Change in the Sensitive Locations Policy**

12. Congregants across our Synod know that the administration has changed the rules that used to limit immigration enforcement at churches. Congregations are educating themselves and spending time, energy, and money, which would otherwise be spent on religious activities, on designating "public" and "private" spaces and how to interact with I.C.E. officers if they show up during worship.

13. As the Synod we have taken steps to inform congregations about these issues and prepare them in the event a raid is carried out at or near a church. This year we had a "know your rights" workshop during our New England Synod Assembly held in Worcester, Massachusetts May 30-31, 2025. We trained people on what to do if I.C.E. showed up. We've also been active in getting congregations to meet locally with advocacy groups to educate themselves and prepare for enforcement on church grounds.

14. Following the administration's change in policy, our Synod has seen a decrease in attendance at some churches, including in East Boston, Massachusetts. The minister there told

3

JA172

some congregants not to participate in weekly public prayer vigils out of concern that I.C.E. could use the events to detain our members.

15. The ability to gather together for regular communal worship in a peaceful and undisturbed manner is vital to practicing our faith. Communal worship gives us strength, and gathering together provides us with spiritual nourishment and community. Coming together every week creates a sense of place and companionship that cannot otherwise exist for our congregants.

16. Decreases in attendance have a ripple effect across our congregations, impacting those that cannot attend but also those that do attend. Those that are prevented from attending due to the new immigration enforcement policies are robbed of the opportunity to fully experience fellowship with God and the other members of the congregation. Worshiping at church provides a space for congregants to encounter God's word, receive sacraments, and participate in rituals that nurture their spiritual life.

17. Similarly, members of our congregation that do attend regularly feel the absence of the missing members. Communal worship relies on the diverse perspective of the entire congregation, and the specter of immigration enforcement looms large over our churches that have seen decreased attendance due to the change in the sensitive locations policy.

18. It's not just at Sunday service that our congregations have seen decreased attendance. For example, one of our churches in Connecticut operates a food pantry as part of their religious mission. They have seen a steady decrease in their Sunday meal program. Throughout 2024, they were feeding an average of 70 families every Sunday. In March of 2025, it was down to an average of 57 families every Sunday, which decreased to an average of 55

4

families per Sunday in April, an average of 45 families per Sunday in May, an average of 34 families per Sunday in June, and an average of 30 families per Sunday thus far in July.

19.    Operating food pantries is an expression of our Lutheran Christian faith, as much as praying or gathering on Sundays. The act of feeding the hungry is a direct response to Jesus' teachings, and caring for and feeding our neighbors is part of the process of directly serving Jesus.

20.    We've seen those decreases in attendance not only within our congregations but at events and meetings of the Synod itself. We had at least two people who didn't come to Worcester for our Annual New England Synod Assembly, May 30-31, 2025 because they feared I.C.E. would come during the assembly. They confirmed that they did not come specifically due to fears of I.C.E.

21.    We had budgeted for and hired Spanish interpreters for those members; that money was lost when, out of fear, our members who would have utilized the service were unable to attend. But the loss of their presence was much more than financial. Our faith is about being together and worshiping together as the people of God. The Synod Assembly is the one chance Lutherans from around New England are able to be together in a mutual space of fellowship, community, and relationship building. There is worship during the assembly, and we could not fully gather as the body of Christ for worship this year because not all of our members were able to be together as one people due to the fear created by this policy.

22.    The decrease in attendance at church creates financial costs as well. There is then a greater need for the Synod to support the clergy, and there are not endless funds. From a policy perspective, if people aren't coming to church and supporting financially, there's greater pressure

5

JA174

on the Synod to provide for the communities. We may be forced to decrease financial support for immigrant communities in the future.

23.    For those who come to services, food pantries, and other parts of our ministry as well as those who stay home, the government's change in policy leads to a lot of fear. It leads to fear for people who are here legally, as well, whether they're born in this country or not. It has led to tremendous anxiety in our congregations and clergy. Most people want to be law-abiding and know how to love and serve our neighbors. But this policy leads to so much fear, it has caused congregations to wonder if outreach ministries to their community, and loving and serving their neighbors in need, puts them on the radar screen for I.C.E. enforcement. Congregations are asking if the risk of loving and serving their neighbors is worth it.

24.    We have congregations that are working with undocumented folks. They are aware that when they're working with undocumented families, that the church is no longer a safe place to protect them. That is due to the change in sensitive locations policy. They were working with these families before the change, and now the pastors need to make different decisions in how they work with them.

25.    We have a pastor—legally here on a Green card—who doesn't feel safe, even when she's preaching. She feels there's nowhere she can go to worship God in peace now that the government can reach into houses of worship. The change in policy impacts her worship leadership. Knowing that her church is not protected anymore weighs on her, and she reports that it feels like it has destabilized her relationship with the congregation. Churches are no longer spaces set apart. At any moment they could be filled with force and violence.

26.    Immigration enforcement taking place at our churches would be devastating. It would take away from the sense of the church as a safe and sacred space, a holy space set apart

6

JA175

to experience God, and it would leave a sense of violation. We preach peace and love, and armed

officers coming into a sanctuary would create lasting harm. It would violate people's sense of

peace and their ability to come together in the future in welcoming worship.

Worcester, Mass.
July 25, 2025

Signed by:

2B8610B0FFEC4ED...
Bishop Nathan D. Pipho

7

# EXHIBIT 18

# Declaration of Rev. Susan Briner

I, Susan J. Briner, declare under penalty of perjury as follows:

1.  I am Bishop of the Southwestern Texas Synod (the "Synod") of the Evangelical Lutheran Church in America ("ELCA").  I was elected Bishop in 2018 and re-elected on May 5, 2024.

2.  Before becoming Bishop, I served as an associate pastor (and later senior pastor) of St. Luke Lutheran Church in Summerville, South Carolina.  I joined the Synod staff in 2012 as the bishop's associate.  Prior to serving as a pastor, I worked in the telecommunications industry for 15 years.  I hold a Bachelor of Science Degree in Computer Science from Duke University and a Master of Divinity Degree from Lutheran Theological Southern Seminary in Columbia, South Carolina.

3.  I make this statement based on my personal knowledge, Synod documents that I have reviewed, and other information made available to me in my role as Bishop.

### The Southwestern Texas Synod

4.  The Synod covers the southwestern area of Texas, spanning from the western edge of the state to just north of Austin and down south to the tip of Texas.  We share the longest border with Mexico of any synod in the ELCA, and our territory includes Austin, San Antonio, and Corpus Christi.  We currently have 113 congregations and 26,436 worshipping members.

5.  Our unique geography joins us with individuals and families fleeing horrible circumstances in their home countries to seek asylum and a new life here in the United States.  Part of our ministry is to offer welcome, safety, and belonging to our migrant neighbors on their journey through direct service, education, and advocacy.

6.  As an immigrant myself, I am passionate about welcoming the stranger.  I currently serve on the board of Global Refuge, and am the co-chair of the ELCA's Conference of

JA179

Bishops' Immigration Ready Bench.  My Synod is coordinating a multi-synodical grant, Sembrando en Los Margenes, focused on a coordinated effort to support and sustain vibrant ministry along the border.

7.      The ELCA has a long history of welcoming immigrants.  In 1998, the ELCA adopted a social message on immigration.  Its basic themes are grounded in the call to "welcome the stranger" in Matthew 25:35 and Paul's admonition in Romans 15:7 to "Welcome one another, just as Christ has welcomed you, to the glory of God."  This social message recognizes and rejoices that our church, along with our country, continues to change with the steady arrival of newcomers to the United States.  It calls for our denomination to advocate for immigration, refugee, and asylum laws that are fair and generous.

8.      In 2016, the ELCA adopted the *AMMPARO Strategy to Accompany Migrant Minors with Protection, Advocacy, Representation and Opportunities*.  AMMPARO represents a whole-church commitment by the ELCA, as a church in the world, to accompany migrant families.

9.      As part of its AMMPARO strategy, the ELCA committed to uphold and guarantee basic human rights and safety of migrant children and their families; address the root causes of migration around the world and the treatment of migrants in transit; work toward just and humane policies affecting migrants in and outside the United States; and engage as a church body with all of its companions, affiliates, and partners to respond to the migration situation and its causes and to advocate for migrant children and their families.  As siblings in Christ, the ELCA is called to bear witness to the conditions affecting so many communities and to work to find solutions that will acknowledge the humanity in all of God's children.

JA180

10.     The ELCA took official action to declare itself a sanctuary denomination in 2019.  As a Sanctuary Denomination, the ELCA has declared publicly that walking alongside immigrants and refugees is a matter of faith and discipleship.

11.     This kind of accompaniment is a core religious practice rooted in the witness, ministry, and mission of Jesus Christ.  In baptism, we are brought into a covenantal relationship with Jesus Christ, and commit as baptized Christians to an identity where we "strive for justice and peace in all the earth."

12.     Following the example of Martin Luther, we believe that advocacy and accompaniment are fundamental expressions of this basic baptismal identity.  Consequently, as a church, we have advocated strongly for stopping the detention of children and families for decades.  We have spoken out against family separation.  We have sought a pathway to citizenship for community members who have lived in the United States for many years.  We have supported DACA recipients.  We have taken steps to address the root causes of migration in a way that honors the humanity in people who must flee terror and repression.  We have done these things because of our faith.

### The Impact of DHS's New Policy on the Southwestern Texas Synod

13.     As Bishop, I am aware that the government's decision to rescind its longstanding policy on immigration enforcement at churches has had a damaging effect on many congregations and Synod-authorized ministries within the Synod.  Pastors have reported diminished attendance at worship services, ministries, and church-sponsored events.  Daycare providers in churches focus on what they will do if ICE shows up on church grounds, rather than on the joy of teaching Jesus's message to children.  Members of our congregations are distracted

JA181

from their worship by anxieties and fears that they, or their neighbors, are at risk of being arrested or deported.

14. Congregations within the Synod have held "Know Your Rights" presentations in an effort to help immigrants fearful of detention or deportation. We see this as a key part of the practice of our faith, as we offer welcome, safety, and education to our neighbors. At one of these presentations, a woman raised her hand and shared that she had not been to church in weeks. She was too afraid that doing so might mean that she would never come back home. Her faith community, which used to be a place of comfort and spiritual strength, was now a risk. She is unable to pray in community, to receive comfort from her fellow parishioners, or embrace those who once walked with her in faith.

15. Another church, Iglesia Luterana San Pablo in San Antonio, planned a "Know Your Rights" presentation for its Spanish-speaking church community in February of 2025. The church had hosted similar events before, and did so at the church after a worship service. This time, however, the church leaders knew that the change in DHS's policy meant that the church was no longer a safe space. They worried that the people the church wanted to help the most with the "Know Your Rights" information would not come to the church where it would be obvious from the main street that there were people inside. Instead, the lay leader decided to hold the presentation at her house, in a more residential area where attendance was less obvious and people would feel safer and less exposed. The pastor told me that she still felt afraid every time the doorbell rang that night, and was constantly checking the windows to make sure that the curtains were closed.

