**Nos. 26-1396, 26-1493**

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

NEW ENGLAND SYNOD, Evangelical Lutheran Church in America; GREATER MILWAUKEE SYNOD, Evangelical Lutheran Church in America; SOUTHWEST CALIFORNIA SYNOD, Evangelical Lutheran Church in America; SOUTHWESTERN TEXAS SYNOD, Evangelical Lutheran Church in America; SIERRA PACIFIC SYNOD, Evangelical Lutheran Church in America; SAN FRANCISCO FRIENDS MEETING OF THE RELIGIOUS SOCIETY OF FRIENDS; PACIFIC YEARLY MEETING OF THE RELIGIOUS SOCIETY OF FRIENDS; NORTH PACIFIC YEARLY MEETING OF THE RELIGIOUS SOCIETY OF FRIENDS; AMERICAN BAPTIST CHURCHES USA; ALLIANCE OF BAPTISTS; METROPOLITAN COMMUNITY CHURCHES,

*Plaintiffs-Appellees/Cross-Appellants*,

v.

UNITED STATES DEPARTMENT OF HOMELAND SECURITY; MARKWAYNE MULLIN, Secretary,

*Defendants-Appellants/Cross-Appellees*.

*On Appeal from the United States District Court for the District of Massachusetts*

# BRIEF OF FAIR AND JUST PROSECUTION AND THE LAW ENFORCEMENT ACTION PARTNERSHIP AS *AMICI CURIAE* IN SUPPORT OF APPELLEES/CROSS-APPELLANTS

Michael Preston Shipp
Estela Dimas
Lisa Alexandra Hamer
FAIR AND JUST PROSECUTION,
A PROJECT OF THE TIDES CENTER
1012 Torney Avenue
San Francisco, CA 94129
(415) 561-6400
pshipp@fairandjustprosecution.org

Hyland Hunt
Dana Kaersvang
DEUTSCH HUNT PLLC
300 New Jersey Ave. NW, Suite 300
Washington, DC 20001
Tel.: 202-868-6915
Email: hhunt@deutschhunt.com

## CORPORATE DISCLOSURE STATEMENT

Fair and Just Prosecution is a project of the Tides Center, which is a 501(c)(3) nonprofit organization. The Tides Center has no parent company and no publicly traded company has a 10% or greater ownership interest in the Tides Center or Fair and Just Prosecution.

The Law Enforcement Action Partnership is a 501(c)(3) nonprofit organization. It has no parent company and no publicly traded company has a 10% or greater ownership interest in it.

s/Hyland Hunt
Hyland Hunt

## TABLE OF CONTENTS


CORPORATE DISCLOSURE STATEMENT ....................................................i

TABLE OF AUTHORITIES.................................................................... iii

INTEREST OF *AMICI CURIAE* ...............................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT.......................................3

ARGUMENT ..........................................................................................6

I. IMMIGRATION ENFORCEMENT AT OR NEAR HOUSES OF WORSHIP ERODES THE TRUST BETWEEN LAW ENFORCEMENT AND THEIR COMMUNITIES THAT IS ESSENTIAL TO PUBLIC SAFETY.................6

A. Building Trust with Immigrant Communities Is Essential to Law Enforcement Effectiveness and Legitimacy. ............................................6

B. The Pervasive Threat of Immigration Enforcement Shatters this Fragile Trust and Sends Entire Communities into the Shadows, Thwarting Effective Law Enforcement. ...................................................9

C. Allowing Immigration Enforcement at or near Houses of Worship Is a Unique Threat to Public Safety and Exacerbates the Fear and Distrust of Law Enforcement Among Immigrant Communities.............15

1. DHS's aggressive enforcement actions are creating an atmosphere of fear and distrust between law enforcement and immigrant and Latino communities. .....................................16

2. Expanding immigration enforcement to areas at or near houses of worship and other sensitive locations is particularly harmful.................................................................19

II. IMMIGRATION ENFORCEMENT AT OR NEAR HOUSES OF WORSHIP THREATENS PUBLIC SAFETY BY WEAKENING CIVIC INSTITUTIONS THAT PROMOTE STABLE AND HEALTHY COMMUNITIES. ........................................................................23

CONCLUSION .......................................................................................29

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*City of Philadelphia v. Sessions*, 309 F. Supp. 3d 289 (E.D. Pa. 2018)..................13

*Fulton v. City of Philadelphia*, 593 U.S. 522 (2021)..............................................24

*Minnesota v. Noem*, 818 F. Supp. 3d 1030 (D. Minn. 2026)..................................16

*Obergefell v. Hodges*, 576 U.S. 644 (2015)..........................................................21

*Phila. Yearly Meeting of Religious Soc'y of Friends v. Dep't of Homeland Sec.*, 187 F.4th 187 (4th Cir. 2026)..........................................................................4

*United States v. California*, 314 F. Supp. 3d 1077 (E.D. Cal. 2018), *aff'd in part*, 921 F.3d 865 (9th Cir. 2019)..........................................................27

*Williams-Yulee v. Fla. Bar*, 575 U.S. 433 (2015).....................................................6

**OTHER AUTHORITIES**

The Associated Press, *Immigration Crackdown Stokes Fear and Solidarity at a Catholic Church in D.C.*, NBC News (Oct. 28, 2025)........................................25

Geoff Bennett & Jonah Anderson, *Whistleblower Warns ICE Has Slashed Training for Recruits*, PBS News Hour (Feb. 26, 2026)..................................................20

Alexandra Berzon et al., *ICE Skipped Basic Checks in Rush for Recruits, Whistle-Blower Says*, N.Y. Times (Sep. 3, 2026)..............................................20

David J. Bier, *One in Five ICE Arrests Are Latinos on the Streets with No Criminal Past or Removal Order*, Cato Institute (Aug. 5, 2025).......................................17

Jill Blair & Malka Kopell, *21st Century Civic Infrastructure: Under Construction*, Aspen Institute (2015)...............................................................................23

Br. of 17 States and D.C. as Amici Curiae, *Perdomo v. Noem*, No. 2:25-cv-05605 (C.D. Cal. July 7, 2025), Dkt. No. 49-1...............................................19

Jacob Bucher et al., *Undocumented Victims: An Examination of Crimes Against Undocumented Male Migrant Workers*, 7 Sw. J. Crim. Just. 159 (2010)............14

Andrea Castillo & Queenie Wong, *L.A. Immigration Raids Force the Undocumented to Trade Their Freedom for Safety*, L.A. Times (June 26, 2025)..........................................................................................25

Bill Chappell, *Churches Have a Long History of Being Safe Havens—For Immigrants and Others*, NPR (Jan. 26, 2025) ....................22

Will Conybeare, *Community Devastated After Congregant Arrested During Immigration Raid on L.A. Church Grounds*, KTLA 5 (Feb. 3, 2026) ....................26

Robert C. Davis et al., *Access to Justice for Immigrants Who Are Victimized: The Perspectives of Police and Prosecutors*, 12 Crim. Just. Pol'y Rev. 183 (2001) ....................10

