**Nos. 26-1396, 26-1493**

# United States Court of Appeals for the First Circuit

NEW ENGLAND SYNOD, Evangelical Lutheran Church in America; GREATER MILWAUKEE SYNOD, Evangelical Lutheran Church in America; SOUTHWEST CALIFORNIA SYNOD, Evangelical Lutheran Church in America; SOUTHWESTERN TEXAS SYNOD, Evangelical Lutheran Church in America; SIERRA PACIFIC SYNOD, Evangelical Lutheran Church in America; SAN FRANCISCO FRIENDS MEETING OF THE RELIGIOUS SOCIETY OF FRIENDS; PACIFIC YEARLY MEETING OF THE RELIGIOUS SOCIETY OF FRIENDS; NORTH PACIFIC YEARLY MEETING OF THE RELIGIOUS SOCIETY OF FRIENDS; AMERICAN BAPTIST CHURCHES USA; ALLIANCE OF BAPTISTS; METROPOLITAN COMMUNITY CHURCHES,

*Plaintiffs-Appellees/Cross-Appellants*,

v.

U.S. DEPARTMENT OF HOMELAND SECURITY; MARKWAYNE MULLIN,

*Defendants-Appellants/Cross-Appellees.*

On Appeal from the United States District Court
for the District of Massachusetts
Case No. 4:25-cv-40102-FDS

## APPELLEES/CROSS-APPELLANTS' COMBINED RESPONSE AND OPENING BRIEF

Madeleine Gates
WASHINGTON LAWYERS' COMMITTEE FOR CIVIL RIGHTS AND URBAN AFFAIRS
700 14th St. NW
Washington, DC 20005

Richard J. Leveridge
Sonia W. Murphy
Brandon A. Levey
GILBERT LLP
700 Pennsylvania Ave. SE #400
Washington, DC 20003

Kevin E. Friedl
J. Sterling Moore
Sarah Goetz
Ayesha Khan
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043

## RULE 26.1 DISCLOSURE STATEMENT

Plaintiffs-Appellees/Cross-Appellants have no parent corporations, and no publicly held corporations hold a 10% or greater ownership interest in any of the Plaintiff entities.

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................1

JURISDICTIONAL STATEMENT ......................................................................2

STATEMENT OF ISSUES ..................................................................................3

STATEMENT OF THE CASE..............................................................................4

A. DHS's 2025 Policy eliminated longstanding substantive and procedural protections for houses of worship. ..........................................4

B. The rescission of protections for houses of worship has seriously harmed Plaintiffs and their members.......................................................8

C. Plaintiffs filed this litigation and secured partial preliminary relief. .......15

SUMMARY OF ARGUMENT............................................................................19

STANDARD OF REVIEW ..................................................................................20

ARGUMENT .........................................................................................................21

I. Plaintiffs have standing to challenge the 2025 Policy....................................21

A. Plaintiffs suffered undisputed injuries in fact.........................................21

B. Plaintiffs' injuries were fairly traceable to the 2025 Policy. ....................23

C. Plaintiffs' injuries could be—and in fact were—at least partially redressed. ...........................................................................................35

II. The district court correctly entered a preliminary injunction. .........................36

A. Plaintiffs are likely to succeed on their RFRA claim. ..............................36

1. The 2025 Policy substantially burdens Plaintiffs' religious exercise. ......................................................................................37

2. The policy cannot survive strict scrutiny........................................44

B. Plaintiffs are likely to succeed on their First Amendment claim. ............47

1. The 2025 Policy infringes on Plaintiffs' freedom of expressive association..................................................................................47

2. The policy cannot satisfy exacting scrutiny.....................................49

C. Plaintiffs will be irreparably harmed without preliminary relief. ............51

D. The equities and public interest weigh in Plaintiffs' favor.......................52

E. The district court did not abuse its discretion in crafting the preliminary injunction. .......................................................................53

III. The district court erred in declining to stay the 2025 Policy. ..........................56

A. The policy is final agency action subject to APA review. ........................56

B. The policy is arbitrary and capricious. ....................................................62

CONCLUSION ........................................................................................................63

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ams. for Prosperity Found. v. Bonta*,
594 U.S. 595 (2021)....................48, 49, 50, 51

*Apache Stronghold v. United States*,
101 F.4th 1036 (9th Cir. 2024) (en banc)....................42, 43

*Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*,
481 U.S. 537 (1987)....................47

*Bennett v. Spear*,
520 U.S. 154 (1997)....................31, 56, 58, 61

*Biden v. Texas*,
597 U.S. 785 (2022)....................32, 56

*Bowen v. Roy*,
476 U.S. 693 (1986)....................40, 41

*Burwell v. Hobby Lobby Stores, Inc.*,
573 U.S. 682 (2014)....................44, 46

*Carrozza v. CVS Pharmacy, Inc.*,
992 F.3d 44 (1st Cir. 2021)....................28

*City of Boerne v. Flores*,
521 U.S. 507 (1997)....................46

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013)....................30

*Cmty. Nutrition Inst. v. Young*,
818 F.2d 943 (D.C. Cir. 1987)....................57

*Comcast of Me./N.H., Inc. v. Mills*,
988 F.3d 607 (1st Cir. 2021)....................47

*ConnectU LLC v. Zuckerberg*,
522 F.3d 82 (1st Cir. 2008)....................35

*Conservation Law Found., Inc. v. Acad. Express, LLC*,
129 F.4th 78 (1st Cir. 2025) ........................................................................23, 33

*Dantzler, Inc. v. Empresas Berrios Inventory & Operations, Inc.*,
958 F.3d 38 (1st Cir. 2020) ..............................................................................30

*Davis v. Wigen*,
82 F.4th 204 (3d Cir. 2023)...............................................................................37

*de Jesus Ortega Melendres v. Arpaio*,
695 F.3d 990 (9th Cir. 2012)..............................................................................53

*Dep't of Com. v. New York*,
588 U.S. 752 (2019)..................................................................................29, 30, 31

*DHS v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020)...............................................................................................63

*Diamond Alt. Energy, LLC v. EPA*,
606 U.S. 100 (2025)..................................................................................29, 31, 35

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009)...........................................................................................62

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024)...........................................................................................31

*Fighting Finest, Inc. v. Bratton*,
95 F.3d 224 (2d Cir. 1996) .................................................................................48

*First Choice Women's Res. Ctrs., Inc. v. Davenport*,
608 U.S. 174 (2026)......................................................................................29, 48

*Gen. Elec. Co. v. EPA*,
290 F.3d 377 (D.C. Cir. 2002) ............................................................................57

*Gonzales v. O Centro Espírita Beneficente União do Vegetal*,
546 U.S. 418 (2006)......................................................................................44, 45

*Hecht Co. v. Bowles*,
321 U.S. 321 (1944)...........................................................................................55

*Holt v. Hobbs*,
574 U.S. 352 (2015)......46

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*,
565 U.S. 171 (2012)......47

*In re Blinds to Go Share Purchase Litig.*,
443 F.3d 1 (1st Cir. 2006)......55

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
110 F.4th 295 (1st Cir. 2024)......23

*Ipsen Biopharms., Inc. v. Azar*,
943 F.3d 953 (D.C. Cir. 2019)......60

*Kaemmerling v. Lappin*,
553 F.3d 669 (D.C. Cir. 2008)......37

*Korte v. Sebelius*,
735 F.3d 654 (7th Cir. 2013)......37

*Laird v. Tatum*,
408 U.S. 1 (1972)......30

*League of Women Voters of U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016)......52

*Lyng v. Int'l Union*,
485 U.S. 360 (1988)......48

*Lyng v. Nw. Indian Cemetery Protective Ass'n*,
485 U.S. 439 (1988)......41, 43

*Mack v. Warden Loretto FCI*,
839 F.3d 286 (3d Cir. 2016)......42

*Mahmoud v. Taylor*,
606 U.S. 522 (2025)......40, 42, 43

*Margolin v. Nat'l Ass'n of Immigr. Judges*,
608 U.S. 339 (2026)......55

*McLouth Steel Prods. Corp. v. Thomas*,
838 F.2d 1317 (D.C. Cir. 1988) ....................................................................60

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)................................................................................62

*Murthy v. Missouri*,
603 U.S. 43 (2024)................................................................................21

*New Doe Child #1 v. Cong. of the U.S.*,
891 F.3d 578 (6th Cir. 2018)..............................................................37

*New York v. Trump*,
171 F.4th 1 (1st Cir. 2026) ..........................................................61, 63

*Nken v. Holder*,
556 U.S. 418 (2009)..............................................................................52

*Ohio v. EPA*,
603 U.S. 279 (2024)..............................................................................62

*OSG Bulk Ships, Inc. v. United States*,
132 F.3d 808 (D.C. Cir. 1998) .............................................................57

*Perrier-Bilbo v. United States*,
954 F.3d 413 (1st Cir. 2020) .........................................................37, 43

*Phila. Yearly Meeting of Religious Soc'y of Friends v. DHS*,
187 F.4th 187 (4th Cir. 2026)...................................................passim
767 F. Supp. 3d 293 (D. Md. 2025) .....................................................49
No. 25-cv-0243, 2026 WL 280089 (D. Md. Feb. 3, 2026)...........................26, 58

*Presbyterian Church (U.S.A.) v. United States*,
870 F.2d 518 (9th Cir. 1989)................................................................22

*Pub. Serv. Co. of N.H. v. W. Newbury*,
835 F.2d 380 (1st Cir. 1987) ................................................................52

*Rhode Island v. Trump*,
155 F.4th 35 (1st Cir. 2025) .................................................................52

*Roman Catholic Bishop of Springfield v. City of Springfield*,
724 F.3d 78 (1st Cir. 2013) ....................................................................42

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
592 U.S. 14 (2020)....................................................................38, 51

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*,
217 F.3d 8 (1st Cir. 2000) ....................................................................52

*Shelton v. Tucker*,
364 U.S. 479 (1960)....................................................................50

*Somerville Pub. Sch. v. McMahon*,
139 F.4th 63 (1st Cir. 2025) ....................................................................52, 53

*Spratt v. R.I. Dep't of Corr.*,
482 F.3d 33 (1st Cir. 2007) ....................................................................37

*Sw. Airlines Co. v. Dep't of Transp.*,
832 F.3d 270 (D.C. Cir. 2016) ....................................................................57

*Tabbaa v. Chertoff*,
509 F.3d 89 (2d Cir. 2007)....................................................................49

*Thai Meditation Ass'n of Ala., Inc. v. City of Mobile*,
980 F.3d 821 (11th Cir. 2020)....................................................................42

*Thomas v. Review Bd. of Ind. Emp. Sec. Div.*,
450 U.S. 707 (1981)....................................................................37

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
578 U.S. 590 (2016)....................................................................57

*United States v. Oakland Cannabis Buyers' Co-op.*,
532 U.S. 483 (2001)....................................................................55

*United States v. Playboy Ent. Grp., Inc.*,
529 U.S. 803 (2000)....................................................................46

*United States v. Texas*,
599 U.S. 670 (2023)....................................................................32

*Util. Air Regul. Grp. v. EPA*,
573 U.S. 302 (2014).....26

*Vaqueria Tres Monjitas, Inc. v. Irizarry*,
587 F.3d 464 (1st Cir. 2009).....51

*Venetian Casino Resort, LLC v. EEOC*,
530 F.3d 925 (D.C. Cir. 2008).....60, 61

*Winter v. NRDC, Inc.*,
555 U.S. 7 (2008).....21, 36

*Woonasquatucket River Watershed Council v. Dep't of Agric.*,
186 F.4th 25 (1st Cir. 2026).....passim

**Statutes**

5 U.S.C. § 704.....56

5 U.S.C. § 705.....passim

5 U.S.C. § 706.....62

28 U.S.C. § 1292.....2

28 U.S.C. § 1331.....2

42 U.S.C. § 2000bb-1.....37, 44

**Rules**

Fed. R. App. P. 4(a)(1)(B).....2

Fed. R. App. P. 4(a)(3).....2

Fed. R. Civ. P. 65(d).....17, 54, 55

**Other Authorities**

ICE, *Immigration Enforcement at Sensitive Locations: Fiscal Year 2020 Report to Congress* (Apr. 18, 2022)....................5

Letter from Todd M. Lyons, Senior Official Performing the Duties of ICE Director, to Rep. Mike Levin (Apr. 14, 2026)....................8

## INTRODUCTION

For decades, the federal government imposed limits on immigration enforcement at houses of worship, recognizing that unrestrained enforcement at such locations was unnecessary and would burden fundamental rights. In January 2025, Defendants the Department of Homeland Security and its Secretary abruptly rescinded those longstanding protections in favor of a different policy ("2025 Policy") that places no substantive limitations on DHS agents' ability to conduct raids, arrests, and similar actions at houses of worship, leaving such actions to agents' uncabined individual discretion.

