Case:Case:26-1396-1396cumDocument00118537835age:Page:1ate Date Filed:10/19/2026/2026ntry Entry ID:6852768160195

**Nos. 26-1396, 26-1493**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIRST CIRCUIT**

---

NEW ENGLAND SYNOD, Evangelical Lutheran Church in America; GREATER MILWAUKEE SYNOD, Evangelical Lutheran Church in America; SOUTHWEST CALIFORNIA SYNOD, Evangelical Lutheran Church in America; SOUTHWESTERN TEXAS SYNOD, Evangelical Lutheran Church in America; SIERRA PACIFIC SYNOD, Evangelical Lutheran Church in America; SAN FRANCISCO FRIENDS MEETING OF THE RELIGIOUS SOCIETY OF FRIENDS; PACIFIC YEARLY MEETING OF THE RELIGIOUS SOCIETY OF FRIENDS; NORTH PACIFIC YEARLY MEETING OF THE RELIGIOUS SOCIETY OF FRIENDS; AMERICAN BAPTIST CHURCHES USA; ALLIANCE OF BAPTISTS; METROPOLITAN COMMUNITY CHURCHES,
PLAINTIFFS-APPELLEES/CROSS-APPELLANTS,

v.

UNITED STATES DEPARTMENT OF HOMELAND SECURITY; MARKWAYNE MULLIN, Secretary,
DEFENDANTS-APPELLANTS/CROSS-APPELLEES.

---

On Appeal from the United States District Court for the District of Massachusetts
Case No. 25-cv-40102-FDS, Judge F. Dennis Saylor IV

---

***AMICI CURIAE* BRIEF OF 14 FAITH-BASED, IMMIGRANT JUSTICE, AND CIVIL RIGHTS ORGANIZATIONS IN SUPPORT OF PLAINTIFFS - APPELLEES/CROSS APPELLANTS AND AFFIRMANCE**

Reem Subei
Sadaf Hasan
MUSLIM ADVOCATES
P.O. Box 66408
Washington, D.C. 20035
(202) 897-1893
reem@muslimadvocates.org
sadaf@muslimadvocates.org

Lynn Damiano Pearson
Farah Khan
NATIONAL IMMIGRATION LAW CENTER
P.O. Box 743013
Los Angeles, CA 90074
(404) 805-4709
damianopearson@nilc.org
khan@nilc.org

*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT AND RULE 29 STATEMENTS

All parties have consented to the filing of this *amici curiae* brief.

Pursuant to Federal Rule of Appellate Procedure 26.1(a) and Circuit Rule 26.1, *amici* are not publicly traded corporations, have no parent corporations, and no publicly held corporation owns 10% or more of their stock.

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *amici* certify that no counsel for any party authored this brief in whole or in part; no entity or person, aside from *amici*, its members, or its counsel, made any monetary contribution intended to fund the preparation or submission of this brief; and no party, its members, or its counsel, has a majority ownership or majority interest or majority control of any amicus.

Dated: October 19, 2026

*/s/ Reem Subei*
Reem Subei

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT AND RULE 29 STATEMENTS.. ii
TABLE OF AUTHORITIES ........................................................................ iii
INTEREST OF *AMICI CURIAE*..........................................................................i
SUMMARY OF THE ARGUMENT.................................................................. ii
ARGUMENT ........................................................................................................ iii
I. Places of Worship Are Sacred and Sensitive Spaces That Courts Have a Duty to Protect from Government Overreach. ......................................... iii
A. The Sensitive Locations Policy Reflected the Special Status of Places of Worship as Legally and Culturally Protected Spaces. ..........v
B. The First Amendment and RFRA Bar Immigration Enforcement from Unduly Intruding upon Places of Worship......... viii
II. The Rescission of the Sensitive Locations Policy Builds on a Legacy of Targeting Muslim and Other Communities Under National Security Frameworks That Wrongly Cast Non-White Immigrants as Putative Threats.........................................................................................................xi
A. The Current Administration Rescinded the Sensitive Locations Policy to Pursue Discriminatory Immigration Enforcement Policies............................................................................................ xiii
B. Examples Arising from *Amicus* Interfaith Center of New York ..... xxii
C. Examples Arising from *Amici* Afghans for a Better Tomorrow and Project ANAR .......................................................................xxvi
D. The Rescission's Harms to Religious Expression And Sermons Within Mosques ................................................................. xxviii
CONCLUSION .....................................................................................................xxix
CERTIFICATE OF COMPLIANCE ........................................................................1
CERTIFICATE OF FILING AND SERVICE .........................................................2

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Dep't of Com. v. New York*,
588 U.S. 752 (2019) ........................................................................3. 22

*Employment Division, Department of Human resources of Oregon v. Smith*, 494 U.S. 872 (1990) ..........................................................11

*Fazaga v. FBI*,
124 F.4th 637 (9th Cir. 2024)..............................................................12

*Hassan v. City of New York*,
804 F.3d 277 (3d Cir. 2015)........................................................12, 13

*Korematsu v. United States*,
323 U.S. 213 (1944) ..........................................................................13

*Lyng v. Int'l Union*,
485 U.S. 360 (1988) ..........................................................................29

*NAACP v. Alabama ex rel. Patterson*,
357 U.S. 449 (1958) ........................................................................2, 22

*NAACP v. Button*,
371 U.S. 415 (1963) ..........................................................................29

*New England Synod, Evangelical Lutheran Church in America v. Department of Homeland Security*, 4:25-cv-40102, (D. Mass. Feb 13, 2026) (ECF No. 75)......................................................................3, 6, 9

*Noem v. Vasquez Perdomo*,
606 U.S. --, 2025 WL 2585637 (Sept. 8, 2025) ....................................17

*Patrolmen's Benevolent Ass'n v. City of New York*,
310 F.3d 43 (2nd Cir. 2002)..................................................................13

*Phila. Yearly Meeting of the Religious Soc'y of Friends v. U.S. Dep't of Homeland Sec.*, No. 25-1512 (4th Cir. Aug. 18, 2026) ..................................3

Case:Case:26-1396-1396 Document:Document:00118453783 Page:Page:5 Date Filed:Date Filed:10/19/2026/2026 Entry ID:Entry ID:6852768 6860195

*Raza v. City of New York*,
998 F. Supp. 2d 70 (E.D.N.Y. 2013) .......... 12

*Red Eagle Law, L.C. v. Edlow*, no. 3:26-cv-04850 (N.D. Cal. 2026); .......... 12

*Roberts v. U.S. Jaycees*,
468 U.S. 609 (1984) .......... 2, 10

*Tanzin v. Tanvir*,
592 U.S. 43 (2020) .......... 2

*Vasquez Perdomo v. Noem*,
148 F.4th 656 (9th Cir. 2025) .......... 16

**STATUTES**

42 U.S.C. § 2000bb-1 .......... 2, 10

**EXECUTIVE ORDERS**

Exec. Order 13899, 84 Fed. Reg. 68779 (Dec. 11, 2019) .......... 19

Exec. Order No. 14188, *Additional Measures to Combat Anti-Semitism* (Jan. 29, 2025) .......... 19

**OTHER AUTHORITIES**

*[U]mmah*, The Pluralism Project, Harvard Univ.,
https://pluralism.org/ummah .......... 8

*[Z]akat*, The Pluralism Project, Harvard Univ.
https://pluralism.org/zakat .......... 9