16. Many congregations within the Synod host Vacation Bible Schools. Of those, three in particular (that we know of) that serve in predominantly Hispanic communities used to

have, on average, 20 to 25 children that would fill the rooms with laughter, crafts, songs, and stories about God's love. This year was different. One of those congregations welcomed only four children. Another had ten, and the third, just nine. All three of these congregations have reported that this is not due to lack of interest or poor outreach—the diminished attendance is because families are now afraid. They are unwilling to step foot in a church, worried that ICE might show up. And as a result, activities that were once joyful, hopeful, and sacred opportunities for our churches to nurture the next generation are now marked by hesitation and anxiety.

17.     Members of the Synod also serve their communities through food pantries, providing nourishment to their neighbors. Operating food pantries is a direct part of our worship, just as much as praying or gathering on Sundays. The act of feeding the hungry is a direct response to Jesus' teachings, and caring for and feeding our neighbors is part of the process of directly serving Jesus. The Lutherans participating in these ministries do not know their clients' immigration status and they do not ask, because it has no bearing on whether these people need assistance. Through the informal conversations between ELCA members and the people they are serving, however, we have learned that many of our neighbors are asylum seekers. In the line for food assistance, they consistently express fear of immigration enforcement. At a food pantry in Austin, we have observed about a 15% reduction in the number of people being served, as compared to 2024. This ministry has changed its policy to allow one person to pick up food for multiple related households, so that clients who feel too vulnerable waiting outside in line might still be able to get the food they need.

18.     Our synod began a new ministry in 2019 ministering to migrants along the U.S.-Mexico border. From the inception of that ministry up until January of this past year, we felt free

JA183

to advertise our ministry, to preach about it, and to fundraise extensively for the ministry, with support from around the country.  Since the implementation of DHS's new policy, however, the Synod has stopped preaching about it.  We have removed its front-page advertising on our website, and we are not actively fundraising for it.  We are afraid that by raising its visibility we will make it a target of immigration enforcement efforts.

19.    I am having trouble putting into words exactly how devastating it would be if ICE were to enter into one of our churches or disrupt one of our ministries.  ICE activity at a food pantry would mean that our clients would be too afraid to return, and we would not be able to serve food anymore.   At a church, it would destroy the sense of peace that we hold dear, turning our place of sanctuary into one filled with violence.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Seguin, Texas
July 24, 2025

*Susan J. Briner*

Rev. Susan J. Briner

JA184

# EXHIBIT 19

## Declaration of the Rev. Paul Doe

I, the Rev. Paul Doe, declare under penalty of perjury, under 28 U.S.C. § 1746, that the following is true and correct:

1. I am the pastor of a Lutheran congregation in the state of Connecticut.

2. My congregation is affiliated with the New England Synod of the Evangelical Lutheran Church in America.

3. I have served as a pastor of my congregation since May 2023.

4. I fear retaliation and harassment against myself and my congregation, so am submitting this declaration under pseudonym.

### My Congregation, the Church Space, and the Importance of Loving and Serving our Neighbors

5. My congregation has approximately 320 baptized members and 280 confirmed members.

6. My congregation has a diverse mix of backgrounds, including people of color, non-native English speakers, and immigrants.

7. All times of worship, including Sunday worship, Midweek worship during Lent, fellowship time, coffee time, weddings, and funerals are open to all. However, during non-worship times our church is a non-public space.

8. In addition to my congregation, there are four or five basketball teams, a non-profit group, and one other congregation that consistently use our space. Additionally, other neighborhood groups and local organizations book our facilities.

9. We operate a food pantry open to the entire community on Sunday afternoons, and our food pantry is open to senior citizens two Tuesday afternoons a month. The Sunday food pantry has a diverse client population while the Tuesday food pantry is made up largely of nearby section 8 housing residents.

10. This openness to sharing our space with different groups and outreach to the community through the food pantries goes to the heart of our faith. Our call as disciples of Jesus is to love and serve God and love and serve our neighbors. That is the drive behind our need to seek out and feed the hungry, needy, and poor in our community. In our city, that need is acute,

1

the levels of poverty are significantly higher than the national average, and my congregation is one of many organizations that engage in feeding the hungry. Our service is grounded in our faith and the need to love our neighbors as ourselves and motivates the difference we're trying to make in our community.

**Effects of Immigration Enforcement on my Congregation**

11. The impact on my congregation of the changes to the sensitive locations policy have been drastic. The threat of an immigration raid at my church has touched all my congregants in one way or another, regardless of their immigration status.

12. The threat of immigration enforcement at the church has become a burden. The awareness of potential immigration enforcement at the church has become part of my mental checklist, much in the same way that the threat of an active shooter might weigh on a teacher.

13. When I am leading worship on Sundays and I'm facing the congregation, I can't help but notice when someone new enters the church. Historically that was a positive thing, a new face to welcome to the congregation. Now, I can't help but note in the back of my mind whether each new person could be concealing a weapon, whether they're wearing a mask, whether they could be an ICE officer in plainclothes entering our service. No longer do we feel completely safe or comfortable throwing open the doors and welcoming everyone into our church without reservation. This mode of fear and suspicion is antithetical to everything our church should be, and it is the opposite of the way we want to operate but circumstances out of our control push us to have these concerns.

14. While our Tuesday food pantry attendance has remained relatively stable, our more vulnerable Sunday food pantry population has seen attendance numbers steadily and dramatically decrease in response to escalating immigration enforcement at houses of worship throughout the nation.

15. Throughout 2024, we were feeding an average of 70 families every Sunday. In March of 2025, we were feeding an average of 57 families every Sunday, which decreased to an average of 55 families fed per Sunday in April, an average of 45 families fed per Sunday in May, an average of 34 families fed per Sunday in June, and an average of 30 families per Sunday thus far in July.

2

16. The decrease in attendance has forced us to consider other ways we might implement the food pantry, including by making distribution more private or hidden. The Sunday food pantry is supposed to be completely open and available to the community and making pick-up more private would reduce access, but we need to consider all the options because people are too worried about immigration enforcement at our church to attend under the current circumstances.

17. Our food pantry has also noticed a noticeable uptick in requests for home delivery, a significantly more burdensome delivery process than our normal food pantry pickup system. This uptick is at least in part motivated by a fear of coming to our church due to escalating immigration enforcement at houses of worship, not due to a sudden increase in clients with mobility issues.

18. In discussing these attendance decreases and requests for home delivery with partner organizations, escalating immigration enforcement has been consistently cited as a major cause, especially as food insecurity has remained high in our community. Time and time again, heightened immigration enforcement at houses of worship has been highlighted as a reason for reluctance to come in-person to the food pantries at our church.

19. The looming threat of immigration enforcement at my church has manifested in other concerning and disturbing ways, forcing us to dedicate resources, effort, energy, and time to prepare for potential raids.

20. Failing to take steps to keep my congregation and those who use our facilities safe at church would be contrary to my faith and religious beliefs.

21. The changes to the sensitive locations policy have forced my congregation to form an ICE preparedness taskforce. The taskforce has engaged in intensive planning, training, and preparation in anticipation of immigration enforcement at our church.

22. We have had congregants attend "know your rights" workshops and familiarized themselves with administrative and judicial warrants.

23. Not only have we been forced to discuss a clear plan of action for what to do if ICE attempts to access our building during worship, but we are undergoing an intensive process of training our members and staff to use a script and verification process for individuals trying to access the church during non-worship hours. We've installed boxes around the church at

3

JA188

points of entry where we are placing sample judicial and administrative warrants, the phone numbers of church leadership, and a question script so congregants can reach out to me if law enforcement try to gain access to the church building and verify whether the officers have warrants or other authority to enter the premises.

24. We are in the process of formalizing this process and teaching it to all the other groups that use our facility regularly, including integrating it into our building use application. This includes emphasizing that the doors must be locked, that individuals that are not known to the group may not enter, and that people should be aware of the immigration enforcement and warrant script.

25. We also maintain an immigration attorney on call to consult with and to contact in the event of an immigration enforcement action at the church.

26. We will be spending thousands of dollars installing signage throughout the church so we can clearly designate which parts of the building are "public spaces" and which parts are "private spaces."

27. Despite all of this preparation, my congregation has explicitly voiced to me their fear and exhaustion in the face of a potential immigration raid on the church, especially on Sundays when everyone is gathered together. Last week, someone flat out told me that "even with our script and preparation, every single one of us are still going to be anxious and terrified if we're the ones that need to answer the door when armed and masked agents come to the church trying to gain entry." No matter how much we prepare, grappling with these issues is profoundly anxiety inducing for the congregation and prevents them from being fully present at worship. This is deeply upsetting when our church should be a safe space.

28. All of this time, money, and effort should be going towards feeding and housing people in need, community worship, and proclaiming the gospel. Instead, these resources are being channeled into preparing for a potentially devastating immigration raid on our community.

Signed by:

*Paul Doe*

1BBF4D112DD64BE...

Connecticut

July 25, 2025

The Rev. Paul Doe

4

JA189

# EXHIBIT 20

**Declaration of Gail Cornwall-Feeley**

I, Gail Cornwall-Feeley, declare under penalty of perjury, under 28 U.S.C. § 1746, that the following is true and correct:

1.      I am a birthright Quaker. I transferred my membership to San Francisco Friends Meeting in 2015.

2.      I currently serve on San Francisco Friends Meeting's Ministry and Care Committee and have done so for more than three years. I also serve as one of San Francisco Friends Meeting's representatives on the Quaker Life Committee at San Francisco Friends School.

3.      I co-coordinate San Francisco Friends Meeting's Saturday volunteer program supporting the Stay Over Program, a family shelter produced by collaboration between the City of San Francisco and San Francisco Unified School District that serves a predominantly Spanish-speaking immigrant population. I have provided food for San Francisco Friends Meeting's Friday Food Sharing and distributed it on the streets surrounding the meeting house, and I have volunteered to help staff the Interfaith Winter Shelter Program at San Francisco Friends Meeting.

**San Francisco Friends Meeting and Worship**

4.      I regularly attend weekly worship at the San Francisco Friends Meeting.

5.      San Francisco Friends Meeting holds unprogrammed Meetings for Worship on Sunday mornings and Wednesday evenings, followed by time for sharing our joys and concerns and for fellowship.

6.      At the conclusion of each meeting, we announce our commitment to welcoming all people regardless of who they are, including people of all races, ethnicities, nationalities, sexualities, gender identities, incarceration histories, and documentation statuses, among others.

At its core, our religious practice is rooted in our beliefs that there is that of God in every person and that worship is a collective experience.

7.    San Francisco Friends Meeting is made up of attendees and members. Attendees are any people who attend our meetings. Members are people who have gone through the formal process of becoming a member of San Francisco Friends Meeting and thereby the broader Religious Society of Friends.

8.    An attendee can become a member by making a written request to the Clerk of Meeting who will then pass the request to the Ministry and Care Committee. This committee forms an ad hoc committee called a clearness committee or visiting committee. Members of the committee meet, sit, and discuss membership with the interested individual. If everyone feels clear following this process, the decision goes to the full Ministry and Care Committee which will make a recommendation for membership to the entire San Francisco Friends Meeting at a monthly business meeting. Typically, approval is "held over" until the following month's business meeting to give people from meeting the opportunity to speak with the individual should they wish to.

9.    The San Francisco Friends Meeting is nonhierarchical. That means there is no clergy that leads worship or decides religious doctrine. Rather, any individual who feels that they have been called upon by the Spirit/God to speak may do so. It is thus said that Quakerism features "a priesthood of all believers."