*District Attorney Nathan J. Hochman Statement on Recent Immigrant Enforcement Actions*, L.A. Cnty. Dist. Att'y's Off. (June 6, 2025) ....................18

*Division of Professional Standards*, Hennepin Cnty. Att'y ....................9

Jessica M. Doucet & Matthew R. Lee, *Civic Communities and Urban Violence*, 52 Soc. Sci. Rsch. 303 (2015) ....................24

*Enhancing Community Policing with Immigrant Populations: Recommendations from a Roundtable Meeting of Immigrant Advocates and Law Enforcement Leaders*, Off. of Cmty. Oriented Policing Servs., U.S. Dep't of Just. (Aug. 28, 2010) ....................14

*Ensuring Victims and Witnesses Feel Safe Coming Forward and Cooperating with the Justice System Ultimately Makes Our Communities Safer*, Phila. Dist. Att'y's Off. ....................9

Fair and Just Prosecution, *U Visa Best Practices for Prosecutors* (2023) ....................8

Nicole Foy, *We Found That More Than 170 U.S. Citizens Have Been Held by Immigration Agents. They've Been Kicked, Dragged and Detained for Days*, ProPublica (Oct. 16, 2025) ....................18

Erika Gonzalez, *Faith Under Fire: How ICE Raids Affect Religious Practice in Texas*, Reporting Texas (Feb. 23, 2026) ....................25

*Hennepin County Attorney Mary Moriarty Statement on Law Enforcement Action in Minneapolis*, Hennepin Cnty. Att'y's Off. (June 4, 2025) ....................19

Aleja Hertzler-McCain, *Diocese of San Bernardino Issues Dispensation Saying Catholics Who Fear ICE Don't Have to Attend Mass*, NPR (July 9, 2025) ....................21

Human Rights Watch, *Immigrant Crime Fighters: How the U Visa Program Makes US Communities Safer* (2018) ....................8

Ill. Accountability Comm'n, *Final Report* (Apr. 2026) ....................16

*Immigrant Affairs Unit*, Brooklyn Dist. Att'y's Off. ....................8

*Immigration Counsel*, Phila. Dist. Att'y's Off. ........................................................8

Philip Jankowski, *Deportation Fears Keep Victim from Cooperating in Domestic Violence Case, Travis DA Says*, Austin American-Statesman (Mar. 8, 2017) .....12

Jack Jenkins, *"This Is Domestic Terror": Shaken by ICE Raids, Pastors Rethink Ministries*, Religion News Service (Aug. 4, 2025) ............................................26

Jesus Jiménez et al., *'Completely Disrupted': Fear Upends Life for Latinos in L.A.*, N.Y. Times (June 30, 2025) ......................................................................18

Jenna King, *ICE in Austin: Greg Casar, Community Leaders Speak Out After Recent Enforcement Activity*, Fox 7 Austin (Aug. 14, 2026) ...............................26

David S. Kirk et al., *The Paradox of Law Enforcement in Immigrant Communities: Does Tough Immigration Enforcement Undermine Public Safety?*, 641 Annals Am. Acad. Pol. & Soc. Sci. 79 (2012)..........................................................11, 15

*Lake County State's Attorney's Office's Public Statement on Improving Community Safety for All Residents*, Lake Cnty. State's Att'y's Off. (June 13, 2025).............9

Nathan Layne, *Immigrant Faithful Turn to Virtual Sermons and Home Communion Amid Trump Crackdown*, Reuters (Sep. 7, 2025)...............................................26

Letter from ICE to Hon. Mike Levin (Apr. 14, 2026) ............................................27

Letter from Law Enforcement Immigration Task Force to Hon. Trey Gowdy & Hon. Zoe Lofgren (July 20, 2015)...................................................................27

Allison McCann, *At Least 24 People Have Been Shot At by Federal Immigration Agents Since Last Year*, N.Y. Times (July 8, 2026)............................................17

Cecilia Menjívar & Cynthia L. Bejarano, *Latino Immigrants' Perceptions of Crime and Police Authorities in the United States: A Case Study from the Phoenix Metropolitan Area*, 27 Ethnic and Racial Stud. 120 (2004)................................10

Jill Theresa Messing et al., *Latinas' Perceptions of Law Enforcement: Fear of Deportation, Crime Reporting, and Trust in the System*, 30 J. Women & Soc. Work 328 (2015) ………………………………………………...……12, 14

Claire Moses & Orlando Mayorquin, *L.A.-Area Bishop Excuses Faithful From Mass Over Fear of Immigration Raids*, N.Y. Times (July 10, 2025)...................26

Valerie J. Munson, *On Holy Ground: Church Sanctuary In the Trump Era*, 47 Sw. L. Rev. 49 (2017)..........................................................................22

Nat'l Immigrant Women's Advoc. Project, *Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforcement: Initial Report from a 2017 National Survey* (May 2018) ....13

Luis Noé-Bustamante, *Latinos Worry More Than Other U.S. Adults About Deportations*, Pew Rsch. Ctr. (Apr. 30, 2025) ....11

*Press Briefing by Press Sec'y Karoline Leavitt*, White House (Jan. 29, 2025) ....4

Allie Preston, *Masked and Unidentifiable: The Risks of Federal Law Enforcement Operating Without Identification*, Ctr. for Am. Progress (Aug. 28, 2025) ....10

Hannah Rappleye et al., *Immigration Crackdown Makes Women Afraid to Testify Against Abusers, Experts Warn*, NBC News (Sep. 22, 2018) ....12

Angelica S. Reina et al., *"He Said They'd Deport Me": Factors Influencing Domestic Violence Help-Seeking Practices Among Latina Immigrants*, 29 J. Interpersonal Violence 593 (2013) ....14

Zak Sos, *Santa Rosa Man Accused of Impersonating Officer, Threatening to Call ICE and Sexually Assaulting Woman*, KTVU Fox 2 (Aug. 20, 2025) ....12

Southern Poverty L. Ctr., *Under Siege: Life for Low-Income Latinos in the South* (Apr. 2009) ....15

*Statement from a DHS Spokesperson on Directives Expanding Law Enforcement and Ending the Abuse of Humanitarian Parole*, Dep't of Homeland Sec. (Jan. 21, 2025) ....4

Nik Theodore et al., *La Esquina (The Corner): Day Laborers on the Margins of New York's Formal Economy*, 9 Working USA: J. Lab. & Soc'y 407 (2006) ....15

Nik Theodore, *Insecure Communities: Latino Perceptions of Police Involvement in Immigration Enforcement* (May 2013) ....12

Tom R. Tyler & Jeffrey Fagan, *Legitimacy and Cooperation: Why Do People Help the Police Fight Crime in Their Communities?*, 6 Ohio St. J. Crim. L. 231 (2008) ....7

Tom R. Tyler & Jonathan Jackson, *Popular Legitimacy and the Exercise of Legal Authority: Motivating Compliance, Cooperation, and Engagement*, 20 Psychol. Pub. Pol'y & L. 78 (2014) ....7