The effect was predictable: DHS agents deployed into church parking lots, surveilled congregants, and arrested people at and around their places of worship. As a result, people across the country, regardless of immigration status, now reasonably fear attending houses of worship. Churches have seen both attendance and financial giving plummet. Congregations religiously compelled to worship with open doors and open arms have suddenly had to lock those doors and train their staff on how to respond to immigration raids. In many places of faith, the open joy and spiritual restoration of communal worship has been replaced by isolation, concealment, and fear.

Plaintiffs—religious organizations representing churches in Massachusetts and across the country—have suffered all these harms and more because of the

2025 Policy. They challenged that policy under the Religious Freedom Restoration Act, the First Amendment, and the Administrative Procedure Act, and secured partial preliminary relief that has already begun to ameliorate some of their harms. On appeal, DHS fails to identify any abuse of discretion in the district court's decision—or even to acknowledge the reality of its 2025 Policy, which the agency incorrectly seeks to minimize as merely "a modest change in internal DHS guidance." DHS Opening Br. 12 ("DHS Br.").

The Court should affirm the preliminary injunction in full. If it does not, it should proceed to consider and reverse the district court's denial of Plaintiffs' request for a stay of the 2025 Policy under the APA, 5 U.S.C. § 705, a request the court denied based on its mistaken view that the policy likely does not constitute final agency action.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331. It granted in part and denied in part Plaintiffs' motion for preliminary relief on February 13, 2026. ADD.62.[1] DHS timely appealed on April 14. JA255; Fed. R. App. P. 4(a)(1)(B). Plaintiffs timely cross-appealed on April 27. JA258; Fed. R. App. P. 4(a)(3). This Court has jurisdiction over both appeals under 28 U.S.C. § 1292(a)(1).

---

[1] Plaintiffs cite the Addendum to DHS's brief as "ADD.__," the Joint Appendix as "JA__," and other items on the district court docket as "Dkt. __."

## STATEMENT OF ISSUES

1. Plaintiffs are religious organizations that have seen attendance at worship services, participation in other ministries, and financial giving plummet as a result of DHS's new policy of unrestrained enforcement at houses of worship. Did the district court abuse its discretion in concluding that at least some Plaintiffs likely have standing to challenge that policy?

2. The district court concluded that Plaintiffs were likely to show that the 2025 Policy violated RFRA and was causing ongoing irreparable injury, and that the balance of equities favored a carefully tailored preliminary injunction. Did the district court abuse its discretion in granting that injunction?

3. If the Court is inclined to narrow or overturn the preliminary injunction: Did the district court err in denying Plaintiffs' request for a stay of the 2025 Policy under 5 U.S.C. § 705, because it concluded that the policy likely did not constitute final agency action subject to APA review?

## STATEMENT OF THE CASE

### A. DHS's 2025 Policy eliminated longstanding substantive and procedural protections for houses of worship.

For more than 30 years, it was the government's consistent policy to restrict immigration-enforcement activities at "sensitive locations" such as schools, hospitals, and, as relevant here, houses of worship.

In 1993, the Immigration and Naturalization Service adopted a policy "to avoid apprehension of persons and to tightly control investigative operations on the premises of schools, places of worship, funerals and other religious ceremonies." JA93-95. That policy required advance notice of such operations, set standards for when they were appropriate, and instructed agents to consider ways to "minimize the impact on operation of the … place of worship." JA93-94.

In 2008, Immigration and Customs Enforcement, a successor of INS, reiterated the need to avoid enforcement "at or near sensitive community locations such as schools, places of worship, and funerals or other religious ceremonies, except in limited circumstances" such as "terrorism-related investigations." JA97-98. Three years later, ICE further underscored the importance of avoiding enforcement actions near those locations. JA100-02. Such actions, the agency stated, should be avoided and could proceed only in exigent circumstances (e.g., terrorism or imminent risk of death) or with prior approval. *Id.*

Arrests at sensitive locations were accordingly rare. ICE Enforcement and Removal Operations records show nine "planned" arrests near places of worship from October 2018 to October 2020. ICE, *Immigration Enforcement at Sensitive Locations: Fiscal Year 2020 Report to Congress* 48-49 (Apr. 18, 2022), *available at* https://perma.cc/8H6N-FWTD. Similar records from ICE Homeland Security Investigations show eleven arrests (one exigent, and ten "planned") at religious spaces from October 2017 through October 2020, with at least seven of the "planned" arrests involving search warrants. *Id.* at 49-51.

In 2021, DHS Secretary Alejandro Mayorkas reaffirmed and strengthened the government's longstanding policy of avoiding enforcement at sensitive locations in a memo that superseded the previous ones. JA104-08 ("Mayorkas Memo"). The Mayorkas Memo described a "fundamental" and "bedrock" principle: DHS can accomplish its mission "without denying or limiting individuals' access to needed medical care, children access to their schools, the displaced access to food and shelter, people of faith access to their places of worship, and more." JA105. It recognized that enforcement actions—"includ[ing] … arrests, civil apprehensions, searches, inspections, … and immigration enforcement surveillance"—at sensitive locations could "restrain people from accessing the protected area to receive essential services or engage in essential activities." JA106-07.

The Mayorkas Memo set forth both substantive and procedural restrictions on agents' ability to conduct enforcement at sensitive locations. It announced that DHS had an "obligation to refrain, *to the fullest extent possible*, from conducting a law enforcement action in or near a protected area"—an obligation the memo made clear "applies at all times and is not limited by hours or days of operation." JA106 (emphasis added); *see also id.* ("The foundational principle of this guidance is that, to the fullest extent possible, we should not take an enforcement action in or near a protected area."). The memo recognized that certain limited circumstances might require enforcement at sensitive locations. JA106-07. Outside of those circumstances, however, it dictated that "an Agent or Officer *must* seek prior approval" before proceeding. JA107 (emphasis added). And because the memo applied to all DHS personnel, not just line agents, any official asked to approve an enforcement action at a sensitive location would themselves be bound by the requirement that such actions be avoided "to the fullest extent possible."

In January 2025, DHS threw out these longstanding protections. In a short memo from Acting DHS Secretary Benjamine Huffman, DHS rescinded the Mayorkas Memo, effective immediately. ADD.70 ("Huffman Memo"). The Huffman Memo does away with the requirement that agents "refrain, to the fullest extent possible, from conducting a law enforcement action in or near a protected area," and it imposes no replacement constraints on agents' authority. It does not

require any internal process for enforcement at sensitive locations. Nor does it require that exigent circumstances exist before agents may raid a sensitive location, let alone define what exigent circumstances might be enough. Instead, the Huffman Memo leaves it to individual agents' "enforcement discretion" whether it is appropriate to undertake enforcement at a sensitive location, specifically disavowing the need for "bright line rules."

In a press release issued the next day, DHS explained that:

> This action empowers the brave men and women in CBP and ICE to enforce our immigration laws and catch criminal aliens—including murders [sic] and rapists—who have illegally come into our country. Criminals will no longer be able to hide in America's schools and churches to avoid arrest. The Trump Administration will not tie the hands of our brave law enforcement, and instead trusts them to use common sense.

JA120.

Following the Huffman Memo, ICE issued further instructions to its agents. ADD.72-73 ("Vitello Memo" and, together with the Huffman Memo, the "2025 Policy"). The Vitello Memo emphasized that DHS "will not be issuing bright line rules regarding where immigration laws are permitted to be exercised" and instead would leave those decisions to the discretion "of the Department's law enforcement personnel." ADD.72. It "charge[d] Assistant Field Office Directors … and Assistant Special Agents in Charge … with responsibility for making case-by-case determinations" when to enforce at sensitive locations, but imposed no

substantive restrictions on those employees' decisionmaking, specifying only that they did not have to provide authorization in writing. ADD.73.

Under the new policy, enforcement at sensitive locations has exploded: ICE itself has reported that, from January 2025 to April 2026, it conducted 1,454 arrests in or near sensitive locations. Letter from Todd M. Lyons, Senior Official Performing the Duties of ICE Director, to Rep. Mike Levin, at 1 (Apr. 14, 2026), *available at* https://perma.cc/87N4-WP8B.

### B. The rescission of protections for houses of worship has seriously harmed Plaintiffs and their members.

DHS's abandonment of the rules restraining enforcement in or near houses of worship has harmed Plaintiffs and their member congregations in multiple ways. Congregants are well aware of DHS's change in policy and the increase in enforcement activity it has unleashed. *See, e.g.*, JA172 ¶¶ 12-13 ("Congregants across our Synod know that the administration has changed the rules that used to limit immigration enforcement at churches."); JA149 ¶ 25 (describing how Spanish-language media has covered these issues extensively). Indeed, prior to entry of the preliminary injunction, DHS agents had already conducted multiple operations at and around Plaintiffs' churches. JA130 ¶ 27 (armed ICE agents used church parking lot for enforcement activity); JA238 ¶¶ 6-12 (around 20 immigration agents used church parking lot as apparent staging area for nearby enforcement action); JA241 (ICE seized multiple people directly in front of

church); JA247-49 ¶¶ 11-22 (ICE pointed gun at and handcuffed pastor a block and a half from church).

For Plaintiffs and their members, having armed federal agents on church property is devastating and shatters their understanding of the church as a safe and sacred place. *See, e.g.*, JA150 ¶ 36 ("We would be deeply traumatized. The congregation might not hold together … . Once congregants stopped coming, I don't know if they would ever come back."); JA175-76 ¶ 26 ("[Enforcement operations] would take away from the sense of the church as a safe and sacred space, a holy space set apart to experience God, and it would leave a sense of violation."); JA222 ¶ 13 ("It would destroy the sacred, welcoming space we have intentionally created and prevent congregants from coming together for communal worship and shared ministry.").

As a direct consequence of DHS's new policy, many congregants were deterred from attending regular worship services because of the fear of immigration enforcement at church. *See, e.g.*, JA129-31 ¶¶ 22, 26, 29; JA138 ¶ 35; JA153 ¶ 10; JA160 ¶ 24; JA164 ¶¶ 11-12; JA172-73 ¶ 14; JA181 ¶ 13; JA222 ¶ 16; JA224-25 ¶ 8; JA230 ¶ 13; JA253 ¶ 6. The drop in attendance at some churches was severe. *See, e.g.*, JA144 ¶ 17 (reporting 50 percent drop in attendance at one church); JA149 ¶¶ 23-24 (reporting a "huge and immediate impact on our weekly attendance"); JA167 ¶ 19 (reporting that "attendance is down 80% and the youth

group attendance is down 40%”). The fear and anxiety created by the 2025 Policy were felt not only by congregants who lack legal status but also by those who have legal status, and even by those who are not immigrants at all. *See, e.g.*, JA149-50 ¶¶ 28-29 (“Even I, as a United States citizen, don’t feel safe at the church.”); JA175 ¶ 25; JA187 ¶ 11; JA203 ¶¶ 22-23.