Ahmadi, Mega Asri Lestari, Abd. Rahman & Abdul Azis,
*Implementation of the Islamic Food Bank Concept in an Effort to Solve the Global Problem of hunger and Good Insecurity* 7
International Journal of Arts and Social Science, 8 (2024) .......... 24

Ali Bradley & Jeff Arnold, *Iranian nationals part of larger ICE enforcement focus: Lyons*, NewsNation (June 26, 2025) .......... 18

Br. of Religious Liberty *Amici Curiae* in Supp. of Reversal of the Dist. Ct., *Hassan v. City of New York*, Case No. 14-1688 (3d Cir. July 10, 2014) ....... 13

Creating Law Enforcement Accountability and Responsibility, et al., *Mapping Muslims: NYPD Spying and its Impact on American Muslims* (2013) ....... 12, 13

Dep't of Homeland Sec., Policy Memorandum PM-602-0192, Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries (Dec. 2, 2025) ....... 19

DHS, *Statement from a DHS Spokesperson on Directives Expanding Law Enforcement and Ending the Abuse of Humanitarian Parole* (Jan. 21, 2025) ....... 11

Dr. Ihsan Bagby, *The American Mosque 2020: Growing and Evolving, Report 2: Perspectives and Activities*, Inst. for Soc. Pol'y and Understanding (July 29, 2021) ....... 9

Faiza Patel & Meghan Koushik, *Countering Violent Extremism*, Brennan Center for Justice (2017) ....... 15

Fiona Andre, *In New York, Fear of ICE Raids Casts Shadow over Ramadan for West African Muslims*, Religion News Serv. (Mar. 18, 2026) ....... 18

Fiona Andre & Ulaa Kuziez, *In Minneapolis, clergy mobilize to manage ICE raids targeting Somali immigrants*, NCR (Dec. 5, 2025) ....... 18

Gloria Pazmino, et al., *What we know about the Tufts University PhD student detained by federal agents*, CNN (Mar. 28, 2025) ....... 20

Hamed Aleaziz & Zolan Kanno-Youngs & Ernesto Londono, *New ICE Operation Is Said to Target Somali Migrants in Twin Cities*, NYT, Dec. 2, 2025 ....... 18

Hannah Allam, *Ohio Chaplain Freed From Jail as DHS Drops Deportation Case*, ProPublica (Sept. 19, 2025) ....... 19

Immigrant Legal Res. Ct.r, *Mineeapolis, MN : Operation Metro Surge* (Dec. 2025) ........ 19

Isiah Holmes, *Deportation Decision for Salah Sarsour Expected before End of September*, Wis. Examiner (Sept. 15, 2026) ........ 19

*Islamic Practices*, The Pluralism Project, Harvard Univ. (2021) ........ 9

Jake Offenhartz, *Pressed for evidence against Mahmoud Khalil, government cites its power to deport people for beliefs*, Assoc. Press (Apr. 10, 2025) ........ 20

Jazmine Ulloa, *The Deep Roots of 4 of Donald Trump's Nativist Remarks*, N.Y. Times (Nov. 1, 2024) ........ 11

Jose Olivares and Will Craft, *Immigrants with no criminal record now largest group in Ice detention*, The Guardian (Sept. 26, 2025) ........ 16

Joseph Stepansky, *US civil rights group documents 'broad attack on Muslim life' in 2025*, Al Jazeera (Mar. 10, 2026) ........ 16

*Jum'ah, The Friday Prayer*, The Pluralism Project, Harvard Univ., https://pluralism.org/jum%E2%80%99ah-the-friday-prayer ........ 8

Khaled A. Beydoun, *Acting Muslim*, 53 Harv. C.R.-C.L. L. Rev. 1 (2018) ........ 13, 14, 15

Kyle Cheney & Josh Gerstein, *DOJ is walking back the White House's goal to arrest 3,000 immigrants per day*, Politico (Aug. 3, 2025) ........ 16

Luis Andres Henao & Mariam Fam, *For U.S. Muslims, Immigration Crackdowns, New War and Anti-Muslim Rhetoric Cloud Ramadan,* PBS NewsHour (Mar. 6, 2026) ........ 16

Maanvi Singh*, Detentions and Disappearances: How ICE has Driven Fear into Michigan's Arab Communities*, The Guardian (Feb. 21, 2026) ........ 20

Maanvi Singh*, Minneaopolis Leaders Call the ICE Surge a "Siege." My Reporting from There Concurs*, The Guardian (Jan 21, 2026) ........ 19

Maanvi Singh*, US agents increasingly arresting Afghan asylum seekers, lawyers say: 'A huge chilling effect,* The Guardian (Dec. 12, 2025) .......... 18

Mandy Taheri, *Muslim Leader in US for 30 Years Held by ICE As Green Card Denied*, Newsweek (Sept. 24, 2025) .......... 19

Margy O'Herron, *Trump's Entry Bans Aren't Really About National Security*, Brennan Center for Justice (Aug. 14, 2025) .......... 17

Maryam Ahmad, *Capital Region Afghan community left reeling after ICE raids*, WAMC Northeast Public Radio (Dec. 15, 2025) .......... 18

*Meet Leqaa Kordia: Palestinian Protester Freed after A Year in "ICE Dungeon,"* Democracy Now! (Apr. 2026) .......... 18

Memorandum from Alejandro N. Mayorkas, Sec'y, Dep't of Homeland Sec., *Guidelines for Enforcement Actions in or Near Protected Areas* (Oct. 27, 2021) .......... 6, 7

Memorandum. from John Morton, Dir., U.S. Immigr. and Customs Enf't, *Enforcement Actions at or Focused on Sensitive Locations*, Policy No. 10029.2, FEA No. 306-112-002b (Oct. 24, 2011) .......... 5

Memorandum from Benjamine C. Huffman, Acting Sec'y, DHS, *Enforcement Actions in or Near Protected Areas* (Jan. 20, 2025) .......... 8

Memorandum from James A. Puleo, Acting Assoc. Comm'r, Immigr. & Naturalization Serv., *Enforcement Activities at Schools, Places of Worship, or at Funerals or Other Religious Ceremonies*, HQ 807-P (May 17, 1993) .......... 5

Memorandum from Caleb Vitello, Acting Director, U.S. Immigration and Customs Enforcement, *Common Sense Enforcement Actions in or Near Protected Areas* (Jan. 31, 2025) .......... 8

Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion* HARVARD L. REV. 1409 (1989) .......... 4, 21

Minyvonne Burke & Denis Romero, *Wife details arrest of Palestinian activist Mahmoud Khalil as judge blocks deportation*, NBC News (Mar. 11, 2025) .......... 20

Case: 26-1396 Document: 00118453785 Page: 9 Date Filed: 11/12/2026 Entry ID: 6860195

*Philadelphia Yearly Meeting of Religious Soc'y of Friends v. U.S. Dep't of Homeland Sec.*,767 F. Supp. 3d. 293 (D. Md. 2025) .............................5

Presidential Proclamation 10949, *Restricting the Entry of Foreign Nationals to Protect the United States from Foreign Terrorists and Other National Security and Public Safety Threats* (June 4, 2025)...................17

Presidential Proclamation 10998, *Redistricting and Limiting the Entry of Foreign Nationals to Protect the Security of the United States* (Dec. 16, 2025)..........................................................................................17

*Ramadan and Eid al-Fitr*, The Pluralism Project, Harvard Univ., https://pluralism.org/ramadan-and-eid-al-fitr.....................................................9

*Trump's Entry Bans Aren't Really About National Security*, Brennan Center For Justice (Aug. 14, 2025) ...................................................................17