10.    The San Francisco Friends Meeting is unprogrammed, which means that no one determines the content of any Meeting for Worship ahead of time. Instead, we gather in silence for worship.

JA192

11.     At our meetings for worship, we gather in silence for a period of Spirit-led waiting worship that lasts one hour. A member of the Welcome Committee is at the open door to greet people, especially newcomers. Those who arrive after the beginning of Meeting for Worship enter on an ongoing basis. The door almost always opens and closes multiple times to admit new arrivals.

12.     People can sit anywhere, and all chairs face the middle. A member of the Ministry and Care Committee sits on a "facing bench," a chair near the front of the room. This person will end worship as well as guide introductions and announcements after worship.

13.     If someone is moved to share a message, they rise and do so. This is called vocal ministry. Vocal ministry can take the form of giving a message, saying a prayer, singing a song, or asking the meeting to join them in song. When they are finished, they sit back down. A period of silence follows before any additional vocal ministry.

14.     Individuals typically only share once during a meeting. People are asked not to respond to each other during meeting, but sometimes a thread or theme develops throughout a meeting. Sometimes there are no messages during a meeting. An hour of silence is not uncommon.

15.     At the end of the hour, there is a shaking of hands initiated by the representative of the Ministry and Care Committee sitting on the facing bench chair, which signals the end of worship.

16.     On the second Sunday of every month, a second period of worship includes the business of San Francisco Friends Meeting. It is referred to as Meeting for Worship with Attention to Business.

17.    On weeks where worship with attention to business takes place, the meeting hears recommendations from its committees about actions that the meeting may take and attends to perfunctory matters, like budgeting.

18.    Although silence begins when the first person settles in, a Meeting for Worship cannot take place with only one person. Our worship is a shared experience.

**San Francisco Friends Meeting's Spirit-Led Calling to Community Engagement**

19.    In addition to being open to all, the San Francisco Friends Meeting and its members and attendees engage directly with our local community in a host of ways.

20.    San Francisco Friends Meeting specifically makes the meeting house available to the community and for people who need space.

21.    By way of example, our meeting hosts ministries centered around caring for our neighbors who live on the streets surrounding our meeting house, including assistance with accessing basic personal care items and laundry facilities. Other ministries involve the preparation and distribution of food to the hungry.

22.    We also participate in the Interfaith Winter Shelter Program, wherein we invite unhoused community members to eat and sleep in our meeting house during March, one of the colder months in our city, without regard to race, ethnicity, and other immutable characteristics as well as without regard to language, nationality, and citizenship, as is core to our religious practice and way of life.

23.    We host a variety of other groups and events at our meeting house, some specifically directed at providing care for newcomers.

JA194

24. These ministries are Spirit-led and are merely a representative sample of the many services we provide to the wider community as part of our call to peace, justice, and equality for all.

**The Importance of Welcoming All-Comers**

25. San Francisco Friends Meeting is open to all comers. It does not matter if it is someone's very first meeting or if they have been coming for decades. The doors are open, physically and metaphorically, to all at San Francisco Friends Meeting. That is an essential part of how we practice our faith.

26. At San Francisco Friends Meeting, we give testimony to our spiritual lives by the way we live. The phrase "let your life speak" is a Quaker saying that reflects a Quaker truth: Quakerism is not about what you believe; it's how you live. Our core testimonies, such as simplicity, peace, integrity, community, equality, and stewardship are how we live our faith in our personal, family, and communal lives.

27. For us, tending to newcomer families on Saturdays and welcoming individual immigrants into our space for food, shelter, and other services are the equivalent of what other religions call prayer.

28. San Francisco Friends Meeting is rooted in communal experience. When anyone speaks during meeting, we believe it is the Spirit/God who is speaking through them and their words are taken the same way as if a pastor were speaking to a congregation. It is ministry given to our meeting.

29. At San Francisco Friends Meeting, our form of worship is "waiting worship." Everyone is collectively waiting together for inspired messages from the Spirit/God. Our worship is not solitary. There is an understanding that we are gathered as a body. The meeting is

not just dozens of people who are in the same room physically. There is a spiritual connectedness with the Spirit/God and with each other. Even at a meeting where there might not be a message, there is a sense of togetherness with every single person in the room, for we are in God and God is in all of us and in all people in the world.

**Detrimental Impact of DHS's New Policy on San Francisco Friends Meeting**

30.     DHS's new policy is causing serious harm to the religious exercise of San Francisco Friends Meeting.

31.     Any immigration-enforcement action at our meeting house during meetings or any of our related ministries and community-service events would seriously harm the religious exercise of San Francisco Friends Meeting, its members, and community members to whom we minister.

32.     Even without actual enforcement action, we fear that immigrants who have been labeled undocumented will not continue to come to our events, fearing ICE enforcement within our space. We fear that other groups that serve the immigrant community will not want to continue renting space from us, fearing ICE enforcement within our space.

33.     Already, the threat of armed immigration officers or immigration-enforcement actions at our meeting as a result of the policy has begun to have an impact on our meeting and is interfering with the religious exercise of San Francisco Friends Meeting and its members and attendees.

34.     After the policy took effect, members and attendees began fearfully discussing what would happen if ICE arrived at the front door or entered our meeting house undercover as attendees. The discussions have included whether to lock the doors or ask those who arrive their purpose in doing so.

JA196

35. But closing off the meeting to the public and interrogating attendees is something we have never done before, because it would interfere with our religious commitment to communal worship.

36. The method of worship at San Francisco Friends Meeting, open worship, works only because everyone is in a circle together. The doors are open and there is a greeter from the Welcome Committee at the doorway to welcome people in. All of that is part of the spiritual hospitality that is central to our religious practice.

37. Because of the communal nature of our worship, there is a spiritual deprivation to all who are gathered any time a single individual is deterred from attending our Meeting for Worship by threat of ICE enforcement. We consider that Meeting for Worship fundamentally changed and spiritually impoverished as a result.

38. The presence of law enforcement—or the threat of that presence—goes against our practice of open worship and spiritual hospitality.

39. Pacifism is deeply ingrained in the Quaker faith and is the ideal that has brought and continues to bring so many people to the doors of San Francisco Friends Meeting. Our pacifism is much more than a surface-level opposition to war. For us, it includes inward peace and peace at home.

40. Knowingly putting a person in harm's way or risking their involvement in a violent encounter violates our religious beliefs. Having weapons or armed people in or around our meeting is inconceivable and contrary to our faith.

41. In our manner of waiting worship, we sit quietly, release distractions, and settle into an inner stillness that leads to Spirit-led listening. Many of us close our eyes for the entirety

JA197

of the hour of worship. For this reason, too, having weapons or armed people in or around the meeting is inconceivable and contrary to our faith.

42.    Even the idea of there being weapons at our meeting is distressing enough to make it very difficult to engage in waiting worship and will discourage attendance. Each time the door opens to admit new attendees, we are now left to wonder if ICE has arrived. This interferes with our ability to achieve stillness and receive messaging from the Spirit/God.

43.    Just as we object to participating in war as a violation of our conscience, we feel that it violates our deeply held religious beliefs to be compelled to worship under threat of ICE enforcement in our space and to be asked to perform our community ministry, inviting in our friends and neighbors who have been labeled undocumented, knowing that ICE enforcement could take place in our space.

San Francisco, CA

July 19, 2025

Gail Cornwall-Feeley

JA198
8

# EXHIBIT 21

## DECLARATION OF PAUL CHRISTIANSEN

I, Paul Christiansen, declare under penalty of perjury, under 28 U.S.C. § 1746, that the following is true and correct:

1. I am a member of the Religious Society of Friends (Quakers) and of Eastside Friends Meeting in Bellevue, Washington.

2. I am also the Clerk of North Pacific Yearly Meeting, and I have held that position for around two years.

3. My role at North Pacific Yearly Meeting includes being the Yearly Meeting's legal agent and representative.

4. To Quakers, a Yearly Meeting is both an association and an annual gathering session. In our religious tradition, it is the highest-level organizational body.

5. North Pacific Yearly Meeting has met continuously since 1972. It comprises over 20 local Quaker congregations—Monthly Meetings—as well as some informal worshipping communities across Washington, Oregon, Idaho, and Montana. North Pacific Yearly Meeting is headquartered in Portland, Oregon.

6. Monthly Meetings, which compose and are recognized by Yearly Meetings, are Quakers' basic organizational unit. Monthly Meetings share certain articles of faith, but each is responsible for developing its own organization as necessary for its orderly and effective operation.

1

7. Some of our component Monthly Meeting serve regions with large immigrant populations, and some have active members or attenders who are immigrants.

8. Monthly Meetings also gather several times a year with others in their region in what are known as Quarterly Meetings. Here, they will make regional decisions and worship together. All Monthly Meetings in North Pacific Yearly Meeting are also members of a Quarterly Meeting.

9. North Pacific Yearly Meeting receives almost all of its financial support from its Monthly Meeting members. Although the final amount that Monthly Meetings send to us is committed to their discernment, we set guidelines that use the number of Monthly Meetings' members or attenders to recommend what size contribution they should make.

10. Monthly Meetings and North Pacific Yearly Meeting therefore depend on their individual members or attenders. Losing members hurts us, both spiritually and financially.

11. Typically, North Pacific Yearly Meeting's Monthly Meeting members and other interested worshippers gather for a single Annual Session during the year. Our most recent Annual Session ended on July 13, 2025. These sessions are both an opportunity for worship and collective decision making on important issues.

12. We believe that anyone can hear the voice of God, and that when they do, they should share it. For this reason, our faith requires us to welcome

everyone, including at Annual Sessions. Anyone who shows up can contribute to our decision making, and we would never exclude anyone based on their immigration status. It is not something we even ask about.

13. We also live out our faith through our hospitality, especially to those in need. And we would never limit that hospitality because of someone's immigration status.

14. North Pacific Yearly Meeting is spiritually connected to the broader world of Quakers, and we work with an organization called Friends World Committee for Consultation (FWCC). We are a part of FWCC's Session of the Americas, and we work routinely with people from all over Latin America.

15. This is part of our spiritual practice of intervisitation, which involves Quakers of all branches visiting each other across the world.

16. Members of North Pacific Yearly Meeting are highly active in intervisitation throughout the Americas, and we celebrate reciprocal visits.

17. We have members connected to FWCC and other organizations in Latin America who in the past have brought guests from those programs to visit our Annual Session.

18. We did not have any international visitors at our July Annual Session this year.

3
JA202

19. We have never before had reason to worry about immigration enforcement at our Annual Session. This year, because of the administration's change in policy, we did.

20. DHS's decision to revoke its sensitive-locations policy has put us and our Monthly Meetings under threat of immigration enforcement. That kind of enforcement action at or near one of our members' places of worship or during a meeting would hurt them and us, and even the threat of it has been harmful.

21. For example, now that showing up could mean they come face-to-face with armed law enforcement officers, I am more reluctant to encourage immigrants to attend worship. Quakers are required to accept all who would join and their presence would add to our worship, so my new hesitation is in direct conflict with my faith. But telling someone that they should attend despite the risk of harm would be antithetical to my religious duties.

22. I know of immigrant attenders who are worried about DHS's new policy, and some may simply not show up in person for worship services if there is a chance that immigration-enforcement actions could happen there.

23. I also know of non-immigrant attenders who worry about indiscriminate immigration enforcement. DHS's policy could discourage them from attending worship services in person as well.