Jazmine Ulloa et al., *New Evidence Shows Agents Using Slurs, Bolstering Profiling Claims*, N.Y. Times (Aug. 11, 2026) ....17

Jennifer S. Vey & Hanna Love, *Transformative Placemaking: A Framework To Create Connected, Vibrant, and Inclusive Communities,* Brookings (Nov. 19, 2019) ........ 23

*Victims of Criminal Activity: U Nonimmigrant Status*, U.S. Citizenship & Immigr. Servs. ........ 7

Min Xie & Eric P. Baumer, *Neighborhood Immigrant Concentration and Violent Crime Reporting to the Police: A Multilevel Analysis of Data from the National Crime Victimization Survey*, 57 Criminology 237 (2019) ........ 11, 13

## INTEREST OF *AMICI CURIAE*[1]

Fair and Just Prosecution (FJP), a project of the Tides Center, is a national organization that brings together elected prosecutors from around the country as part of a nonpartisan network of leaders committed to a justice system grounded in fairness, equity, compassion, and fiscal responsibility. The leaders that FJP works with hail from over 60 jurisdictions—urban, suburban, and rural alike. Among its work, FJP develops and helps to implement policies that serve the two primary interests the prosecutors in our network are obligated to pursue: justice and public safety.

The Law Enforcement Action Partnership (LEAP) is a nonprofit organization whose members include police, prosecutors, judges, corrections officials, and other law enforcement officials advocating for criminal justice and drug policy reforms that will make our communities safer and more just. LEAP's speaker's bureau numbers more than 275 criminal justice professionals advising on police community relations, incarceration, harm reduction, drug policy, and global issues. Through speaking engagements, media appearances, testimony, and support of allied efforts, LEAP calls for more practical and ethical policies from a public safety perspective.

---

[1] No counsel for any party authored this brief in whole or in part, and no person or entity other than *amici*, their members, or their counsel made a monetary contribution intended to fund the brief's preparation or submission. All parties have consented to the filing of this brief. *See* Fed. R. App. P. 29(a)(2), (4).

Many of the communities that FJP's network represents and LEAP's speakers hail from have large immigrant populations, with or without legal status. Within the FJP and LEAP networks are prosecutors and other law enforcement officials who have taken different approaches to immigration enforcement and have implemented varying immigration-related policies. They are united, however, behind the core principle that immigration enforcement must align with community safety and cannot compromise it. To this end, FJP and LEAP are committed to ensuring that all members of the community feel protected, while building and maintaining a cooperative relationship between immigrant communities and local law enforcement based on trust and respect.

FJP and LEAP write to explain the public safety interests at stake in this case. Beyond the injuries to Appellees' religious exercise, the government's elimination of the 2021 sensitive locations policy—which placed restrictions on civil immigration enforcement in houses of worship and other sensitive locations—destroys the community trust and civic institutions that are essential for public safety. The government minimizes its policy changes and the ensuing harms, arguing that no harm can be traced to this policy change so long as it is accompanied by other government actions that also create fear within immigrant communities. This argument gives short shrift to the special role played by the civic institutions that are no longer shielded by the sensitive locations policy. The government's arguments

also fail to account for the public's reasonable and well-founded reaction to the policy change, eroding public trust in prosecutors and police when houses of worship become settings for immigration surveillance and enforcement.

## INTRODUCTION AND SUMMARY OF ARGUMENT

For over 30 years, the federal government imposed stringent limits on civil immigration enforcement in or near "protected" or "sensitive" locations. These places—including houses of worship, as well as schools, hospitals, and emergency relief providers—provide such essential services that overall community health and safety suffer if they cannot function or if people cannot safely access them. In these spaces, the government authorized enforcement actions only as a last resort, such as when there was "a national security threat" or "an imminent risk of death, violence, or physical harm to a person."[2]

But in January 2025, the government dispensed with those restrictions and granted discretion to individual Immigration and Customs Enforcement (ICE) and Border Patrol agents to seize people and conduct other enforcement actions in what had formerly been protected areas. This was not a quiet policy change, but one that came with a clear, public statement of the government's intent to conduct immigration enforcement in houses of worship: "[c]riminals will no longer be able

---

[2] JA107 (2021 Policy).

to hide in America's schools and churches to avoid arrest."[3] And the White House Press Secretary declared, on behalf of the administration, that anyone who enters the U.S. without authorization is, "by definition, a criminal."[4]

Aside from the concrete injuries the Appellee churches would suffer in the absence of a preliminary injunction, FJP and LEAP ask this Court to consider the issue from another perspective: public safety. In amici's view, the challenged DHS enforcement policy presents a two-fold threat to public safety and crime reduction, which the government's balance-of-equities analysis completely ignores.

First, eliminating constraints on immigration enforcement at or near places of worship—which have for centuries been understood as sacred places of sanctuary—is a profound betrayal. The hard-fought trust between law enforcement and immigrant communities is shattered when communities cannot count on law enforcement to respect longstanding, cross-cultural norms. This trust is essential for public safety. Without it, law enforcement loses legitimacy, and people fear police and prosecutors rather than working with them to report and prosecute crimes. And ICE's actions cause a loss of trust in local law enforcement because immigrant

---

[3] *Statement from a DHS Spokesperson on Directives Expanding Law Enforcement and Ending the Abuse of Humanitarian Parole*, Dep't of Homeland Sec. (Jan. 21, 2025), https://tinyurl.com/y75jyv8v; *see also Phila. Yearly Meeting of Religious Soc'y of Friends v. Dep't of Homeland Sec.*, 187 F.4th 187, 194 (4th Cir. 2026).

[4] *Press Briefing by Press Sec'y Karoline Leavitt*, White House (Jan. 29, 2025), https://tinyurl.com/2t3wd2sm.

communities may not recognize the distinction between different law enforcement agencies. As people retreat into the shadows, already vulnerable immigrant populations will be even more susceptible to victimization and reluctant to report crime and participate in the legal system.

Second, in opening the door to greater immigration enforcement in protected areas, the DHS enforcement policy weakens core civic institutions that together promote stable and healthy communities and lower crime rates. The essential services that these once-protected institutions provide—including healthcare, education, spiritual guidance, and other social services—form the foundation of public safety and are associated with crime reduction. Indeed, houses of worship often provide social welfare services such as support groups, counseling, meals, childcare, classes, and even shelter. When these services are compromised, people suffer, communities fray, and the resulting instability makes crime more likely and law enforcement's job more difficult.

In assessing the public interest and balance of the equities underlying the district court's preliminary injunction, amici urge the Court to account for the extraordinary threat to public safety and effective law enforcement represented by the 2025 Policy rescinding constraints on immigration enforcement in sensitive locations.

# ARGUMENT

## I. IMMIGRATION ENFORCEMENT AT OR NEAR HOUSES OF WORSHIP ERODES THE TRUST BETWEEN LAW ENFORCEMENT AND THEIR COMMUNITIES THAT IS ESSENTIAL TO PUBLIC SAFETY.