When congregants stay home for fear of ICE at their church, they are deprived of the opportunity to take part in a central ritual of their faith—gathering with others in communal worship—harming both them and their churches. *See, e.g.*, JA173 ¶ 16; JA182 ¶ 14 (describing how one congregant is now “unable to pray in community, to receive comfort from her fellow parishioners, or embrace those who once walked with her in faith”). The absence of those congregants in turn harms the broader congregation, including those who are able to attend, because they are deprived of the ability to worship alongside their full religious community. *See, e.g.*, JA127-28 ¶ 18; JA150 ¶¶ 30-32; JA153 ¶ 10; JA164 ¶ 12; JA173 ¶¶ 15-17; JA197 ¶¶ 36-37; JA221 ¶ 11; JA225 ¶¶ 10-11.

For Lutherans, who “consider it an experience of the fullness of the body of Christ when we are able to come together,” the absence of their fellow congregants “compromises the body … gathering for Eucharist.” JA127-28 ¶ 18. So too, Baptists view “[c]ommunal worship and fellowship” as “fundamental” to their faith, JA230 ¶ 15, and believe they are unable to “live up to the duties and

obligations of [thei]r religious tradition" when DHS's policy prevents them from "be[ing] able to minister to anyone at church regardless of their legal status." JA217 ¶ 25. For Metropolitan Community churches, "[i]nclusivity is core to [their] religious practice," as is "[c]ommunal worship"; "[e]very single congregant's presence adds to the communal worship experience." JA221 ¶¶ 10-11. And for Quakers, that loss of spiritual unity equates to being cut off from hearing the voice of God as expressed through their absent co-congregants. JA135 ¶ 13; JA193 ¶¶ 13-14; JA201 ¶ 12.

Plaintiffs and their congregations also suffered the financial impact of decreased giving that comes with decreased attendance. JA135 ¶ 13; JA164 ¶ 12; JA174 ¶¶ 21-22; JA201 ¶¶ 9-10. For some congregations, particularly those serving marginalized communities, that loss of funding threatened to shut them down entirely. JA150 ¶ 33.

The effects of the 2025 Policy extend beyond regular worship services to other vital expressions of Plaintiffs' and their members' faith, such as their operation of food pantries for the needy, church camps, schools, and English as a Second Language (ESL) classes. JA129-30 ¶¶ 23, 28; JA138 ¶¶ 37-38; JA143-44 ¶¶ 15, 18; JA152-53 ¶¶ 3-4, 9; JA166 ¶¶ 15, 17; JA173-74 ¶¶ 18-20; JA183 ¶ 17; JA187 ¶ 14; JA216-17 ¶ 22. These programs are central to Plaintiffs' religious practice. JA126-27 ¶¶ 16-18; JA139 ¶ 43; JA148 ¶ 18; JA152 ¶ 4 ("[I]f we leave

people hungry, we're leaving Jesus hungry. It's an essential part of who we are to have these food distributions."); JA164 ¶ 10; JA174 ¶ 19; JA183 ¶ 17; JA186 ¶ 10; JA208 ¶ 21; JA230 ¶ 15 (explaining the importance of Sunday schools "for the next generation's spiritual formation").

Yet just as it suppressed attendance at regular worship services, DHS's policy left people too scared to take part in these other programs—even to receive food when in need. JA129-30 ¶¶ 23 (charitable flea market), 28 (ESL classes); JA138 ¶ 37 (organizing events in support of immigrants); JA143-44 ¶¶ 15 (summer camp), 18 (food pantry); JA153 ¶¶ 8-9 (food pantry); JA160-61 ¶¶ 24, 28 (food pantry); JA166 ¶¶ 15 (diaper pantry), 17 (Vacation Bible School); JA173 ¶ 18 (food pantry); JA182 ¶ 16 (Vacation Bible School); JA187-88 ¶¶ 14-18 (food pantry); JA216 ¶ 22 (church day care and food pantries); JA230-31 ¶¶ 14, 18 (food pantries). The result is significant harm to Plaintiffs' ability to carry out their religious mandate in the wider world.

The climate of fear and anxiety created by DHS's policy infringes Plaintiffs' exercise of religion and association in other ways too. It has led pastors to avoid preaching freely about their churches' stance on immigration or other issues, for fear that it might draw enforcement attention to the church—to the detriment of the entire congregation. JA175 ¶¶ 24-25; JA183-84 ¶ 18; JA216-17 ¶¶ 20-21, 25 ("[I]f the pastors who are charged with shepherding [congregants] along the way

cannot fully speak, none of us are experiencing religion to its fullest extent.”). It has driven behind closed doors ceremonies such as baptisms that before would have been occasions for communal worship and celebration, open to both members and the wider community. JA142-45 ¶¶ 10, 12, 16, 18, 20; JA161 ¶ 27; *see also* JA182 ¶ 15. One congregation even considered changing the day and time that it holds Mass, to avoid the threat of ICE targeting its congregants at regularly scheduled worship services. JA145 ¶ 21.

Even those who continue to attend must do so with the fear that armed agents may be waiting outside or may even seek to enter the sanctuary, which directly burdens their religious worship. JA144 ¶ 19; JA175 ¶ 25 (“Churches are no longer spaces set apart. At any moment they could be filled with force and violence.”); JA187 ¶ 13 (“When I am leading worship on Sundays … I can’t help but note in the back of my mind whether each new person … could be an ICE officer in plainclothes entering our service.”); JA198 ¶ 42 (“Each time the door opens to admit new attendees, we are now left to wonder if ICE has arrived. This interferes with our ability to achieve stillness and receive messaging from the Spirit/God.”); JA203-04 ¶¶ 20, 26; JA217 ¶ 26; JA222 ¶¶ 14-15; JA231 ¶ 16. Congregations whose faith directs them to worship together with open doors and open arms have felt compelled to lock the doors to their churches, put up signage declaring previously open areas to be private, and otherwise take steps inconsistent

with their religious commitment to welcoming all comers. JA129 ¶¶ 22, 24; JA139 ¶ 40; JA143 ¶ 12; JA149-50 ¶¶ 22, 34-35; JA161 ¶ 27; JA166 ¶ 16; JA172, 175 ¶¶ 12, 23; JA216-17 ¶¶ 20, 23-24; JA222 ¶ 16; JA224-25 ¶¶ 5, 7, 9.

Many have also had to spend time, effort, and financial resources on training and preparation in the event of an ICE raid—resources that would otherwise be devoted to accomplishing their religious mission, such as by providing social services. JA150 ¶ 35; JA165, 167 ¶¶ 14, 20; JA172 ¶¶ 12-13; JA181-82 ¶¶ 13-14 ("Daycare providers in churches focus on what they will do if ICE shows up on church grounds, rather than on the joy of teaching Jesus's message"); JA188-89 ¶¶ 21-26, 28; JA208 ¶ 21; JA224 ¶ 6. They were driven to take these measures by their religious commitment to protecting their fellow worshippers, particularly the most vulnerable among them. JA139 ¶ 41; JA164, 167 ¶¶ 10, 18; JA182 ¶ 14; JA188 ¶ 20 ("Failing to take steps to keep my congregation and those who use our facilities safe at church would be contrary to my faith and religious beliefs."); JA197 ¶ 40 ("Knowingly putting a person in harm's way or risking their involvement in a violent encounter violates our religious beliefs."); JA203 ¶ 21; JA208 ¶ 21. For many of these congregations, DHS's policy thus creates an implacable injury of conscience: either violate their belief in freely welcoming all to communal worship or violate their belief that they must avoid putting others in

harm's way. JA131 ¶ 33; JA139 ¶¶ 40-41; JA166 ¶ 16; JA197 ¶¶ 35, 40; JA203 ¶ 21; JA225 ¶ 9.

### C. Plaintiffs filed this litigation and secured partial preliminary relief.

Plaintiffs sued in July 2025, alleging that DHS's 2025 Policy violates the Religious Freedom Restoration Act; infringes their protected rights of expressive association under the First Amendment; and is arbitrary and capricious, contrary to law and in excess of statutory authority, and contrary to constitutional right under the Administrative Procedure Act. JA85-89. Plaintiffs immediately filed a motion for a stay under 5 U.S.C. § 705 or a preliminary injunction to halt the 2025 Policy, which the district court granted in part and denied in part. ADD.1-62.

The court began its analysis with standing. After carefully analyzing the evidentiary record as to each Plaintiff, the court found that most Plaintiffs (eight of eleven) had made a clear showing they were likely to establish each element of standing. ADD.13-39. In particular, it found that these eight Plaintiffs had shown injury in the form of declines in attendance at worship services, participation in social ministries such as food pantries, and financial giving. ADD.14-18. In contrast, it found that the three remaining Plaintiffs—the North Pacific Yearly Meeting, Pacific Yearly Meeting, and San Francisco Friends Meeting—had not sufficiently established their standing to seek preliminary relief. ADD.30-34, 38.

Next, the court concluded that the injuries it had identified were likely traceable to the 2025 Policy. ADD.20-38. Even if "other competing causes," such as "increased immigration enforcement generally," may have added to Plaintiffs' injuries, the court found that "the adoption of a policy that largely removes restrictions on immigration raids at churches, coupled with a public statement that '[c]riminals will no longer be able to hide in America's … churches to avoid arrest,' would likely cause a marked decrease in church attendance, particularly in communities with large immigrant populations." ADD.22-23 (quoting JA120). By the same token, because the reinstatement of protections for houses of worship would likely cause at least some people to return to church, the court found that these eight Plaintiffs had shown their injuries were redressable. ADD.38-39.

On the merits, the court determined that Plaintiffs had shown a likelihood of success on their claim that the 2025 Policy violates RFRA. The court concluded that the policy "clearly" imposes a substantial burden on Plaintiffs' religious exercise by inhibiting people from attending church or receiving services there. ADD.40-43. And it rejected DHS's argument that the 2025 Policy was the least restrictive means of advancing the government's interests, noting that the Mayorkas Memo itself was an example of less restrictive means and that DHS had introduced no evidence "to suggest that limitations on immigration-enforcement operations in churches … would in any material respect impair the effective

enforcement of the immigration laws." ADD.43-44. Because the court found a likelihood of success on the merits of this claim, it deemed it unnecessary to decide Plaintiffs' First Amendment claim. ADD.46-48.

Turning to Plaintiffs' APA claims, the court ruled that those claims were not likely to succeed because the 2025 Policy likely did not constitute "final agency action" subject to APA review. It reached this conclusion based on its assessment that the Mayorkas Memo—which the 2025 Policy rescinded—had no "legal consequences" because it did not absolutely prohibit immigration enforcement at sensitive locations, was not based on an interpretation of the Immigration and Nationality Act, and did not purport to limit DHS's statutory authority. ADD.49-53. Because it concluded that the 2025 Policy was likely not subject to APA review, the court did not address the merits of Plaintiffs' APA claims and did not grant a stay of agency action under 5 U.S.C. § 705.

Having found that DHS's policy was likely substantially burdening Plaintiffs' religious practice, the court had no difficulty concluding that Plaintiffs had also shown a likelihood of irreparable harm and that the balance of equities and public interest likewise favored granting preliminary relief. ADD.54-56.

In crafting its preliminary injunction, the court emphasized the requirements of Federal Rule of Civil Procedure 65(d). It stated that an order directing a return to the Mayorkas Memo would not satisfy Rule 65(d)'s requirement that injunctive

relief provide bright-line rules that defendants can implement and the court can oversee. ADD.59-60. Accordingly, the court issued an injunction "that largely tracks the contours of that policy [the Mayorkas Memo] while providing more specific requirements and limitations." ADD.60.