Transactional Records Access Clearinghouse, *Immigration Detrention Quick Facts*, (last visited Sept. 24, 2026) .........................................................17

Ulaa Kuziez, *Eritrean Imam Dies in ICE Custody as Detainee Deaths Hit 20-year High*, Religion News (Dec. 21, 2025) ...........................................20

*US detains British commentator Sami Hamdi in middle of national speaking tour*, Reuters, Oct. 26. 2025 ...............................................................20

U.S. Citizenship & Immigration Servs., Recent Courd Order on Hold Policies (Aug. 28, 2026 ...........................................................................20

*Who are the students Trump wants to deport?*, Al Jazeera (Mar. 27, 2025) ..........................................................................................................20

## INTEREST OF *AMICI CURIAE*

*Amici curiae* are 14 faith-based, immigrant justice, and civil rights organizations from around the country that serve a wide array of faith communities, including Muslim communities, that want and need judicial enforcement of federal laws that safeguard the religious exercise and association of all people in the United States. *Amici* submit this brief to highlight these federal legal protections and underscore the concrete harms that follow from the government's violation of them through its rescission of a longstanding policy prohibiting immigration enforcement in sensitive locations, including in and around places of worship ("the Sensitive Locations Policy"). *Amici* herein demonstrate the tangible harms experienced by all immigrant communities because of the chilling impacts of the rescission on their statutory and constitutional freedoms of religious expression and association, including in connection with Islamic faith practices.[1]

---

[1] *Amici* are: (1) Afghans For A Better Tomorrow; (2) Global Justice Institute; (3) Bend the Arc: A Jewish Partnership for Justice; (4) The American-Arab Anti-Discrimination Committee; (5) El Paso, TX Monthly Meeting- Religious Society of Friends; (6) Asian American Legal Defense and Education Fund; (7) Community United for Status and Protection ("CUSP"); (8) Muslim Bar Association of New York; (9) CAIR Foundation; (10) The Interfaith Center of New York; (11) The Sikh Coalition ; (12) Interfaith Alliance; (13) Muslims for Progressive Values; and (14) Project ANAR.

## SUMMARY OF THE ARGUMENT

The Sensitive Locations Policy offered reassurance that federal immigration agents would treat mosques, churches, synagogues, and temples across the United States as sanctuaries for communal worship, not immigration-enforcement sites. For over thirty years, the Sensitive Locations Policy restricted immigration enforcement in places of worship, consistent with core constitutional and statutory protections. The rescission of the Sensitive Locations Policy violates those bedrock legal protections. It disregards the unique legal and cultural status of places of worship, imposes predictable and substantial burdens on religious exercise and expressive association, and resurrects a troubling history of alienation and suspicion directed at minority faith communities, including Muslims.[2]

The Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. §2000bb *et seq.*, prohibits government action that substantially burdens religious exercise—even through a rule of general applicability—unless it is the least restrictive means of furthering a governmental interest. The First Amendment independently protects the right of expressive association, including communal worship, that the rescission threatens. By eliminating protections that the government itself

---

[2] *See Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 (1984) (freedom of association is "an indispensable means of preserving other individual liberties"); *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460–63 (1958) (protecting against government actions that chill association).

previously recognized as essential, the rescission chills worship and attendance at mosques and other places of worship, deters participation in religious programming, and pressures faith leaders to censor their sermons. These harms demonstrate that the rescission cannot be squared with the constitutional and statutory protections afforded to religious exercise.

The district court correctly held that Plaintiffs are likely to succeed on their RFRA claim, resting standing on measurable declines in worship attendance, participation in social ministries, and donations that are fairly traceable to the 2025 Policy.[3] The Fourth Circuit has since affirmed a preliminary injunction against the same policy on materially similar reasoning.[4] The experiences described below demonstrate concrete injuries well beyond the Plaintiffs' congregations and are the "predictable effect" of the rescission.[5]

## ARGUMENT

### I. Places of Worship Are Sacred and Sensitive Spaces That Courts Have a Duty to Protect from Government Overreach.

This Court has a critical role to play in ensuring that religious freedoms are not undermined by unchecked executive authority. As with houses of worship

---

[3] *New England Synod, Evangelical Lutheran Church in America v. Department of Homeland Security*, 4:25-cv-40102, (D. Mass. Feb 13, 2026) ECF No. 75
[4] *Phila. Yearly Meeting of the Religious Soc'y of Friends v. U.S. Dep't of Homeland Sec.,* No. 25-1512 (4th Cir. Aug. 18, 2026)
[5] *Dept of Com. V. New York*, 588 U.S. 752, 768 (2019)

central to the practice of Christianity, Judaism, and other world religions, places of Islamic worship are uniquely sacred places involving communal worship, community gatherings, fellowship, counseling, and education, for all people, regardless of citizenship or immigration status.

A core tenet of Islam is to assist the most oppressed in society, in accordance with its central religious principles of compassion, justice, and human dignity. These core Islamic principles guide mosques in the essential role they play in welcoming immigrants, refugees, and asylum-seekers with open arms to engage in communal worship and to provide them with food, clothing, shelter, education, and other critical services to help their survival and their integration within the community. As one imam who partners with the Interfaith Center of New York and serves a diverse Muslim immigrant community in New York City has recounted, "Mosques act as places of worship and as community centers—offering food pantries, language support, youth programs, and advocacy—so that no one feels isolated or left behind.  These principles inspire us to provide spiritual guidance as well as practical support, ensuring that our *masajid* [mosques] remain sanctuaries of faith, compassion, and justice for immigrants and all vulnerable neighbors."[6]

---

[6] In September 2025, Muslim Advocates and the National Immigration Law Center, in partnership with the Interfaith Center of New York, conducted

### A. The Sensitive Locations Policy Reflected the Special Status of Places of Worship as Legally and Culturally Protected Spaces.

For over thirty years, the federal government maintained a policy of not conducting immigration enforcement operations in designated "Sensitive Locations" (also referred to as "Protected Areas"), including, but not limited to, places of worship and of religious ceremonies.[7] A government policy that restricts immigration enforcement in these particular protected areas is crucial for ensuring that all people, regardless of immigration status, can exercise their faith without fear.[8]

The Director of Immigration and Customs Enforcement ("ICE") recognized this in his 2011 memorandum reaffirming the longstanding Sensitive Locations Policy and maintaining tight restrictions on enforcement activity at sensitive locations, including houses of worship.[9] The U.S. Department of Homeland

---

confidential survey with respondents spanning imams and leaders serving Muslim communities in New York City. The goal of the survey was to understand whether and how the rescission of the Sensitive Locations Policy has impacted the needs and goals of any mosques or Islamic community centers the respondents serve. This brief highlights and draws from the survey results.

[7] *See, e.g.*, Memorandum from James A. Puleo, Acting Assoc. Comm'r, Immigr. & Naturalization Serv., *Enforcement Activities at Schools, Places of Worship, or at Funerals or Other Religious Ceremonies*, HQ 807-P (May 17, 1993).

[8] Amended Complaint, *New England Synod, Evangelical Lutheran Church in America v. Department of Homeland Security*, 4:25-cv-40102, (D. Mass. Jun 04, 2026) ECF No. 97

[9] Memorandum from John Morton, Dir., U.S. Immigr. and Customs Enf't, *Enforcement Actions at or Focused on Sensitive Locations*, Policy No. 10029.2,

Security ("DHS") further expanded the Sensitive Locations Policy in 2021 by directing immigration authorities "[t]o the fullest extent possible" to avoid enforcement actions in areas that would interfere with "people's access to essential services or engagement in essential activities."[10] In relevant part, it recognized that the government could achieve its "enforcement mission without denying or limiting . . . people of faith access to their places of worship," emphasizing that "[a]dherence to this principle is one bedrock of our stature as public servants."[11] Accordingly, the Sensitive Locations Policy enabled members of faith communities to participate in "essential services or activities," including religious exercise and association regardless of immigration status, by removing the threat of undue immigration enforcement from places where such activities occur.