24. Some Monthly Meetings have virtual attendance options, but some do not. And even when such an option is available, it does not facilitate complete participation in our worship. Some Friends find it is essentially impossible to facilitate a spiritual connection online.

25. Quakers are religiously committed to peace, and we do not use weapons.

26. Armed law enforcement showing up in worship rooms or at meeting houses without our request would be massively disruptive to our ability to worship. Because we avoid and abhor physical violence, bringing weapons into our place of worship would be an assault on our faith and a violation. Friends would feel that our connection with the Spirit that takes away the need for violence would have been disrupted.

27. There is a history of that kind of disruption occurring in Quaker meetings, and this new threat reawakens old concerns.

Burien, Washington

July 18, 2025

**Signed by:**

51F43A2AC37342C...

Paul Christiansen

# EXHIBIT 22

**Declaration of Jeanne-Marie Duval Pierrelouis**

I, Jeanne-Marie Duval Pierrelouis, declare under penalty of perjury, under 28 U.S.C. § 1746, that the following is true and correct:

1. I am a Clerk of the Multnomah Monthly Meeting of the Religious Society of Friends located in Portland, Oregon.

2. The Multnomah Monthly Meeting is affiliated with the North Pacific Yearly Meeting of the Religious Society of Friends.

3. I have served as a Clerk of the Multnomah Friends Meeting since July 2025.

**Multnomah Friends Meeting and Worship**

4. I regularly attend weekly worship at the Multnomah Monthly Meeting's Meetinghouse.

5. The weekly worship meetings take place every Sunday. Our meetings are open and anyone may attend.

6. The Multnomah Monthly Meeting congregation has roughly 200 regular attenders and members. Our community is diverse and welcoming, and includes attenders with varied backgrounds, including immigrants.

7. The Multnomah Monthly Meeting is nonprogrammed.

8. That means there is no pastor that leads worship. Instead, during the silence of our non-programmed service, anyone may feel moved to offer a spoken message, vocal ministry, that is inspired by their holy encounter.

**Multnomah Monthly Meeting's Community Interactions and the Importance of Meeting with All-Comers**

9. In addition to being open to all, the Multnomah Monthly Meeting and its members engage directly with our local community in a host of ways.

10. Multnomah Monthly Meeting hosts a community lunch program as part of our ministry. All members of the community are welcome, but the lunch program has a particular focus on outreach to those who are hungry and most in need. In order to make every member of the community feel as welcomed as possible, we do not check identification or require documentation from anyone attending the lunch program.

11. Multnomah Monthly Meeting also maintains an immigration fund which helps support the legal costs of local immigration cases. This fund is

1

JA206

formally allocated as part of our budget and through the generosity of our members.

12. Multnomah Monthly Meeting has under its care, Mountain View Worship Group, which meets twice per month in Dalles, Oregon. Mountain View Worship Group has been accompanying an asylum-seeking family for years, providing financial support, assisting with housing, childcare, and going with them to appointments and hearings.

13. Multnomah Monthly Meeting is open to all-comers. It does not matter if it is someone's very first meeting, lunch program, or if they have been attending the meeting for decades. The doors are open to them, physically and metaphorically.

14. In Quaker meetings, meeting minutes represent the wording of a decision or an agreed upon action to be taken by the meeting as a whole. Meeting minutes are adopted collectively.

15.  Multnomah Monthly Meeting, in its Meeting for Worship for Business, dedicated time for the creation of a meeting Minute of Support for litigation against the rescission of the sensitive locations policy due to concerns about the impact the change in policy would have on the community and immigrants in particular. Participants in the Meeting community spent time drafting the minute, and in individual and corporate discernment during the Meeting for Worship for Business. The Minute was adopted on April 22, 2025, and reads in part, "The experience of connecting with the divine is strong when individuals can worship together without fear of abduction. The religious community is deeply harmed when any person fears to attend worship or does so in fear."

16. Multnomah Monthly Meeting is rooted in communal experience. When someone speaks during meeting, it is similar to when a pastor speaks to a congregation, and it's to be taken the same way. It is ministry given to the congregation. All the community programming and efforts, from the lunch program to the immigration legal fund, are part of our profound dedication to welcoming everybody to Multnomah Monthly Meeting.

**Effects of ICE Enforcement at Multnomah Monthly Meeting and the Presence of Armed Immigration Officers**

17. The idea of the presence of armed immigration officers has tangibly impacted our meeting. Multnomah Monthly Meeting is deeply concerned

2

JA207

about the possibility of immigration enforcement at our Meetinghouse. Our deep concerns and our spiritual testimonies require us to take concrete actions to attempt to better protect our community and mitigate possible harms.

18. Some Multnomah Monthly Meeting members and attenders regularly protest outside of the local ICE office. Some members and attenders also join groups that escort folks to their immigration appointments. As a faith community, Friends worry that ICE might choose to retaliate against us by targeting our congregation.

19. As Quakers, Multnomah Monthly Meeting has a deep commitment to pacifism. Our Peace Testimony is much more than a surface level opposition to war. Pacifism is deeper and broader than that. For us, it includes inward peace and peace at home. Our dedication to non-violence includes asking people to respect our beliefs by not bringing weapons into the Meetinghouse. The change in the sensitive locations policy and the recent escalation of immigration enforcement in and around houses of worship have forced us to spend increasingly more time and discernment on addressing this fear. To date, we have put up signage at the entrance of our Meetinghouse and included a "no weapons" policy in our rental agreement. The presence of armed immigration officers at the Meetinghouse is completely antithetical to our faith.

20. Our concerns about the change in sensitive locations policy go further. Multnomah Monthly Meeting has immigrants who attend worship as part of our community. These Friends, including those who are naturalized citizens, are experiencing heightened fear and anxiety about attending Meetings for Worship since the change in policy at the start of the administration and even more so after recent escalations in immigration enforcement at and around houses of worship. Concerns about immigration raids have prompted us to spend time developing plans to protect our most vulnerable community members, including designating private zones throughout the Meetinghouse, closed to the public.

21. Our community lunch program is also part of our ministry of radical hospitality and worship. Every lunch begins with a prayer. Since the change in the sensitive locations policy in January and even more so since the increased immigration enforcement actions at houses of worship on the West Coast, we have seen increased anxiety among our unhoused neighbors attending the lunch program. The lunch program serves many people with

3

traumatic histories and resulting mental health challenges. We work hard to create a space that best supports a feeling of safety and welcome to mitigate these challenges. I am concerned about the mental health harm that would result if armed federal agents entered the Meetinghouse. Many of these community members would be traumatized and scared away from our community. Unhoused people are incredibly vulnerable anytime identification is required, including proving citizenship. These concerns have weighed heavily on the hearts of Friends involved with the lunch program. In response, Friends have made contingency plans, put up signs designating non-public areas, and sought out information on constitutional protections in order to be ready to respond.

22. Any decrease in Friends attending or being fully present and grounded during worship has a cascading effect, diminishing corporate worship for the entire Meeting.

Portland, Oregon

July 22, 2025

Jeanne-Marie Duval Pierrelouis

4

JA209

traumatic histories and resulting mental health challenges. We work hard to create a space that best supports a feeling of safety and welcome to mitigate these challenges. I am concerned about the mental health harm that would result if armed federal agents entered the Meetinghouse. Many of these community members would be traumatized and scared away from our community. Unhoused people are incredibly vulnerable anytime identification is required, including proving citizenship. These concerns have weighed heavily on the hearts of Friends involved with the lunch program. In response, Friends have made contingency plans, put up signs designating non-public areas, and sought out information on constitutional protections in order to be ready to respond.

22. Any decrease in Friends attending or being fully present and grounded during worship has a cascading effect, diminishing corporate worship for the entire Meeting.

Portland, Oregon

July 22, 2025

_____

Jeanne-Marie Duval Pierrelouis

4

JA210

traumatic histories and resulting mental health challenges. We work hard to create a space that best supports a feeling of safety and welcome to mitigate these challenges. I am concerned about the mental health harm that would result if armed federal agents entered the Meetinghouse. Many of these community members would be traumatized and scared away from our community. Unhoused people are incredibly vulnerable anytime identification is required, including proving citizenship. These concerns have weighed heavily on the hearts of Friends involved with the lunch program. In response, Friends have made contingency plans, put up signs designating non-public areas, and sought out information on constitutional protections in order to be ready to respond.

22. Any decrease in Friends attending or being fully present and grounded during worship has a cascading effect, diminishing corporate worship for the entire Meeting.

Portland, Oregon

July 22, 2025

_____

Jeanne-Marie Duval Pierrelouis

4

JA211

# EXHIBIT 23

## <u>DECLARATION OF CAROLE COLLINS</u>

I, Carole Collins, declare under penalty of perjury, under 28 U.S.C. § 1746, that the following is true and correct:

1. I am a Co-Director of the Alliance of Baptists (the "Alliance").

2. I joined the Alliance in 2009.

3. Along with my co-director, I direct the work of the Alliance.

4. I am also a CPA and manage all of the Alliance's finances, while also maintaining relationships and supporting the Alliance's member congregations, chaplains, and pastoral educators.

### Organizational Background

5. The Alliance is a Christian denominational organization, headquartered in Raleigh, North Carolina.

6. The Alliance is a network of Baptists comprised of approximately 5,000 individual members and 155 member churches, in the United States, Canada, and the Republic of Georgia.  Most of these members are based in 31 states across the United States.

7. Emerging from the Southern Baptist Convention, the Alliance was founded in 1987 to serve as a voice and home for progressive Baptists (and Christians more broadly) who are committed to social and economic justice, and achieving equality for all people.

8. The Alliance was founded on the principles of "freedom of the individual . . . [and] the local church, the larger body of Christ, servant leadership, social and economic justice, and the principle of a free church in a free state."

JA213

9. The Alliance has been involved in many socio-political movements consistent with these foundational principles and religious tenets.

10. In 1990, the Alliance offered the first public apology from any Baptist organization in the South for the sins of slavery. Since then, the Alliance has proclaimed its support for several social issues, including gun-control reform, ecological justice, food justice, and support of immigrants and refugees.

11. We are guided by an organizational Covenant which affirms our religious beliefs and mandates. This Covenant states:

> We are a people of faith formed by a long tradition of dissent and historic Baptist freedoms. Celebrating this heritage, we seek to cultivate beloved community, claiming our identity within the body of Christ in the world and our solidarity with all creation. We welcome and affirm all persons with full respect to gender, sexual, racial, and ethnic identities. We hold space for all persons with varying abilities, social standing, or economic status.

12. The Covenant reflects our beliefs that churches are sacred and inclusive spaces, where people of all backgrounds and walks of life should be free to seek and receive the word of God.

### The Alliance's Religious Beliefs and Practices Concerning Immigration

13. It is not only my personal belief that we must welcome foreigners as our neighbors, but it is also a religious mandate. As Baptists, we believe that the members of our denomination—and the Christian faith writ large—have a fundamental obligation to lead with love, show mercy, and walk humbly with God. This means that we must show kindness and compassion to our immigrant neighbors, regardless of their immigration status.

14. Documented or undocumented, we consider immigrants to be members of our community whom we should love as we love ourselves. From the Parable of the

JA214

Good Samaritan in Luke 10:25‑37[1] to Leviticus 19:34[2]—teaching us to treat the whole world as our neighbors—the Bible makes our call to support immigrants very clear.