Prosecutors and other law enforcement actors know that building trust within the communities they serve is essential to public safety. Trust fosters systemic legitimacy and ensures that members of the community will feel confident and safe reporting crimes and cooperating with law enforcement. The 2025 Policy represents a unique and specific threat to that hard-earned trust. People do not trust law enforcement that violates long-established, widely held norms. The 2025 Policy will severely alienate immigrant communities and push them further away from prosecutors and other law enforcement actors and into the shadows, jeopardizing the safety of us all.

### A. Building Trust with Immigrant Communities Is Essential to Law Enforcement Effectiveness and Legitimacy.

Our legal system "depends in large measure on the public's willingness to respect and follow its decisions." *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 445-46 (2015). In particular, prosecutors' and law enforcement's work is acutely dependent on community members' confidence in the system. The willingness of victims and witnesses to report crimes to law enforcement, cooperate with prosecutors, show up for court proceedings, and testify truthfully depends on their trust in the system and

their belief that it is fair and legitimate. Research supports that when people have trust in legal authorities and the legitimacy of police, courts, and the law, they are more likely to report crimes, cooperate as witnesses, and accept police and judicial system authority.[5] Conversely, when people perceive law enforcement as biased or as a threat to, rather than a protector of, their community, they are more likely to distrust and therefore avoid the legal system (and other government institutions) as a whole—severely undermining the ability of police and prosecutors to work effectively.[6]

Because community trust is critical to public safety, prosecutors and law enforcement have taken proactive steps to obtain the trust of immigrant communities, protect immigrant crime victims, and encourage witness cooperation. For example, prosecutors have regularly served as the local officials empowered to certify U-Visas. Created by Congress in 2000 as part of the Violence Against Women Act, U-Visas grant temporary legal status to qualifying crime survivors who are helpful to law enforcement.[7] U-Visas can strengthen fraught relationships between

---

[5] *See* Tom R. Tyler & Jeffrey Fagan, *Legitimacy and Cooperation: Why Do People Help the Police Fight Crime in Their Communities?*, 6 Ohio St. J. Crim. L. 231, 263-64 (2008); Tom R. Tyler & Jonathan Jackson, *Popular Legitimacy and the Exercise of Legal Authority: Motivating Compliance, Cooperation, and Engagement*, 20 Psychol. Pub. Pol'y & L. 78, 78-79 (2014).

[6] *See* Tyler & Fagan, *supra* note 5; Tyler & Jackson, *supra* note 5.

[7] *See Victims of Criminal Activity: U Nonimmigrant Status*, U.S. Citizenship & Immigr. Servs., https://tinyurl.com/4m75wsau (last updated Dec. 22, 2025).

law enforcement and immigrant communities, increasing the likelihood that immigrants will report crime by helping undocumented community members feel protected by the law. They also send bad actors the message that victims will have recourse in a victim-protective legal system.[8] Law enforcement officials report that the U-Visa program has the "immediate practical benefits of ensuring that victims are able to assist with investigations," and long-term benefits, like building confidence among immigrant communities that "going to law enforcement will help rather than hurt them."[9]

Prosecutors around the country have also found other ways to build trust with immigrant communities. For example, the Brooklyn District Attorney's Office established an Immigrant Affairs Unit, which "investigates and prosecutes individuals and businesses that target and exploit immigrants through fraud" and participates in community "know your rights" events and resource fairs for immigrant communities.[10] Similarly, the Philadelphia District Attorney's Office houses an Immigration Counsel to assist immigrant victims and witnesses through the criminal justice system.[11] The Hennepin County Attorney's Office has

---

[8] *See* Fair and Just Prosecution, *U Visa Best Practices for Prosecutors*, at 5-6 (2023), https://tinyurl.com/2uaaxmz6.

[9] Human Rights Watch, *Immigrant Crime Fighters: How the U Visa Program Makes US Communities Safer*, at 14-15 (2018), https://tinyurl.com/yc6t4m8d.

[10] *Immigrant Affairs Unit*, Brooklyn Dist. Att'y's Off., https://tinyurl.com/4xu9cjad.

[11] *Immigration Counsel*, Phila. Dist. Att'y's Off., https://tinyurl.com/4s6ksmhc.

established an Immigration Policy Unit to develop policies addressing immigrant victims, witnesses, and defendants.[12] Other prosecutors have emphasized their commitment to equal justice for immigrants. For example, the Lake County State's Attorney issued a statement emphasizing that the office is independent of the federal government and is "dedicated to serving all residents" and "upholding justice for EVERY victim—regardless of immigration status[.]"[13]

The overarching goal prompting outreach to immigrant communities "is to create better relationships between law enforcement agencies and immigrant communities by encouraging victims and witnesses of crime to speak out, no matter their legal status."[14] When that happens, law enforcement is more effective and communities are safer.

### B. The Pervasive Threat of Immigration Enforcement Shatters this Fragile Trust and Sends Entire Communities into the Shadows, Thwarting Effective Law Enforcement.

Many immigrants are prone to distrust authorities in the U.S. because they had hostile experiences with the legal system in their home countries, experience

---

[12] *Division of Professional Standards*, Hennepin Cnty. Att'y, https://tinyurl.com/mrxschv9.

[13] *Lake County State's Attorney's Office's Public Statement on Improving Community Safety for All Residents*, Lake Cnty. State's Att'y's Off. (June 13, 2025), https://tinyurl.com/yvu6h7ha.

[14] *Ensuring Victims and Witnesses Feel Safe Coming Forward and Cooperating with the Justice System Ultimately Makes Our Communities Safer*, Phila. Dist. Att'y's Off., https://tinyurl.com/3nrkkpjd.

language barriers, or are unfamiliar with the U.S. legal system.[15] But when community members live in constant fear that law enforcement is targeting them wherever they go—especially at or near houses of worship—and worry that even benign law-enforcement interactions might result in arrest and deportation, there is a fundamental breakdown in trust that threatens public safety and impedes justice-system leaders from doing their jobs. In these circumstances, undocumented immigrants—and their lawfully present families and neighbors—fear that turning to the police and cooperating with prosecutors could bring adverse immigration consequences. This dynamic poses a major challenge to both the investigation and prosecution of individual crimes as well as the proper allocation of public safety resources. Even where local law enforcement is not involved in immigration enforcement, immigrant communities may not know or recognize the distinction between local law enforcement officers and ICE agents, especially because many ICE agents hide their identities.[16]

---

[15] Cecilia Menjívar & Cynthia L. Bejarano, *Latino Immigrants' Perceptions of Crime and Police Authorities in the United States: A Case Study from the Phoenix Metropolitan Area*, 27 Ethnic and Racial Stud. 120, 126, 129-30, 140-42 (2004); Robert C. Davis et al., *Access to Justice for Immigrants Who Are Victimized: The Perspectives of Police and Prosecutors*, 12 Crim. Just. Pol'y Rev. 183, 185, 189-191 (2001).

[16] *See, e.g.*, Allie Preston, *Masked and Unidentifiable: The Risks of Federal Law Enforcement Operating Without Identification*, Ctr. for Am. Progress (Aug. 28, 2025), https://tinyurl.com/3tfwzm9t.