The preliminary injunction order required the eight Plaintiffs found to have standing to provide a list of the locations of their members' houses of worship and adjacent protected areas, such as parking lots, playgrounds, and cemeteries. ADD.67. It bars DHS from conducting immigration enforcement actions inside these areas except in "exigent circumstances," defined as an immediate threat to human life or safety. ADD.65-66. It also bars DHS from conducting enforcement "near" such areas—i.e., within 100 feet of any entrance—except in exigent circumstances or after securing approval from agency headquarters. ADD.66. And it bars DHS from setting up checkpoints to target individuals on their way to or from a designated protected area. *Id.* Finally, the order exempts enforcement actions taken pursuant to a judicial or administrative warrant. *Id.*

Following issuance of the preliminary injunction, a number of those Plaintiffs covered by the injunction have seen worshippers return to services. Dkt. 111-17 ¶ 32; Dkt. 111-21 ¶¶ 35, 38; Dkt. 111-40 ¶¶ 22-23; Dkt. 111-44 ¶¶ 16-18, 22, 24; Dkt. 111-53 ¶¶ 19, 21; Dkt. 111-57 ¶ 20; Dkt. 111-64 ¶¶ 10-12; Dkt. 111-67 ¶¶ 28-29; Dkt. 111-77 ¶¶ 39, 41-42. Attendance at Plaintiffs' ministries

has similarly rebounded under the protections of the injunction. *See, e.g.*, Dkt. 111-21 ¶¶ 35-37 (attendance at community meal improved; community members began renting the church's social hall again); Dkt. 111-64 ¶ 13 (increased participation at food pantries); Dkt. 111-77 ¶ 40 (families who had previously avoided coming to church together attended a children's day celebration); Dkt. 111-48 ¶ 17 (attendance at food distribution has stabilized and returned to normal); Dkt. 111-44 ¶¶ 17-18, 21-22, 24 (attendance at food distributions and youth group rebounded).

## SUMMARY OF ARGUMENT

The district court correctly found that most Plaintiffs had standing to seek preliminary relief against DHS's 2025 Policy rescinding limits on immigration enforcement at houses of worship. Plaintiffs documented Article III injury in the form of decreased attendance at worship services and social ministries, and decreased financial giving—neither of which the government disputes. DHS urges that these harms are not fairly traceable to its new no-holds-barred approach to enforcement at churches, but the district court did not abuse its discretion in rejecting that claim, and its reasoning was recently echoed by the Fourth Circuit, which unanimously rejected nearly identical arguments by DHS.

Nor was there any abuse of discretion in the court's decision to enter a preliminary injunction. DHS's arguments why its 2025 Policy did not impose a

substantial burden under the Religious Freedom Restoration Act largely rehash its losing arguments on standing. And DHS does not come close to showing that the new policy is the least restrictive means of advancing a compelling government interest—including because for decades the government was able to enforce the immigration laws while limiting enforcement operations at churches. The court correctly held that Plaintiffs were likely to suffer irreparable harm in the absence of preliminary relief and that the equities favored an injunction. And because the 2025 Policy infringes Plaintiffs' First Amendment rights of expressive association as well, this Court could also affirm the injunction on those alternative grounds.

If the Court were to disagree and overturn the injunction in whole or in part, Plaintiffs conditionally cross-appeal from the denial of their request to stay the 2025 Policy under 5 U.S.C. § 705. The district court committed legal error when it concluded that the policy was likely not "final agency action" subject to review under the Administrative Procedure Act. Contrary to the court's conclusion, the policy produced concrete legal consequences by dictating the obligations of DHS personnel when carrying out their duties and determining where and under what circumstances people could be surveilled, questioned, and seized.

## STANDARD OF REVIEW

The Court reviews the decision to grant or deny a preliminary injunction for abuse of discretion; "under that standard, [it] review[s] questions of law de novo

and factual findings for clear error." *Woonasquatucket River Watershed Council v. Dep't of Agric.*, 186 F.4th 25, 39 (1st Cir. 2026). The same standard governs "challenges to the breadth of the relief that the District Court ordered." *Id.* at 49.

## ARGUMENT

### I. Plaintiffs have standing to challenge the 2025 Policy.

"At the preliminary injunction stage … the plaintiff must make a 'clear showing' that [it] is 'likely' to establish each element of standing." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (quoting *Winter v. NRDC*, 555 U.S. 7, 22 (2008)). "The three elements of Article III standing are (1) an injury-in-fact, (2) that is fairly traceable to the defendant's challenged conduct, and (3) that is likely to be redressed by a favorable judicial decision." *Woonasquatucket*, 186 F.4th at 36 (quotation marks omitted). There was no abuse of discretion in the district court's finding that eight Plaintiffs had shown they were likely to establish standing.

#### A. Plaintiffs suffered undisputed injuries in fact.

Plaintiffs documented several forms of cognizable harm, any one of which would be sufficient for standing. For purposes of this appeal, it is sufficient to address the two types of injuries on which the district court relied, neither of which

is disputed by DHS: decreased attendance at worship services and social ministries, and decreased financial giving.[2]

First, Plaintiffs documented decreased attendance at worship services and decreased participation in other ministry activities such as food pantries, church camps, schools, and diaper banks, caused by fear of immigration enforcement in and near houses of worship after the 2025 Policy was adopted. *See supra* at 9-12. "These descriptions of the impact of the 2025 Policy also include the negative effect that reduced attendance has had on their communal worship, which is central to the plaintiffs' practice of their religion." *See Phila. Yearly Meeting of Religious Soc'y of Friends v. DHS*, 187 F.4th 187, 199 (4th Cir. 2026) ("*PYM*").

These harms from decreased attendance "easily meet the first requirement of the standing inquiry." *Id.*; *see also Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 523 (9th Cir. 1989) (holding that "allegations of a decrease in congregants' participation in worship services and other religious activities, of the cancellation of a Bible study class, of the diversion of clergy energy from pastoral duties, and of congregants' reluctance to seek pastoral counseling" described cognizable harms to plaintiff churches). Just as in the district court, *see* ADD.16,

---

[2] The district court analyzed these as three forms of harm. ADD.20. For simplicity, and because the relevant analysis here does not differ as between decreased attendance at worship and decreased participation in other ministry activities, this brief discusses those two injuries together.

DHS does not contest that such reductions are occurring or that they constitute injury in fact.

Second, Plaintiffs showed that the 2025 Policy decreased financial giving to Plaintiffs and their members. *See supra* at 11; ADD.18. "Such an out-of-pocket loss is a quintessential injury in fact." *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 110 F.4th 295, 308 (1st Cir. 2024) (quotation marks omitted); *see also PYM*, 187 F.4th at 208 (Agee, J., concurring) (separately emphasizing that "the plaintiffs' representations that the 2025 Policy led them to receive fewer financial contributions is an independent injury in fact sufficient to demonstrate that they are likely to establish Article III standing"). DHS does not contest that such financial harms are occurring or that they satisfy the first element of standing.

### B. Plaintiffs' injuries were fairly traceable to the 2025 Policy.

Plaintiffs also showed they were likely to establish that their injuries are "fairly traceable to the challenged conduct of the defendant[s]." *See Conservation Law Found., Inc. v. Acad. Express, LLC*, 129 F.4th 78, 90 (1st Cir. 2025).

The preliminary injunction record established that congregations were aware of the change in policy and the resulting lessening of protections for houses of worship. *See, e.g.*, JA149 ¶ 25; JA153 ¶ 8; JA172 ¶¶ 12-13. It included numerous instances of congregants stating outright that they were avoiding attending worship or other services because of the increased risk of enforcement at church. *See, e.g.*,

JA130 ¶ 26 ("Many members have expressed their fear of coming to worship given the possibility of being detained by ICE while at church."); JA142 ¶ 9 ("Many of our congregants confide in me and have expressed concern about the potential for ICE raids at the church or in the surrounding area."); JA250 ¶ 30 ("We've gotten calls from people saying they were just too afraid that ICE might come to the church.").

The record also showed that such fears were a stark departure from what Plaintiffs had experienced prior to the 2025 Policy. As one pastor stated, "[b]efore the recission of the sensitive locations policy, I had never heard from a congregant that they feared immigration enforcement at our church." JA224-25 ¶ 8; *see also* JA128 ¶ 19 ("Once you were in your seat at church, you didn't expect ICE to show up there. … That was true even in the first Trump administration, because the sensitive locations policy was still in place then."); JA224 ¶ 7 ("Before the recission … we did not lock doors or verify who was coming in during services."). Similarly, the record showed that attendance decreases coincided in time with adoption of the 2025 Policy. *See, e.g.*, JA149 ¶ 23; JA165 ¶ 14; JA253 ¶ 6.

The district court did not abuse its discretion in evaluating this evidence and concluding that eight Plaintiffs were likely to show that their declines in attendance and financial giving were fairly traceable to the 2025 Policy—a judgment that was later confirmed when, following issuance of the preliminary injunction, many

Plaintiffs saw attendance rebound. *See supra* at 18-19. None of DHS's arguments to the contrary holds any water.

*First*, DHS disputes the reality of what the 2025 Policy did, seeking to minimize its abandonment of protections for houses of worship as a minor tweak to internal procedures that could not have caused Plaintiffs' injuries. DHS places heavy reliance on the fact that the Mayorkas Memo did not categorically prohibit enforcement in or near churches. DHS Br. 12-13. That is beside the point. The salient fact is that the Mayorkas Memo set out important substantive and procedural restrictions on such enforcement, including the cardinal "obligation to refrain, to the fullest extent possible, from conducting a law enforcement action in or near a protected area." JA105-06. (Although the Mayorkas Memo calls this limitation "fundamental" and "foundational," *id.*, DHS barely mentions it here.)

The 2025 Policy, in contrast, rescinded those restrictions and put *no* substantive limitations in their place. Thus, "a primary effect of the 2025 Policy is to remove the prior limitations on DHS enforcement actions at or near places of worship," "necessarily increas[ing] the likelihood that DHS will engage in immigration enforcement actions at or near houses of worship." *PYM*, 187 F.4th at 203-04; *see also supra* at 8 (describing how DHS has in fact done so). Indeed, DHS conceded as much when, in announcing the policy change, it said that the Mayorkas Memo had "thwart[ed] law enforcement in or near so-called 'sensitive'

areas" and "tie[d] the hands of our brave law enforcement," but that the new policy would "empower" DHS agents "to … catch criminal aliens" "in America's schools and churches." JA120. That near-contemporaneous explanation for the 2025 Policy further contradicts DHS's claim here that the policy is inconsequential.

DHS makes several efforts to support that claim, but those efforts fall flat. It points out that the Mayorkas Memo said it "did not 'limit' the 'statutory authority' of DHS's agencies or agents." DHS Br. 13 (quoting JA107). But it is elementary that an agency cannot amend statutory law; only Congress can. *See, e.g.*, *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 327 (2014) ("An agency … may change its own conduct, but it cannot change the law."). What DHS could and did do, however, is restrict how its agents would exercise the authority granted under statute. *See Phila. Yearly Meeting of Religious Soc'y of Friends v. DHS*, No. 25-cv-0243, 2026 WL 280089, at *4 (D. Md. Feb. 3, 2026); *cf.* JA95 (in earlier iteration of sensitive locations policy, stating that "[t]his directive does not affect the scope of authority of Service officers under the Immigration and Nationality Act, *but is directed to the operational implementation of such authority*" (emphasis added)).

Similarly, DHS notes that the Mayorkas Memo allowed for enforcement if approved in advance by agency headquarters, JA107, while the Vitello Memo requires ICE agents (but not those at other DHS components, such as Border Patrol) to seek prior approval from certain designated supervisors, ADD.73.

But even setting aside other differences between those two approaches, DHS's argument overlooks that the Mayorkas Memo announced an agency-wide policy "to refrain, to the fullest extent possible, from conducting a law enforcement action in or near a protected area." JA106. It therefore imposed not only procedural limitations—i.e., who could give prior approval—but substantive limitations, which applied to approving officials no less than to agents in the field. In contrast, the 2025 Policy imposes no substantive limitations at all on approving or conducting raids, arrests, or surveillance at churches or similar locations.