The 2021 DHS policy memorandum ("2021 Policy") confirmed that this abstention was meant to be far-reaching, instructing DHS agents to avoid general investigative activities, such as "arrests, civil apprehensions, searches, inspections, seizures, service of charging documents or subpoenas, interviews, and immigration

---

FEA No. 306-112-002b (Oct. 24, 2011), https://www.ice.gov/doclib/ero-outreach/pdf/10029.2-policy.pdf.

[10] Memorandum from Alejandro N. Mayorkas, Sec'y, Dep't of Homeland Sec., *Guidelines for Enforcement Actions in or Near Protected Areas* at 2–3 (Oct. 27, 2021), https://www.ice.gov/doclib/news/guidelines-civilimmigrationlaw10272021.pdf.

[11] *Id.* at 2.

enforcement surveillance" in sensitive locations.[12] While the 2021 Policy recognized limited exigent circumstances in which officers might undertake immigration enforcement in sensitive locations, such as an "imminent risk of death, violence, or physical harm to a person," it still imposed, like prior policies, certain reporting requirements for any enforcement carried out under those conditions.[13] The 2021 Policy's restrictions on the types of immigration enforcement in protected areas, together with the heightened process required even in exceptional circumstances, underscore the government's recognition that effective immigration enforcement cannot come at the expense of protections that ensure people retain access to essential services and activities, including faith practices.

However, on January 20, 2025, DHS Acting Secretary Benjamine Huffman issued a new memorandum (the "Rescission Memo") that rescinded the restrictions from the 2021 Policy and instead directed ICE agents to rely only on their own "common sense" in deciding whether to exercise their enforcement authority at or near places of worship.[14] Eleven days later, ICE moved approval for such actions

---

[12] *Id.* at 4.
[13] *Id.*
[14] Memorandum from Benjamine C. Huffman, Acting Sec'y, DHS, *Enforcement Actions in or Near Protected Areas* (Jan. 20, 2025), https://www.dhs.gov/sites/default/files/2025-03/25_0120_S1_enforcement-actions-in-near-protected-areas.pdf.

from agency headquarters to field-level supervisors.[15] With the current administration's emphasis on mass deportation and related immigration confinement, the deference to an ICE agent's "common sense" throws the doors wide open to limitless abuses of discretion that violate bedrock legal protections enshrined in RFRA and the First Amendment. The rescission of the 2021 Policy therefore unduly deters people from congregating at houses of worship and overall undermines fundamental religious freedoms. The district court's injunction which largely restores the 2021 Policy's protections, is a measured response to the harm.[16]

### B. The First Amendment and RFRA Bar Immigration Enforcement from Unduly Intruding upon Places of Worship.

Places of worship are sacred spaces of community gathering, communal worship, and spiritual expression that receive the highest levels of protection under the First Amendment and RFRA. Mosques serve as the spiritual, cultural, and communal heart for Muslim communities—providing far more than a space for prayer. Mosques are where Muslims gather weekly for *Jummah* (Friday prayers),

---

[15] Memorandum from Caleb Vitello, Acting Director, U.S. Immigration and Customs Enforcement, *Common Sense Enforcement Actions in or Near Protected Areas* (Jan. 31, 2025) https://www.ice.gov/doclib/foia/policy/CommonSenseEnforcementActInNearProtectedAreas.pdf

[16] *New England Synod, Evangelical Lutheran Church in America v. Department of Homeland Security*, 4:25-cv-40102, (D. Mass. Feb 13, 2026) ECF No. 75

which anchors community connection.[17] (*Jummah* derives from an Arabic word meaning "gathering.")[18] Attending *Jummah* is an essential practice of Islamic faith, as is Friday sermon or *khutbah*, which is delivered by an imam who not only offers spiritual guidance but also addresses pressing social-justice issues impacting the global Muslim community or *Ummah*.[19] Throughout the week, mosques also serve as a center of community religious activity, spanning congregate daily prayers and assorted programs for social services, women, youth, and education.[20]

During Ramadan—the holiest month in Islam, focusing on fasting, prayer, and reflection—mosques become the center of vibrant religious observance on both individual and community levels.[21] Muslim community members use mosques as spaces for: hosting communal meals known as *iftars* to break the daily fast, engaging in late night prayers, and organizing charitable initiatives, such as food drives or fundraising for the needy.[22] Indeed, a pillar of Islam requires

---

[17] *See, e.g.*, *Jum'ah, The Friday Prayer*, The Pluralism Project, Harvard Univ., https://pluralism.org/jum%E2%80%99ah-the-friday-prayer.
[18] *Id.*
[19] *Id.*; *see also, e.g.*, *[U]mmah*, The Pluralism Project, Harvard Univ., https://pluralism.org/ummah.
[20] *See, e.g.*, Dr. Ihsan Bagby, *The American Mosque 2020: Growing and Evolving, Report 2: Perspectives and Activities*, Inst. for Soc. Pol'y and Understanding (July 29, 2021), https://ispu.org/report-2-mosque-survey-2020/#mosque-activities.
[21] *See, e.g.*, *Ramadan and Eid al-Fitr*, The Pluralism Project, Harvard Univ., https://pluralism.org/ramadan-and-eid-al-fitr.
[22] *Id.*

Muslims to pay *zakat*, a donation of a portion of personal income to one or more charitable causes.[23] Muslims often give *zakat* to support the charitable services and programming that their mosques provide.[24]

Courts have long recognized that the freedoms of religious exercise and association demand robust protection from government interference. Indeed, the Supreme Court has recognized that the First Amendment-protected freedom of association is "an indispensable means of preserving other individual liberties,"[25] for the "freedom to speak [or] to worship . . . could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed[.]"[26] Under RFRA, Congress provided broader protections to religious freedoms, by prohibiting the government from "substantially burden[ing] a person's exercise of religion even if the burden results from a rule of general applicability," unless the government action satisfies strict scrutiny.[27] It is against this historical backdrop and the significant import of

---

[23] *See, e.g.*, *[Z]akat*, The Pluralism Project, Harvard Univ. https://pluralism.org/zakat.
[24] *Islamic Practices*, The Pluralism Project, Harvard Univ. (2021), https://pluralism.org/files/pluralism/files/9._islamic_practices_formerly_five_pillars.docx.pdf?m=1630091542 ("American Muslims often distribute their *zakat* through local mosques").
[25] *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 (1984).
[26] *Id.* at 622.
[27] 42 U.S.C. § 2000bb-1; *Employment Division, Department of Human resources of Oregon v. Smith*, 494 U.S. 872 (1990).

places of worship to American history and laws enshrining religious freedoms that the rescission of the Sensitive Locations Policy must be considered.

## II. The Rescission of the Sensitive Locations Policy Builds on a Legacy of Targeting Muslim and Other Communities Under National Security Frameworks That Wrongly Cast Non-White Immigrants as Putative Threats.