15.    We have also publicly proclaimed our support for immigrants and our belief that they should be safe from governmental action in houses of worship.  For example, we published a statement in support of the "Protecting Sensitive Locations Act of 2019," which was a congressional effort to codify and expand the Department of Homeland Security's decades-long policy limiting immigration enforcement in safe spaces, including houses of worship.  Since then, the Alliance and several of our member churches have expressed their commitment to providing sanctuary to or solidarity with refugees and other immigrants.

16.    In addition, we have funded ministry/congregational partners who work closely with immigrant populations to assist them in providing food, legal aid, and other social services.

17.    The Bible says, "[w]hen you reap the harvest of your land, do not reap to the very edges of your field or gather the gleanings of your harvest.  Leave them for the poor and for the foreigner residing among you.  I am the Lord your God."[3]  Our member churches use our funding to provide social services to all people, including immigrants, because the Bible mandates that we do not use everything for ourselves but leave something for the most vulnerable among us.

---

[1] "On one occasion an expert in the law stood up to test Jesus.  "Teacher," he asked, "what must I do to inherit eternal life?". . .  He answered, "'Love the Lord your God with all your heart and with all your soul and with all your strength and with all your mind' and, 'Love your neighbor as yourself.'"  Luke 10:25, 27.
[2] "You shall treat the alien who resides with you no differently than the natives born among you; you shall love the alien as yourself; for you too were once aliens in the land of Egypt.  I, the LORD, am your God."  Leviticus 19:34.
[3] Leviticus 23:22.

18.   It is through service to these communities that we meet our Biblical mandate.

**The Impact of the Rescission of the "Sensitive Locations" Policy on the Alliance**

19.   Our member churches in the D.C., Maryland, and Virginia metropolitan area, New York City, Raleigh, Dallas, Chicago, Louisville, Nashville, Birmingham, Atlanta, Hattiesburg, and Oakland exist in communities with significant immigrant populations from all over the world—with Africa and Central America being the most represented.

20.   We have heard from member congregations and pastors in these communities and across the country that the recission of the sensitive locations policy has caused them to change the way that they act on our denomination's religious mandate. Pastors from multiple churches have reported not feeling comfortable preaching freely about their stance on immigration, and removing signage from church windows indicating that they are a place of refuge for undocumented immigrants for fear of becoming a target for immigration enforcement.  Even churches that declared themselves sanctuary churches under the previous policy are no longer publicizing themselves as "sanctuary churches."

21.   Because the policy recission has forced pastors to be more discreet about their sanctuary status due to fear of unwarranted attention from Immigration and Customs Enforcement ("ICE"), they have not been able to reach and minister to as many immigrants.

22.   Additionally, one Virginia-based congregation that operates a day-care and preschool on church grounds has reported a decrease in attendance because parents and caregivers are afraid that their children will be confronted by immigration authorities on the property, and that parents might be detained at

drop-off or pick-up times.  This same congregation has reported a decrease in attendance at outdoor food pantries because participants are afraid of ICE's presence in the immediate vicinity of the church.  Another congregation in New York has reported a similar decrease in participation in food pantries where church members and non-church members alike would form lines outside to receive food donations every weekend.

23. Multiple congregations have also revisited their security protocols and begun locking church doors.  Locking the church doors and monitoring who is coming and going is antithetical to our religious teachings.

24. The Alliance believes in freedom of conscience and freedom to practice religion without undue harm or threat from state actors, and this policy recission is a violation of those fundamental beliefs.

25. To live up to the duties and obligations of our religious tradition, we must be able to minister to anyone at church regardless of their legal status.  We are deprived of that right and ability when the most vulnerable people in our communities are afraid to come to church.  It is our belief that people come to church to restore or establish a relationship with the Divine, and if the pastors who are charged with shepherding them along the way cannot fully speak, none of us are experiencing religion to its fullest extent.

26. If ICE were to enter our religious spaces or threaten to do so, implicitly or explicitly, it would impact our ability to practice and minister as our faith requires. We should be welcoming immigrants to our churches openly and without limitation as a mandate of our religion.  Instead, we are fearful that, at any

JA217

moment, ICE could come into the sanctuary and remove members of our community.

27.    An ICE raid within the context of a worship service or other religious activity would be an absolute violation of what we know as a sacred, safe space. It would be the equivalent of a slave catcher coming into the church and other invasions of sacred spaces during slavery in the United States. That is how extreme and unnerving ICE activity in the sanctuary would feel. It would go against what we believe and preach about in communion, and what Jesus called us to be as his disciples.

Sylva, North Carolina
July 22, 2025

Carole Collins

6

# EXHIBIT 24

**Declaration of Rev. Cecilia Eggleston**

I, Rev. Cecilia Eggleston, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1.  I am the Moderator of Metropolitan Community Churches ("MCC"), also known as Universal Fellowship of Metropolitan Community Churches ("UFMCC").

2.  I was first elected Moderator in 2019 by MCC's General Conference and reelected in 2025. MCC's denominational conference is made up of lay delegates and clergy from MCC member congregations.  As Moderator, I act as MCC's chief visionary, spiritual leader, official spokesperson, and CEO. I also appoint the Council of Elders, which oversees the denomination's spiritual and pastoral responsibilities, and I chair the Governing Board, which is elected by the General Conference to oversee the day-to-day administration of denomination business.

3.  I make this statement based on my personal knowledge, MCC business documents that I have reviewed, and other information made available to me during the ordinary course of my duties conducting the business of MCC.

**Metropolitan Community Churches**

4.  MCC is a 501(c)(3) religious organization.

5.  MCC's principal address is at 3276 E Venice Ave, Venice, FL 34292.

6.  MCC was founded in 1968 by Rev. Troy Perry. We celebrate diversity and strive to build a community that is grounded in God's radically inclusive love for all people. Since the start, MCC has had a particular focus on welcoming LGBTQ+ individuals, and many of our members and clergy identify as LGBTQ+. We were the first religious organization to bless same-sex marriages beginning in 1969.

7.  MCC has approximately 90 member churches in the United States and about 27 additional member churches globally.

8.  To become members of MCC, congregations must complete an application process. The requirements of being a member church include adherence to MCC's Statement of Faith and Core Values, upholding the UFMCC bylaws, and paying a monthly assessment to MCC. Member churches elect Lay Delegates who carry the congregation's vote to the

JA220

General Conference. Clergy from member churches also cast votes at the General Conference, where the business of the denomination is conducted.

**Centrality of Communal Worship and Inclusivity to MCC's Practice of Faith**

9. MCC's four core values are inclusion, community, spiritual transformation, and justice. Offering a safe, inclusive, and welcoming place for all comers is a core tenet of our religious practice. In Isaiah 56:7, God calls us to make a "house of prayer for all the peoples." From the start, we have served as a spiritual home for LGBTQ+ individuals when many religious organizations were not welcoming. This gives us a unique understanding of the spiritual needs of people who are societally disfavored and a deep empathy for outcasts and strangers. As Matthew 25:36-40 instructs, when we care for those at the margins – the poor, the sick, the stranger, the prisoner – in doing so, we serve God.

10. MCC congregations have always been and will continue to be welcoming places for immigrants. Inclusivity is core to our religious practice: our denominational requirements for worship are that churches use inclusive language and have an "open table," that is, we welcome all comers to take communion with us, regardless of their religious tradition. We do not inquire about immigration status in welcoming individuals into our congregations. We are always mindful that Jesus was a refugee. Many of MCC's member churches count immigrants, both with legal status and without, among their congregations.

11. Communal worship is central to our religious practice. From our denomination's founding, the choice to include "Community" in our name denotes the importance we place on building a spiritual and physical home for congregants. Each member church celebrates communion in their worship services. Our congregations value gathering together for worship and form strong bonds with one another. Every single congregant's presence adds to the communal worship experience. MCC also believes in the "priesthood of all believers," that is, every single person is gifted and called by God to serve. We expect most of our congregants to become involved in the ministry of the church, as part of their own spiritual growth.

**Detrimental Impact of Immigration Enforcement on MCC**

12. Many of our member churches have immigrants in their congregations. Still more engage in social justice ministries that provide clothes and food to their local communities, including to immigrants.

13. An immigration enforcement action at one of our member churches would seriously harm MCC, its congregants, and community members to whom the church ministers. It would destroy the sacred, welcoming space we have intentionally created and prevent congregants from coming together for communal worship and shared ministry.

14. The recission of the sensitive locations policy has already harmed MCC member churches. The threat that certain congregants may be targeted for immigration enforcement during a worship service detracts from creating an inclusive and safe house of prayer.

15. Leadership, clergy, and congregants have expressed a sense of anxiety and fear about the possibility of immigration enforcement in a member church.

16. One MCC member church in California, which has a substantial number of immigrant attendees and offers worship services in Spanish, has reported declines in attendance by immigrant members. It has been forced to take steps to protect congregants in case of an immigration raid. These steps include closing off entrances that were once open, marking areas private, and developing a plan if immigration authorities enter the church.

17. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: 7/24/2025

Signed by:

Rev. Cecilia Eggleston

4A727E3596C54F3...

Rev. Cecilia Eggleston

JA222

# EXHIBIT 25

**Declaration of Rev. John Doe**

I, Rev. John Doe, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1. I am the Senior Pastor at a Metropolitan Community Churches ("MCC") member church in California.

2. I wish to submit this declaration anonymously out of fear that my church will be targeted for immigration enforcement action.

3. Our church is blessed to welcome many immigrant congregants. We welcome all comers without regard to immigration status. Some of our congregants are currently in immigration proceedings.

4. As part of our practice of faith, we seek to make a house of worship that is inclusive. We offer two worship services every Sunday, one in English, and one in Spanish. We also hold a weekly food pantry that serves many community members, including immigrants.

5. As soon as the sensitive locations policy was rescinded, leadership at our church began taking steps to protect our congregants. We have prominently placed signs stating that ICE and DHS may not enter our premises. Areas that were previously public have now been made private spaces, marked with signage stating that they are accessible to authorized personnel only.

6. Our staff and congregation have been forced to spend substantial time and resources training on what to do in case of an immigration raid. My role in case of a raid will be to speak directly with agents who enter to ensure they are complying with their legal obligations. We have marked off specific areas where immigration authorities cannot go without a judicial warrant. We take time out of every worship service to review the plan with our congregants. Everyone who attends worship services carries the burden and stress of this preparation.

7. During our Spanish language service, we have started locking the doors once the service starts. Volunteers from the congregation post at an entrance to let people in only if they are present to attend worship services. Before the recission of the sensitive locations policy, we did not lock doors or verify who was coming in during services.

8. Some immigrants in our congregation, regardless of status, have stopped attending in-person worship services. They have confided in me that they are afraid to come to

JA224

JA225

worship services because they worry the church will be targeted by immigration enforcement. Before the recission of the sensitive locations policy, I had never heard from a congregant that they feared immigration enforcement at our church.

9. Locking doors, closing off entrances, making public areas private, and screening entrants is the opposite of what MCC has been preaching for over 50 years. We have been forced to choose between creating a welcoming and inclusive space, as our faith requires, and protecting our congregants.

10. It is very painful to me that some congregants are no longer attending services for fear of immigration enforcement at the church. The purpose of a church is to gather in community. When part of our community is at home, we are fractured. When part of our community is afraid, we are all afraid.