The heightened fear of arrest and deportation generated by the 2025 Policy and experienced by immigrant and Latino communities predictably hinders cooperation with police and prosecutors. Research and experience show that "the development of trusting relationships between citizens and the police is often challenged by the presence and application of local and federal immigration enforcement programs."[17] According to a recent Pew survey, 51% of Latino immigrants and 42% of all Latino adults in the U.S. worry about forced removal of themselves, family members, or close friends.[18] Immigrants often assume that interaction with law enforcement officials could have adverse consequences for themselves or a loved one.[19] As a consequence, people in communities of recent immigrants are less likely to report violent crime. One study found that in neighborhoods where 65% of residents are immigrants, there is only a 5% chance that a victim will report a violent crime, compared with a 48% chance in a neighborhood where only 10% of residents are born outside the U.S.[20] Another survey of Latinos in four major cities found that 70% of undocumented immigrants

---

[17] Min Xie & Eric P. Baumer, *Neighborhood Immigrant Concentration and Violent Crime Reporting to the Police: A Multilevel Analysis of Data from the National Crime Victimization Survey*, 57 Criminology 237, 254 (2019).
[18] Luis Noé-Bustamante, *Latinos Worry More Than Other U.S. Adults About Deportations*, Pew Rsch. Ctr. (Apr. 30, 2025), https://tinyurl.com/ynevhsyc.
[19] David S. Kirk et al., *The Paradox of Law Enforcement in Immigrant Communities: Does Tough Immigration Enforcement Undermine Public Safety?*, 641 Annals Am. Acad. Pol. & Soc. Sci. 79, 79-80 (2012).
[20] Xie & Baumer, *supra* note 17, at 249.

and 44% of all Latinos would be less likely to contact law enforcement authorities if they were victims of a crime for fear that the police would ask about their immigration status or the immigration status of people they know, and 67% of undocumented immigrants and 45% of all Latinos would be less likely to voluntarily offer information about, or report, crimes because of the same fear.[21]

These fears are illustrated in tragic statistics showing a significant drop in sexual assault reporting at times of increased immigration enforcement and confirmed by prosecutors' testimony.[22] In one recent tragic incident, a victim delayed reporting a sexual assault out of fear of being deported; the man who assaulted her had impersonated a police officer and threatened to turn her over to immigration enforcement.[23] Research confirms that "immigration enforcement

---

[21] Nik Theodore, *Insecure Communities: Latino Perceptions of Police Involvement in Immigration Enforcement*, at 5-6 (May 2013), https://tinyurl.com/mvyetu8a; *see also* Jill Theresa Messing et al., *Latinas' Perceptions of Law Enforcement: Fear of Deportation, Crime Reporting, and Trust in the System*, 30 J. Women & Soc. Work 328, 334 (2015) (study indicating "that for each 1-point increase in fear of deportation, Latina participants were 15% less willing to report being victim of a violent crime to police").

[22] Philip Jankowski, *Deportation Fears Keep Victim from Cooperating in Domestic Violence Case, Travis DA Says*, Austin American-Statesman (Mar. 8, 2017), https://perma.cc/9AYX-5FQP; Hannah Rappleye et al., *Immigration Crackdown Makes Women Afraid to Testify Against Abusers, Experts Warn*, NBC News (Sep. 22, 2018), https://tinyurl.com/9n5b7s3v.

[23] Zak Sos, *Santa Rosa Man Accused of Impersonating Officer, Threatening to Call ICE and Sexually Assaulting Woman*, KTVU Fox 2 (Aug. 20, 2025), https://tinyurl.com/35m62a3e.

programs" can impede or demolish trust of law enforcement, and thus "may dissuade residents from calling on the police to help address crime problems."[24]

Law enforcement is keenly aware that fear of immigration consequences impairs public safety. In a national survey, one-fifth of police officers reported that increased immigration enforcement made immigrants less willing to make police reports, to help police when they arrive at a crime scene, to assist with subsequent investigations, and to work with prosecutors.[25] In another survey of law enforcement agencies, 71% of respondents believed that when immigrant victims do not cooperate with law enforcement, it adversely affects law enforcement's ability to hold violent perpetrators accountable; 64% of respondents believed that it affects officer safety; and 68% reported that it affects community safety.[26]

In addition, because people do not want law enforcement potentially questioning the status of a parent or grandparent, the fear of immigration

---

[24] Xie & Baumer, *supra* note 17, at 254.

[25] Nat'l Immigrant Women's Advoc. Project, *Promoting Access to Justice for Immigrant and Limited English Proficient Crime Victims in an Age of Increased Immigration Enforcement: Initial Report from a 2017 National Survey*, at 101-02 (May 2018), https://perma.cc/52MV-X8TG; *see also City of Philadelphia v. Sessions*, 309 F. Supp. 3d 289, 341 (E.D. Pa. 2018) (noting police commissioner's "testimony that the City's ability to fight crime is impaired when victims and witnesses are afraid to report crimes for fear of immigration consequences").

[26] Nat'l Immigrant Women's Advoc. Project, *supra* note 25, at 54, 103.

enforcement also makes individuals with citizenship or lawful status reluctant to cooperate with law enforcement, particularly in mixed-status households.[27]

The public safety implications of this breakdown in trust are dire. Undocumented people are already susceptible to victimization, and since people who prey on the most vulnerable know that immigrant communities are reluctant to report crimes, these communities face a heightened risk of criminal conduct.[28] For example, in one study, nearly two-thirds of undocumented migrant workers reported being the victim of at least one crime, with the most common being theft and robbery.[29] Undocumented immigrants are also vulnerable to domestic violence, with abusive partners exploiting the threat of removal and financial dependence to maintain power and control.[30] In the workplace, between 40-80% of low-income

---

[27] *See*, *e.g.*, Messing et al., *supra* note 21, at 335.

[28] *See*, *e.g.*, *Enhancing Community Policing with Immigrant Populations: Recommendations from a Roundtable Meeting of Immigrant Advocates and Law Enforcement Leaders*, Off. of Cmty. Oriented Policing Servs., U.S. Dep't of Just., at 16 (Aug. 28, 2010), https://tinyurl.com/dfcnrtxe.

[29] Jacob Bucher et al., *Undocumented Victims: An Examination of Crimes Against Undocumented Male Migrant Workers*, 7 Sw. J. Crim. Just. 159, 164, 166 & tbl. 2 (2010).

[30] *See*, *e.g.*, Messing et al., *supra* note 21, at 329-30 (citing several studies); Angelica S. Reina et al., *"He Said They'd Deport Me": Factors Influencing Domestic Violence Help-Seeking Practices Among Latina Immigrants*, 29 J. Interpersonal Violence 593, 601 (2013).

Latino immigrants reported being victims of wage theft,[31] and other immigrants report facing violence at work.[32]

Thus, paradoxically, "harsh legal sanctions against immigrants … framed as a means to keep communities 'safe' … in fact have the opposite effect," pushing people outside the law's protection and cultivating crime.[33] Expanding that aggressive enforcement into areas at or near houses of worship magnifies this negative effect by disconnecting immigrants from their faith communities, which are often their most important social support networks.