DHS next suggests that, because the Mayorkas Memo allowed enforcement in "exigent circumstances," and because it did not purport to exhaustively list every scenario that might constitute exigent circumstances, the memo really is no different from the 2025 Policy and its "have at it" approach to enforcement. DHS Br. 13-14. The Court can readily dismiss that suggestion. Even the simplest rule—e.g., "no exit except in emergencies"—may have exceptions that call for some degree of judgment in application, without being any less a rule because of it.

DHS further seeks to downplay its change in policy by arguing that the First Amendment and RFRA continued to meaningfully check individual agents' behavior. DHS Br. 14-15. DHS did not make this argument in district court, *see generally* Dkt. 56 (opposition to motion for preliminary relief), nor did it submit any evidence to support it, such as by showing that agents took these legal

protections into account, or were even aware of them. This argument is therefore waived. *See, e.g.*, *Carrozza v. CVS Pharmacy, Inc.*, 992 F.3d 44, 59 (1st Cir. 2021).

More than that, it is the exact opposite of what DHS has argued elsewhere, including in its brief on appeal, where it strenuously insists on its "compelling interest in the *uniform* enforcement of the Nation's immigration laws." DHS Br. 32 (emphasis added); *see also* Dkt. 56 at 27 (complaining that a "policy that imposes heightened procedural requirements for [enforcement at sensitive locations] beyond what Congress provided in the INA would create a nationwide hodgepodge of immigration enforcement sanctuaries with different rules for the enforcement of generally applicable laws"); JA120 (announcing that "[t]he Trump Administration will not tie the hands of our brave law enforcement"). DHS cannot throw out its policy restraining enforcement at sensitive locations, announce open season on "America's schools and churches," JA120, conduct *at least* 1,454 arrests at sensitive locations, and continue to assert a pressing need for "uniform" enforcement—then claim that the resulting harms are not traceable to its actions because it is showing an unspecified measure of restraint that is inconsistent with the facts on the ground and the uniform enforcement the government says it needs.

*Second*, DHS disputes traceability on the ground that decreases in Plaintiffs' attendance and financial giving are attributable to the actions of third parties—i.e., congregants and others who receive vital services at Plaintiffs' houses of

worship and now reasonably fear immigration enforcement will occur there. DHS Br. 19-21. Yet DHS acknowledges, as it must, that the district court could properly consider the predictable effects of the 2025 Policy on third-party behavior. *See, e.g.*, *First Choice Women's Res. Centers, Inc. v. Davenport*, 608 U.S. 174, 189-90 (2026) (making "commonsense inferences when assessing Article III standing, including inferences about third party behavior" (quotation marks omitted)); *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 116 (2025) (same); *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019) (same). The district court did so, concluding that both common sense and the evidentiary record established that Plaintiffs' decreases in attendance and giving were fairly traceable to the 2025 Policy. ADD.23-38; *see also PYM*, 187 F.4th at 200-01 (confirming traceability on similar facts).

On appeal, DHS does not directly dispute that these effects were predictable. Nor could it: DHS itself predicted exactly these results in the Mayorkas Memo. JA105 (warning that, "if we take an action at an emergency shelter, it is possible that noncitizens … will be hesitant to visit the shelter and receive needed [services]"). Indeed, that is a major reason why for decades the government maintained protections for sensitive locations in the first place.

DHS argues that any such effects, even if predictable, were unreasonable. DHS Br. 20-21. But the Supreme Court's most recent cases in this area, cited

immediately above, "require[] no more than *de facto* causality." *Dep't of Com.*, 588 U.S. at 768. For example, in *Department of Commerce*, the Court held that third-party reaction was sufficiently established even where it depended on "third parties choosing to violate their legal duty to respond to the census" *and* on "the Federal Government … itself break[ing] the law by using noncitizens' answers against them for law enforcement purposes." *Id.* at 767-68. The Court was unpersuaded by the government's invocation of *Clapper v. Amnesty International USA*, 568 U.S. 398 (2013), *see Dep't of Com.*, 588 U.S. at 768, which DHS likewise relies on here. *Clapper* involved an attenuated chain of causation entirely unlike the situation in this case, and little evidence beyond "conjecture" about how third parties would respond. *Compare Clapper*, 568 U.S. at 417 n.7, *with supra* at 23-24.[3] This case is governed by *Department of Commerce*, not *Clapper*. *See PYM*, 187 F.4th at 199-200.

*Laird v. Tatum*, 408 U.S. 1 (1972), is even less helpful to DHS. *Contra* DHS Br. 21. The challengers in *Laird* objected generally to the existence of a government program they did not allege affected them in any specific way. *See* 408 U.S. at 9-10. That is worlds away from this case, where Plaintiffs have documented

---

[3] For similar reason, this case is not controlled by *Dantzler, Inc. v. Empresas Berrios Inventory & Operations, Inc.*, in which the Court held that the plaintiff's allegation of traceability—unlike the situation here—was "nothing more than a bare hypothesis." 958 F.3d 38, 48-49 (1st Cir. 2020).

ongoing, specific, and undisputed injuries fairly traceable to the 2025 Policy. *See PYM*, 187 F.4th at 200 n.6 (rejecting government's same argument and explaining that "the plaintiffs' injuries in the present case are not comparable to the injuries alleged and rejected in *Laird*").

For similar reason, this case does not involve anything like the "distant … ripple effects" disapproved in *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 383 (2024). *Contra* DHS Br. 22. Plaintiffs are religious organizations challenging DHS's rescission of a policy that formerly protected their member houses of worship. "Unlike the plaintiff doctors in *Alliance for Hippocratic Medicine* … the plaintiffs' theory of causation here is direct and straightforward." *See PYM*, 187 F.4th at 200-01. DHS's imagined parade of "horribles," *see* DHS Br. 22-23, thus is not implicated by recognizing standing here. *See PYM*, 187 F.4th at 206 n.8 (rejecting government's similar argument as "meritless").

To the extent DHS means to argue that parties cannot challenge actions that do not directly "regulate or constrain" their conduct, *see, e.g.*, DHS Br. 21-22, that is not an accurate statement of the law. *See, e.g.*, *Diamond*, 606 U.S. at 125-26 (plaintiffs had standing to challenge action that did not directly regulate them); *Dep't of Com.*, 588 U.S. at 767-68 (same); *Bennett v. Spear*, 520 U.S. 154, 167-71 (1997) (same); *PYM*, 187 F.4th at 200 (rejecting government's same argument).

Lastly on this point, DHS misreads *United States v. Texas*, 599 U.S. 670 (2023), which it claims "indicate[s]" that even parties actually injured by "the downstream effects of … immigration enforcement policies" are barred from challenging those policies. DHS Br. 23; *but cf. Biden v. Texas*, 597 U.S. 785, 813 (2022) (hearing challenge by states allegedly injured by downstream effects of DHS's rescission of "Remain in Mexico" immigration policy). *United States v. Texas* holds nothing of the sort. As the Supreme Court emphasized, that case "raise[d] only the narrow Article III standing question of whether the Federal Judiciary may in effect order the Executive Branch to take enforcement actions against violators of federal law"—a "discrete standing question" that made the case "categorically different" from cases (such as this one) "involving statutory requirements or prohibitions on the Executive." *Texas*, 599 U.S. at 684-85. As the district court concluded, ADD.39, and the Fourth Circuit recently agreed, *see PYM*, 187 F.4th at 198 n.5, *Texas* plays no role in the standing analysis here.

*Third*, DHS turns to the evidentiary record, but its efforts to identify clear error in the district court's factual findings rest on cherry-picking statements out of context and ignoring contrary evidence. DHS Br. 15-19. For example, DHS seeks to dismiss certain of Plaintiffs' declarants as mistakenly believing that enforcement at churches was categorically barred by the Mayorkas Memo. *Id.* at 16-17. In fact, the declarations—including the passages quoted by DHS—evince a clear (and

correct) understanding that the 2025 Policy "deprive[d] churches … of substantial protection from immigration enforcement operations," even if such operations were not categorically prohibited by the Mayorkas Memo. *PYM*, 187 F.4th at 205; *see, e.g.*, JA153 ¶ 8 ("Our congregants and those who come to our food distributions are aware that there used to be more protections at church from immigration enforcement and that that's no longer the case"). For the reasons already discussed, DHS also errs in attempting—once again—to recast its 2025 Policy as a minor tweak to internal approval chains with little practical effect. *See* DHS Br. 15-16.

Citing other statements, DHS speculates that congregants and others may be staying away not because they fear enforcement in or near their house of worship but because of more general fears of increased immigration enforcement. *Id.* at 17-18. As an initial matter, that theory overlooks that "[a] plaintiff can satisfy traceability by showing that the defendant's conduct is one among multiple causes of the alleged injury." *Conservation Law*, 129 F.4th at 90 (quotation marks omitted); *see also* ADD.21-22. It is also contradicted by the numerous declarations recounting congregants' fears of enforcement actions specifically *at church*, *see supra* at 23-24, actions that would previously have been subject to the significant restrictions in the Mayorkas Memo.

DHS is not helped by its citation to declarations describing enforcement activity "in the area of" or "blocks away" from churches. That congregants feel fear when ICE shows up near their church is an entirely rational response to DHS's policy change—after all, absent teleportation, there is no way for ICE to arrive "at" a church without first being "near" the church—and does nothing to undermine the district court's traceability finding.

Nor can DHS defeat traceability by disputing the number of enforcement actions it has so far carried out on Plaintiffs' property. *Contra* DHS Br. 17-19. That argument misunderstands the nature of the relevant Article III injuries. Those injuries are not based on the severe harms that would befall any member congregation actually subjected to an immigration enforcement operation, but on the ongoing, predictable, and well-documented decreases in attendance and financial giving that are affecting Plaintiffs' members as a result of the 2025 Policy. As Plaintiffs showed and the district court found, those injuries were not just "certainly impending"—they were actually occurring, and would continue to occur in the absence of preliminary relief. There is simply no basis for DHS's suggestion that prospective relief should have been unavailable. *See id.* at 19.[4]

[4] Similarly, DHS's claim that the district court could not consider enforcement actions that occurred after the filing of the complaint is beside the point, and DHS fails to explain how this supposed error made any difference to the outcome here. DHS Br. 18 n.1. DHS is also wrong on the merits. Plaintiffs' complaint alleged injuries to all Plaintiffs, and DHS has rightly never challenged the sufficiency of

### C. Plaintiffs' injuries could be—and in fact were—at least partially redressed.

The district court also correctly determined that it could fashion relief that would redress at least some of Plaintiffs' injuries. ADD.38-39. This standard is not demanding, *see, e.g.*, *Diamond*, 606 U.S. at 114 (emphasizing that a likelihood of recovering "[e]ven one dollar … would satisfy the redressability component" (quotation marks omitted)), and is easily met here. Because Plaintiffs showed that their harms "are likely traceable to the 2025 Policy," the court correctly judged that "granting the relief they seek would likely lead to at least some increase in attendance." ADD.38-39. There was no abuse of discretion in that judgment. To the contrary, it has since been confirmed by the rebounds in attendance that many Plaintiffs have experienced following entry of the injunction. *See supra* at 18-19.

DHS's counterarguments are meritless. *See* DHS Br. 24-25. The government rehashes its efforts to recast certain parts of Plaintiffs' declarations in a light more favorable to it, addressed above, while simply ignoring the evidence that Plaintiffs'

---

those allegations, in a motion to dismiss or otherwise. There was no error in the court considering additional evidence that only confirmed Plaintiffs' ongoing injuries. The cases DHS cites involved motions to dismiss challenging the sufficiency of the allegations in those complaints, and are thus distinguishable. Further undermining DHS's argument, Plaintiffs have since filed an amended complaint, Dkt. 97, meaning that, even under DHS's own misguided theory, these facts could plainly support Plaintiffs' standing to secure forward-looking relief. *See ConnectU LLC v. Zuckerberg*, 522 F.3d 82, 91 (1st Cir. 2008) ("An amended complaint, once filed, normally supersedes the antecedent complaint.").

congregants and others now reasonably fear immigration enforcement actions in and around houses of worship. DHS also notes that the preliminary injunction does not absolutely forbid enforcement at Plaintiffs' protected locations. *Id.* at 25. But as explained, the injunction restores critical protections that limit when such enforcement can take place. As the Fourth Circuit recently held, relief that "limit[s] the circumstances under which enforcement activities at sensitive locations could occur" makes it likely that "at least some" people "will return to the plaintiffs' houses of worship"—even if the relief "would not completely prevent immigration enforcement actions" at those locations. *PYM*, 187 F.4th at 201-02.