The Sensitive Locations Policy provided a check on the longstanding pattern and practice of targeting Black and Brown communities, including Muslim communities, under the guise of national security with that same logic extending to non-white immigrants of all faiths and backgrounds. In the wake of the events of September 11, 2001 ("9/11"), the creation of DHS institutionalized a national-security framework rooted in immigration-enforcement policies that cast non-white immigrant communities as putative threats requiring control through racial and religious profiling, targeted surveillance, confinement, and removal—in the absence of individualized suspicion. [28] The pervasive stereotyping of non-white

---

[28] *Compare* Jazmine Ulloa, *The Deep Roots of 4 of Donald Trump's Nativist Remarks*, N.Y. Times (Nov. 1, 2024), https://www.nytimes.com/2024/11/01/us/politics/trump-immigration-rhetoric-history.html (detailing historical roots of racist, xenophobic, nativist, and inflammatory rhetoric from then-candidate Trump), *with* DHS, *Statement from a DHS Spokesperson on Directives Expanding Law Enforcement and Ending the Abuse of Humanitarian Parole* (Jan. 21, 2025), https://www.dhs.gov/news/2025/01/21/statement-dhs-spokesperson-directives-expanding-law-enforcement-and-ending-abuse (in characterizing the rescission of the Sensitive Locations Policy, flatly equating noncitizens in the U.S. with "criminal aliens—including murderers and rapists").

people generally and Muslims specifically as threats to national security, by immigration policy and law-enforcement surveillance alike, detrimentally impacts these communities' sense of belonging and safety in the United States. Members of affected communities have described their experiences of surveillance as "invasive," a "deep betrayal," and "traumatiz[ing]."[29]

**Decades of Surveillance:** Aside from immigration restrictions, Muslim communities in America have been the targets of suspicionless surveillance programs of both federal and local law enforcement, purportedly justified by national security concerns.[30]

In the wake of 9/11, for instance, the New York City Police Department ("NYPD") infiltrated and surveilled Muslim mosques and communities in the New York tri-state area and beyond for over ten years in the name of national security.[31]

---

[29] Creating Law Enforcement Accountability and Responsibility, et al., *Mapping Muslims: NYPD Spying and its Impact on American Muslims* (2013), at 4, https://www.law.cuny.edu/wp-content/uploads/page-assets/academics/clinics/immigration/clear/Mapping-Muslims.pdf [hereinafter "*Mapping Muslims*"].

[30] *See, e.g.*, *Hassan v. City of New York*, 804 F.3d 277, 307 (3d Cir. 2015) (holding that Muslim plaintiffs in New Jersey had standing to challenge the warrantless surveillance program of the New York City Police Department ("NYPD")); *see also Raza v. City of New York*, 998 F. Supp. 2d 70, 73 (E.D.N.Y. 2013) (discussing constitutional claims based on suspicionless NYPD surveillance); *Fazaga v. FBI*, 124 F.4th 637, 648 (9th Cir. 2024) (addressing claims based on FBI surveillance of Muslim communities in Southern California).

[31] *See, e.g.*, *Hassan*, 804 F.3d at 285.

The resultant chilling effect on impacted communities was documented and clear: worshippers feared attending mosques, knowing that their mere attendance could, on its own, subject them to surveillance and targeting.[32]

**CVE Program**: The federal "Countering Violent Extremism" ("CVE") program, initiated in 2011, was purportedly intended to counter any violent ideologies present in the U.S., but in practice it focused almost exclusively on Muslim communities across the country.[33] The CVE program allowed DHS to "map" and identify informants within mosques, student organizations, and other religious community spaces, further infringing on religious communities and contributing to a relationship of distrust with law enforcement.

### A. The Current Administration Rescinded the Sensitive Locations Policy to Pursue Discriminatory Immigration Enforcement Policies.

The rescission of the Sensitive Locations Policy is part of this administration's mass deportation and detention agenda that disproportionately targets non-white immigrants across the nation. The administration has justified the

---

[32] *See, e.g.*, *Mapping Muslims* at 12–45; Br. of Religious Liberty *Amici Curiae* in Supp. of Reversal of the Dist. Ct., *Hassan v. City of New York*, No. 14-1688 (3d Cir. July 10, 2014), https://ccrjustice.org/sites/default/files/assets/Hassan%20-%20Religious%20Liberty%20Amicus%20Brief.pdf.

[33] Faiza Patel & Meghan Koushik, *Countering Violent Extremism*, Brennan Center for Justice . at 5 (2017), https://www.brennancenter.org/media/254/download/Report_Brennan%20Center%20CVE%20Report_0.pdf?inline=1

rescission as essential to enabling immigration enforcement against "criminal aliens," yet its own data contradicts those assertions—showing that immigrants with no criminal record are now the largest group in U.S. immigration confinement.[34] The administration reportedly adopted a goal of 3,000 immigration arrests per day, a goal that has led to "roving patrols" of federal agents who arrest and confine people based on their race, ethnicity, the language they speak, or profession.[35]

The current administration's immigration targeting of non-white communities has specifically included intensified attacks against non-citizens from predominantly Muslim countries. For example, President Trump announced in

---

[34] *See e.g.,* Jose Olivares and Will Craft, *Immigrants with no criminal record now largest group in Ice detention*, The Guardian (Sept. 26, 2025), https://www.theguardian.com/us-news/2025/sep/26/immigrants-criminal-record-ice-detention ; Transactional Records Access Clearinghouse, *Immigration Detention Quick Facts*, https://tracreports.org/immigration/quickfacts/ (last visited Ept. 24, 2026) (showing that 70.6% of people held in ICE detention have no criminal conviction according to date current as of Jully 11, 2026, and many of those with convictions only committed minor offenses, including traffic violations)

[35] Kyle Cheney & Josh Gerstein, *DOJ is walking back the White House's goal to arrest 3,000 immigrants per day*, Politico (Aug. 3, 2025), https://www.politico.com/news/2025/08/03/white-house-doj-immigration-quota-mismatch-00490406; *see also Vasquez Perdomo v. Noem*, 148 F.4th 656, 663, 671 (9th Cir. 2025) (denying stay of district court's Temporary Restraining Order, which had found likelihood of success on the merits of plaintiffs' claims alleging suspicionless immigration stops and arrests that violate the Fourth Amendment), *stay granted by Noem v. Vasquez Perdomo*, 606 U.S. --, 2025 WL 2585637 (Sept. 8, 2025).

June 2025 a new set of entry bans applying to nationals of 19 countries, mainly located in the Middle East, North Africa, and sub-Saharan Africa, with nationals who are predominantly Muslim and/or Black—all characterized as "high risk" without individualized suspicion or findings.[36] Since the institution of those entry bans, aggressive interior immigration enforcement actions have swept up nationals from the banned Muslim-majority countries—including Somalia,[37] Afghanistan, [38]

---

[36] Presidential Proclamation 10949, *Restricting the Entry of Foreign Nationals to Protect the United States from Foreign Terrorists and Other National Security and Public Safety Threats* (June 4, 2025), https://www.whitehouse.gov/presidential-actions/2025/06/restricting-the-entry-of-foreign-nationals-to-protect-the-united-states-from-foreign-terrorists-and-other-national-security-and-public-safety-threats/; *see also* Margy O'Herron, *Trump's Entry Bans Aren't Really About National Security*, Brennan Center For Justice (Aug. 14, 2025), https://www.brennancenter.org/our-work/research-reports/trumps-entry-bans-arent-really-about-national-security.