11. My own and the congregation's experience of worship is diminished knowing that some are unable to participate, and that some participate only with great fear and anxiety.

12. I fear an immigration raid at our church. Such a raid would desecrate our sacred space and greatly harm our ability to welcome and serve immigrant communities. It would inhibit our ability to carry out God's command to welcome the stranger and to love our neighbors.

Dated: July 21, 2025

Rev. John Doe
Rev. John Doe

JA225

# EXHIBIT 26

# Declaration of Rev. Dr. Gina C. Jacobs-Strain

I, Gina C. Jacobs-Strain, declare under penalty of perjury as follows:

1.  I am the General Secretary of American Baptist Churches USA ("ABCUSA").

2.  I have served as the General Secretary for the last 18 months.  Prior to holding this position, I served as the Executive Director for American Baptist Women's Ministries for more than six years.  Before that, I served as an interim pastor in New Jersey and served with the American Baptist Churches of New Jersey region.

3.  I make this statement based on my personal knowledge, ABCUSA documents that I have reviewed, and other information made available to me as General Secretary of ABCUSA.

### American Baptist Churches USA

4.  ABCUSA is rooted in the first Baptist association formed in 1707 and today is comprised of member churches that span the United States, including Puerto Rico. Approximately 4,700 congregations and 1.3 million individual members participate in shared mission and ministry.  ABCUSA ranks as the sixth-largest Baptist denomination in the United States.

5.  ABCUSA is one of the most ethnically diverse Protestant denominations in the United States, with a rich and growing immigrant membership that reflects the global body of Christ.  This diversity is especially evident in the strong presence of congregations across the denomination which are made up of persons who are Hispanic/Latino, Haitian, and Karen/Chin/Kachin and members of other refugee groups from Burma.  This is further supported by our various caucuses, including: the Alliance of Asian American Baptist Churches; the American Baptist Haitian Caucus and the American Baptist Hispanic Caucus.

6.  ABCUSA includes a vibrant number of congregations representing diverse national backgrounds (for example, Hispanic/Latino, Haitian, Chin, Kachin, Karen, etc.).  Many

JA228

of these churches are bilingual or Spanish-speaking and are actively engaged in ministries of evangelism, discipleship, community development, worship, and social justice.

7.      The denomination's history reflects its evolving mission and identity.  Originally established as the Northern Baptist Convention, the name was changed to the American Baptist Convention in 1950 to better reflect its broader national reach.  In 1972, during a period of intentional reorganization that reaffirmed local church leadership and mission focus, it adopted its current name, American Baptist Churches USA.

8.      American Baptists have a long and respected legacy of social justice and public witness.  This includes historical leadership in the education of freedmen after the Civil War, active involvement in the Civil Rights Movement, support for the empowerment of women, and ongoing work in areas such as environmental stewardship and racial reconciliation.

### ABCUSA's Religious Beliefs and Practices Concerning Immigration

9.      ABCUSA believes that serving and ministering to immigrants and refugees is a biblical and moral responsibility.  Rooted in Scripture's call to love our neighbors, show hospitality, and seek justice, American Baptists affirm the dignity and rights of all people.  We believe that all people are made in the image of God and deserve dignity, compassion, and support.  Our long-standing commitment to immigrants and refugees is an expression of our faith in action—offering holistic ministry, advocating for just policies, and partnering in resettlement efforts as we live out God's call to welcome the stranger and serve those in need.

10.      We support organizations like Church World Service and others to help resettle refugees and raise awareness about immigration issues in both church and society.

11.    ABCUSA expresses its deep commitment to immigrants and refugees through compassionate ministry, direct service, and advocacy—reflecting the biblical call to "welcome the stranger" (Matthew 25:35).

12.    Ultimately, our approach reflects Christ's call to love, serve, and seek justice for all people, especially the vulnerable and marginalized.

## The Impact of DHS's New Policy on ABCUSA

13.    While ABCUSA congregations vary in their experiences based on geography and demographics, several immigrant-rich churches, particularly those serving undocumented or mixed-status families, have reported increased fear and anxiety among members.  Even congregants who have legal status in the United States worry that ICE may enter their church and arrest indiscriminately.  Member churches in the western United States have reported noticeably diminished attendance at worship services, Bible studies, and community programs, out of concern for potential encounters with immigration enforcement.

14.    Some churches have observed a chilling effect on participation in ministries that once served as vital touchpoints for community support, such as food pantries, ESL classes, or counseling services.  Pastors have shared anecdotal reports of visible Immigration and Customs Enforcement ("ICE") presence or activity near places of worship or faith-based events, which has further discouraged engagement and fostered mistrust and fear.

15.    Communal worship and fellowship are fundamental to our faith.  Many member churches host Bible studies, which are an essential part of spiritual growth for American Baptists, as well as a fellowship hour after the worship service, where congregants can gather as a community.  Churches also offer Sunday School to children during the worship services, which forms the basis for the next generation's spiritual formation.  Our ability to come together for

worship and fellowship is significantly burdened when members of the congregations stay home, depriving them and their fellow congregants of their religious community.

16.    For many of our members, immigrants and non-immigrants alike, church is no longer a safe place of refuge.  American Baptists are accustomed to coming to church to worship and fellowship with their neighbors.  Now, some congregants report feeling stress and anxiety, worrying that their activities may be disrupted with arrests.

17.    Earlier this summer, a member church in upstate New York experienced an incursion by ICE onto their property.  This church is heavily involved in resettling refugees who arrive in the United States.  Four individuals—one wearing a t-shirt identifying him as an agent of ICE, one wearing a t-shirt labeled "FBI," and two others in plain clothes—came through the privacy gate into the parsonage of the church property.  They indicated that they were looking for someone.  The pastor told these individuals that they needed a warrant.  Eventually, after the pastor told them repeatedly that they needed to leave, the individuals left the property.

18.    At the beginning of July, ABCUSA hosted its Biennial Mission Summit in Omaha, Nebraska, which was attended by over 1,000 people.  Many Latino American Baptists chose not to come to the Summit out of fear that they would be detained or engaged by ICE.  ABCUSA leadership had to consider how we would respond if immigration enforcement officers appeared at the conference.  We ensured that two people familiar with ICE and its practices were present at the conference and available to assist if needed.  The leadership trusted that these people would be able to recognize valid warrants put forth by any ICE officers, and advise American Baptists of their legal rights if ICE appeared.

19.    The rollback of protections at sensitive locations undermines our churches' abilities to be safe and welcoming places of refuge and support.  ABCUSA, consistent with its

biblical commitments, continues to advocate for just and humane immigration practices and to provide pastoral care and public witness alongside and on behalf of affected individuals and families.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

_____                    _____
July 26, 2025                                             Rev. Dr. Gina C. Jacobs-Strain

JA232

# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| NEW ENGLAND SYNOD, *et al.*,<br><br>    Plaintiffs,<br><br>    v.<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY, *et al.*,<br><br>    Defendants. | Civil Action No. 4:25-cv-40102-FDS |

**DECLARATION OF JOSHUA KINCAID**

I, Joshua Kincaid, pursuant to the provisions of 28 U.S.C. § 1746, declare, under penalty of perjury, as follows:

1.  I am employed by the United States Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE"), Enforcement and Removal Operations ("ERO") as a Deportation Officer in the Syracuse, New York sub-office of ERO Buffalo ("ERO Buffalo"). As a Deportation Officer, I am responsible for the identification, arrest, case management, and removal of aliens unlawfully present in the United States.

2.  I am aware of the allegations made by Plaintiffs in this lawsuit. I submit this Declaration in support of the Defendants' Opposition to Plaintiffs' Motion for Preliminary Relief. All statements in this Declaration are based on my personal knowledge or knowledge obtained in the course of my official duties.

JA234

3. On May 24, 2025, I and four other officers travelled to a target's last known address in Utica, New York (the "Target Address"). The purpose of this visit was to make inquiries regarding the location of the target, who had been issued an I-200, Warrant for Arrest of Alien. Upon arriving at the Target Address, the Target Address appeared to me to be a private residence within a residential neighborhood.

4. I and two other officers knocked on the front door of the Target Address.  A female answered the door and indicated that the target no longer lived there.  The female did not provide any information regarding the current whereabouts of the target.  After receiving this information, the other officers and I left the Target Address.

5. I did not observe any signage or other indications at the Target Address signifying that it is used for the purpose of religious worship.

6. It is routine and in the ordinary course of my duties as a Deportation Officer to visit a target's last known address, and speak with the occupant(s) of the address.

7. I am aware of a news article dated June 4, 2025, from The Daily Sentinel in Rome, New York, in which a pastor recounts that law enforcement officers, including an ICE officer, visited her home on May 24, 2025. Thomas Caputo, *Local pastor urges Utica council to address possible federal overreach by ICE, FBI agents*, THE DAILY SENTINEL (June 4, 2025), https://www.romesentinel.com/news/local-pastor-urges-utica-council-to-address-possible-federal-overreach-by-ice-fbi-agents/article_14e7b267-4b10-42ed-adb1-7e801c2be127.html.  The news article contains a photograph of the pastor.  I believe that the individual I encountered at the Target Address on May 24, 2025, is the pastor depicted in this news article.

I declare that the foregoing is true and correct to the best of my knowledge.

JA235

Dated: August 14, 2025

JOSHUA R KINCAID

Digitally signed by
JOSHUA R KINCAID
Date: 2025.08.14
09:53:33 -04'00'

Joshua Kincaid, Deportation Officer
Enforcement and Removal Operation
U.S. Immigration and Customs Enforcement

JA236

# Exhibit 1

**Declaration of Rev. Caleb Crainer**

I, Rev. Caleb Crainer, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1. I am Reverend Caleb Crainer. I am the Presiding Minister at St. Andrew's Lutheran Church ("St. Andrew's") in Los Angeles, California. St. Andrew's is part of the Southwest California Synod of the Evangelical Lutheran Church in America.

2. I began serving at St. Andrew's in 2012. I hold degrees in theology from Valparaiso University (B.A.), The Graduate Theological Union (M.A.), and the Lutheran Seminary Program in the Southwest (M. Div.).

3. I make this declaration based on personal knowledge and information relayed to me in the course of my duties as the Presiding Minister at St. Andrew's.

4. In our Christian tradition, Jesus teaches frequently about our sacred calling to love strangers and neighbors (Matthew 22:37-40, Mark 12:31, Luke 6:27-28, John 15:12). We take this faith-based calling seriously at St. Andrew's and have a history of welcoming and including people from around the world as members and leaders in our community.

5. In July 2025, St. Andrew's was featured in an NPR article entitled "Los Angeles houses of worship plan for possible ICE raids."[1] I was interviewed for the article and shared how our church had been preparing for the possibility of immigration enforcement following the recission of the government's policy of not conducting such enforcement at houses of worship. I described how we developed plans in the case of raids and conducted role-playing exercises so that staff and congregants know what to do. Our faith requires us to take these steps to protect the most vulnerable among us.

6. On Friday, October 17, 2025 around 6 a.m., a white van pulled into our church parking lot. The parking lot is clearly attached to the church; it is right next to the sanctuary building and is surrounded by a low barrier.

7. Our church is on private property and, due to security issues we have had in the past, is marked with "No Trespassing" signs.

8. Security camera footage of the church parking lot shows additional unmarked white vans entering the parking lot around 9 a.m., as well as unmarked SUVs.