**C. Allowing Immigration Enforcement at or near Houses of Worship Is a Unique Threat to Public Safety and Exacerbates the Fear and Distrust of Law Enforcement Among Immigrant Communities.**

The 2025 Policy rescinding protections constraining immigration enforcement at or near houses of worship threatens community trust in law enforcement, and therefore public safety, in two ways. First, it magnifies the overall atmosphere of fear and distrust that has been amplified by recent aggressive immigration enforcement actions. Knowing that no place is sacred to immigration enforcement stokes the public's reasonable fear of aggressive enforcement, a harm

---

[31] *See* Southern Poverty L. Ctr., *Under Siege: Life for Low-Income Latinos in the South*, at 6 (Apr. 2009), https://tinyurl.com/c9esjftn; *see also* Nik Theodore et al., *La Esquina (The Corner): Day Laborers on the Margins of New York's Formal Economy*, 9 Working USA: J. Lab. & Soc'y 407, 417 & tbl. 8 (2006) (finding a wage theft rate of approximately 50% in New York).
[32] Southern Poverty L. Ctr., *supra* note 31, at 7.
[33] Kirk et al., *supra* note 19, at 82-83.

that is directly traceable to the 2025 Policy. Second, inviting ICE and Border Patrol agents to transgress once-protected places—places that form the backbone of a strong and stable civil society and that provide services both spiritually sacred and essential to survival—permits uniquely destructive actions that will deeply wound community trust in all law enforcement and threaten its legitimacy.

### 1. DHS's aggressive enforcement actions are creating an atmosphere of fear and distrust between law enforcement and immigrant and Latino communities.

The 2025 Policy was issued in a context that aggravated its impact. Since January 2025, DHS has dramatically scaled up immigration enforcement using tactics that have sowed fear and distrust in law enforcement. Large-scale enforcement actions like "Operation Midway Blitz" in Chicago and "Operation Metro Surge" in Minneapolis exemplify DHS's tactics:

> DHS deployed roving patrols of agents to spread fear in residential neighborhoods. They stopped people for questioning based on how they looked, how they spoke or where they worked. They arrested people without probable cause, often without asking any questions about their immigration status before placing them in handcuffs. Agents on these roving patrols donned face masks, military fatigues, body armor, and military-style weapons. They drove unmarked cars and refused to identify themselves. They recorded protesters and legal observers to intimidate them from documenting their activities. They used physical force and tear gas indiscriminately.[34]

---

[34] Ill. Accountability Comm'n, *Final Report*, at 4-5 (Apr. 2026), https://tinyurl.com/3zmujnwt; *see also Minnesota v. Noem*, 818 F. Supp. 3d 1030, 1036-38 (D. Minn. 2026) (describing evidence presented in support of challenge to federal actions during Operation Metro Surge in Minneapolis).

Sadly, DHS's aggressive enforcement tactics have also resulted in the deaths of several people. Between January 2025 and July 2026, immigration enforcement agents have shot at least 24 people across the country, killing six, including three U.S. citizens.[35]

DHS's apparent use of racial profiling further alarms and alienates people, particularly in Latino communities that have borne the brunt of this enforcement. After reviewing ICE arrest records, the Cato Institute found that "[i]llegal profiling accounts for a substantial portion of [ICE] arrests in 2025," with one in five arrested being Latinos with no criminal record or removal order.[36] Court filings across the country include body-camera footage, text messages, and other documents showing immigration enforcement agents using racial slurs and targeting people based on their skin color or perceived ethnicity.[37] These records also reveal that at least 65 United States citizens were stopped, questioned, or detained based on their

[35] Allison McCann, *At Least 24 People Have Been Shot At by Federal Immigration Agents Since Last Year*, N.Y. Times (July 8, 2026), https://tinyurl.com/yudy5kf5.

[36] David J. Bier, *One in Five ICE Arrests Are Latinos on the Streets with No Criminal Past or Removal Order*, Cato Institute (Aug. 5, 2025), https://tinyurl.com/mujfbamh.

[37] Jazmine Ulloa et al., *New Evidence Shows Agents Using Slurs, Bolstering Profiling Claims*, N.Y. Times (Aug. 11, 2026), https://tinyurl.com/233nbcxm.

appearance.[38] Racial profiling has made many U.S. citizens feel unsafe in their own communities and has forced them to change their behaviors, including carrying identifying documents with them wherever they go. One person told reporters: "I'm a boring senior that … likes to go for walks, and for the first time in history, I don't feel safe."[39]

Both state and local prosecutors have publicly condemned these tactics while explaining how they destroy community trust, undermine the legitimacy of law enforcement, and compromise public safety. In Los Angeles, District Attorney Nathan Hochman said even though "immigration enforcement is under federal jurisdiction and not within the authority of our office, we recognize the real and profound impact these operations have on the trust between immigrant communities and local law enforcement."[40] In Hennepin County, Minnesota, home to Minneapolis, County Attorney Mary Moriarty emphasized her "singular focus … on the safety of the people who live here," and said that "ICE showing up in the heart

---

[38] *Id.; see also* Nicole Foy, *We Found That More Than 170 U.S. Citizens Have Been Held by Immigration Agents. They've Been Kicked, Dragged and Detained for Days*, ProPublica (Oct. 16, 2025), https://tinyurl.com/ds632u3r (documenting over 170 citizens detained by ICE during raids or protests).

[39] Jesus Jiménez et al., *'Completely Disrupted': Fear Upends Life for Latinos in L.A.*, N.Y. Times (June 30, 2025), https://tinyurl.com/yeyssm3f.

[40] *District Attorney Nathan J. Hochman Statement on Recent Immigrant Enforcement Actions*, L.A. Cnty. Dist. Att'y's Off. (June 6, 2025), https://tinyurl.com/5cu6mpa5.

of one of our vibrant immigrant communities alongside local law enforcement causes grievous and irreparable harm. … ICE's presence will keep people from reporting crimes, from testifying as witnesses, and from seeking help."[41] And 18 state attorneys general, in a brief challenging suspicionless stops and racial profiling in Los Angeles, argued that such tactics have "undermined the trust, built over years, between local law enforcement and the immigrant community," thus "creat[ing] a culture of fear that has disrupted community life" and "impeded the daily operations of local law enforcement."[42]

#### 2. Expanding immigration enforcement to areas at or near houses of worship and other sensitive locations is particularly harmful.

The 2025 Policy expanding immigration enforcement at or near houses of worship and other sensitive locations exacerbates this very serious public safety problem, and uniquely so. When properly understood in the larger context of escalating arrests, violence, and racial profiling, the 2025 Policy is far more than a "modest" change to who decides. *See* Gov't Br. at 12-13. The rescission memo, and the threats that accompanied it, strike at the core of human existence and dignity and send a clear message that nowhere is safe—that law enforcement and the legal

---

[41] *Hennepin County Attorney Mary Moriarty Statement on Law Enforcement Action in Minneapolis*, Hennepin Cnty. Att'y's Off. (June 4, 2025), https://tinyurl.com/y5fsvbyp.