## II. The district court correctly entered a preliminary injunction.

Plaintiffs seeking preliminary relief must show that (1) they are "likely to succeed on the merits," (2) they are "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [their] favor," and (4) "an injunction is in the public interest." *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008). The district court did not abuse its discretion in concluding that Plaintiffs had met this standard.

### A. Plaintiffs are likely to succeed on their RFRA claim.

The Religious Freedom Restoration Act prohibits the government from "substantially burden[ing] a person's exercise of religion," unless it demonstrates that the challenged action "is in furtherance of a compelling governmental interest"

and "is the least restrictive means of furthering that … interest." 42 U.S.C. § 2000bb-1(a)-(b). This prohibition applies "even if the burden results from a rule of general applicability." *Id.* § 2000bb-1(a). The district court correctly concluded that Plaintiffs are likely to succeed on their claim that the 2025 Policy substantially burdens the exercise of their faith because it has inhibited Plaintiffs' communal worship and other religious ministries, forced Plaintiffs to compromise their religious beliefs, permitted enforcement actions in and near sacred spaces, and impaired Plaintiffs' outreach and faith formation activities. DHS has not shown that this policy satisfies strict scrutiny.

**1. The 2025 Policy substantially burdens Plaintiffs' religious exercise.**

RFRA does not define "substantial burden," and this Court has not expressly adopted a governing test. *See* ADD.40. However, other circuits agree that a substantial burden exists where the government "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs."[5] *Perrier-Bilbo v. United States*, 954 F.3d 413, 431 (1st Cir. 2020) (quoting *Thomas v. Review Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 717-18 (1981)); *see also Spratt v. R.I. Dep't of Corr.*,

[5] *See, e.g.*, *PYM*, 187 F.4th at 203; *Kaemmerling v. Lappin*, 553 F.3d 669, 678 (D.C. Cir. 2008); *Davis v. Wigen*, 82 F.4th 204, 212 (3d Cir. 2023); *New Doe Child #1 v. Cong. of the U.S.*, 891 F.3d 578, 589-90 (6th Cir. 2018); *Korte v. Sebelius*, 735 F.3d 654, 682-83 (7th Cir. 2013).

482 F.3d 33, 38 (1st Cir. 2007) (applying, *arguendo*, same definition to claim under Religious Land Use and Institutionalized Persons Act).

Plaintiffs' uncontroverted evidence demonstrates that the 2025 Policy substantially burdens their religious exercise because it has pressured them and their members to modify their behavior and violate their religious beliefs in a number of ways. Communal worship is central to all Plaintiffs' practice of their faith. *See supra* at 10-11. And all Plaintiffs have a faith-based obligation to welcome the immigrant and the "stranger," to welcome all comers regardless of immigration status, and to serve those in their communities in need. However, as a direct and predictable result of DHS's actions, Plaintiffs' members have seen fewer people at worship services and at church ministries, particularly immigrant-focused and immigrant-serving ministries. *See supra* at 9-12; *cf. Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19-20 (2020) (per curiam) (restrictions on attendance at worship services "strike at the very heart of the First Amendment's guarantee of religious liberty"). These declines in attendance at Plaintiffs' churches "undermin[e] their ability to worship communally and … provide immigrant-focused services." *PYM*, 187 F.4th at 204. As a result of the declines, many Plaintiffs have seen a corresponding drop in financial giving. *See supra* at 11. Financial losses further impact Plaintiffs' ability to exercise their religion, as Plaintiffs and their members need funds to stay open and to conduct programming.

Plaintiffs have also been forced to take measures that conflict with their sincerely held religious beliefs in preparation for potential immigration enforcement actions at their houses of worship. To protect congregants, many have begun locking doors, marking previously public areas as private, and even having members guard the doors, making their houses of worship less welcoming and less open to the public. *See supra* at 12-14. They have spent time and resources training staff and congregants about how to respond in the event of a raid, in some instances using time during worship services to review protocols. *See supra* at 14. Plaintiffs' religious practice of serving immigrants and worshipping communally with all who wish to join is burdened when "congregants [must] choose between inviting immigrants to join the congregation and the feeling that doing so would place attendees in danger of being targeted by immigration enforcement." *PYM*, 187 F.4th at 204. DHS's policy has also burdened Plaintiffs' ability to publicize their activities, as many have stopped advertising Spanish-language services and immigrant-focused ministries for fear of attracting the attention of immigration enforcement. *See supra* at 12.

Finally, the 2025 Policy "would permit immigration-enforcement officers to set up a checkpoint just outside a church, or to question parishioners in the middle of a Catholic Mass," which would unquestionably "substantially hinder, constrain, and inhibit individuals from attending church or religious schools or programs,

regardless of citizenship status, thereby imposing a 'substantial burden.'" ADD.43; *see also* DHS Br. 30 (conceding same). Indeed, under the 2025 Policy, DHS has already carried out operations at and around houses of worship, including Plaintiffs' members' houses of worship. *See supra* at 8-9. Where, as here, DHS has removed protections for houses of worship and "made clear that it intends to target houses of worship in future immigration enforcement actions," "the threat of immigration enforcement at [Plaintiffs'] houses of worship is real and substantial" and "this increased threat of immigration enforcement at the plaintiffs' houses of worship has resulted in substantial pressure on the plaintiffs to violate numerous beliefs." *PYM*, 187 F.4th at 204.

In response, DHS again attempts to recast the policy as merely concerning internal government procedure. DHS Br. 28. As explained, this argument fails, including because "the 2025 Policy is not merely a matter of government record keeping" but instead "'implicates direct, coercive interactions' between government agents and churchgoers." *PYM*, 187 F.4th at 205 (quoting *Mahmoud v. Taylor*, 606 U.S. 522, 557 (2025)).

DHS relies on cases that address starkly different situations from the one at issue here. DHS Br. 26-27. In *Bowen v. Roy*, the Supreme Court explained that the Free Exercise Clause does not permit individuals to "demand that the Government join in their chosen religious practices," and so the plaintiffs could not insist that

government agencies "refrain[] from using a number to identify their daughter" internally in administering benefits. 476 U.S. 693, 699-700 (1986). In contrast, a policy dictating the terms of immigration enforcement's engagement at public places like churches and mosques cannot plausibly be characterized as an "internal" government choice akin to the "size or color of the Government's filing cabinets." *Id.* at 700.

*Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439 (1988), is similarly inapposite: There, the Court held that the government's use of its own land to build a road or harvest timber could not form the basis of a free exercise claim, while Plaintiffs here are plainly not seeking to control the use of federal land. *See PYM v. DHS*, 187 F.4th at 205 & n.7 (distinguishing *Bowen* and *Lyng*). DHS's references to regulations setting approval levels for settling claims are similarly beside the point, DHS Br. 28, as the 2025 Policy does not merely alter the requisite level of approval for enforcement actions at sensitive locations but instead eliminates crucial substantive limitations on both when and how such actions can take place. *See, e.g.*, *PYM*, 187 F.4th at 203 ("[A] primary effect of the 2025 Policy is to remove the prior limitations on DHS enforcement actions at or near places of worship.").

DHS next argues that the 2025 Policy cannot substantially burden Plaintiffs' religious exercise because it does not prohibit Plaintiffs from welcoming

immigrants, holding worship services, or conducting ministries, or impose a financial penalty on them for doing so. DHS Br. 28, 32. But the Supreme Court has specifically rejected interpreting the Free Exercise Clause "as nothing more than protection against compulsion or coercion to renounce or abandon one's religion." *Mahmoud*, 606 U.S. at 558-59; *see also Roman Catholic Bishop of Springfield v. City of Springfield*, 724 F.3d 78, 96 (1st Cir. 2013) ("We do not agree with those courts that have suggested that nothing short of coercion to change or abandon one's religious beliefs can meet the substantial burden test.").

In so arguing, DHS asks the Court to adopt a narrow definition of substantial burden that other circuits have squarely rejected. In *Mack v. Warden Loretto FCI*, the Third Circuit held that "indirect pressure" that caused a Muslim prisoner to cease praying was sufficient to state a substantial burden. 839 F.3d 286, 304 (3d Cir. 2016); *see also Thai Meditation Ass'n of Ala., Inc. v. City of Mobile*, 980 F.3d 821, 831-32 (11th Cir. 2020) ("[I]t isn't necessary for a plaintiff to prove … that the government required her to completely surrender her religious beliefs; modified behavior, if the result of government coercion or pressure, can be enough."). And in *Apache Stronghold v. United States*, the Ninth Circuit sitting en banc overruled an earlier decision cabining substantial burdens under RFRA to instances where "individuals are forced to choose between following the tenets of their religion and receiving a governmental benefit" or "coerced to act contrary to

their religious beliefs by the threat of civil or criminal sanctions." 101 F.4th 1036, 1043 (9th Cir. 2024) (en banc) (per curiam). No circuit endorses the cramped definition of "substantial burden" the government now advances, and this Court should not do so either. *See Apache Stronghold*, 101 F.4th at 1102-03 (Nelson, J., concurring).

The remainder of DHS's arguments are readily dispatched. *Lyng* hardly stands for the proposition that "RFRA does not empower plaintiffs to restrict how the government operates outside plaintiffs' own church property." DHS Br. 29. First, *Lyng* preceded the passage of RFRA by five years, and certainly no such limitation appears in the statute. Moreover, the Court held in *Lyng* that the petitioners' rights to use sacred sites on federal land "do not divest the Government of its right to use what is, after all, *its* land," 485 U.S. at 453—not that the government has free rein to burden religious exercise anywhere but private property. *Cf. Mahmoud*, 606 U.S. at 547 (free exercise rights not limited to "the confines of one's own home").

Equally unconvincing is DHS's contention that the district court's reasoning will lead to RFRA claims based on closed highway exits or increased drug enforcement. *See* DHS Br. 29-30. As DHS acknowledges, RFRA's substantiality requirement filters cognizable claims, and "not every imposition or inconvenience rises to the level of a 'substantial burden.'" *Perrier-Bilbo*, 954 F.3d at 432; *see also*

*PYM*, 187 F.4th at 206 n.8 (noting that "each challenged government action must be examined under the rigorous substantial burden test" and rejecting government's slippery slope arguments). And DHS's suggestion that the harms here are too "attenuated" to establish a substantial burden, DHS Br. 31, merely recycles the agency's erroneous traceability arguments, discussed above.

**2. The policy cannot survive strict scrutiny.**

*Compelling government interest.* Because the 2025 Policy imposes a substantial burden on Plaintiffs' religious practice, it can stand only if DHS meets its burden to show that the policy "is the least restrictive means of furthering [a] compelling governmental interest." 42 U.S.C. § 2000bb-1(b). Under this standard, the "compelling governmental interest" that DHS must demonstrate is a compelling interest in "application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 430-31 (2006). "[C]ategorical" claims of generalized interests, such as in education or drug control, do not suffice. *Id.*; *see also Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 726-27 (2014) (holding that courts must "look beyond broadly formulated interests" and instead scrutinize "the marginal interest in enforcing" the challenged action in a particular case (brackets omitted)); *PYM*, 187 F.4th at 210-11 (Agee, J., concurring).