[37] *See, e.g,* Hamed Aleaziz & Zolan Kanno-Youngs & Ernesto Londono, *New ICE Operation Is Said to Target Somali Migrants in Twin Cities*, NYT, Dec. 2, 2025, https://www.nytimes.com/2025/12/02/us/politics/ice-somali-migrants-minneapolis-st-paul.html?unlocked_article_code=1.5k8.UqSM.EXryXwMFcxOi&smid=url-share; *see also* Fiona Andre & Ulaa Kuziez, *In Minneapolis, clergy mobilize to manage ICE raids targeting Somali immigrants*, NCR (Dec. 5, 2025), https://www.ncronline.org/news/minneapolis-clergy-mobilize-manage-ice-raids-targeting-somali-immigrants.

[38] *See, e.g.,* Maanvi Singh, *US agents increasingly arresting Afghan asylum seekers, lawyers say: 'A huge chilling effect,'* The Guardian (Dec. 12, 2025), https://www.theguardian.com/us-news/2025/dec/12/afghan-asylum-seekers-immigration; *see also* Maryam Ahmad, *Capital Region Afghan community left reeling after ICE raids*, WAMC Northeast Public Radio (Dec. 15, 2025), https://www.wamc.org/news/2025-12-15/capital-region-afghan-community-reels-from-ice-raids.

and Iran[39]—and have in at least some instances involved enforcement in or around mosques.[40] Continued interior immigration enforcement against people from Muslim-majority countries subject to entry bans is very concerning, particularly given the recent expansion of the bans to the nationals of additional Muslim-majority countries, including Burkina Faso, Mali, Sierra Leone, the occupied Palestinian territories, and Syria.[41] The government also sought to "re-vet" people within the interior who come from countries whose nationals were subject to the bans,[42] until those USCIS policies were enjoined by a federal court.[43]

Against this backdrop of seemingly endless discriminatory bans that target individuals from Muslim-majority countries, interior immigration enforcement continues to escalate against these communities, including the targeting of high

---

[39] *See, e.g.*, Ali Bradley & Jeff Arnold, *Iranian nationals part of larger ICE enforcement focus: Lyons*, NewsNation (June 26, 2025), https://www.newsnationnow.com/us-news/immigration/iranian-nationals-ice-enforcement-lyons/.

[40] *See, e.g.*, Ahmad, *Capital Region Afghan community left reeling after ICE Raids*, n. 43, *supra*.

[41] Presidential Proclamation 10998, *Redistricting and Limiting the Entry of Foreign Nationals to Protect the Security of the United States* (Dec. 16, 2025), https://www.whitehouse.gov/presidential-actions/2025/12/restricting-and-limiting-the-entry-of-foreign-nationals-to-protect-the-security-of-the-united-states/ .

[42] Dep't of Homeland Sec., Policy Memorandum PM-602-0192, Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries (Dec. 2, 2025).

[43] *See Red Eagle Law, L.C. v. Edlow*, No. 3:26-cv-04850 (N.D. Cal.); *see also* U.S. Citizenship & Immigr. Servs., Recent Court Order on Hold Policies (Aug. 28, 2026), https://www.uscis.gov/newsroom/alerts/recent-court-order-on-hold-policies

profile imams and religious leaders, with at least one Imam dying while in immigration detention.[44]

The administration has also used immigration enforcement tools in ways that have chilled political expression,[45] including targeting expression supportive of the lives and freedom of Palestinians.[46] The policy has disproportionately led to the

---

[44] *See, e.g.*, Mandy Taheri, *Muslim Leader in US for 30 Years Held by ICE As Green Card Denied*, Newsweek (Sept. 24, 2025), https://www.newsweek.com/muslim-leader-detained-ice-2134137 (discussing immigration enforcement against Marwan Marouf, a long-time Islamic community leader in Dallas); *see also* Hannah Allam, *Ohio Chaplain Freed From Jail as DHS Drops Deportation Case*, ProPublica (Sept. 19, 2025), https://www.propublica.org/article/ayman-soliman-dhs-deportation-free-ohio (discussing immigration enforcement against Ayman Soliman, an Egyptian Muslim chaplain in Ohio); Ulaa Kuziez, *Eritrean Imam Dies in ICE Custody as Detainee Deaths Hit 20-year High*, Religion news (Dec, 21, 2025) https://religionnews.com/2025/12/21/eritrean-imam-dies-in-ice-custody-as-detainee-deaths-hit-20-year-high/ (reporting on the death of Ohio Imam Fouad Saeed Abdulkadir in immigration detention, a legal permanent resident from Eritrea)

[45] *Id*. § 1 (relying on definition of antisemitism that includes First Amendment protected speech, such as "claiming that the existence of a State of Israel is a racist endeavor" and "[d]rawing comparisons of contemporary Israeli policy to that of the Nazis," among other examples, set out in Exec. Order 13899, 84 Fed. Reg. 68779 (Dec. 11, 2019) (incorporating International Holocaust Remembrance Alliance's definition of antisemitism, https://holocaustremembrance.com/resources/working-definition-antisemitism)).

[46] *See* Exec. Order No. 14188, *Additional Measures to Combat Anti-Semitism* § 2 (Jan. 29, 2025), https://www.whitehouse.gov/presidential-actions/2025/01/additional-measures-to-combat-anti-semitism/ (declaring it "the policy of the United States to . . . us[e] all available and appropriate legal tools to prosecute, remove, or otherwise hold to account the perpetrators of unlawful anti-Semitic harassment and violence.").

high-profile immigration confinement[47] and targeting of Muslim students, protestors, religious leaders, and academics who have publicly expressed support for Palestine.[48]

Interior enforcement escalated in December 2025, following relentless anti-immigrant and anti-Muslim remarks made by the administration targeting

---

[47] *See, e.g.*, Jake Offenhartz, *Pressed for evidence against Mahmoud Khalil, government cites its power to deport people for beliefs*, Assoc. Press (Apr. 10, 2025), https://apnews.com/article/mahmoud-khalil-columbia-university-trump-c60738368171289ae43177660def8d34; *See* also *US detains British commentator Sami Hamdi in middle of national speaking tour*, Reuters, Oct. 26. 2025, https://www.cnn.com/2025/10/26/us/sami-hamdi-british-commentator-detained.

[48] *See, e.g.*, *Who are the students Trump wants to deport?*, Al Jazeera (Mar. 27, 2025), https://www.aljazeera.com/news/2025/3/27/who-are-the-students-trump-wants-to-deport; Minyvonne Burke & Denis Romero, *Wife details arrest of Palestinian activist Mahmoud Khalil as judge blocks deportation*, NBC News (Mar. 11, 2025), https://www.nbcnews.com/news/us-news/protesters-demand-release-palestinian-activist-mahmoud-khalil-judge-bl-rcna195786 (describing DHS arrest of Mr. Khalil, as he and his wife were headed back home after breaking their Ramadan fast at a communal *iftar* dinner); Gloria Pazmino, et al., *What we know about the Tufts University PhD student detained by federal agents*, CNN (Mar. 28, 2025), https://www.cnn.com/2025/03/27/us/rumeysa-ozturk-detained-what-we-know (detailing DHS arrest of Rümeysa Öztürk as she headed to an *iftar* dinner to break her daily Ramadan fast).; Isiah Holmes, *Deportation Decision for Salah Sarsour Expected before End of September,* Wis. Examiner (Sept. 15, 2026), *https*://wisconsinexaminer.com/2026/09/15/deportation-decision-for-salah-sarsour-expected-before-end-of-september/ (detailing deportation case of Salah Sarsour, board member of American Muslims for Palestine). ; *Meet Leqaa Kordia: Palestinian Protester Freed After a Year in "ICE Dungeon,"* Democracy Now! (Apr. 3, 2026), https://www.democracynow.org/2026/4/3/leqaa_kordia_palestinian_activist (detailing medical emergencies experienced by Leqaa Korida while in immigration detention).