9. From the vehicles emerged federal agents wearing vests marked "POLICE" and masks covering their faces. They apparently used our church's parking lot as a staging area for some kind of enforcement action. There were around 20 agents in our parking lot.

10. I am aware that there was an immigration enforcement action at a nearby carwash that day; it is possible that our church's parking lot was used as a staging area for that action.

11. In videos of the incident at St. Andrew's, individuals with their hands zip-tied can be seen being escorted by the masked federal agents.

12. Shortly before 10 a.m., a community member arrived for voice lessons she had scheduled at the church and saw the immigration enforcement action taking place. Most of the agents she observed were wearing bulletproof vests and visible firearms. After she parked and exited her car, one of the agents moved toward her, making threatening gestures. She told the agents that they needed to leave the church parking lot. They left.

13. The church did not give the agents permission to use our parking lot for their actions and would not have done so if asked.

---

[1] https://www.npr.org/2025/07/13/nx-s1-5466054/los-angeles-houses-of-worship-plan-ice-raids

Doc ID: aea905b7151f3f3cf8193aed01bb4371395ea1a3

JA238

14. The congregation at St. Andrew's is horrified by this unsanctioned use of our space. I am also horrified to think that the broader community might believe that we allowed this raid to occur; in viewing video of the incident taken by a bystander, I heard someone say, "I can't believe the church would let this happen."

15. Though we have taken a number of steps to prepare in the event of a raid, we did not think that agents would come onto our property and use it for their purposes without permission. I now realize that what we had done previously to protect our congregation from immigration enforcement was not sufficient. Clearly, federal agents will force their way onto our property and do whatever they want without respecting our dignity and autonomy.

16. In response to this violation, we have had to take a number of steps to improve our church campus's security. We undertook a $5,000 overhaul of our security cameras, and may add additional ones – we had been planning an upgrade eventually, but after this, we had to move quickly. We have added additional "No Trespassing" signs. We are going to implement a means of closing off the parking lot at night, which we have never had to do before.

17. This violation has made me think about the church property in a whole new way. Our parking lot was important to the community during the COVID-19 pandemic: it was a place where people would sit outside and meet up, and where kids could ride their bikes safely. It is where we have events like our annual Oktoberfest and trunk-or-treat. Since ICE staged its raid on our property, though, I have realized that we need to take stronger steps to defend our congregation and to think more defensively about the property, which will be at the expense of creating a welcoming and open meeting place for the congregation and community.

18. In the wake of the raid, we have also had to take steps to address what happened with our congregation and the broader community. We have sent a letter to community members and have had numerous conversations with parishioners. We will be doing more trainings about responses to immigration enforcement.

19. I have known something like this could occur ever since the government removed protections from houses of worship. I wish that I did not feel scared, but I am, for my congregants and for my community.

Dated: 11 / 21 / 2025

_____

Rev. Caleb Crainer

Doc ID: aea905b7151f3f3cf8193aed01bb4371395ea1a3

JA239

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
CENTRAL DIVISION

| | |
|---|---|
| **New England Synod, Evangelical Lutheran Church in America,** *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>**Department of Homeland Security,** *et al.*,<br><br>Defendants. | **Case No. 4:25-cv-40102-FDS** |

**PLAINTIFFS' SECOND NOTICE OF SUPPLEMENTAL FACTS**

Plaintiffs write to inform the Court of several recent incidents highlighting the urgent need for the relief requested in Plaintiffs' pending motion for a stay under 5 U.S.C. § 705 or, in the alternative, a preliminary injunction. *See* ECF Nos. 32, 33.

***All God's Children Metropolitan Community Church***

In just the past several weeks, multiple incidents have occurred at and around All God's Children Metropolitan Community Church—a member of Plaintiff MCC—in Minneapolis.

*First*, last week, ICE agents detained the church's senior pastor at gunpoint nearby the church. As detailed in the attached declaration, Rev. Kenny Callaghan noticed a commotion about one a half blocks from the church on Wednesday, January 7. Ex. 27 ¶ 13. When he saw ICE agents surrounding a woman, Rev. Callaghan told the agents, "Take me. Stop harassing her. Take me." *Id.* ¶ 14. In response, an agent approached Rev. Callaghan threateningly, pointed a gun at him, and asked if he was afraid, to which Rev. Callaghan responded: "I am not afraid." *Id.* ¶ 15. ICE agents then handcuffed Rev. Callaghan and put him in the back of an SUV. They left him there, returning to the car three separate times to ask if he was afraid yet. Each time, he told them

no. *Id.* ¶¶ 15–16. The third time they came, they asked for his identification and cell phone. They then told him, "Well, you're white. You won't be any fun anyway. You can get out of the car." *Id.* ¶ 18.

*Second*, the same day that ICE agents detained Rev. Callaghan at gunpoint, they were also recorded seizing multiple people immediately in front of the church.[1] *Id.* ¶ 20–21. The video shows at least a half-dozen SUVs, some with flashing lights, surrounding a car that had been stopped on the street just feet away from church property. A crowd of DHS agents is seizing what looks like two people, appearing to be handcuffing them and putting them into waiting cars. The church property and "All God's Children" marquee are clearly visible in this still from the video:



---

[1] The video has been publicly posted to social media and can be viewed at https://www.facebook.com/leef.jackson.2025/videos/1397093661910402/.

*Third*, these incidents followed another one several weeks ago in which Rev. Callaghan personally witnessed ICE agents seizing someone who appeared to be a Somali man about four blocks from the church. *Id.* ¶ 22.

Under DHS's prior sensitive locations policy, which applied not only to houses of worship but to the areas around them, *see* Ex. 4 at 3 (ECF No. 1-4), incidents like these would not have been allowed near the church outside of extreme circumstances.

All God's Children, which is located in a predominantly immigrant neighborhood, Ex. 27 ¶ 7, has continued to experience the negative impacts of the Defendants' 2025 Policy. The local community has responded predictably and reasonably to the increased risk of being seized or surveilled by DHS (regardless of legal status, or even whether they are in fact immigrants) at and around the church. At the church's weekly meal service, for example, which is attended largely by members of the local immigrant community, attendance has fallen by more than half what it was a year ago. That meal service is a core part of the congregation's ministry, yet the congregation is unable to carry out its religious mandate to feed the hungry and care for the vulnerable when the fear created by Defendants' policy prevents the hungry and vulnerable from coming to church to receive needed services. *Id.* ¶ 9, 24–28. Similarly, All God's Children has experienced a severe financial loss from the cancellation of reservations of its social hall for events such as baptisms and wedding parties. Last year, such rentals provided 20-25% of the church's budget, income that is critical to allowing the congregation to operate ministries such as its food pantry. *Id.* ¶ 18, 30–31. Congregants, too, now no longer feel safe attending church and say they will stop coming until they can feel safe again. *Id.* ¶ 32.

***University Baptist Church***

Elsewhere in Minneapolis, the University Baptist Church, a member of Plaintiff Alliance of Baptists, has likewise been affected by DHS's policy of unrestrained enforcement at and around houses of worship. At services this past Sunday, January 11, church staff and congregants got word that ICE vehicles were parked outside a different church less than a half a mile away. Ex. 28 ¶ 10. The start of regular services had to be postponed while church staff made an announcement from the pulpit to notify people and remind them of the protocols the church has put in place in case ICE or other federal agents seek entry. *Id.* Ushers locked the doors—something the church never felt compelled to do before Defendants' change in policy, and that is antithetical to their beliefs of free and open worship—and kept a look out during the service. Even before the current ramp-up of DHS agents in Minneapolis began last month, immigrant and Latino members of the congregation had already begun staying away from services because they no longer felt safe at the church. *Id.* ¶ 6.

These incidents represent a small sample of the ongoing and irreparable harms to Plaintiffs, their members, and many others caused by DHS's 2025 Policy. *See also, e.g.*, Exs. 10-26 (ECF No. 33-1–33-17); Decl. of Rev. Caleb Crainer (ECF No. 65-2). Without the relief sought in Plaintiffs' pending motion for a stay or preliminary injunction, these harms will continue unabated. Plaintiffs respectfully request the Court's prompt intervention in order to prevent further serious and irreparable harm.

Dated: January 13, 2026

Ryan Downer*
Madeleine Gates*
WASHINGTON LAWYERS' COMMITTEE FOR
   CIVIL RIGHTS AND URBAN AFFAIRS

Respectfully submitted,

*/s/ Kevin E. Friedl*
Kevin E. Friedl*
Sarah Goetz*
Andrew Bookbinder*
J. Sterling Moore*

4

700 14th St. NW, Suite 400
Washington, DC 20005
ryan_downer@washlaw.org
madeleine_gates@washlaw.org
melissa_colon@washlaw.org

Richard J. Leveridge*
Sonia W. Murphy*
Brandon A. Levey*
Samone Ijoma*
Brittney M. Welch*
GILBERT LLP
700 Pennsylvania Ave. SE #400
Washington, DC 20003
Leveridger@gilbertlegal.com
Murphys@gilbertlegal.com
Leveyb@gilbertlegal.com
Ijomas@gilbertlegal.com
Welchb@gilbertlegal.com

Mark B. Samburg
Ayesha Khan*
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
Phone: (202) 448-9090
Fax: (202) 796-4426
kfriedl@democracyforward.org
sgoetz@democracyforward.org
abookbinder@democracyforward.org
smoore@democracyforward.org
msamburg@democracyforward.org
akhan@democracyforward.org

*Admitted *pro hac vice*

# EXHIBIT 27

## <u>DECLARATION OF REV. KENNY CALLAGHAN</u>

I, Kenny Callaghan, declare under penalty of perjury, under 28 U.S.C. § 1746, that the following is true and correct:

1. I am a senior pastor at All God's Children Metropolitan Community Church in Minneapolis, Minnesota.

2. All God's Children is a member of the Metropolitan Community Churches, a plaintiff in this case.

### Our Church and Ministries

3. All God's Children is a welcoming, inclusive, LGBTQIA+ congregation dedicated to reflecting God's unconditional transforming love for all people.

4. As part of our faith, we believe that church should provide a spiritual community where people of any and all backgrounds are invited and feel welcome to explore and discover a God who is real and relevant to their lives. It is a core part of our spiritual practice to welcome all people and help them recognize that God has created them and they are beautiful the way they are.

5. Many in our congregation are queer, and we know as queer people what it feels like to be marginalized. That perspective is part of what makes MCC what it is. We feel that God has called us to be a beacon of light and welcoming in our community.

6. Our religious commitment to welcoming and inclusion absolutely includes immigrants. Jesus was an immigrant. It was an immigrant who taught us how to love other people.

7.    The neighborhood where All God's Children is located is predominately immigrants, with many Somali and Latinx immigrants who are our neighbors.

8.    Our religious practice is not limited to Sunday worship services, and includes following Jesus's example by ministering to those in our community.

9.    One way we do this is through a ministry that we call Thursday's Table. It's a community feed. Anyone who wants to have a full home-cooked meal can come by the church between 11 a.m. and 1 p.m. each Thursday. People who come are predominantly immigrants, Latinx people, and seniors who come from senior housing. They tell us that it's a meal they don't have to eat alone. They come here for community.