[42] Br. of 17 States and D.C. as Amici Curiae, *Perdomo v. Noem*, No. 2:25-cv-05605 (C.D. Cal. July 7, 2025), Dkt. No. 49-1, at 1, 13, https://tinyurl.com/4d7et57e.

system will punish you, your family, and your friends merely for exercising core constitutional rights and seeking essential services, including spiritual well-being. Facing this threat, both citizens and non-citizens alike will view law enforcement not as a trusted protector of public safety, but as a malevolent institution to be feared and avoided.

First, this policy marks a dramatic departure from the decades-long tradition of authorizing immigration enforcement in "protected areas" only as a last resort, such as when there is "a national security threat" or "an imminent risk of death, violence, or physical harm to a person."[43] Now individual agents retain "discretion," based on their own "common sense," to arrest and search people in these spaces.[44] Shifting the judgment calls to individual agents is particularly troubling given that ICE reportedly improperly vetted and lowered standards for ICE recruits and also cut 240 hours of training out of a 584-hour program, removing classes and testing relating to use of force, firearm safety, and constitutional fundamentals.[45] Codifying the "common sense" of improperly vetted, poorly trained agents is a near-limitless standard, and a marked shift from requiring agents to "seek prior approval from their

[43] JA106-07 (2021 Policy).
[44] Add.70 (2025 Policy).
[45] Alexandra Berzon et al., *ICE Skipped Basic Checks in Rush for Recruits, Whistle-Blower Says*, N.Y. Times (Sep. 3, 2026), https://tinyurl.com/5etr4nkt; Geoff Bennett & Jonah Anderson, *Whistleblower Warns ICE Has Slashed Training for Recruits*, PBS News Hour (Feb. 26, 2026), https://tinyurl.com/mpdr5by9.

Agency's headquarters … before taking an enforcement action in or near a protected area."[46] Indeed, DHS issued a statement emphasizing that the new policy "empowers" and does not "tie the hands" of ICE agents.[47]

Second, houses of worship have long been protected precisely because the activities held there are so important "to the well-being of people and the communities of which they are a part."[48] For many community members, the practice of religion is a deeply personal, familial, and communal exercise in understanding their lives and place in the world, and many congregants view in-person worship as a religious mandate that they cannot abandon without spiritual consequences.[49] As a matter of constitutional law, the "First Amendment ensures that religious organizations and persons are given proper protection as they seek to teach the principles that are so fulfilling and so central to their lives and faiths[.]" *Obergefell v. Hodges*, 576 U.S. 644, 679-80 (2015). Beyond religious activities, houses of worship are often the only locations where members of community groups can meet and support one another: from public service organizations like Kiwanis

---

[46] JA107 (2021 Policy).

[47] JA120.

[48] JA105 (2021 Policy).

[49] Aleja Hertzler-McCain, *Diocese of San Bernardino Issues Dispensation Saying Catholics Who Fear ICE Don't Have to Attend Mass*, NPR (July 9, 2025), https://tinyurl.com/3v9bzc32 (diocese issuing dispensations for members who cannot attend services due to fear of immigration enforcement at or near churches).

and Rotary clubs, to support groups for those wrestling with addiction, cancer, and grief.

While constraints on immigration enforcement in houses of worship date back 30-plus years,[50] the legal and cultural norms recognizing houses of worship as protected spaces of sanctuary and refuge date back centuries. In the 1800s, U.S. churches gave safe harbor to enslaved people, and later to people resisting military conscription during the Vietnam War. These practices followed centuries-old traditions—dating back to the earliest years of Christianity—holding that churches were sacred and protected spaces.[51] Eliminating the historical protections against government interference by immigration enforcement in and around these sensitive spaces is thus uniquely destructive to the community's trust and faith in law enforcement.

To dispense with these longstanding, cross-cultural norms not for the sake of public safety, but to find, detain, and deport immigrant members of the community, shatters law enforcement legitimacy and tells all people to avoid the legal system rather than depend on it.

---

[50] Add.7 (district court opinion).

[51] Bill Chappell, *Churches Have a Long History of Being Safe Havens—For Immigrants and Others*, NPR (Jan. 26, 2025), https://tinyurl.com/ffab3bsj; *see also* Valerie J. Munson, *On Holy Ground: Church Sanctuary In the Trump Era*, 47 Sw. L. Rev. 49, 50-54 (2017).

## II. IMMIGRATION ENFORCEMENT AT OR NEAR HOUSES OF WORSHIP THREATENS PUBLIC SAFETY BY WEAKENING CIVIC INSTITUTIONS THAT PROMOTE STABLE AND HEALTHY COMMUNITIES.

Ensuring community-wide access to houses of worship and other sensitive locations promotes the overall "well-being of … the communities of which they are a part[.]"[52] More specifically, community-wide access promotes a stable, healthy, and well-connected civil society with lower crime rates. Places of worship house programs designed to address the root causes of—and thereby reduce—community violence. Enjoining the 2025 Policy thus favors the interest in public safety. Leaving the 2025 Policy in effect would have the opposite effect. The 2025 Policy weakens houses of worship as core civic institutions by effectively excluding people from them, diminishing their public-safety benefit and thereby burdening the limited resources of local law enforcement.

"Civic infrastructure—or the organizations and institutions that help people connect with one another, address shared concerns, and solve public problems—forms the backbone of a healthy community."[53] Ample research shows that "more civically robust communities will be better off and have lower crime rates than

---

[52] JA105 (2021 Policy).

[53] Jennifer S. Vey & Hanna Love, *Transformative Placemaking: A Framework To Create Connected, Vibrant, and Inclusive Communities,* Brookings (Nov. 19, 2019), https://tinyurl.com/2e8stsuv; *see also* Jill Blair & Malka Kopell, *21st Century Civic Infrastructure: Under Construction*, Aspen Institute (2015), https://tinyurl.com/yck5jdhk.

civically weak communities," in particular those with "a strong matrix of religious and secular institutions to facilitate civic engagement and a locally invested and stable population."[54] Each of these "component[s] theoretically contributes to the ability of communities to foster cohesion and efficacy, secure and manage local municipal resources, and prevent a host of crime and public health related problems."[55]

Houses of worship are an important component of this civic infrastructure that provide multiple public safety benefits. They not only foster opportunities to build community and seek spiritual guidance, but they also often provide critical social services—from meals to shelter to childcare to counseling—that are essential to community well-being and ultimately, public safety. For example, the Appellee churches in this case offer multiple community services, including housing, English classes, food banks, diaper distribution, and childcare facilities.[56] *See also Fulton v. City of Philadelphia*, 593 U.S. 522, 547-48 (2021) (Alito, J., concurring) (recounting history and unique role of religious charities caring for children via orphanages and foster care placement). Such services are not just central to religious practice,

---

[54] Jessica M. Doucet & Matthew R. Lee, *Civic Communities and Urban Violence*, 52 Soc. Sci. Rsch. 303 (2015), https://tinyurl.com/4tyab7n6.

[55] *Id*.