Yet categorical claims are all DHS can offer here (just as in the district court), asserting only a general interest in "uniform enforcement of the Nation's immigration laws." DHS Br. 32-34. That falls well short of a compelling government interest. *See, e.g.*, *O Centro*, 546 U.S. at 429-30. DHS instead needed to show a compelling interest in maintaining its policy of unconstrained enforcement at Plaintiffs' houses of worship specifically. But here, as in the district court, DHS utterly failed to meet this standard. For example, at no point in this litigation has DHS put forward any evidence demonstrating the necessity of conducting immigration enforcement without a judicial warrant or exigent circumstances at Plaintiffs' houses of worship—or even at houses of worship in general. And generic references to a desire for uniform application of the laws cannot suffice, as "RFRA operates by mandating consideration, under the compelling interest test, of exceptions to 'rules of general applicability.'" *Id.* at 436. Indeed "it would [be] surprising" to find a compelling interest in uniformity where, as here, the government has long recognized an exception for religious organizations. *See id.* (no compelling interest in uniformity, given "the longstanding exemption from the Controlled Substances Act for religious use of peyote").

*Least restrictive means.* Even if DHS had identified a relevant compelling government interest, it could not meet the "exceptionally demanding" least-

restrictive means test, as the district court rightly concluded. ADD.43-44; *see Hobby Lobby*, 573 U.S. at 728 (citing *City of Boerne v. Flores*, 521 U.S. 507, 532 (1997)). To meet that test, DHS would have had to show that it "lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting parties." *Hobby Lobby*, 573 U.S. at 728. Where a less restrictive means is available, "the Government must use it." *Holt v. Hobbs*, 574 U.S. 352, 365 (2015) (quoting *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 815 (2000)).

DHS cannot show that the 2025 Policy is the least restrictive means of accomplishing its asserted goals. ADD.43-44. Indeed, for decades, the government was able to conduct immigration enforcement while respecting the rights of worshippers. *See Hobby Lobby*, 573 U.S. at 730 (finding that "HHS itself has demonstrated that it has at its disposal an approach that is less restrictive" because it already offered an accommodation for certain entities). DHS's prior policy is a less restrictive means, and DHS has not shown it to be inadequate to meet the government's interests. *See* ADD.43. DHS calls the prior policy "unduly bureaucratic" and "far less timely and effective," DHS Br. 34-35, but cites to no evidence in support of these claims. As in the Fourth Circuit, DHS "has never explained why the [Mayorkas Memo] inhibited its ability to effectively engage in

immigration enforcement actions at or near the plaintiffs' places of worship[.]" *PYM*, 187 F.4th at 211 (Agee, J., concurring).

### B. Plaintiffs are likely to succeed on their First Amendment claim.

The district court did not reach Plaintiffs' First Amendment expressive association claim because it found Plaintiffs were likely to succeed under RFRA. ADD.48; *see also PYM*, 187 F.4th at 194 n.2 ("[B]ecause we affirm the district court's holding on RFRA, we need not reach the First Amendment claim."). But because Plaintiffs' First Amendment claim is also likely to succeed, it provides an independent basis to affirm the injunction. *See, e.g.*, *Comcast of Maine/New Hampshire, Inc. v. Mills*, 988 F.3d 607, 612 (1st Cir. 2021) ("We can affirm the entry of the preliminary injunction on any ground supported by the record.").

#### 1. The 2025 Policy infringes on Plaintiffs' freedom of expressive association.

Plaintiffs' religious gatherings constitute expressive association protected by the First Amendment. *See Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 544 (1987) ("[T]he Court has upheld the freedom of individuals to associate for the purpose of engaging in … religious activities."). "Religious groups are the archetype of associations formed for expressive purposes," and "the First Amendment gives special solicitude to the[ir] rights." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 200 (2012) (Alito, J., concurring) (quotation marks omitted).

"Associational rights are protected not only against heavy-handed frontal attack, but also from being stifled by more subtle governmental interference, and these rights can be abridged even by government actions that do not directly restrict individuals' ability to associate freely." *Lyng v. Int'l Union*, 485 U.S. 360, 367 n.5 (1988) (quotation marks and brackets omitted). Government actions that "discourage people from associating with groups engaged in protected First Amendment advocacy" and "encourage groups and individuals to cease or modify protected First Amendment advocacy the government disfavors" infringe on those groups' expressive association. *First Choice Women's Res. Ctrs., Inc. v. Davenport*, 608 U.S. 174, 189 (2026) (quotation marks and brackets omitted); *see also Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 616 (2021) ("Exacting scrutiny is triggered by state action which *may* have the effect of curtailing the freedom to associate" (quotation marks omitted)). These claims are cognizable where "the interference with expressive associational rights" is "'significant.'" *Fighting Finest, Inc. v. Bratton, Inc.*, 95 F.3d 224, 228 (2d Cir. 1996) (quoting *Int'l Union*, 485 U.S. at 366-67).

DHS's 2025 Policy inhibits Plaintiffs' and their members' ability to engage in communal worship, to minister to their communities, and to engage in faith education and formation activities with their congregations. The fear created by

that policy deters immigrants and non-immigrants alike from coming together at Plaintiffs' houses of worship to take part in religious worship and receive vital services. *See Tabbaa v. Chertoff*, 509 F.3d 89, 102 (2d Cir. 2007) (government policy of searching and detaining participants at religious conference significantly burdened expressive association rights in part because "the prospect of being singled out for such extensive processing could reasonably deter others from associating at similar conferences"). And even those who are not themselves deterred from gathering suffer injury to their expressive-association rights, because they are deprived of the ability to associate with others for the purpose of communal worship and other expressions of their religious faith. The chilling effect DHS's policy has on Plaintiffs' associational activities is squarely within the types of harms the Supreme Court has recognized as infringing expressive associational rights. *See Phila. Yearly Meeting of Religious Soc'y of Friends v. DHS*, 767 F. Supp. 3d 293, 322-26 (D. Md. 2025) (holding that 2025 Policy burdened protected associational rights).

**2. The policy cannot satisfy exacting scrutiny.**

Government actions that infringe on expressive associational rights must satisfy exacting scrutiny, which requires that the action be "substantially related to a sufficiently important interest" and "be narrowly tailored to the government's asserted interest." *Americans for Prosperity*, 594 U.S. at 607-08. DHS cannot meet

this standard with respect to the 2025 Policy. *See PYM*, 767 F. Supp. 3d at 326-28 (so holding). There is no substantial relationship between conducting unrestricted enforcement at houses of worship and a sufficiently important government interest. DHS has argued that the government has an interest in uniform enforcement of immigration laws. DHS Br. 32. But the government was demonstrably able to conduct immigration enforcement in the decades preceding the 2025 Policy. *See, e.g.*, JA105 (DHS "can accomplish [its] enforcement mission without denying or limiting … people of faith['s] access to their places of worship"). DHS has put forth no evidence demonstrating the need for immigration enforcement in or near houses of worship and thus cannot show that the 2025 Policy is substantially related to any relevant interest.

Even if DHS could make that showing, it cannot show that the policy is narrowly tailored. *See Shelton v. Tucker*, 364 U.S. 479, 488 (1960) (even where "the governmental purpose [is] legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved"). Where, as here, there is a "dramatic mismatch" between the government's interest in immigration enforcement and the policy that DHS has "implemented in service of that end," the policy "falls far short of satisfying the means-end fit that exacting scrutiny requires." *Americans for Prosperity*, 594 U.S. at 612-13.

The 2025 Policy has had profound negative impacts on communal worship and ministry across the United States, without yielding any improvements in immigration enforcement that could not be achieved while respecting the rights of worshippers. As noted, there is nothing in the record to show that unrestrained immigration enforcement at houses of worship "form[s] an integral part" of DHS's enforcement of immigration law, as would be expected in light of the substantial burden on association the 2025 Policy inflicts. *See Americans for Prosperity*, 594 U.S. at 613 (holding that disclosure requirement was not narrowly tailored where there was no instance where the information collected "did anything to advance the Attorney General's investigative, regulatory, or enforcement efforts"). DHS's 2025 Policy does not meet exacting scrutiny.

### C. Plaintiffs will be irreparably harmed without preliminary relief.

The substantial burdening of Plaintiffs' religious exercise and associational freedoms are irreparable harms, necessitating preliminary relief. *See PYM*, 187 F.4th at 206-07; *Roman Catholic Diocese*, 592 U.S. at 19 ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 484 (1st Cir. 2009) (noting that violations of certain rights are per se irreparable harm, including "infringements of free speech, association, privacy or other rights as to which temporary deprivation is viewed of such qualitative

importance as to be irremediable by any subsequent relief" (quoting *Pub. Serv. Co. of N.H. v. W. Newbury*, 835 F.2d 380, 382 (1st Cir. 1987))). Plaintiffs' and their members' religious injuries are substantial and are "not accurately measurable or adequately compensable by money damages." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 217 F.3d 8, 13 (1st Cir. 2000) (quotation marks omitted).

In arguing that Plaintiffs will not be irreparably harmed, DHS merely reiterates its standing and RFRA arguments, which fail for the reasons already discussed. *See* DHS Br. 36-37.

### D. The equities and public interest weigh in Plaintiffs' favor.

The district court correctly concluded that the balance of equities and public interest weigh in favor of Plaintiffs' requested relief. These factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

"[T]here is generally no public interest in the perpetuation of unlawful agency action." *Rhode Island v. Trump*, 155 F.4th 35, 50 (1st Cir. 2025) (quoting *Somerville Pub. Sch. v. McMahon*, 139 F.4th 63, 76 (1st Cir. 2025)). Rather, "there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (quotation marks omitted). Moreover, "it is always in the public interest to prevent the violation of a party's

constitutional rights." *de Jesus Ortega Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quotation marks omitted).

DHS's protestations that the government is injured by not being able to implement its preferred policy, DHS Br. 37-38, ring hollow in light of the government's failure to show why the change in policy was necessary or how it was hindered from enforcing immigration laws under the previous policy. *See* ADD.56 ("[T]he fact that there is a public interest in achieving a particular end, such as effectively enforcing immigration law, does not mean that any and all means of achieving that end are necessarily in the public interest."). Similarly, DHS's argument that the injunction improperly interferes with its internal operations would apply to virtually any injunction against the government, and rests on the same misapprehension that "the public's interests are indistinguishable from the appellants' interests." *Somerville Pub. Sch.*, 139 F.4th at 76.

### E. The district court did not abuse its discretion in crafting the preliminary injunction.

As a fallback, DHS argues that injunctive relief should be limited to requiring it to follow the Mayorkas Memo, and that the district court abused its discretion by requiring anything else. DHS Br. 39-41; *see Woonasquatucket*, 186 F.4th at 49 ("[C]hallenges to the breadth of the relief that the District Court ordered" are reviewed for abuse of discretion.).

In granting in part Plaintiffs' motion, the court concluded that a preliminary injunction was necessary to prevent the irreparable harms Plaintiffs had identified. ADD.54-55. It further concluded that the injunction could not simply reinstate the Mayorkas Memo consistent with Rule 65(d)'s requirements, ADD.58-61—a conclusion that DHS does not contest on appeal. *Cf. Woonasquatucket*, 186 F.4th at 48 (describing government's complaint that a different order "lack[ed] the requisite detail and precision to provide notice of what [it] prohibits" (quotation marks omitted)). The court therefore carefully crafted its injunction to address Plaintiffs' injuries while providing the specificity required by Rule 65(d). In doing so, the court did not rely on any claims not raised by the parties or otherwise reframe the case the parties had brought before it.

DHS's sole argument why this relief constitutes an abuse of discretion is that it "depart[s] from the principle of party presentation," DHS Br. 40-41, because Plaintiffs purportedly "sought a preliminary injunction requiring DHS to abide by [the Mayorkas Memo]," *id.* at 39. But that mischaracterizes Plaintiffs' request for relief, which more broadly asked the district court, if it did not simply require a return to the Mayorkas Memo, to "[i]n the alternative" enter "a preliminary injunction barring Defendants from implementing or otherwise giving effect to their new policy," Dkt. 32 at 2, which the court's preliminary injunction does. *See also* JA90 (prayer for relief).