Minnesota's Muslim and Somali communities.[49] This narrative resulted in "Operation Metro Surge," which saw the deployment of over 3,000 immigration enforcement officers to the Twin Cities. The operation targeted Muslim communities, in particular Somali and Southeast Asian refugees, and was characterized by intense violence and the killings of two U.S. citizens by DHS officers. Over 4,000 people were arrested during the operation.[50] For Muslims in Minnesota and throughout the country, the violent tactics used during Operation Metro Surge led to a deep chilling of religious practice and expression during Ramadan this year, with many Mosques and Islamic centers cancelling *iftar* celebrations and public gatherings due to security concerns around immigration enforcement[51]. In the wake of this operation, Muslim communities have been

---

[49] *See* Joseph Stepansky, *US civil rights group documents 'broad attack on Muslim life' in 2025*, Al Jazeera (Mar. 10, 2026), https://www.aljazeera.com/news/2026/3/10/us-civil-rights-group-documents-broad-attack-on-muslim-life-in-2025 (detailing President Trump's remarks about Somali Americans leading up to Operation Metro Surge)

[50] *See e.g.,* Immigrant Legal Res. Ctr., *Minneapolis, MN: Operation Metro Surge* (Dec. 2025), https://www.ilrc.org/immigration-enforcement/federal-tracking/large-scale-raids/minneapolis-mn-operation-metro-surge; Maanvi Singh, *Minneapolis Leaders Call the ICE Surge a "Siege." My Reporting from There Concurs,* The Guardian (Jan. 21, 2026), https://www.theguardian.com/commentisfree/2026/jan/21/minneapolis-ice-surge-siege

[51] *See e.g.,* Luis Andres Henao & Mariam Fam, *For U.S. Muslims, Immigration Crackdowns, New War and Anti-Muslim Rhetoric Cloud Ramadan*, PBS NewsHour (Mar. 6, 2026), https://www.pbs.org/newshour/nation/for-u-s-muslims-immigration-crackdowns-new-war-and-anti-muslim-rhetoric-cloud-ramadan; Fiona

living in fear, especially as enforcement operations continue to target Islamic places of worship.[52]

The Sensitive Locations Policy, when it was in effect, gave faith communities—including Muslims—some assurance that their sacred spaces would be protected against undue governmental incursion in the form of civil immigration enforcement. The rescission of the Sensitive Locations Policy expands the sphere of risk from the rest of daily life into houses of worship, where people of varied faiths, including Muslims, seek to exercise religious freedoms safeguarded by RFRA and the First Amendment.

The Rescission of the Sensitive Locations Policy Has Chilled Muslim Communities from Engaging in Crucial Religious Practices and Accessing Community-Based Services.

The rescission of the Sensitive Locations Policy compounds the harms to the bedrock freedom of religious exercise enshrined in RFRA and the First Amendment. Because Islamic practice is deeply communal, rooted in Friday

---

Andre, *In New York, Fear of ICE Raids Casts Shadow over Ramadan for West African Muslims*, Religion News Serv. (Mar. 18, 2026), https://religionnews.com/2026/03/18/in-new-york-fear-of-ice-raids-casts-shadow-over-ramadan-for-west-african-muslims/

[52] *See* Maanvi Singh, *Detentions and Disappearances: How ICE has Driven Fear into Michigan's Arab Communities*, The Guardian (Feb. 21, 2026), https://www.theguardian.com/us-news/2026/feb/21/michigan-arab-communities-ice-fear

prayers, collective religious study, and shared observances like Ramadan, the ability for immigration agents to freely enter mosques inevitably strikes at the heart of Muslim communities' religious practices—chilling Muslim congregants and leaders alike, regardless of citizenship or immigration status, and further eroding the ability of Muslim communities to gather, worship, and thrive in their sacred spaces as intended under RFRA and the First Amendment.

Courts have long recognized that government action that predictably deters participation in protected religious and associational life inflicts a cognizable injury.[53] Because communal worship is central to religious exercise across traditions, the absence of any congregant because of governmental chilling diminishes the community's protected expression.[54] In August of this year, the Fourth Circuit agreed, finding that DHS' rescission of the Sensitive Locations Policy caused irreparable injury to plaintiff religious organizations and affirming the district court's preliminary injunction.[55]

---

[53] *See, e.g.*, *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460–61 (1958) (recognizing violation of First Amendment right of association implicated by compelled disclosure of member-lists).

[54] *See, e.g.*, *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019) (injury may flow from the "predictable effect of Government action on the decisions of third parties").

[55] *Philadelphia Yearly Meeting of Religious Soc'y of Friends v. U.S. Dep't of Homeland Sec.*, No. 25-1512, 2026 WL 2409055, at *12 (4th Cir. Aug. 18, 2026).

Harms to Muslim communities and interference with their communal practices in mosques can be directly traced to the rescission of the Sensitive Locations Policy and not merely to a general increase in immigration enforcement. As detailed below, directly impacted Muslim community members have observed and experienced tangible, non-speculative harms of the kind the district court held cognizable—measurable declines in attendance, worship, and participation their religious social practices, and donations- due to fear of immigration enforcement near or inside their mosques.

### B. Examples Arising from *Amicus* Interfaith Center of New York

Over the course of 25 years, *amicus* Interfaith Center of New York ("ICNY") has built a religiously diverse and civically engaged network of grassroots and immigrant religious leaders in New York City. Those religious leaders include imams serving Muslim immigrant communities from South Asia, the Middle East and North Africa, West Africa, and the Caribbean, across the five boroughs of New York City.

In a survey that counsel for *amici* conducted in September 2025, the respondent imams affiliated with ICNY reported a decrease in attendance at their mosques—including during *Jummah* (Friday prayers) and Ramadan (the holiest month in Islam)—due to community fears of immigration enforcement near or inside the mosques. One imam reported that even U.S. citizens are fearful of

attending mosque, because of the risks to their noncitizen family and friends who are also congregants.

For Muslims, religious charity and social services are obligatory Islamic exercises. Across the board, the respondent imams affiliated with ICNY have also reported taking new security measures due to fears of immigration enforcement inside or near their mosques, such as: reducing whether and how events at mosques are publicly or otherwise widely promoted and advertised; turning away or checking up on the background of unfamiliar congregants or new attendees; putting up "private" signs inside or around the mosques to require immigration agents to secure judicial warrants in order to enter without congregants' permission; and increasing Know Your Rights trainings for board members and/or community members about immigration enforcement. All of the respondent imams also reported a drop in donations or financial support caused by the decreased attendance resulting from fear of immigration enforcement around or inside their mosques—hampering the ability of the mosques to provide critical social services, including the provision of charitable meals and community-oriented religious programming. Serving food to those in need is an essential part of Islamic practice, and the failure to perform it disables Muslim communities from living in accordance with their religious beliefs. *Zakat* (or charity in Arabic) is a religious

activity that aims to alleviate manifestations of poverty and inequality, such as hunger.[56]