10.    In addition, we have a ministry to the Latinx community where people can rent our social hall to host religious and cultural activities such as baptisms, quinceañeras and quinceañeros, wedding parties, and anniversary celebrations. In many cases, the people using our hall may be living in apartments or small homes and would not be able to gather their extended families together without the larger space that our church can provide. We use the money from these rentals to keep our doors open and fund our other ministries, such as Thursday's Table.

### Recent DHS Activity Near Our Church

11.    Several recent actions by federal immigration agents have taken place at and around our church.

12.    On January 7, 2026, I was handcuffed and detained by ICE agents within a few hundred feet of the church shortly after arriving for work.

13.    As I arrived at church that day, I noticed that there was something going on just a block and a half from the church. I grabbed my whistles, because we're used to doing that, and I

went down to see what was going on. I realized it was an ICE raid and that there were many, many protesters.

14.    I joined the peaceful protesting and before I knew it, I saw ICE agents circling a young woman who appeared to be Hispanic, so I approached her. We at that point were chanting, "We are not afraid, we are not afraid." I said to this ICE agent, "Take me. Stop harassing her. Take me." I did nothing to threaten the agent. I did not have a weapon.

15.    The agent came to me, got in my face, pointed a gun at me, and said, "Are you afraid now?" I responded: "I am not afraid."

16.    The next thing I knew, they were putting handcuffs on me and they put me in the back of an SUV.

17.    They came back three times to the car to ask me if I was afraid yet, to which I replied, "Hell no, I'm not afraid of you. And I'm never going to be afraid of you."

18.    The third time when they came back, they asked for my identification and cell phone. I asked them if I was under arrest; they didn't answer. And then they said to me, "Well, you're white. You won't be any fun anyway. You can get out of the car."

19.    I was astounded to see such blatant racism and violence directed at me and other members of the community.

20.    The same day, in a separate incident, ICE seized people in the street right in front of the church and put at least one of them in a waiting car.

21.    There is a video clip from somebody's cell phone. In the clip, you can see at least two people being seized from a car pulled over to the side of the street directly in front of the church. The people and their car are surrounded by at least a half-dozen SUVs, some with flashing lights, and a crowd of federal agents, who appear to be putting the people in handcuffs.

3

The church property and the church marquee are clearly visible, just feet from where the people are being seized.

22.    A third incident occurred several weeks ago, when I saw ICE seizing someone who appeared to be a Somali man about four blocks from our church.

**Effect on our Church**

23.    Since January 2025, we have been compelled to take additional steps to try to keep safe our congregants and others who receive services at our church. In particular, we've done extensive training with our staff and volunteers about what to do if ICE shows up at the church, such as instructing them on what a warrant looks like and what it means. Our religious faith requires us to take these actions in order to maintain our church as a safe and welcoming place for congregants and our community.

24.    Despite these efforts, we have seen major decreases in the number of people we are able to serve through our Thursday's Table ministry.

25.    Last winter, we were feeding up to 125 people each Thursday. Last Thursday, we had just 56 people attend.

26.    Christmas was on Thursday this year, and we did our Thursday's Table ministry as usual that day. But even on Christmas, when we would normally expect to see more people, fewer people showed up, and we were only able to feed about 80 people.

27.    That decrease means there are hungry people who are not being fed, and people who would otherwise be able to come together in community at our church who are staying home alone and isolated. It also directly impairs our practice of our faith because we know there are members of our community we would otherwise be able to minister to, feed, and serve but who are afraid to come. They see our church as no longer the safe space it once was.

28.    We're trying to figure out ways to get people what they need, such as by packaging up meals to take to people in their homes, but it's difficult.

29.    Our church has also been severely impacted by the fact that community members are now afraid to rent our social hall for religious and cultural events.

30.    It's primarily our Latinx community neighbors who take advantage of this ministry, but more recently they have been canceling reservations out of fear of attending. All of our December rentals cancelled, and all have so far cancelled for January too. We've gotten calls from people saying they were just too afraid that ICE might come to the church.

31.    This will severely impact the church. It's huge for us. Last year, private rentals provided 20-25% of our budget. That money is what allows us to keep our doors open doing the kind of ministry that we do. This will have a significant ability to carry out the same level of ministry.

32.    We have also seen a decrease in the number of congregants who are willing to show up for worship services. Just this week, I learned that several members of our congregation, including at least three Latinx members as well as others in our congregation, have notified church staff that they no longer feel safe attending church and will stop coming until they can feel safe again. Even though all are American citizens, they are afraid that will not be enough to protect them from harassment by ICE agents. One member specifically told us that she is fearful because of the incidents happening right around our church.

33.    I can't comprehend how ICE could leave the choice to carry out raids and arrests around churches to their "common sense." Their "common sense" got Renee Good killed. It got countless people pepper sprayed and people, including older people, pushed to the ground. It got

a lethal weapon pointed at my face for saying I wasn't afraid. I didn't see a lot of common sense in what they did and said to me and others.

Minneapolis, Minnesota
January 13, 2026

Rev. Kenny Callaghan
_____
Rev. Kenny Callaghan

**Signature:** *Rev. Kenny Callaghan*
Rev. Kenny Callaghan (Jan 13, 2026 14:23:19 CST)

**Email:** ███████████████

6

# EXHIBIT 28

JA252

## DECLARATION OF REV. DOUG DONLEY

I, Doug Donley, declare under penalty of perjury, under 28 U.S.C. § 1746, that the following is true and correct:

1.      I am the pastor at University Baptist Church in Minneapolis, MN.

2.      University Baptist Church is a member of the Alliance of Baptists, a plaintiff in this lawsuit.

3.      At University Baptist Church, our mission is to be a loving and inclusive community seeking faith, joy, and action nurtured by the biblical traditions, the teachings of Christ, and God's continuing revelation.

4.      We welcome all comers and believe that engaging with people of different backgrounds and walks of life enhances our practice of faith. For example, our church has a sister church in Nicaragua. Some of our congregants have sponsored members of our sister church through the humanitarian parole program.

5.      Prior to the recission of the sensitive locations policy, we understood the church to be a space where immigrants could worship without fear of immigration enforcement interference.

6.      As soon as President Trump ended the sensitive locations policy, we saw a decline in attendance by Latinx attendees at our church, because they feared immigration enforcement during worship. These community members comprise approximately 10% of our congregation but, because they no longer feel safe at church, they rarely are able to attend services anymore. We are a close-knit congregation, and they are an integral part of our church body.

JA253

7.      When congregants stay home out of fear, not only are they deprived of the opportunity to be in community and practice their faith, but the entire congregation is deprived of their fellowship. We are all diminished when we become more homogenous.

8.      We have taken a number of steps to try to keep congregants safe. We have marked areas as private. We have trained our staff and volunteers to ask for signed judicial warrants if law enforcement show up, and have also trained on the difference between an administrative warrant and a judicial warrant. We have sometimes locked our doors during services—something we never used to have to do and that goes against our beliefs that church should be a place of welcome.

9.      Spreading a message of welcome and love to our immigrant neighbors is part of our religious faith, but we are forced to censor that message publicly to try to keep people safe.

10.      These issues have been ongoing. Just this past Sunday, January 11, 2026, we got word right before our Sunday worship service that ICE was parked outside a church less than half a mile away from us. We made an announcement at the start of service from the pulpit to let everyone know what was going on and to remind them of our protocols. Our ushers locked the doors and kept a lookout, ready to alert the congregants if they spotted immigration enforcement coming.

11.      I pray that one day soon we can worship together as a church, celebrate our diversity, and practice our faith without fear. Until that day, we will continue to take whatever measures we can to protect our congregation.

Minneapolis, MN

Date: 1/13/2026

Signed by:

Rev. Doug Donley

65F5335B6B1A47E...

Rev. Doug Donley

JA254

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| NEW ENGLAND SYNOD, *et al.*,<br><br>　　Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF<br>HOMELAND SECURITY, *et al.*,<br><br>　　Defendants. | Civil Action No. 4:25-cv-40102-FDS |

## NOTICE OF APPEAL

Defendants, United States Department of Homeland Security and Markwayne Mullin,

in his official capacity as Secretary of Homeland Security, hereby appeal to the United States

Court of Appeals for the First Circuit this Court's Preliminary Injunction entered on February

13, 2026.  *See* ECF Nos. 74–75.

Dated: April 14, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ANDREW I. WARDEN
Assistant Branch Director

　/s/ *Kristina A. Wolfe*
KRISTINA A. WOLFE (VA Bar No. 71570)
RICHARD C. GILES (WY Bar No. 8-7222)
Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.

JA255

Washington, D.C.  20530
Tel: 202-353-4519
Fax: 202-616-8470
Email:  Kristina.Wolfe@usdoj.gov
*Counsel for Defendants*

2

JA256

## CERTIFICATE OF SERVICE

I hereby certify that on April 14, 2026, the foregoing pleading was filed electronically through the CM/ECF system, which causes all parties or counsel to be served by electronic means as more fully reflected on the Notice of Electronic Filing.

/s/ *Kristina A. Wolfe*
Kristina A. Wolfe
Senior Trial Counsel
United States Department of Justice

3

JA257

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
CENTRAL DIVISION

|  |  |
|---|---|
| **New England Synod, Evangelical Lutheran Church in America,** *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>**Department of Homeland Security,** *et al.*,<br><br>Defendants. | **Case No. 4:25-cv-40102-FDS** |

**NOTICE OF CROSS-APPEAL**

Plaintiffs New England Synod, Evangelical Lutheran Church in America (ELCA); Greater Milwaukee Synod, ELCA; Southwest California Synod, ELCA; Southwestern Texas Synod, ELCA; Sierra Pacific Synod, ELCA; San Francisco Friends Meeting of the Religious Society of Friends; Pacific Yearly Meeting of the Religious Society of Friends; North Pacific Yearly Meeting of the Religious Society of Friends; American Baptist Churches USA; Alliance of Baptists; and Metropolitan Community Churches hereby appeal to the United States Court of Appeals for the First Circuit from the portions of the preliminary injunction order entered in this action on February 13, 2026 (ECF Nos. 74 and 75) that are adverse to Plaintiffs.

Dated: April 27, 2026

Ryan Downer*
Madeleine Gates*
WASHINGTON LAWYERS' COMMITTEE FOR
    CIVIL RIGHTS AND URBAN AFFAIRS
700 14th St. NW, Suite 400
Washington, DC 20005
ryan_downer@washlaw.org
madeleine_gates@washlaw.org

Respectfully submitted,

*/s/ Kevin E. Friedl*
Kevin E. Friedl*
Sarah Goetz*
Andrew Bookbinder*
J. Sterling Moore*
Mark B. Samburg
Ayesha Khan*
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553

Richard J. Leveridge*
Sonia W. Murphy*
Brandon A. Levey*
Samone Ijoma*
Brittney M. Welch*
GILBERT LLP
700 Pennsylvania Ave. SE #400
Washington, DC 20003
Leveridger@gilbertlegal.com
Murphys@gilbertlegal.com
Leveyb@gilbertlegal.com
Ijomas@gilbertlegal.com
Welchb@gilbertlegal.com

Washington, DC 20043
Phone: (202) 448-9090
Fax: (202) 796-4426
kfriedl@democracyforward.org
sgoetz@democracyforward.org
abookbinder@democracyforward.org
smoore@democracyforward.org
msamburg@democracyforward.org
akhan@democracyforward.org


*Admitted *pro hac vice*