[56] *See, e.g.*, Add.9-10, Add.17, Add.26.

implicating constitutional and statutory free exercise rights when threatened, but also crucial for social stability and public safety.

The 2025 Policy has already encroached upon these important religious functions. Beyond reduced attendance at Appellee churches' worship services and social ministries,[57] houses of worship across the country have experienced a decline in attendance and participation since DHS announced the new policy. For example, in East Los Angeles, Pastor Carlos Rincon said that the threat of immigration enforcement has cut attendance at his Pentecostal church by half.[58] Five miles away, at Our Lady of Lourdes Church, Father Ricardo Gonzalez reports that attendance is down at least 30%.[59] In Washington D.C., near the White House, a Catholic pastor stated that half of his congregation was afraid to go to church.[60] A pastor in Houston, Texas said attendance at his church has fallen 25-40%.[61] Interviews with more than two dozen pastors and other religious leaders across the country indicated that fear has driven down attendance at services and hindered their ability to minister to their

---

[57] Add.23-30.

[58] Andrea Castillo & Queenie Wong, *L.A. Immigration Raids Force the Undocumented to Trade Their Freedom for Safety*, L.A. Times (June 26, 2025), https://tinyurl.com/5ezrufr6.

[59] *Id*.

[60] The Associated Press, *Immigration Crackdown Stokes Fear and Solidarity at a Catholic Church in D.C.*, NBC News (Oct. 28, 2025), https://tinyurl.com/5bwtj9n7.

[61] Erika Gonzalez, *Faith Under Fire: How ICE Raids Affect Religious Practice in Texas*, Reporting Texas (Feb. 23, 2026), https://tinyurl.com/3jnwz3d2.

communities.[62] Elsewhere, the Diocese of San Bernardino took the extraordinary step of absolving parishioners of their obligation to attend Mass, citing fear of immigration raids.[63]

No one should fear going to their chosen house of worship in America. Yet congregants' fears of the federal government conducting enforcement actions at or near houses of worship are well-founded and have been borne out across the country. One report documented 10 instances of such enforcement actions between January and August 2025.[64] More recently, in Austin, Texas, ICE agents arrested several people in front of a church who were on their way to a free food distribution event at the church.[65] At a Los Angeles church, ICE agents wearing masks and carrying weapons forced their way on to church property during a food distribution event, disrupting food distribution and childcare and after-school programs.[66]

---

[62] Nathan Layne, *Immigrant Faithful Turn to Virtual Sermons and Home Communion Amid Trump Crackdown*, Reuters (Sep. 7, 2025), https://tinyurl.com/53as9sdr.

[63] Claire Moses & Orlando Mayorquin, *L.A.-Area Bishop Excuses Faithful From Mass Over Fear of Immigration Raids*, N.Y. Times (July 10, 2025), https://perma.cc/8P2D-8866.

[64] Jack Jenkins, *"This Is Domestic Terror": Shaken by ICE Raids, Pastors Rethink Ministries*, Religion News Service (Aug. 4, 2025), https://tinyurl.com/3pc67hab.

[65] Jenna King, *ICE in Austin: Greg Casar, Community Leaders Speak Out After Recent Enforcement Activity*, Fox 7 Austin (Aug. 14, 2026), https://tinyurl.com/euxp5kfx.

[66] Will Conybeare, *Community Devastated After Congregant Arrested During Immigration Raid on L.A. Church Grounds*, KTLA 5 (Feb. 3, 2026), https://tinyurl.com/w25nneft.

These are only a few examples of the 2025 Policy undermining the sacred exercise of religious freedom. By ICE's own tally, the agency made nearly 1,500 arrests at or near sensitive locations between January 20, 2025 and April 1, 2026.[67] The 2025 Policy creates real and substantial injuries to communities of worship, undermines the unique role that these institutions play in the community, and magnifies the fear—and the complete breakdown of trust—generated by aggressive immigration enforcement tactics in immigrant communities.

It will ultimately be local prosecutors and law enforcement in high-immigrant jurisdictions and the communities they serve—not federal officials—who will bear the brunt of this breakdown in civil society. As this enforcement policy further erodes the ability of houses of worship and other core civic institutions to serve and support their communities, greater amounts of already scarce and carefully allocated local law enforcement resources will be required to protect public safety.[68] Thus, in addition to delegitimizing law enforcement—itself a grave public safety threat—the

[67] *See* Letter from ICE to Hon. Mike Levin, at 1 (Apr. 14, 2026), https://tinyurl.com/bdz9tjb8.

[68] *See* Letter from Law Enforcement Immigration Task Force to Hon. Trey Gowdy & Hon. Zoe Lofgren (July 20, 2015), https://perma.cc/V7MX-VCAF; *United States v. California*, 314 F. Supp. 3d 1077, 1108 (E.D. Cal. 2018), *aff'd in part*, 921 F.3d 865 (9th Cir. 2019) (explaining that it is "entirely reasonable for the State to determine that assisting immigration enforcement in any way … is a detrimental use of state law enforcement resources").

2025 Policy will weaken local enforcement and other civic institutions that form the foundation of effective public safety policy.

* * * * *

In addition to burdening religious exercise, rescinding constraints on immigration enforcement at or near places of worship and other sensitive locations will severely undermine effective law enforcement and public safety. Rescinding the sensitive locations policy in the context of other aggressive and discriminatory enforcement tactics makes the harm from the rescission worse. The pending threat to arrest people for attending their church, synagogue, mosque, or other religious institution will shatter any remaining trust between immigrant communities and law enforcement. In addition, it will keep people from seeking essential services that, along with law enforcement, promote public health and safety. In short, the 2025 Policy is not a public safety measure. It is a public safety threat.

## CONCLUSION

The district court's entry of a preliminary injunction should be affirmed.

Respectfully submitted,

/s/Hyland Hunt

Hyland Hunt
Dana Kaersvang
DEUTSCH HUNT PLLC
300 New Jersey Ave. NW, Ste. 300
Washington, DC 20001
(202) 868-6915
hhunt@deutschhunt.com

Michael Preston Shipp
Estela Dimas
Lisa Alexandra Hamer
FAIR AND JUST PROSECUTION,
A PROJECT OF THE TIDES CENTER
1012 Torney Avenue
San Francisco, CA 94129
(415) 561-6400
pshipp@fairandjustprosecution.org

*Counsel for* Amici Curiae

October 2, 2026

## CERTIFICATE OF COMPLIANCE

This amicus curiae brief is in 14-point Times New Roman proportional font and contains 6,479 words as counted by Microsoft Word, excluding the items that may be excluded. The brief thus complies with the type-face, style, and volume limitations set forth in Rule 29(a)(5) and 32(a)(5)–(7)(B) of the Federal Rules of Appellate Procedure.

/s/Hyland Hunt
Hyland Hunt

October 2, 2026

## CERTIFICATE OF SERVICE

I hereby certify that, on October 2, 2026, I served the foregoing brief upon all counsel of record by filing a copy of the document with the Clerk through the Court's electronic docketing system.

/s/Hyland Hunt
Hyland Hunt