But even if DHS's factual premise were correct, its conclusion would not follow. District courts enjoy broad discretion in crafting injunctive remedies. *See, e.g.*, *United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 496 (2001) ("The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case." (quoting *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944))). DHS notably fails to identify a single case in which a court was found to have abused its discretion by not tracking exactly the language of a proposed order—much less when the court concluded that alternative relief would be inconsistent with Rule 65(d). In fact, this Court has specifically rejected the argument that a court, "in shaping an equitable remedy," abuses its discretion by ordering a different remedy from that requested by plaintiffs. *In re Blinds to Go Share Purchase Litig.*, 443 F.3d 1, 8, 11 (1st Cir. 2006) (no abuse of discretion where court ordered rescission of contract instead of specific performance, as plaintiffs had requested).

Because this is not a case where the court "decided a case different from the one [Plaintiffs] advanced," *Margolin v. Nat'l Ass'n of Immigr. Judges*, 608 U.S. 339, 343 (2026), and the court acted well within its broad equitable discretion to craft relief to address Plaintiffs' injuries, DHS identifies no error in the scope of the injunction.

## III. The district court erred in declining to stay the 2025 Policy.

Plaintiffs conditionally cross-appeal from the district court's denial of their request for a stay of agency action under the Administrative Procedure Act, 5 U.S.C. § 705. If the Court were inclined to narrow or overturn the district court's preliminary injunction, it should proceed to consider the court's analysis of Plaintiffs' APA claims and hold that the court erred in denying a stay based on its conclusion that the 2025 Policy is not final agency action.

### A. The policy is final agency action subject to APA review.

The APA provides for judicial review of "final agency action." 5 U.S.C. § 704. Final agency actions are those (1) that "mark the consummation of the agency's decisionmaking process" and (2) "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (quotation marks omitted).

Agency memoranda constitute final agency action if they bind agency staff in ways that determine rights or obligations or from which legal consequences flow. *See, e.g.*, *id.* at 157, 159, 177-78 (biological opinion from Fish and Wildlife Service that effectively bound Bureau of Reclamation); *Biden v. Texas*, 597 U.S. 785, 808 (2022) (internal memo that "bound DHS staff by forbidding them to continue the program in any way from that moment on"); *Woonasquatucket*, 186 F.4th at 42 (internal agency directives to withhold funds). The same holds true

in the enforcement context. *See, e.g.*, *OSG Bulk Ships, Inc. v. United States*, 132 F.3d 808, 812 (D.C. Cir. 1998) ("[A]n agency's adoption of a general enforcement policy is subject to review."); *Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 948 (D.C. Cir. 1987) (an agency's "cabining of [its] prosecutorial discretion can in fact rise to the level of a substantive, legislative rule" subject to review).

Courts take a "pragmatic approach … to finality." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599 (2016) (quotation marks omitted). In assessing whether an agency policy bound staff, courts consider both the words of the policy and the way the agency applied it. *See, e.g.*, *Sw. Airlines Co. v. Dep't of Transp.*, 832 F.3d 270, 275 (D.C. Cir. 2016) ("In assessing whether a particular agency action qualifies as final … , this court and the Supreme Court have looked to the way in which the agency subsequently treats the challenged action."); *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 383 (D.C. Cir. 2002) ("[A]n agency pronouncement will be considered binding as a practical matter if it either appears on its face to be binding … or is applied by the agency in a way that indicates it is binding.").

Here, the 2025 Policy marked the consummation of DHS's decisionmaking process because it rescinded, effective immediately, the prior sensitive locations policy. The first prong of the *Bennett* test is therefore satisfied—and DHS does not argue otherwise. *See* ADD.49.

The 2025 Policy is also one "by which rights or obligations have been determined" and "from which legal consequences will flow," *Bennett*, 520 U.S. at 178 (quotation marks omitted), because it rescinded a directive—the Mayorkas Memo—that imposed binding limitations on DHS personnel's ability to undertake immigration enforcement operations at and around sensitive locations. *See Phila. Yearly Meeting of Religious Soc'y of Friends v. DHS*, No. 25-cv-0243, 2026 WL 280089, at *3-6 (D. Md. Feb. 3, 2026) ("Because the 2025 Policy was the consummation of agency action, redetermined the rights and obligations of immigration officers, and withdrew a safe harbor set forth in the [Mayorkas Memo], the Court finds that it was a final agency action.").

That the Mayorkas Memo did so is demonstrated both by its text and the way DHS applied it. By its terms, the memo was binding. It provided direct instructions from the head of the agency to all agency personnel about their unflagging "obligation" to refrain from enforcing at sensitive locations—an obligation the memo repeatedly emphasized was "foundational" and "fundamental" to the agency's "execution of [its] enforcement responsibilities." JA105-06. The memo set forth in detail the limited circumstances in which such enforcement could occur, commanding, for example, that, "[a]bsent exigent circumstances, an Agent or Officer *must* seek prior approval" before proceeding. JA107 (emphasis added). The memo required employees to receive training on its

instructions. *Id.* And it further directed that any enforcement action at a sensitive location "*must* be fully documented in [an agency system of record] in a manner that can be searched and validated," including the reason the action was taken at that location. JA107-08 (emphasis added). Nothing in the text of the Mayorkas Memo suggests that agency personnel were free to simply ignore its clear and "foundational" directive by pursuing unrestrained enforcement at houses of worship, and DHS submitted no evidence to support that unlikely interpretation.

To the contrary, the record evidence uniformly supports the view that DHS treated the Mayorkas Memo as a binding requirement on its agents. Prior to the memo's rescission, DHS's website invited the public to submit complaints "[i]f DHS officers and agents take enforcement actions that are believed to be *in violation of* the protected areas policy." JA113 (emphasis added). That invitation to police agents' conduct—and the description of deviations from the policy as "violation[s]"—would make little sense if the memo had been purely precatory advice that agents were free to heed or ignore, as DHS argued in district court. And DHS, again, submitted no evidence to support that view of the memo. Rather, when it rescinded the memo, the agency stated outright that the prior policy had "tie[d] the hands of our brave law enforcement" and "thwart[ed] law enforcement in or near so-called 'sensitive' areas." JA120. It announced that its new policy would "empower" agents. *Id.*

By entirely eliminating the binding limitations in the Mayorkas Memo, the 2025 Policy is an action "by which … obligations have been determined"—specifically, the obligations on DHS personnel when carrying out their duties and interacting with the public. Likewise, the 2025 Policy is one "from which legal consequences will flow" because it dramatically expands the range of scenarios under which people may be surveilled, questioned, and seized at a place of worship. *Cf. Ipsen Biopharmaceuticals, Inc. v. Azar*, 943 F.3d 953, 956-58 (D.C. Cir. 2019) ("increased risk of prosecution and penalties constitutes a 'legal consequence' under *Bennett*" even where such consequences are "not … certain").

The district court nonetheless concluded that Plaintiffs were unlikely to show that the Mayorkas Memo—and thus DHS's rescission of that memo—satisfied the second prong of *Bennett*. ADD.49-53. That was legal error. The court noted that the memo "did not entirely prevent immigration-enforcement actions at sensitive places." ADD.52. But the fact that a rule contains exceptions ("no exit except in emergencies") does not make it less of a rule. *See McLouth Steel Prods. Corp. v. Thomas*, 838 F.2d 1317, 1321 (D.C. Cir. 1988) (concluding that an exception to a rule does not turn the rule into a nonbinding policy statement); *see also Venetian Casino Resort, LLC v. EEOC*, 530 F.3d 925, 931 (D.C. Cir. 2008) (holding that policy that left agency staff with discretionary decisionmaking authority was final agency action).

The court also noted that the Mayorkas Memo "did not indicate that [it] was based on an interpretation of the [Immigration and Nationality Act]." ADD.52. But the memo does appear to have been motivated by an understanding of RFRA and the First Amendment. *See* JA105 (noting the "fundamental" principle that government should not deny or limit "people of faith['s] access to their places of worship"). And in any event, an agency action need not be based on an interpretation of a statute in order to be final. *See, e.g.*, *Bennett*, 520 U.S. at 158-59, 177-78 (holding that Fish and Wildlife Service's determination that a water-management project "was likely to jeopardize the continued existence of [two species of endangered fish]" was final agency action); *Woonasquatucket*, 186 F.4th at 41 (agencies' decisions to freeze federal grants were final agency actions).

So too, agency action need not "purport to limit an agency's or employee's statutory authority" in order to be final. *Contra* ADD.52 (quotation marks omitted). *See, e.g.*, *Woonasquatucket*, 186 F.4th at 41; *New York v. Trump*, 171 F.4th 1, 18 (1st Cir. 2026) (similarly holding that decisions to withhold federal grant money were final agency actions); *Venetian Casino*, 530 F.3d at 931 ("permitting employees to disclose confidential information without notice" constituted final agency action). What matters is that, as explained, the Mayorkas Memo imposed limits on DHS agents' exercise of their statutory authority—limits that agents did not have discretion to simply ignore.

**B. The policy is arbitrary and capricious.**

Plaintiffs have also shown that the 2025 Policy is likely "arbitrary [and] capricious," in violation of 5 U.S.C. § 706(2)(A).

"An agency action qualifies as 'arbitrary' or 'capricious' if it is not reasonable and reasonably explained." *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (quotation marks omitted). For multiple reasons, Plaintiffs are likely to prevail on their claim that the policy is neither reasonable nor reasonably explained. For example, in issuing the policy, DHS failed to adequately explain why it was departing from its decades-long policy of avoiding immigration enforcement in sensitive locations. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (holding that agencies may change course from prior policies but, when doing so, "the agency must show that there are good reasons for the new policy"). Indeed, the Huffman Memo articulates no rationale at all, and therefore flunks the requirement that agency actions be "reasonably explained." *Ohio*, 603 U.S. at 292.

Relatedly, in issuing the 2025 Policy, DHS "simply ignore[d] 'an important aspect of the problem,'" *id.* at 293 (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983))—namely, the predictable and substantial harms that its new policy would inflict on the free exercise of religion and association. Nothing in the 2025 Policy reflects that DHS considered any of the likely consequences of its decision.

Lastly, the policy entirely fails to account for the substantial reliance interests created by the prior protections for sensitive locations. An agency, when departing from a prior policy, must "assess whether there were reliance interests [engendered by the prior policy], determine whether they were significant, and weigh any such interests against competing policy concerns." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 33 (2020); *accord Woonasquatucket*, 186 F.4th at 47; *New York*, 171 F.4th at 24. DHS did none of these things, with the result that the 2025 Policy is likely arbitrary and capricious.

## CONCLUSION

The Court should affirm the preliminary injunction in full. If it does not, the Court should reach and reverse the district court's decision to deny a stay under 5 U.S.C. § 705.

Dated: September 25, 2026

Respectfully submitted,

*/s/ Kevin E. Friedl*
Kevin E. Friedl
J. Sterling Moore
Sarah Goetz
Ayesha Khan
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
kfriedl@democracyforward.org
smoore@democracyforward.org
sgoetz@democracyforward.org
akhan@democracyforward.org

Madeleine Gates
WASHINGTON LAWYERS' COMMITTEE FOR CIVIL RIGHTS AND URBAN AFFAIRS
700 14th St. NW
Washington, DC 20005
(202) 319-1000
madeleine_gates@washlaw.org

Richard J. Leveridge
Sonia W. Murphy
Brandon A. Levey
GILBERT LLP

700 Pennsylvania Ave. SE #400
Washington, DC 20003
leveridger@gilbertlegal.com
murphys@gilbertlegal.com
leveyb@gilbertlegal.com

## CERTIFICATE OF COMPLIANCE

This document complies with Federal Rule of Appellate Procedure 28.1(e)(2)(B)(i) because, excluding the portions exempted by Rule 32(f), it contains 14,688 words.

*/s/ Kevin E. Friedl*
Kevin E. Friedl