For a particular Muslim leader who partners with ICNY and whom counsel for *amici* interviewed, mosques serve as the heartbeat of his diverse community in New York City. The mosques he leads serve mixed-status communities spanning U.S. born citizens, naturalized U.S. citizens, green card holders, people with work permits, and undocumented members. From the humble beginnings of renting storefronts to create spaces of prayer over thirty years ago, when he first arrived in the U.S.—his religious community has now grown into a network of several mosques across New York City, anchored by a community center that connects people for the most important moments of their lives: from Ramadan *iftars* and Eid celebrations to weddings and funerals. The network of mosques not only provides places of worship but also after-school programming and tutoring for children, food distribution for the needy, and critical support for asylum-seekers who crossed the southern border for safety over three years ago. The mosques have been indispensable in welcoming asylum-seekers by helping them secure housing, food, and a sense of community within the country from which they now hope to

---

[56] Ahmadi, Mega Asri Lestari, Abd. Rahman & Abdul Azis, *Implementation of the Islamic Food Bank Concept in an Effort to Solve the Global Problem of hunger and Good Insecurity*, 7 International Journal of Arts and Social Science, 8 (2024), https://ijassjournal.com/2024/V7I4/41466639121.pdf.

obtain safety under humanitarian protections enshrined in U.S. law. These services have long depended on the sense of safety and trust the mosques have historically provided to community members. Since the rescission of the Sensitive Locations Policy, members no longer view the mosques as a safe space but instead live in the shadows in fear of immigration enforcement. The leader reported that congregants have directly expressed their fears of immigration enforcement at the mosques and that the mosques are not a safe space anymore.

The leader reports that during Ramadan and Eid, which normally draw the largest crowds, congregations this year were only half their usual size, with long cherished celebrations like communal cookouts for Eid cancelled altogether for fear of DHS agents appearing in and around the mosque. He has also observed reduced attendance at daily prayers and at *Jummah* (Friday prayers) for which congregants had otherwise packed their mosques, before the rescission of the Sensitive Locations Policy. He further reports that, since the rescission, parents of vulnerable youth hesitate to bring their children to the mosques for crucial educational programming meant to keep them off the streets and to provide them a safe and supportive learning environment.

The harms that these and other Muslim communities face because of the rescission illustrate a broader point. Communal worship has long been a defining feature of myriad religious practices across faith traditions. Just as Muslims gather

at mosques for prescribed congregational prayers, so, too, do Jews at synagogues and Christians at churches. These rituals, along with shared observances such as holidays, study groups, and communal meals, are essential to nurturing identity, belonging, and solidarity. When government policies unduly target people at their houses of worship, they disrupt these communal practices and fracture the cohesiveness of religious communities, spanning citizenship and immigration status, and in violation of protections enshrined in RFRA and the First Amendment.

### C. Examples Arising from *Amici* Afghans for a Better Tomorrow and Project ANAR

The rescission of the Sensitive Locations Policy has harmed the ability of community-based organizations and legal-services providers to offer crucial social and legal services at mosques. Afghans For a Better Tomorrow ("AFBT") is a grassroots organization focused on social justice for Afghan new arrivals across the United States. Project ANAR is a legal-services organization that provides immigration legal services to Afghans across the United States. Both have reported to counsel for amici that they have observed, since the rescission, fear and reluctance from mosque leadership in having social and legal services provided on-site at their mosques, given risks and fears of immigration enforcement in or around the mosques. Leadership's concern was that providing services

simultaneously sets their community events up as easy targets for immigration enforcement.

For example, AFBT reports developing a close relationship with a mosque over the past three years, which has served as a community hub for an influx of asylum-seekers who crossed the southern border and settled in New York City. Since the rescission of the Sensitive Locations Policy, the imam at the mosque informed AFBT of the mosque's fears of related immigration enforcement in and around the mosque, given the size of the undocumented community gathering there on a monthly basis to receive services from AFBT. As a result, the mosque cancelled AFBT's immigrant-focused community programming in July and August 2025 and has fully discontinued the services as of December 2025—which means Afghan congregants will not receive the following at the mosque: food drives, art therapy for 30–40 children navigating the trauma of migration, maternal healthcare for pregnant women, legal advisals, and community connection through communal prayer.

Given that the Afghan community AFBT serves is largely food-insecure, relies on cash assistance, and lives in shelters in New York City, AFBT has observed that the fear of immigration enforcement at and around mosques has had ripple effects in rupturing community safety and well-being that mosques had been

uniquely well- situated to provide the Afghan community, until the rescission of the Sensitive Locations Policy.

Similarly, Project ANAR reports having had to shift its community-facing work in mosques to virtual events, with the result of impeding fair access to its programming, given the generational and economic gaps within the Afghan community in accessing technology needed to attend virtual events online. Project ANAR also reports having had to change how it publicizes events and services at or involving mosques, by steering away from more public channels like social media to expending more time and resources on targeted outreach to raise awareness about their legal clinics and advisal services at and for mosques. As a result, Project ANAR has observed a reduction in the numbers of community members who do participate in their Know Your Rights events and legal clinics at mosques, since the rescission of the Sensitive Locations Policy.

### D. The Rescission's Harms to Religious Expression and Sermons Within Mosques

The rescission of the Sensitive Locations Policy burdens religious practice by changing the association congregants and attendees have with faith leaders. An imam affiliated with ICNY has reported to counsel for *amici* that peers have been self-censoring their sermons since the rescission. Counsel for *Amici*, Muslim Advocates has also heard directly from imams in Chicago who have curtailed or altered their sermons out of concern that their words may draw immigration-related

scrutiny or enforcement—particularly in the current moment, where DHS has already targeted noncitizen imams.[57] They emphasized their dismay at self-censoring their speeches on the genocide in Gaza and the related suffering of people in Muslim majority countries. The Supreme Court has emphasized that First Amendment freedoms "need breathing space to survive," and that indirect, "subtle" interferences are constitutionally impermissible.[58] Because religious exercise is inherently expressive, courts do not second guess a congregation's own understanding of what their faith requires.[59] When sermons are diluted to avoid government attention, the substance of worship itself is altered-- a substantial burden on expressive association and free exercise, in violation of the First Amendment and RFRA.

## CONCLUSION

The rescission of the Sensitive Locations Policy unduly chills religious exercise for all faith communities across the United States, including mixed-status Muslim communities. This Court should affirm the district court's grant of Plaintiffs-Appellees' request for a preliminary injunction against the rescission.

---

[57] *See* n. 48, *supra*.
[58] *See NAACP v. Button*, 371 U.S. 415, 433 (1963); *Lyng v. Int'l Union*, 485 U.S. 360, 367 & n.5 (1988).
[59] *See NAACP*, 371 U.S. at 433; *Lyng*, 485 U.S. at 367 & n.5.

Dated: October 19, 2026

Respectfully Submitted,

*/s/ Reem Subei*
Reem Subei
Sadaf Hasan
MUSLIM ADVOCATES
P.O. Box 66408
Washington, D.C. 20035
(202) 897-1893
reem@muslimadvocates.org
sadaf@muslimadvocates.org

Lynn Damiano Pearson
Farah Khan
NATIONAL IMMIGRATION LAW CENTER
P.O. Box 743013
Los Angeles, CA 90074
404.805.4709
damianopearson@nilc.org
khan@nilc.org

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

This amicus brief complies with the type-volume limit of Federal Rule of Appellate Procedure 29(a)(5) because it contains 6,397 words**.** This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)–(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

Dated: October 19, 2026

*/s/ Reem Subei*
Reem Subei

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 19th day of October 2026, I caused a true and correct copy of the foregoing brief to be filed with the Clerk of the United States Court of Appeals for the First Circuit via the Court's CM/ECF system. Counsel for all parties are registered CM/ECF users and will be served by the appellate CM/ECF system.

Dated: October 19, 2026

*/s/ Reem Subei*
Reem Subei